1  Micheline N. Fairbank, Bar No. 226038
**FENNEMORE CRAIG P.C.**
2  7800 Rancharrah Parkway
Reno, NV 89704
3  Tel: (775) 788-2200
Email: mfairbank@fennemorelaw.com

4
Daniel Rapaport, Bar No. 67217
5  Mark Bostick, Bar No. 111241
Kurt Franklin, Bar No. 172715
6  Thiele R. Dunaway, Bar No. 130953
**FENNEMORE WENDEL**
7  1111 Broadway, 24th Floor
Oakland, CA 94607
8  Tel: (510) 834-6600 / Fax: (510) 834-1928
Email: drapaport@fennemorelaw.com
9           mostick@fennemorelaw.com
           kfranklin@fennemorelaw.com
10          rdunaway@fennemorelaw.com

11
James Hill, Bar No. 90478
12  Chris V. Hawkins, Bar No. 222961
**FENNEMORE LLP**
13  600 B. Street, 17th Floor
San Diego, CA 92101
14  Tel: (619) 233-4100 / Fax: (619) 231-4372
Email: jhill@fennemorelaw.com
15          chawkins@fennemorelaw.com

16  Attorneys for KENNETH W. MATTSON

17                    UNITED STATES BANKRUPTCY COURT

18          NORTHERN DISTRICT OF CALIFORNIA – SANTA ROSA DIVISION

| 19 | In Re: | Case No. 24-10714 (CN) |
|---|---|---|
| 20 | KENNETH W. MATTSON | Chapter 11 |
| 21 | | |
| 22 | Respondent Debtor. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF RESPONDENT DEBTOR KENNETH W. MATTSON'S MOTION TO DISMISS INVOLUNTARY PETITION** |
| 23 | | |
| 24 | | |
| 25 | | Date:     February 5, 2025 |
| 26 | | Time:     11:00 a.m. |
| 27 | | Place     1300 Clay Street, Room 215 |
| 28 | | Judge:    Hon. Charles Novack |

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

Respondent Debtor Kenneth W. Mattson, through its counsel of record, submits this Request for Judicial Notice in Support of Kenneth W. Mattson's Motion to Dismiss Involuntary Petition filed on December 20, 2024,

| No. | Title of Document |
|---|---|
| 1 | Complaint filed before the Superior Court of the State of California, County of Sacramento, in the matter captioned *Kenneth W. Mattson v. Timothy LeFever, LeFever Mattson, et al.*, Case No. 24CV011305. |
| 2 | Indemnity Agreement between Kenneth W. Mattson, Timothy LeFever, and LeFever Mattson effective January 1, 2024. |
| 3 | Complaint filed before the Superior Court of the State of California, County of Sonoma, in the matter captioned *Timothy LeFever, LeFever Mattson, Divi Divi Tree, LP, and Windscape Apartments, LLC v. Kenneth W. Mattson and KS Mattson Partners, LP*, Case No. 34CV03485. |
| 4 | June 27, 2024, email from Tim LeFever to Ken Mattson regarding Indemnity payments. |
| 5 | Declaration of Bradley D. Sharp In Support of Chapter 11 Petitions and First Day Motions, United States District Court for the Northern District of California, Case No. 24-10545, Docket No. 5. |
| 6 | *In Re. LeFever Mattson*, Monthly Operating Report, United States District Court for the Northern District of California, Case No. 24-10545, Docket No. 453. |

In resolving a motion to dismiss, this Court may take judicial notice of documents referenced in the Petition. *See Kenneally v. Bank of Nova Scotia*, 711 F.Supp.2d 1174, 1182 (S.D. Cal. 2010); Dkt. #1 at 6. The court may also take judicial notice of matters in the public record, including court filings and other public records. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."); *Daniel v. M-I, LLC*, 2015 WL 5834276, at *2 (E.D. Cal. Oct. 1, 2015) ("The

court may take judicial notice … since the [first amended complaint] filed in state court and the Amended Summons are publicly filed documents in another court.").

In support of his Motion, Kenneth W. Mattson attaches six exhibits to this Motion: (1) a copy of the complaint filed by Mr. Mattson against Petitioner and Mr. LeFever in California state court; (2) a copy of the Indemnity Agreement referenced in the Petition; (3) a copy of the complaint filed by LeFever Mattson against Mr. Mattson in California state court; (4) a copy of the June 27, 2024 demand referenced in the Petition; (5) a copy of the declaration of Bradley D. Sharp in Support of Chapter 11 Petitions and First Day Motions filed in Petitioner's bankruptcy proceeding; (6) the Monthly Operating Report filed by LeFever Mattson in its bankruptcy proceedings. All of these documents are subject to judicial notice because they are either public filings (Exs. 1, 3, 5, 6), referenced in the Petition (Exs. 2, 4), or other matters of public record consisting of filings wit.

Dated:        December 20, 2024            FENNEMORE WENDEL


By:*/s/ Mark Bostick*
    Mark Bostick
    Thiele R. Dunaway
    James P. Hill
    Christopher V. Hawkins
    Attorneys for KENNETH W. MATTSON

# EXHIBIT 1

Filed
Superior Court of California
Sacramento
06/06/2024
larsonh
By _____, Deputy
24CV011305

1   Micheline N. Fairbank, Bar No. 226038
    Daniel Rapaport, Bar No. 67217
2   Kurt Franklin, Bar No. 172715
    Thiele R. Dunaway, Bar No. 130953
3   **FENNEMORE WENDEL**
    1111 Broadway, 24th Floor
4   Oakland, CA 94607
    Tel: (510) 834-6600 / Fax: (510) 834-1928
5   Email: mfairbank@fennemorelaw.com
        drapaport@fennemorelaw.com
6       kfranklin@fennemorelaw.com
        rdunaway@fennemorelaw.com
7
    Attorneys for Plaintiff
8   KENNETH W. MATTSON

9
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
10
                        COUNTY OF SACRAMENTO
11

12
    KENNETH W. MATTSON,                     Case No. _____
13
                Plaintiff,                  **COMPLAINT FOR DECLARATORY**
14  vs.                                     **RELIEF, RECISSION, UNFAIR**
                                            **COMPETITION, DERIVATIVE ACTION,**
15  TIMOTHY LeFEVER, an individual; LeFEVER **IMPROPER REMOVAL OF DIRECTOR**
    MATTSON, a California Corporation, and  **AND ILLEGAL DENIAL OF ACCESS TO**
16  DOES 1-10, inclusive.                   **CORPORATE DOCUMENTS**

17              Defendants.                 Action Filed: June 6, 2024

18

19      Plaintiff KENNETH W. MATTSON hereby alleges as follows:

20                              **THE PARTIES**

21      1.      Plaintiff Kenneth W. Mattson ("Plaintiff" or "Mattson") is an individual residing

22  in the State of California. Plaintiff is one of the two founders of Defendant LeFever Mattson, a

23  duly organized California corporation formerly known as K.W.M. Enterprises and incorporated in

24  1989 ("LeFever Mattson"). Defendant LeFever Mattson is incorporated in the State of California

25  and its principal place of business is in the City of Citrus Heights, County of Sacramento, State of

26  California. Until late 2023, Mattson was the Chief Executive Officer of LeFever Mattson, and

27  Mattson owns and controls one-half of the outstanding shares of LeFever Mattson.

28

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

Case: 24-30074 Doc# 24-2   Filed: 12/20/24   Entered: 12/20/24 19:36:18   Page 5 of
135

BY FAX

1    2.    Defendant Timothy LeFever ("LeFever") is the other shareholder in LeFever

2    Mattson and also owns one-half of its outstanding shares. Defendant LeFever resides in the

3    County of Solano. LeFever is an attorney at law, who is currently licensed to practice law in the

4    State of California and was admitted to the State Bar of California in December 1986.

5    3.    Plaintiff is informed and believes, and thereon alleges, that the acts described

6    below were in part committed by, aided by, and abetted by certain individuals and/or entities

7    whose true names, capacities, and/or precise roles are not known at the present time. Such

8    individuals and/or entities have thus been sued herein as fictitiously named "DOE" defendants,

9    DOES 1-10, inclusive. Those fictitiously named defendants (the "DOES") will be identified

10    during the discovery process, at which point this Complaint will be promptly amended to disclose

11    their identities and relationship to Plaintiff's claims.

12    4.    Plaintiff is informed and believes, and thereon alleges, that at all times mentioned

13    herein, each of the Defendants was the agent and/or representative and/or employee of each of the

14    remaining defendants and in doing things herein mentioned was acting within the scope of such

15    agency and/or representation and/or employment.

16    **VENUE AND JURISDICTION**

17    5.    Sacramento County is the proper venue for this dispute because it is the principal

18    place of business of Defendant LeFever Mattson and many of the acts complained of occurred in

19    this County. This is an unlimited civil action in which Declaratory Relief and other remedies are

20    requested, and the amount in controversy exceeds $25,000.

21    **GENERAL ALLEGATIONS**

22    6.    LeFever Mattson is in the business of owning and managing real estate properties

23    in the State of California. It invests its own funds in various residential and commercial projects.

24    It often works with individual investors on specific projects. It also forms limited partnerships

25    and transfers limited partnership interests in a single asset entity, which is used as the

26    development vehicle. Historically, it sometimes acquired real property with investors who

27    became tenants in common as to a particular parcel or parcels of real property.

28    - 2 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

1    7.    LeFever and Mattson agreed that they had equal ownership and control over

2    LeFever Mattson, but Mattson would primarily interact with investors. Until recently, they were

3    the only Directors. LeFever also delegated significant operational decisions to Mattson.

4    However, LeFever always had access to all company documents, was privy to all material

5    decisions and called Mattson, at least daily, to discuss operations.

6    8.    Each entity, which owned a parcel, or parcels of real property developed by

7    LeFever Mattson, had a separate, though sometimes overlapping, group of investors, or was

8    owned solely by LeFever Mattson. While there was no fixed obligation to make distributions to

9    investors, it was Mattson's practice to do so, whenever possible. Real estate investments rise and

10   fall depending on numerous market factors. When the U.S. economy has faltered, there is less

11   competition for real estate and values decline. As was the case for many, LeFever Mattson

12   experienced extreme hardship during the COVID-19 pandemic due to tenant defaults, decreased

13   demand and consequential loss of income. In fact, during times of crisis in the real estate world,

14   Mattson advanced personal funds to entities to allow their investors to receive money to assist

15   their individual situations. LeFever refused to make contributions to help investors, although he,

16   unlike Mattson, always demanded and received an annual salary of between $500,000 and

17   $1,000,000. If Mattson made personal advances, he was only repaid such advances, without

18   interest or fees, and then only when an entity had generated a surplus, allowing for

19   reimbursement.

20   9.    A dispute arose in 2023 between LeFever and Mattson in connection with a

21   Limited Partnership named Divi Divi Tree LP ("Divi"), in which LeFever Mattson was a general

22   partner. Divi originally owned a 400-unit apartment building located in Riverside, California. At

23   one time, LeFever Mattson owned a significant interest in Divi. However, over the years,

24   LeFever Mattson sold its interests to new investors and deposited investment proceeds in a

25   separate operational account for the benefit of LeFever Mattson. These sales were documented

26   through Purchase and Sales Agreements, although Defendants now refuse to provide copies to

27

28                                          - 3 -

PENNIMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

Case: 24-30172-DM #24-2    Filed: 12/20/24    Entered: 12/20/24 19:36:18    Page 7 of
135

1 | Plaintiff. LeFever now claims LeFever Mattson did not authorize such sales and claims falsely
2 | that Mattson used investment funds for personal purposes (the "Disputed Transactions").

3 |       10.    In late 2023, LeFever Mattson's legal counsel, Scott Smith ("Smith"), resigned
4 | from his law firm, Hanson Bridgett, and was retained by LeFever Mattson, as part-time General
5 | Counsel. Smith, shortly thereafter, accused Mattson of misconduct and threatened unspecified
6 | legal actions and that he would notify governmental authorities of Defendants' claims of
7 | misconduct by Mattson. Defendants demanded Mattson enter into an Indemnity Agreement
8 | indemnifying LeFever Mattson. Mattson believed that he had acted appropriately but proposed
9 | that if Divi investors were somehow damaged by him, he would bear the expenses associated
10 | with resolving any errors.

11 |       11.    In February 2024, at a Special Board Meeting called by LeFever, without an
12 | agenda, Defendants and Smith insisted Mattson resign as CEO, which he did in order to allow
13 | him time to clear up these claims. Defendants and Smith also demanded, and Mattson agreed to
14 | amend the Bylaws of LeFever Mattson to allow Smith to become a third director. Smith and
15 | LeFever also presented Mattson with an eight page document, captioned as an Indemnity
16 | Agreement, which they demanded he sign on the spot. Plaintiff is informed and believes, and
17 | thereon alleges that, a true and correct copy of that document is attached as **Exhibit A.**
18 | Hereinafter, Exhibit A may also be referred to as "the document." Plaintiff cannot be sure that
19 | the document attached as Exhibit A is an authentic copy of the document Plaintiff signed at that
20 | Board Meeting, because Defendants never provided him with a copy of the executed document
21 | and later refused to provide a copy after Plaintiff's request. Because of their long standing
22 | relationships, Plaintiff trusted LeFever and Smith to have fairly and reasonably crafted the
23 | Agreement based upon their prior discussions, Mattson did not closely examine the contents of
24 | the agreement, instead relying on LeFever and Smith's representations at the meeting. However,
25 | that document, which Mattson only briefly glanced through, but did not read completely,
26 | provided egregious terms far in excess of what had been previously discussed. It contained
27 | Recitals, which were false, and designed to deflect claims against Defendants and to admit
28 |

- 4 -

FINNEMORE WENDE
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

Case: 24-10173 Doc# 24-2 Filed: 12/20/24 Entered: 12/20/24 19:36:18 Page 8 of
135

1   wrongdoing by Mattson.  At all times, Plaintiff understood and believed thereon to his detriment,

2   that Smith was the attorney for LeFever Mattson and was not representing LeFever's personal

3   interests, much less Smith's own interests.  Plaintiff's reliance has proven to be erroneous as the

4   Indemnity Agreement was for the benefit of LeFever and Smith and contained false statements.

5          12.     The agreement, initially discussed conceptually between LeFever, Smith and

6   Mattson, was intended to be limited to indemnifying LeFever Mattson regarding potential claims

7   from potential Divi investors. It was proposed that Plaintiff would bear the expenses associated

8   with resolving any errors. However, the actual Agreement presented at the Board Meeting by

9   LeFever and Smith was far broader in scope, contained unenforceable provisions, offered no

10  consideration to Mattson, and was unconscionable. Plaintiff is informed and believes, and thereon

11  alleges, that Smith prepared the Indemnity Agreement, which provided broad indemnities to both

12  Defendants and Smith personally.  Smith did not disclose that the document required that Mattson

13  indemnify Smith for any actions by Smith, in connection with his acts and omissions related to

14  LeFever Mattson.  Smith did not disclose this conflict of interest, either orally or in writing.

15  While both Smith and LeFever are attorneys at law, neither of them advised Mattson of the

16  Draconian and unfair terms contained in the document, the effect of the document, or that

17  Mattson should seek independent counsel before signing it.  While Plaintiff believes he signed the

18  document, he has not been provided with a fully executed copy.

19         13.     Some, but not all of the unfair, false, unconscionable, and illegal terms of the

20  document are the following:

21         a.      The Recitals contain false statements that LeFever and LeFever Mattson

22  were not aware of the Disputed Transactions, received no benefit from them, and are not

23  obligated to the investors to honor those agreements.

24         b.      The undisclosed scope of Mattson's purported indemnification obligation

25  under Exhibit A was not limited to what was proposed and purportedly seeks indemnity for any

26  event concerning LeFever Mattson that may arise, even criminal actions, which was not agreed to

27  and is against public policy.

28                                          - 5 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

Case: 24-03017 14-6973 Doc# 24-2    Filed: 12/20/24    Entered: 12/20/24 19:36:18    Page 9 of
135

c.     The document purports to provide Smith with a broad personal indemnity that would cover any civil or criminal damages, which is an improper overreach by corporate counsel and against public policy and was an undisclosed conflict of interest and violated the California Rules of Professional Conduct.

d.     The document purports to allow LeFever and Smith to hire any attorneys, regardless of cost, with no oversight by Mattson and require Mattson immediately pay such fees and costs generated and further allows Defendants to settle any claim for any amount and requires Mattson to pay all such expenses without objection, regardless of their fairness or reasonableness.

e.     The document purports to provide a guarantee of payment without defense or offset, regardless of negligence, fraud, or misconduct by LeFever or Smith.

f.     The document purports to provide LeFever and Smith with exclusive power to decide if they are entitled to corporate indemnity, which is contrary to the California Corporations Code. It allows them to select "independent" counsel for LeFever Mattson and creates a presumption of entitlement to indemnity, which is unfair, and contrary to California law and purports to bind Mattson as a shareholder.

g.     The document purports to shift presumptions under California law regarding indemnification.

h.     The document purports to illegally waive Plaintiff's right to a jury trial guaranteed by California law.

i.     The document purports to bind third-parties, which were not asked to consent to its terms.

14.     The document provides no consideration whatsoever to Plaintiff, except the illusory consideration that LeFever and LeFever Mattson "shall give Indemnitor such information and cooperation in connection with the Proceeding as may be reasonably appropriate; provided that such cooperation is at no cost or Expense to Indemnitee or any Indemnitee Party."

15.     Not only, was the "consideration" for Plaintiff illusory, but also, this promise was breached by Defendants. Immediately, after Plaintiff signed Exhibit A, Defendants began what

- 6 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

Case: 24-10715   Doc# 24-2   Filed: 12/20/24   Entered: 12/20/24 19:36:18   Page 10 of 135

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

Plaintiff is informed and believes, and thereon alleges, was a preplanned scheme to destroy Plaintiff. LeFever unilaterally stopped making proper limited partnership distributions to investors, causing consternation; however, as Mattson had stepped down as CEO and was not on equal footing, he was precluded from intervening to protect the investors' interests. Simultaneously, Defendants repeatedly contacted LeFever Mattson investors making false factual statements, that the investors' interests were invalid, and that Mattson wrongfully took their money, when in fact, the sales were regular, documented and authorized by the CEO and certainly not hidden from LeFever. LeFever has even made attempts to encourage lawsuits against Mattson. Plaintiff is informed and believes, and thereon alleges that, these extra judicial statements could prejudice future adjudication proceedings.

16. On May 14, 2024, Plaintiff, through his counsel, wrote LeFever and requested various documents Plaintiff's counsel would need in connection with a threatened or pending investigation of Mattson and LeFever Mattson by the Department of Justice. The requested information was necessary and reasonable, and was also sought to document third-party transactions, yet Defendants, through Smith, refused to provide the requested information, without additional and highly unreasonable demands and conditions. In any event, as a Director, Mattson was entitled to access to all unprivileged corporate documents. Smith and Defendants knew Mattson had been physically and electronically locked out of access to LeFever Mattson documents. They knew the so-called cooperation provision required information delivery, but Defendants breached the only covenants of Exhibit A, which gave Plaintiff anything. See communications attached collectively as **Exhibit B.**

17. Defendants thus repudiated and breached the terms of Exhibit A, which precludes Defendants from any and all of the benefits of Exhibit A, allowing for it to be rescinded and deemed null and void. Plaintiff has since formally rescinded Exhibit A by written notice of transmittal prior to the filing of this Complaint.

- 7 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

FENIMORE WINDE
ATTORNEYS AT LAW
OAKLAND

Case: 24-30074 Doc# 24-2 Filed: 12/20/24 Entered: 12/20/24 19:36:18 Page 11 of 135

## FIRST CAUSE OF ACTION

### (Declaratory Relief – Against All Defendants)

18.     Plaintiff realleges and incorporates by reference all the allegations above, as though fully set forth herein.

19.     California Code of Civil Procedure § 1060 allows any person interested under a contract, including a determination of any question of construction or validity arising under the instrument or contract, to seek declaratory relief from the Superior Court. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties with respect to Exhibit A. Plaintiff contends that for the reasons previously alleged, Exhibit A is invalid, was without consideration and was the subject of fraud, and/or was breached by Defendants, making it invalid, not enforceable and that Plaintiff has no obligations to any person based on that document. Plaintiff is informed and believes, and thereon alleges that, Defendants contend Exhibit A is fully enforceable and that their refusal to provide requested corporate documents is somehow excusable, rather than a breach of their obligations.

20.     The scope of the indemnity on its face applies only to transactions where terms and conditions of sale of interests are not "clearly documented," which is the definition for Third-Party Transactions contained in the Third Recital of Exhibit A.

21.     Proceedings is defined to include investigation of a civil, criminal, administrative or investigative nature in which LeFever Mattson or LeFever is involved as a party, potential party, or a non-party witness or otherwise. Exhibit A, Section I.01(h).

22.     The scope of indemnification applies only to Third-Party Transactions or damages incurred in connection with Proceedings relating to Third-Party Transactions. Exhibit A, Section III.01(b) and that it cannot bind any person or entity who did not sign it.

23.     Should the Court determine Exhibit A is enforceable and was not breached by Defendants, Plaintiff requests the Court narrowly construe and limit all rights of indemnification to circumstances where a transaction was not "clearly documented." Further, that Exhibit A can only bind a signatory.

- 8 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

Case: 24-03074 Doc# 24-2    Filed: 12/20/24    Entered: 12/20/24 19:36:18    Page 12 of 135

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

24. An actual controversy has arisen and exists between Plaintiff and Defendants as to their respective rights and obligations in regard to the enforceability and scope of indemnity addressed in Exhibit A.

25. Plaintiff desires a judicial determination of these issues and the Parties' respective rights and obligations, and a judicial determination is necessary and appropriate at this time under the circumstances in order that Plaintiff and Defendants may ascertain their respective rights and obligations as set forth above. A Court order is necessary for future conduct. Declaratory judgment from the Court will resolve this dispute and relieve Plaintiff from the extraordinary and unconscionable burden Defendants seek to place on Plaintiff. Plaintiff has no adequate and speedy remedy at law to resolve the Parties' dispute, other than by declaratory judgment from this Court and respectfully requests that the Court resolve this dispute by issuing a judicial declaration as to the Parties' respective rights and liabilities with regard to Exhibit A.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

### (Rescission – Against All Defendants)

26. Plaintiff incorporates all the allegations above as though fully set forth herein.

27. Plaintiff brings this Cause of Action pursuant to California Civil Code §§ 1688 and 1689 to extinguish the Indemnity Agreement attached hereto as Exhibit A.

28. Any execution of this document by Plaintiff was given by mistake. Plaintiff understood the scope of his offer of indemnification was to be limited to potential claims by investors related to any errors by him in sales of interests in the Divi limited partnership.

29. Plaintiff's consent was obtained by duress, fraud, menace, and undue influence undertaken by Defendants and the corporate attorney, Smith, who was jointly interested with Defendants in personal protection.

30. Plaintiff obtained no consideration for the onerous obligations imposed by Exhibit A. Further, any possible consideration to Plaintiff failed as Defendants refused in writing to provide needed information to Plaintiff, so as to allow him to demonstrate the true facts to the

- 9 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

1 Department of Justice and investors, so as to avoid or limit claims and reputational damage and

2 otherwise protect his rights.

3    31.    The Indemnity Agreement prepared by Defendants and their agents is in part

4 unlawful and was obtained by attorney Smith, in part for his own benefit, without disclosure of

5 his conflict of interest or who he was representing while knowing Plaintiff was unrepresented.

6    32.    Plaintiff received and accepted no benefits from Exhibit A and has notified

7 Defendants in writing that he has rescinded any express or implied consent to Exhibit A.

8    WHEREFORE, Plaintiff prays for judgment as set forth below.

9                          **THIRD CAUSE OF ACTION**

10                   **(Unfair Competition – Against All Defendants)**

11    33.    Plaintiff incorporates all the allegations of Paragraphs 1-18 and 26-31 above as

12 though fully set forth herein.

13    34.    Plaintiff, a natural person, brings this Cause of Action based upon California

14 Business and Professions Code § 17200, which precludes any unlawful, unfair, or fraudulent

15 business act or practice.

16    35.    LeFever Mattson is a real estate business continually operating in the State of

17 California since 1989. One of its business strategies was to acquire, own and manage apartment

18 buildings through limited partnerships in which individuals invested. One of those limited

19 partnerships was Divi. As the CEO of LeFever Mattson, which at one time owned a significant

20 interest in Divi, Mattson was authorized to sell and transfer limited partnership interests to

21 investors and did so. Funds collected by LeFever Mattson were then deposited into a special

22 account and such proceeds were used, as needed, for LeFever Mattson's corporate purposes. This

23 type of transaction was a longstanding business practice of the corporation.

24    36.    Beginning in November 2023, Defendant LeFever Mattson, aided and abetted by

25 LeFever, implemented a plan to disadvantage and injure Plaintiff and the third-party investors in

26 Divi. Defendants claimed that the sale and transfer, of limited partnership interests in Divi owned

27 by LeFever Mattson, by its CEO and 50% shareholder, to individual investors was not authorized.

28                              - 10 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

Case: 24-30174  Doc# 24-2    Filed: 12/20/24    Entered: 12/20/24 19:36:18    Page 14 of 135

Defendants claimed that therefore, since LeFever Mattson must still own its undivided and undiluted interest in Divi, that the investors owned nothing, and they had been defrauded by Plaintiff. Defendants also encouraged civil lawsuits and other proceedings be brought against Plaintiff claiming Mattson had stolen investors' money. Defendants' allegations of wrongful conduct by Plaintiff are false. Sales of LeFever Mattson's interests in Divi to third-parties was in the regular course of business, documented and within the authority of Plaintiff as CEO of LeFever Mattson. Proceeds from sales were used for legitimate corporate purposes. Plaintiff contends the investors own the interests they purchased.

37. Thereafter, Defendants, along with Smith, who failed to disclose the fact he was to personally benefit, through fraud, undue influence, menace, and mistake, presented Plaintiff with an unconscionable and partially illegal agreement to sign, as well as corporate documents, effectively ceding control of LeFever Mattson to Defendant LeFever and to Smith.

38. Plaintiff is informed, believes, and based thereon, alleges that, in furtherance of Defendants' scheme to seize control of LeFever Mattson, Defendants stopped paying normal and regular distributions to the investors and have declared prior transfers to investors void and retained the sales proceeds. Plaintiff is informed and believes and thereon alleges that Defendants are using these funds for their own purposes.

39. Defendants' unfair business practices have proximately caused significant injury in fact to Plaintiff, as well as the Divi investors. Such practices are unfair, illegal, and fraudulent.

40. Defendants should be and Plaintiff requests this Court enjoin Defendants from any further actions to transfer any revenue from Divi, except to pay normal business expenses and distributions to third-party investors. Defendants should be ordered to disgorge all net revenue from operations of Divi to its investors and Plaintiff on a pro rata basis. Further, LeFever Mattson should be ordered to account for and disgorge all proceeds from sales of limited partnership interests, which sales it now rejects. Plaintiff contends the sales of LeFever Mattson's limited partnership interests in Divi by LeFever Mattson to the investors should be confirmed. To the extent the Court determines the sales did not bind LeFever Mattson, LeFever Mattson should

- 11 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

Case: 24-31014741731 Doc# 24-2    Filed: 12/20/24    Entered: 12/20/24 19:36:18    Page 15 of 135

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

1    be required to disgorge all funds taken from and equitably owned by Plaintiff and the Divi

2    investors, together with interest calculated at an appropriate rate.

3          WHEREFORE, Plaintiff prays for judgment as set forth below.

4                     **FOURTH CAUSE OF ACTION**

5        **(Derivative Claim Against LeFever and Nominally Against LeFever Mattson)**

6       41.     Plaintiff incorporates all the allegations above as though fully set forth herein.

7       42.     In late 2023, Defendant LeFever assumed the role of CEO of Defendant LeFever

8    Mattson, which in this Cause of Action, is named only as a nominal defendant. As such, and as a

9    Director, LeFever had fiduciary duties of loyalty, good faith, fair dealings, full disclosure, and

10    due care to LeFever Mattson (sometimes referred to herein as the "Company").

11       43.     Plaintiff is informed and believes, and on that basis, alleges, that these fiduciary

12    duties were and are being breached by Defendant LeFever, who has acted fraudulently,

13    negligently, and without the care, skill, prudence and diligence that a reasonably prudent person

14    acting in the capacity, and familiar with such matters, would use, and acting intentionally and

15    imprudently to refuse to honor sales of limited partnership interests by LeFever Mattson in Divi

16    to third-party investors, while also retaining investor funds and retaining the benefits of those

17    funds delivered to the Company for said limited partnership interests in Divi.

18       44.     The acts by LeFever include, but are not limited to the following:

19          a.     He used fraud, duress, intimidation, and threats to coerce Plaintiff to agree

20    to change the Bylaws and appoint Smith to the Board of Directors, so as to effectively gain

21    control of the Company.

22          b.     As CEO, he has declared to investors that the interests they lawfully

23    acquired in Divi were not authorized and the sales are null and void.

24          c.     He has ceased all normal monetary distributions to Divi investors.

25          d.     He has refused to return investors the funds paid to, deposited with, and

26    used generally by the Company, in consideration for their limited partnership interests.

27

28                          - 12 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

Case: 24-10714 Doc# 24-2    Filed: 12/20/24    Entered: 12/20/24 19:36:18    Page 16
of 135

e.     He has falsely stated that sales by the Company were made by Plaintiff in his individual capacity, and the proceeds were not received by the Company.

f.     He has created, allowed, and encouraged conflicts of interest at the Company.

45.     These breaches of fiduciary duties by LeFever have and will result in substantial damages to the Company, including but not limited to lawsuits and reputational damage. LeFever Mattson should authorize a legal action against LeFever to protect investors but will not do so because LeFever effectively controls the Company.

46.     Plaintiff brings this action derivatively for the right and for the benefit of the shareholders of the Company to redress injuries suffered, and to be suffered, as a result of the breaches of fiduciary duty and other violations by Defendant CEO LeFever. Formal demand on the Directors to bring an action against LeFever would be futile in light of LeFever's control of the Board, and the fact that the Company's remedy is to file an action to remove him as CEO and Director, and remove Smith as a Director and counsel, and to immediately agree to honor the Company's commitments to the investors in Divi. LeFever and Smith have directly participated in the wrongs complained of herein, which disables them from acting independently, objectively and in good faith to advance the interests of the Company or respond informally to any demand by Plaintiff. Based on the allegations of the Complaint and the actions by LeFever to date, including the failure and refusal to honor the rights of its investors and the interests of the Company and its shareholders, such demand would be a futile and useless act, and said Company is therefore sued and named as a nominal Defendant in this Cause of Action.

47.     By refusing to honor its agreements with investors, or even return the proceeds it received therefrom, LeFever has caused economic harm and damage to the Company, thus breaching his fiduciary duties, causing damage in an amount not presently ascertainable, but in all events in an amount in excess of the jurisdictional threshold of this Court and in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for a judgment as set forth below.

- 13 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

Case: 24-31007109731 Doc# 24-2     Filed: 12/20/24     Entered: 12/20/24 19:36:18     Page 17 of 135

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

**FIFTH CAUSE OF ACTION**

**(Improper Removal of Director and Reinstatement – Against All Defendants)**

48.     Plaintiff incorporates all the allegations of Paragraphs 1-16, 18-24, 26-31, 32-39 and 41-46 above as though fully set forth herein.

49.     On May 14, 2024, Plaintiff, who was a Director of LeFever Mattson, demanded access to specified unprivileged corporate documents from Defendants, which demand was refused. See Exhibit B.

50.     Plaintiff had an absolute statutory right to these documents pursuant to California Corporations Code § 1602.

51.     On June 1, 2024, LeFever advised Plaintiff that he was calling a Special Meeting of the Board of Directors of LeFever Mattson for June 3, 2024. No agenda was provided.

52.     Plaintiff is informed and believes, and thereon alleges that, at the Board meeting, as part of LeFever's scheme to further take control of LeFever Mattson, and to preclude Plaintiff from his statutory right of access to corporate documents, LeFever and Smith purported to remove Mattson as a Director.

53.     The Board of Directors is precluded from removing a Director by California Corporations Code §303. The only way to remove a Director would be by suit in the Superior Court under § 304. Defendants did not take such action and Plaintiff requests this Court declare that Plaintiff is currently a Director of LeFever Mattson, entitled to all rights such status provides, and for monetary damages caused to Plaintiff by Defendants' wrongful actions in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment as set hereinafter set forth below.

**SIXTH CAUSE OF ACTION**

**(Access to Corporate Documents – Corporations Code §§ 1602 and 1603 Against**

**LeFever Mattson)**

54.     Plaintiff incorporates all the allegations above as though fully set forth herein.

- 14 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

55. Plaintiff, as Director was illegally locked out of access to corporate documents by Defendants. On May 14, 2024, a request for a set of specific corporate documents was made in writing. At the time Plaintiff, as a Director, had a right to inspect and copy these documents pursuant to California Corporations Code § 1602. That statutory right was violated by Defendants.

56. Seeking to undermine Plaintiff's access to documents, Plaintiff is informed and believes, and thereon alleges, that on June 3, 2024, Defendants purported to remove Plaintiff as a Director, despite the fact that they had no authority to do so pursuant to California Corporations Code § 303.

57. Plaintiff brings his Sixth Cause of Action pursuant to California Corporations Code § 1603, which provides that upon refusal of a lawful demand for inspection, this Superior Court, may enforce the right, or in the alternative, may order a third-party inspection. LeFever Mattson's actions have also caused damage to Plaintiff in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below:

## PRAYER FOR RELIEF

Plaintiff requests the relief described below as follows:

## ON THE FIRST CAUSE OF ACTION

1. For a declaration that the Indemnity Agreement attached as Exhibit A be deemed to be null, void, and unenforceable;

2. In the alternative, that Defendants breached their obligations under the terms of Exhibit A and based thereon, Plaintiff has no liabilities or obligations to Defendants or others;

3. In the alternative, that Plaintiff's only indemnity obligations are under circumstances in which that indemnity for the claims, damages, and proceedings is based solely upon transactions in which funds collected were from transactions in which the terms and conditions were not clearly documented;

4. For a declaration that Exhibit A does not bind any person or entity which did not sign it;

- 15 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

Case: 24-03071 Doc# 24-2 Filed: 12/20/24 Entered: 12/20/24 19:36:18 Page 19 of 135

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

5.     For a temporary restraining order and preliminary injunction restraining and enjoining Defendants from taking any action based on Exhibit A until this matter has been finally adjudicated;

6.     For costs of the suit; and

7.     For such other and further relief as the Court deems proper.

**ON THE SECOND CAUSE OF ACTION**

1.     For a judgment that the Indemnity Agreement attached as Exhibit A was breached by Defendants or is otherwise unenforceable and was properly rescinded;

2.     For costs of suit; and

3.     For such other and further relief as the Court deems proper.

**ON THE THIRD CAUSE OF ACTION**

1.     For a judgment that sales of Divi limited partnership interests are binding on LeFever Mattson and that attempts to deny their enforceability and retain proceeds from such sales are acts of unfair competition;

2.     Judgment requiring Defendants to disgorge net income of Divi to Plaintiff and investors in an amount to be proven at trial;

3.     For preliminary and permanent injunctive relief precluding Defendants from transferring any revenue from Divi, except to pay normal business expenses and distributions to third-party investors on a pro rata basis;

4.     For costs of the suit; and

5.     For such other and further relief as the Court deems proper.

**ON THE FOURTH CAUSE OF ACTION**

1.     For a judgment that Defendant LeFever breached his fiduciary duties to the Company by improperly exercising his control over it to refuse to honor sales of limited partnership interests by the Company in Divi to third-party investors, while also retaining investor funds and the benefits of those funds, delivered to the Company;

2.     For consequential damages caused to the Company by the conduct described

- 16 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

1  above, in an amount to be proven at trial;

2      3.    For costs of suit; and

3      4.    For such other and further relief as the Court deems proper.

4                **ON THE FIFTH CAUSE OF ACTION**

5      1.    For a declaration that Plaintiff was improperly removed as a Director of LeFever

6  Mattson and that all actions by the Board on June 3, 2024, and thereafter, are null and void;

7      2.    For the reinstatement of Plaintiff to his position as a Board member of LeFever

8  Mattson;

9      3.    For damages against all Defendants for the improper attempt to remove Plaintiff as

10  a Board member;

11     4.    For costs of the suit; and

12     5.    For such other and further relief as the Court deems proper.

13                **ON THE SIXTH CAUSE OF ACTION**

14     1.    For an order that Plaintiff is entitled to immediate access to inspect all

15  unprivileged corporate documents and that the documents initially requested be immediately

16  made available for a judgment to that effect;

17     2.    For damages against LeFever Mattson for its denial of access to corporate

18  documents, in an amount to be proven at trial;

19     3.    For costs of the suit, and

20     4.    For such other and further relief as the Court deems proper.

21  Dated: June 6, 2024                 FENNEMORE WENDEL

22

23                          By: _Micheline Fairbank_____

24                              Micheline N. Fairbank
                                Daniel Rapaport
25                              Kurt Franklin
                                Thiele R. Dunaway
26                              Attorneys for Plaintiff
                                KENNETH W. MATTSON
27

28                              - 17 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

Case: 24-10715   Doc# 24-2   Filed: 12/20/24   Entered: 12/20/24 19:36:18   Page 21
of 135

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

# EXHIBIT A

# INDEMNITY AGREEMENT

THIS INDEMNITY AGREEMENT (this "**Agreement**") entered into effective as of January 1, 2024, is made by Kenneth W. Mattson, an individual (the "**Indemnitor**") in favor, and for the benefit of, Timothy LeFever, an individual ("**LeFever**") and LeFever Mattson, a California corporation ("**LeFever Mattson**", individually and collectively with LeFever, the "**Indemnitee**"; Indemnitor, LeFever and LeFever Mattson are each individually referred to herein as a "**Party**" and collectively as "**Parties**").

## RECITALS

**WHEREAS,** Indemnitor and LeFever are the sole shareholders and sole members of the board directors of LeFever Mattson (the "**Board**");

**WHEREAS,** LeFever Mattson is the owner of various interests in, and the general partner and/or manager of, limited partnerships and limited liability companies that own, develop, manage and operate real estate and other business assets (collectively, the "**Operating Entities**");

**WHEREAS,** Indemnitor has entered into numerous transactions with individuals and/or entities pursuant to which Indemnitor has secured funds on terms and conditions not clearly documented (collectively, the "**Third Party Transactions**");

**WHEREAS,** the Parties acknowledge and agree that: (i) none of the Third Party Transactions were presented to the Board or shareholders of LeFever Mattson prior to the date that the Third Party Transactions were entered into, (ii) none of the Third Party Transactions were authorized or approved by the Board or shareholders of LeFever Mattson at any time prior to or after the date that the Third Party Transactions were entered into, (iii) neither LeFever nor LeFever Mattson is in any way a party to or obligated in connection with any of the Third Party Transactions, and (iv) neither LeFever nor LeFever Mattson received any benefit, directly or indirectly, economic or otherwise, in connection with or as a result of the Third Party Transactions;

**WHEREAS,** Indemnitor has covenanted and agreed to exercise Indemnitor's best efforts to properly document each of the Third Party Transactions as transactions solely between Indemnitor and the relevant third parties, and to obtain a release of Indemnitee insofar as such Third Party Transactions are concerned; and

**WHEREAS,** Indemnitee has agreed to reasonably cooperate with Indemnitor's efforts to document the Third Party Transactions conditioned on Indemnitor's agreement to indemnify Indemnitee and hold Indemnitee harmless from and against the Third Party Transactions, as hereinafter set forth, subject to the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the Recitals, which are incorporated by reference, the representations, covenants, and warranties contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties, intending to be bound legally, agree as follows:

DAMAGES AT RION

# ARTICLE I

## DEFINITIONS

**Section I.01. Definitions**. The following terms, as used in this Agreement, have the respective meanings set forth below:

(a) **"Affiliate"** of any Person means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, and the term **"Affiliated"** shall have a correlative meaning. The term **"control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Members of the immediate family (i.e., spouse, parents and children) of any Person, and any family trusts for, and estate planning vehicles of, any Person and such Person's immediate family shall be deemed to be Affiliates of such Person.

(b) **"Damages"** include any and all liabilities, losses, costs, and/or Expenses (as defined below) incurred by an Indemnitee Party in connection with any Proceeding related to a Third Party Transaction, or arising from any misrepresentation or breach of any representation, warranty or covenant by Indemnitor in this Agreement.

(c) **"Disinterested Director"** means a member of the Board who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(d) **"Expenses"** include any and all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedes bond or other appeal bond or their equivalent, and (ii) Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the LeFever Mattson.

(e) **"Independent Counsel"** means a law firm, or a partner or member of a law firm, that is (i) experienced in matters of corporation law, (ii) approved by both the Indemnitor and Indemnitee, and (iii) neither presently is, nor in the past five years has been, retained to represent (A) any Party hereto in any matter material to such Party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (B) any other party to a Proceeding giving rise to a claim for indemnification hereunder.

(f) **"Liabilities"** means (i) all obligations incurred by any Indemnitee Party in connection with any Third Party Transaction; (ii) all Expenses incurred by any Indemnitee Party in the defense of Proceeding related to a Third Party Transaction, (iii) all Expenses incurred by any Indemnitee Party in connection with the protection, preservation, and enforcement by any Indemnitee Party of any rights, or remedies related to a Third Party Transaction, (iv) all Damages incurred by or assessed against any Indemnitee Party; and (iv) all Expenses incurred in the defense, protection, preservation, and enforcement by Indemnitee of any rights, liens, or remedies against Indemnitor or in the defense, protection, preservation, and enforcement of this Agreement and (v) any other liability incurred by Indemnitor to Indemnitee under this Agreement.

(g) **"Person"** means any individual, partnership, limited partnership, limited liability company, trust, estate, corporation, custodian, nominee or any other individual or entity acting on its own or in any representative capacity.

(h) **"Proceeding"** means any threatened, pending or completed claim, demand action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding against Indemnitee, whether brought directly or in the name or right of LeFever Mattson, and whether against Lefever, Lefever Mattson, or both, and whether of a civil, criminal, administrative or investigative nature, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is, may or will be involved as a party, a potential party, a non-party witness or otherwise by reason of (i) the fact that Indemnitee is or was a director or officer of LeFever Mattson, (ii) any action taken by Indemnitee or any action or inaction

on Indemnitee's part, including while LeFever was or is acting as a director or officer of LeFever Mattson, or (iii) the fact that he or she is or was serving at the request of LeFever Mattson as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of LeFever Mattson or any Affiliate, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

**Section II.01. Representations and Warranties.** Indemnitor represents and warrants:

(a)     All of the Recitals set forth above are true, correct and complete in all respects.

(b)     Indemnitor is an individual residing in the State of California, and has all necessary power, authority and capacity to enter into and perform the terms of this Agreement.

(c)     Indemnitor and/or its Affiliates have received direct and indirect financial benefit in connection with the Third Party Transactions, and will receive direct and indirect financial benefit in exchange for Indemnitor's execution of this Agreement.

(d)     The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the fulfillment of or compliance with the terms and conditions of this Agreement, is not prevented or limited by, and does not conflict with or result in a breach of, the terms, conditions, or provisions of any contractual or other restriction on Indemnitor or any of its Affiliates, or agreement or instrument of any nature to which Indemnitor and/or its Affiliates is/are now a party, and it does not constitute a default under any of the foregoing.

(e)     This Agreement constitutes the valid and legally binding obligation of Indemnitor enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, or similar laws affecting the enforcement of creditor's rights generally.

(f)     There is no action or proceeding pending or, to the best of Indemnitor's knowledge, threatened. against, or materially affecting, Indemnitor or Indemnitor's assets before any court or administrative agency that might adversely affect Indemnitors' ability to perform the obligations under this Agreement.

## ARTICLE III

## INDEMNIFICATION AND GUARANTY

**Section III.01. Indemnification and Payment Obligations.** Indemnitor, on behalf of itself and its Affiliates, agents, successors, assigns, attorneys, employees and all other representatives (collectively referred to as the "**Indemnitor Parties**"), hereby agrees to indemnify, defend and hold harmless LeFever, LeFever Mattson, and their Affiliates, agents, successors, assigns, attorneys, employees and all other representatives (but specifically excluding Indemnitor Parties) (collectively referred to as the "**Indemnitee Parties**") from and against:

(a)     **Third-Party Transactions**. Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with any Third Party Transaction.

(b)     **Proceedings**. Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with any Proceeding in any way related to a Third Party Transaction.

(c)     **Settlement/Negotiations**. Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with the negotiation, settlement and/or other compromise of any claim or controversy in any way related to a Third Party Transaction.

**Section III.02. Expenses.** Indemnitor shall advance the Expenses incurred by any Indemnitee Party in connection with any Proceeding, as well as in all other instances when an Indemnitee Party is entitled to indemnification hereunder. Such advancement of expenses shall be made as soon as reasonably practicable, but in any event no later than thirty

(30) days after the receipt by Indemnitor of a written statement or statements requesting such advances from time to time (which statement(s) shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause an Indemnitee Party to waive any privilege accorded by applicable law shall not be included with the invoice). Expense advances shall be unsecured and interest free and made without regard to the ability of any Indemnitee Party to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by Indemnitor. This Section 3.02 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding for which indemnity is not permitted under this Agreement.

Section III.03. Payment. All payments by Indemnitor hereunder shall be paid in lawful money of the United States of America. Each payment obligation for Liabilities and/or Damages shall give rise to a separate cause of action, and separate lawsuits may, but need not, be brought hereunder as each cause of action arises. Amounts owed hereunder shall be funded by Indemnitor, promptly when the obligations are due, if applicable, or in any event not later than thirty (30) days after receipt of written demand from Indemnitee. If Indemnitor fails to pay or reimburse an Indemnitee Party as required hereunder within thirty (30) days following written demand therefor, Indemnitee may exercise any right or remedy set forth herein or available to it at law or in equity, and the Indemnitee shall additionally be entitled to interest on the unpaid amount accrued at a rate equal to the lesser of ten percent (10%) per annum and the highest rate permitted by applicable law.

Section III.04. Guaranty. Indemnitor hereby unconditionally, irrevocably, and absolutely guarantees to Indemnitee Parties the full, prompt, and complete payment when due of each of the Liabilities to be indemnified against by Indemnitor pursuant to this Agreement.

Section III.05. Unconditional Nature of Guaranty.

(a) The obligations of Indemnitor under this Agreement are irrevocable, absolute, and unconditional and shall remain in full force and effect until the Liabilities and all obligations related to the Third Party Transactions have been fully and finally paid and performed. This Agreement is made without defense, offset, or counterclaim, each of which is hereby waived by Indemnitor. This Agreement the obligations hereunder shall not be affected, limited, modified, or impaired upon the happening from time to time of any event or circumstance which might otherwise constitute a defense available to, or a discharge of Indemnitor with respect to, its obligations under this Agreement.

(b) Indemnitor agrees that no act or omission of any kind or at any time shall in any way impair the' rights of Indemnitee to enforce any right, power, or benefit under this Agreement, and, no setoff, counterclaim, reduction, or diminution of any obligation which Indemnitor has or may have against Indemnitee, or any assignee or successor thereof shall be available hereunder.

Section III.06. Indemnitee's Rights to Proceed Against Indemnitor. Indemnitee, in its sole discretion, shall have the right to proceed first and directly against Indemnitor under this Agreement, without proceeding against or exhausting any other remedies which it may have against any entity or Person which may have guaranteed or is otherwise responsible or liable for Liabilities or Damages.

Section III.07. Waivers. Except as specifically set forth herein, Indemnitor expressly waives demand, presentment, protest, and notice of the acceptance of this Agreement or other action taken in reliance hereon and all other demands and notices of any description in connection with this Agreement, the Liabilities, Damages or otherwise.

### ARTICLE IV

### NOTICES AND DEFENSE OF CLAIMS

Section IV.01. Notice of Indemnification. Indemnitee shall notify the Indemnitor in writing of any matter with respect to which Indemnitee and/or an Indemnitee Party intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to Indemnitor shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding or matter for which indemnification is sought. The failure by Indemnitee to notify Indemnitor will not relieve the Indemnitor from any liability which it may have to Indemnitee and/or any Indemnitee Party hereunder or other than under this Agreement, and any delay in so notifying the Indemnitor shall not constitute a waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Indemnitor.

Section IV.02. Assumption of Defense. In the event the Indemnitor may be obligated to indemnify Indemnitee and/or any Indemnitee Party, Indemnitor shall be entitled assume the defense of such matter with counsel approved by

Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of Indemnitor's election to do so. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Indemnitor, the Indemnitor will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Indemnitor's assumption of the defense of any such Proceeding, the Indemnitor shall be obligated to pay the fees and expenses of Indemnitee's counsel in the event of any of the following: (i) to the extent the employment of counsel by Indemnitee is authorized by the Indemnitor, (ii) counsel for the Indemnitor or Indemnitee shall have reasonably concluded that there is a conflict of interest between Indemnitor and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the fees and expenses are non-duplicative and reasonably incurred in connection with Indemnitee's role in the Proceeding despite the Indemnitor's assumption of the defense, (iv) the Indemnitor is not financially or legally able to perform its indemnification obligations, or (v) the Indemnitor shall not have retained, or shall not continue to retain, such counsel to defend such Proceeding. The Indemnitor shall have the right to conduct such defense as it sees fit in its sole discretion. Regardless of any provision in this Agreement, Indemnitee shall have the right to employ counsel in any Proceeding at Indemnitee's personal expense.

**Section IV.03. Cooperation**. Indemnitee shall give the Indemnitor such information and cooperation in connection with the Proceeding as may be reasonably appropriate; provided that such cooperation is at no cost or Expense to Indemnitee or any Indemnitee Party.

**Section IV.04. Delivery of Notices.** Unless specifically stated otherwise in this Agreement, all notices, waivers, and demands required or permitted hereunder shall be in writing and delivered to the addresses set forth below, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered United States mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third (3rd) business day following deposit with the United States Postal Service; or (d) electronic transmission (email) provided that the transmission is completed no later than 4:00 p.m. Pacific on a business day and the original also is sent via overnight courier or United States Mail, whereby delivery is deemed to have occurred at the end of the business day on which electronic transmission is completed.

| To Indemnitor: | Address: | 6359 Auburn Blvd., Suite B |
| | Attention: | Ken Mattson |
| | Email: | mrskwm@hotmail.com |
| To Indemnitee: | Address: | 6359 Auburn Blvd., Suite B |
| | | Citrus Heights, CA 95621 |
| | Attention: | Tim LeFever |
| | Email: | tlefever@lefma.com |

Any Party may change its address for purposes of this Section 4.04 by giving written notice as provided in this Section 4.04. All notices and demands delivered by a Party's attorney on a Party's behalf shall be deemed to have been delivered by said Party. Notices shall be valid only if served in the manner provided in this Section 4.04.

### ARTICLE V

### INDEMNIFICATION PROCESS

**Section V.01. Entitlement To Indemnification**. Upon written request by Indemnitee for indemnification pursuant to Section 4.01(a), a determination with respect to Indemnitee Party's entitlement thereto shall be made in the specific case (A) by a majority vote of the Disinterested Directors, even though constituting less than a quorum of the Board, or (B) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee. If it is determined that an Indemnitee Party is entitled to indemnification, payment to Indemnitee shall be made within thirty (30) days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be considered Expenses, to the extent permitted by applicable law.

**Section V.02. Independent Counsel**. In the event the determination of entitlement to indemnification is to be

made by Independent Counsel pursuant to Section 5.01, the Independent Counsel shall be selected as provided in this Section 5.02. Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to Indemnitor advising it of the identity of the Independent Counsel so selected. Within ten (10) days after such written notice of selection shall have been given, Indemnitor may deliver to the Indemnitee a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "**Independent Counsel**" as defined in Article I of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected by Indemnitee shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within twenty (20) days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 4.01(a) hereof, and (ii) the final disposition of the Proceeding, the parties have not agreed upon an Independent Counsel, the Indemnitee may petition a court of competent jurisdiction for resolution of any objection and for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 5.01 hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 6.01 of this Agreement, the Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

**Section V.03. Burden of Proof**. In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 4.01(a) of this Agreement, and the Indemnitor shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption in connection with the making by such person, persons or entity of any determination contrary to that presumption.

**Section V.04. Expenses**. The Indemnitor agrees to pay the reasonable fees and expenses of any Independent Counsel and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

## ARTICLE VI

### REMEDIES

**Section VI.01. Commencement of Action**. In the event that (i) a determination is made pursuant to Section 5.01 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 3.02 or 5.04 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 5.01 of this Agreement within ninety (90) days after the later of the receipt by the Indemnitor of the request for indemnification or the final disposition of the Proceeding, (iv) payment of indemnification pursuant to this Agreement is not made within thirty (30) days after a determination has been made that an Indemnitee Party is entitled to indemnification, or (v) the Indemnitor or any other person or entity takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of Indemnitee's entitlement to such indemnification or advancement of Expenses. Alternatively, Indemnitee, at his, her or its option, may seek an award in arbitration with respect to Indemnitee's entitlement to such indemnification or advancement of Expenses, to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within one hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 6.01(a). The Indemnitor shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration in accordance with this Agreement.

**Section VI.02. Effect of Determination of Availability of Indemnification**. Neither (i) the failure of to have made a determination in accordance with Section 5.01 above that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination in accordance with Section 5.01 above that Indemnitee has not met the applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has or has not met the applicable standard of conduct. In the event that a determination shall have been made that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Article VI shall be conducted in all respects as a de novo trial, or arbitration, on the merits, and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Article VI, the Indemnitor shall, to the fullest extent not prohibited by law, have the burden of proving

**Section VI.03. Defenses.** To the fullest extent not prohibited by law, the Indemnitor shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Article VI that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Indemnitor is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Article V of this Agreement that Indemnitee is entitled to indemnification, the Indemnitor shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Article VI, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

**Section VI.04.** Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of a Proceeding.

# ARTICLE VII

## GENERAL PROVISIONS

**Section VII.01. Term**. This Agreement shall continue until and terminate upon the later of (a) seven (7) years after the Effective Date; or (b) one (1) year after the final termination of any Proceeding, including any appeal, then pending in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any proceeding commenced by Indemnitee pursuant to this Agreement relating thereto.

**Section VII.02. Final Expression; Modifications.** Each Party hereto acknowledges that this writing is intended as a final expression and a complete and exclusive statement respecting the subject matter hereof. This Agreement supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to this Agreement. No course of prior dealing between or among any Party or Parties, no usage of trade, and no parol or extrinsic evidence of any nature shall be used to supplement or modify any terms, and there are no conditions to the full effectiveness, of this Agreement.

**Section VII.03. No Remedy Exclusive; Effect of Waiver.** No remedy conferred in this Agreement upon or reserved to any Party hereto is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any default, omission, or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. No waiver, amendment, release, or modification of this Agreement shall be established by conduct, custom, or course of dealing, but solely by an instrument in writing duly executed by the Parties hereto. A waiver on one occasion shall not be a bar to or waiver of any right on any other occasion.

**Section VII.04. Expenses.** The non-prevailing party agrees to pay all out-of-pocket costs and expenses of the prevailing party (as determined by a final, non-appealable judgment), including reasonable attorneys' fees, incurred by the prevailing party in connection with any dispute or enforcement proceedings under this Agreement.

**Section VII.05. Benefit and Assignment.** This Agreement is binding upon and inures to the benefit of each Party hereto, and their respective successors and assigns. No Party may assign all or any part of this Agreement without the prior written consent of all other Parties hereto.

**Section VII.06. Severability.** The invalidity or unenforceability of any one or more phrases, sentences, clauses, or sections contained in this Agreement shall not affect the validity or enforceability of the remaining portions of this Agreement, or any part thereof.

**Section VII.07. Waiver; Amendment.** This Agreement and any term, covenant, or condition hereof may not be changed, waived, discharged, modified, or terminated except by a writing executed by the Parties hereto. No waiver by any Party of any default hereunder shall operate as a waiver of any term or covenant of any other agreement or of any other default or of the same default on any prior or subsequent occasion, unless otherwise consented to by the Party entitled to enforce the default.

**Section VII.08. Interpretation.** Whenever used herein, the singular shall include the plural, the plural the singular,

**Section VII.09. Further Assurances.** Each Party shall each execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and do all such other acts and things, as may be required by law or as may be necessary or advisable to carry out the intent and purpose of this Agreement. Without limiting the generality of the foregoing, each Party shall execute such documents and file such instruments or notices as may be necessary or desirable.

**Section VII.10. JURY TRIAL WAIVER.** INDEMNITOR AND INDEMNITEE EACH WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION, OR PROCEEDING OR ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT OF ANY PARTY'S RIGHTS AND REMEDIES AND ACKNOWLEDGE THAT SUCH PARTY MAKES THE WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THE WAIVER WITH SUCH PARTY'S ATTORNEYS.

**Section VII.11. GOVERNING LAW; SUBMISSION TO JURISDICTION.** THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. ANY LEGAL SUIT, ACTION, OR PROCEEDING RELATING TO THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF CALIFORNIA, EACH PARTY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

**Section VII.12. No Third-Party Beneficiaries.** The provisions of this Agreement are not intended for the benefit of and shall not confer any rights to any creditor (including Lender) or other person to whom any debts, liabilities, or obligations are owed by any of the Parties hereto.

**Section VII.13. Non-Exclusivity.** Except as expressly set forth herein, the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

**Section VII.14. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same agreement. Counterparts may be executed and delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

**Section VII.15. Captions.** The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

[SIGNATURE PAGE FOLLOWS]

20271005.2

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date set forth above.

**INDEMNITOR**

By: _____
Name:  Kenneth W. Mattson

**INDEMNITEE**

LeFever

By: _____
Name:  Timothy LeFever

LeFever Mattson, a California corporation

By: _____

Name: Kenneth W. Mattson
Title: Chief Executive Officer

20271005.2

# EXHIBIT B

# Randy Sue Pollock
Attorney at Law

286 Santa Clara Avenue
Oakland, California 94610

Tel: (510) 763-9967
Fax: (510) 380-6551
rsp@rspollocklaw.com
www.rspollocklaw.com

May 14, 2024

**VIA E-MAIL: tlefever@lefma.com**

Tim LeFever
6359 Auburn Blvd., Suite B.
Citrus Heights, CA 95621

Re: **Ken Mattson**

Dear Mr. LeFever:

I have been engaged to represent Mr. Mattson in connection with possible criminal proceedings arising out of his work for LeFever Mattson. I write you both in your individual and representative capacities. As part of my review, I need a great deal of information and data regarding the issues raised by you and the DOJ. This letter is to request you provide me with the information described below as soon as practicable.

First, I read an email dated May 9, 2024, the subject line of which is Divi Divi / Ken Mattson. It alleges Mr. Mattson:

1) Engaged in a large number of unauthorized and improper transactions concerning his interest in Divi Divi Tree;

2) He improperly transferred limited partnership interests unknown to the Board or Shareholders of LeFever Mattson;

3) He improperly made distributions;

4) He entered into an Indemnity Agreement for the benefit of LeFever Mattson;

5) You referred his attorney to "the proper authorities."

In order to properly evaluate this information and better advise Mr. Mattson, I request all documents, including all forms of written and electronic communication which you or LeFever Mattson have access to which refer, relate or evidence these statements. This would include communications between you and Scott Smith.

In order to attempt to understand and resolve any possible criminal exposure, we also request that you provide any documents, as broadly described above, which you believe suggest any other actions by Mr. Mattson which may be improper, unethical or fraudulent, which caused any damage, potential damage or loss to LeFever Mattson, you, any investor in any entity or property, or any other third-party.

I also request all structural documents, such as Articles, By-Laws, Minutes, Operating Agreements, and Resolutions for LeFever Mattson, Divi Divi Tree LP and any other entity which you contend has been damaged or potentially damaged by any improper action by Mr. Mattson.

Mr. Mattson certainly wants to be able to evaluate and rectify, if appropriate, any situation where his actions may have been problematic. Your prompt cooperation will be of great assistance in that regard.

Sincerely,

Randy Sue Pollock

Randy Sue Pollock

**Randy Sue Pollock**

**From:** Scott Smith <ssmith@lefma.com>
**Sent:** Tuesday, May 21, 2024 5:50 PM
**To:** Randy Sue Pollock
**Subject:** RE: Ken Mattson

Caution: External (ssmith@lefma.com)

First-Time Sender: Details

Report This Email FAQ GoDaddy Advanced Email Security, Powered by INKY

Hello Randy Sue, upon the conclusion of a meeting where Ken answers my questions, I have no problem providing you information and documents serving as evidence of the statements in clauses (1) and (2) of your letter to Tim LeFever. These statements come directly from a single source. Can you please let me know what you are referencing insofar as clause (3) in your letter which reads "He improperly made distributions"? I do not believe this statement was included in Tim LeFever's email notice sent on May 9, and I am unaware of the source. I'll provide you the agreement referenced in clause (4) of your letter at the conclusion of our meeting. I am uncertain as to what your letter is referring to insofar as clause (5), and the statement that "You referred his attorney to the proper authorities". I believe you are referring to a statement in Tim's notice that we've referred this matter to the proper authorities, but please confirm. If you intended to ask who those authorities are, I can tell you that we were referring to the SEC and US Attorneys Office.

If and when Ken is ready to meet, I will also require of him the completion of certain action items he's left undone. In particular, Ken needs to execute grant deeds in favor of LeFever Mattson concerning a number of properties that are part of our Pinyon Creek II development. Ken improperly titled these properties in his entity, KS Mattson Partners, LP. These properties belong to LeFever Mattson and he needs to effect their transfer to LeFever Mattson immediately. The deeds at issue have been sent to him already on a number of occasions, so this request should not come as a surprise. I would also request that you ask your client to consider resigning from LeFever Mattson's board of directors. It is clear that Ken is incapable of performing the necessary functions of a board member and satisfying his duties as a director under California law. This has been and will continue to be to his own detriment, and we believe it both necessary and appropriate for Ken to resign immediately. Please advise before our meeting takes place of whether he is willing to step down, and if he is, I will prepare a letter of resignation for your review.

If all of this is acceptable to you, please let me know the time and place you would like this meeting to occur. I hope it is clear that if this meeting is to take place, it needs to happen as soon as possible. Please let me know as well whether you plan to attend.

Thank you,

Scott
Scott C. Smith,
General Counsel, LeFever Mattson
6359 Auburn Blvd · Citrus Heights, CA 95621
Email: ssmith@lefma.com
Tel: (415) 279-5932

1

## Randy Sue Pollock

| | |
|---|---|
| **From:** | Randy Sue Pollock |
| **Sent:** | Wednesday, May 22, 2024 8:01 PM |
| **To:** | Scott Smith |
| **Subject:** | Ken Mattson |

Mr. Smith,

In light of the federal rcriminal investigation, I cannot make Ken available to answer your questions. In connection with your query regarding improper distributions, it appears to me that you are making general claims of financial misconduct. If you are not claiming improper distributions, that is fine, however I need to review all documents relating to your allegations of financial impropriety. You are correct that my reference to your communications with governmental authorities would include the SEC and US attorney's office, I would like to review those communications.

I believe Ken is entitled to unfettered access to the requested documents and must demand that they be immediately provided without condition. As to your question regarding deeds, I do not yet have information about this, but will review it. If you could also send documents confirming the proper title for these properties, I will expedite my review of those issues. Please advise immediately if you will in fact provide the requested documents or not.
Please let us know if in connection with this request you are representing Mr. LeFever and LeFever-Mattson.

*RANDY SUE POLLOCK*
Law Office of Randy Sue Pollock
286 Santa Clara Avenue
Oakland, CA 94610
T 510-763-9967
F 510-380-6551
C 510-703-3370
www.rspollocklaw.com

1

## Randy Sue Pollock

External (ssmith@lefma.com)

Report This Email FAQ GoDaddy Advanced Email Security, Powered by INKY

Hi Randy Sue, and apologies for the delay in responding to your email. I've been busy all day putting out fires lit by your client. I still have a couple to go before my weekend starts, but I will endeavor to respond to your email as soon as possible early next week.

Thank you,

Scott

Scott C. Smith,
General Counsel, LeFever Mattson
6359 Auburn Blvd · Citrus Heights, CA 95621
Email: ssmith@lefma.com
Tel: (415) 279-5932

**From:** Randy Sue Pollock <rsp@rspollocklaw.com>
**Sent:** Wednesday, May 22, 2024 8:01 PM
**To:** Scott Smith <ssmith@lefma.com>
**Subject:** Ken Mattson

Mr. Smith,

In light of the federal rcriminal investigation, I cannot make Ken available to answer your questions. In connection with your query regarding improper distributions, it appears to me that you are making general claims of financial misconduct. If you are not claiming improper distributions, that is fine, however I need to review all documents relating to your allegations of financial impropriety. You are correct that my reference to your communications with governmental authorities would include the SEC and US attorney's office, I would like to review those communications.

I believe Ken is entitled to unfettered access to the requested documents and must demand that they be immediately provided without condition. As to your question regarding deeds, I do not yet have information about this, but will review it. If you could also send documents confirming the proper title for these properties, I will expedite my review of those issues. Please advise immediately if you will in fact provide the requested documents or not.
Please let us know if in connection with this request you are representing Mr. LeFever and LeFever-Mattson.

*RANDY SUE POLLOCK*
Law Office of Randy Sue Pollock
286 Santa Clara Avenue
Oakland, CA 94610
T 510-763-9967

1

# EXHIBIT C

**Randy Sue Pollock**

| | |
|---|---|
| **From:** | Scott Smith <ssmith@lefma.com> |
| **Sent:** | Thursday, May 23, 2024 5:20 PM |
| **To:** | Randy Sue Pollock |
| **Subject:** | FW: Special Meeting of the Board of Directors |

External (ssmith@lefma.com)

Report This Email FAQ GoDaddy Advanced Email Security, Powered by INKY

Hi Randy Sue, I hope your vacation is off to a wonderful start!

I do not know whether or not your client forwarded the below email to you, but as a courtesy, I wanted to let you know that a LeFever Mattson board meeting will take place tomorrow morning as planned. Your client is under no obligation to attend, and his absence will not affect the meeting or our ability to conduct and conclude business at the meeting. We will, however, address various company issues and make decisions likely affecting the interest of all shareholders. The meeting will take place by phone but only directors (Tim LeFever, Ken Mattson and myself) are invited to attend.

Thank you,

Scott

Scott C. Smith,
General Counsel, LeFever Mattson
6359 Auburn Blvd · Citrus Heights, CA 95621
Email: ssmith@lefma.com
Tel: (415) 279-5932

**From:** TIM LEFEVER <lefever96@aol.com>
**Sent:** Tuesday, May 21, 2024 6:52 PM
**To:** Ken Mattson <mrskwm@hotmail.com>; Scott Smith <ssmith@lefma.com>
**Subject:** Special Meeting of the Board of Directors

Ken and Scott,

Pursuant to Article III, Section 11 of the LeFever Mattson Bylaws, please accept this email as notice of a Special Meeting of the Board of Directors of LeFever Mattson to be held on Friday, May 24, 2024 at 9am, by phone call that I will initiate.

Please confirm that you will be on that call.

Tim

Sent from my iPhone

1

**Randy Sue Pollock**

From:       Randy Sue Pollock
Sent:       Thursday, May 23, 2024 5:31 PM
To:         Scott Smith
Subject:    Re: Special Meeting of the Board of Directors

Thank you.  Trying to focus on Mexico but I need to know what's going on.

Rsp

Randy Sue Pollock
Attorney at Law
286 Santa Clara Avenue
Oakland, CA 94610
T: 510-763-9967
F: 510-380-6551
C: 510-703-3370
www.rspollocklaw.com

Sent from my iPhone...

Please excuse autocorrect non sequiturs and typos

On May 23, 2024, at 6:20 PM, Scott Smith <ssmith@lefma.com> wrote:

> External (ssmith@lefma.com)
>
> Report This Email FAQ GoDaddy Advanced Email Security, Powered by INKY
>
> Hi Randy Sue, I hope your vacation is off to a wonderful start!
>
> I do not know whether or not your client forwarded the below email to you, but as a courtesy, I wanted to let you know that a LeFever Mattson board meeting will take place tomorrow morning as planned. Your client is under no obligation to attend, and his absence will not affect the meeting or our ability to conduct and conclude business at the meeting. We will, however, address various company issues and make decisions likely affecting the interest of all shareholders. The meeting will take place by phone but only directors (Tim LeFever, Ken Mattson and myself) are invited to attend.
>
> Thank you,

1

# EXHIBIT 2

# INDEMNITY AGREEMENT

THIS INDEMNITY AGREEMENT (this "**Agreement**") entered into effective as of January 1, 2024, is made by Kenneth W. Mattson, an individual (the "**Indemnitor**") in favor, and for the benefit of, Timothy LeFever, an individual ("**LeFever**") and LeFever Mattson, a California corporation ("**LeFever Mattson**", individually and collectively with LeFever, the "**Indemnitee**"; Indemnitor, LeFever and LeFever Mattson are each individually referred to herein as a "**Party**" and collectively as "**Parties**").

## RECITALS

**WHEREAS**, Indemnitor and LeFever are the sole shareholders and sole members of the board directors of LeFever Mattson (the "**Board**");

**WHEREAS**, LeFever Mattson is the owner of various interests in, and the general partner and/or manager of, limited partnerships and limited liability companies that own, develop, manage and operate real estate and other business assets (collectively, the "**Operating Entities**");

**WHEREAS**, Indemnitor has entered into numerous transactions with individuals and/or entities pursuant to which Indemnitor has secured funds on terms and conditions not clearly documented (collectively, the "**Third Party Transactions**");

**WHEREAS**, the Parties acknowledge and agree that: (i) none of the Third Party Transactions were presented to the Board or shareholders of LeFever Mattson prior to the date that the Third Party Transactions were entered into, (ii) none of the Third Party Transactions were authorized or approved by the Board or shareholders of LeFever Mattson at any time prior to or after the date that the Third Party Transactions were entered into, (iii) neither LeFever nor LeFever Mattson is in any way a party to or obligated in connection with any of the Third Party Transactions, and (iv) neither LeFever nor LeFever Mattson received any benefit, directly or indirectly, economic or otherwise, in connection with or as a result of the Third Party Transactions;

**WHEREAS**, Indemnitor has covenanted and agreed to exercise Indemnitor's best efforts to properly document each of the Third Party Transactions as transactions solely between Indemnitor and the relevant third parties, and to obtain a release of Indemnitee insofar as such Third Party Transactions are concerned; and

**WHEREAS**, Indemnitee has agreed to reasonably cooperate with Indemnitor's efforts to document the Third Party Transactions conditioned on Indemnitor's agreement to indemnify Indemnitee and hold Indemnitee harmless from and against the Third Party Transactions, as hereinafter set forth, subject to the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the Recitals, which are incorporated by reference, the representations, covenants, and warranties contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties, intending to be bound legally, agree as follows:

20271005.2

LEFEVERPLEM001-00214458.0001

# ARTICLE I
# DEFINITIONS

**Section 1.01. Definitions.** The following terms, as used in this Agreement, have the respective meanings set forth below:

(a) **"Affiliate"** of any Person means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, and the term **"Affiliated"** shall have a correlative meaning. The term **"control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Members of the immediate family (i.e., spouse, parents and children) of any Person, and any family trusts for, and estate planning vehicles of, any Person and such Person's immediate family shall be deemed to be Affiliates of such Person.

(b) **"Damages"** include any and all liabilities, losses, costs, and/or Expenses (as defined below) incurred by an Indemnitee Party in connection with any Proceeding related to a Third Party Transaction, or arising from any misrepresentation or breach of any representation, warranty or covenant by Indemnitor in this Agreement.

(c) **"Disinterested Director"** means a member of the Board who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(d) **"Expenses"** include any and all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedes bond or other appeal bond or their equivalent, and (ii) Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the LeFever Mattson.

(e) **"Independent Counsel"** means a law firm, or a partner or member of a law firm, that is (i) experienced in matters of corporation law, (ii) approved by both the Indemnitor and Indemnitee, and (iii) neither presently is, nor in the past five years has been, retained to represent (A) any Party hereto in any matter material to such Party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (B) any other party to a Proceeding giving rise to a claim for indemnification hereunder.

(f) **"Liabilities"** means (i) all obligations incurred by any Indemnitee Party in connection with any Third Party Transaction; (ii) all Expenses incurred by any Indemnitee Party in the defense of Proceeding related to a Third Party Transaction, (iii) all Expenses incurred by any Indemnitee Party in connection with the protection, preservation, and enforcement by any

2

20271005.2

Case: 24-10714    Doc# 24-2    Filed: 12/20/24    Entered: 12/20/24 19:36:18    Page 43 of 135

LEFEVERT-EM001-00214458.0001_0002

Indemnitee Party of any rights, or remedies related to a Third Party Transaction, (iv) all Damages incurred by or assessed against any Indemnitee Party; and (iv) all Expenses incurred in the defense, protection, preservation, and enforcement by Indemnitee of any rights, liens, or remedies against Indemnitor or in the defense, protection, preservation, and enforcement of this Agreement and (v) any other liability incurred by Indemnitor to Indemnitee under this Agreement.

(g) **"Person"** means any individual, partnership, limited partnership, limited liability company, trust, estate, corporation, custodian, nominee or any other individual or entity acting on its own or in any representative capacity.

(h) **"Proceeding"** means any threatened, pending or completed claim, demand action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding against Indemnitee, whether brought directly or in the name or right of LeFever Mattson, and whether against Lefever, Lefever Mattson, or both, and whether of a civil, criminal, administrative or investigative nature, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is, may or will be involved as a party, a potential party, a non-party witness or otherwise by reason of (i) the fact that Indemnitee is or was a director or officer of LeFever Mattson, (ii) any action taken by Indemnitee or any action or inaction on Indemnitee's part, including while LeFever was or is acting as a director or officer of LeFever Mattson, or (iii) the fact that he or she is or was serving at the request of LeFever Mattson as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of LeFever Mattson or any Affiliate, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

**Section 2.01. Representations and Warranties.** Indemnitor represents and warrants:

(a) All of the Recitals set forth above are true, correct and complete in all respects.

(b) Indemnitor is an individual residing in the State of California, and has all necessary power, authority and capacity to enter into and perform the terms of this Agreement.

(c) Indemnitor and/or its Affiliates have received direct and indirect financial benefit in connection with the Third Party Transactions, and will receive direct and indirect financial benefit in exchange for Indemnitor's execution of this Agreement.

(d) The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the fulfillment of or compliance with the terms and conditions of this Agreement, is not prevented or limited by, and does not conflict with or result in a breach of, the terms, conditions, or provisions of any contractual or other restriction on Indemnitor or any of its Affiliates, or agreement or instrument of any nature to which Indemnitor and/or its Affiliates is/are now a party, and it does not constitute a default under any of the foregoing.

3

20271005.2

LEFEVERT-EM001-00214458.0001_0003

(e)     This Agreement constitutes the valid and legally binding obligation of Indemnitor enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, or similar laws affecting the enforcement of creditor's rights generally.

(f)     There is no action or proceeding pending or, to the best of Indemnitor's knowledge, threatened against, or materially affecting, Indemnitor or Indemnitor's assets before any court or administrative agency that might adversely affect Indemnitors' ability to perform the obligations under this Agreement.

## ARTICLE III
## INDEMNIFICATION AND GUARANTY

**Section 3.01. Indemnification and Payment Obligations.** Indemnitor, on behalf of itself and its Affiliates, agents, successors, assigns, attorneys, employees and all other representatives (collectively referred to as the "**Indemnitor Parties**"), hereby agrees to indemnify, defend and hold harmless LeFever, LeFever Mattson, and their Affiliates, agents, successors, assigns, attorneys, employees and all other representatives (but specifically excluding Indemnitor Parties) (collectively referred to as the "**Indemnitee Parties**") from and against:

(a)     **Third-Party Transactions**. Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with any Third Party Transaction.

(b)     **Proceedings**.  Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with any Proceeding in any way related to a Third Party Transaction.

(c)     **Settlement/Negotiations**.  Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with the negotiation, settlement  and/or other compromise of any claim or controversy in any way related to a Third Party Transaction.

**Section 3.02. Expenses.** Indemnitor shall advance the Expenses incurred by any Indemnitee Party in connection with any Proceeding, as well as in all other instances when an Indemnitee Party is entitled to indemnification hereunder.  Such advancement of expenses shall be made as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt by Indemnitor of a written statement or statements requesting such advances from time to time (which statement(s) shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause an Indemnitee Party to waive any privilege accorded by applicable law shall not be included with the invoice). Expense advances shall be unsecured and interest free and made without regard to the ability of any Indemnitee Party to repay such advances.  Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by Indemnitor. This Section 3.02 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding for which indemnity is not permitted under this Agreement.

4

20271005.2

**Section 3.03. Payment.** All payments by Indemnitor hereunder shall be paid in lawful money of the United States of America. Each payment obligation for Liabilities and/or Damages shall give rise to a separate cause of action, and separate lawsuits may, but need not, be brought hereunder as each cause of action arises. Amounts owed hereunder shall be funded by Indemnitor, promptly when the obligations are due, if applicable, or in any event not later than thirty (30) days after receipt of written demand from Indemnitee. If Indemnitor fails to pay or reimburse an Indemnitee Party as required hereunder within thirty (30) days following written demand therefor, Indemnitee may exercise any right or remedy set forth herein or available to it at law or in equity, and the Indemnitee shall additionally be entitled to interest on the unpaid amount accrued at a rate equal to the lesser of ten percent (10%) per annum and the highest rate permitted by applicable law.

**Section 3.04. Guaranty.** Indemnitor hereby unconditionally, irrevocably, and absolutely guarantees to Indemnitee Parties the full, prompt, and complete payment when due of each of the Liabilities to be indemnified against by Indemnitor pursuant to this Agreement.

**Section 3.05. Unconditional Nature of Guaranty.**

(a)     The obligations of Indemnitor under this Agreement are irrevocable, absolute, and unconditional and shall remain in full force and effect until the Liabilities and all obligations related to the Third Party Transactions have been fully and finally paid and performed. This Agreement is made without defense, offset, or counterclaim, each of which is hereby waived by Indemnitor. This Agreement the obligations hereunder shall not be affected, limited, modified, or impaired upon the happening from time to time of any event or circumstance which might otherwise constitute a defense available to, or a discharge of Indemnitor with respect to, its obligations under this Agreement.

(b)     Indemnitor agrees that no act or omission of any kind or at any time shall in any way impair the rights of Indemnitee to enforce any right, power, or benefit under this Agreement, and, no setoff, counterclaim, reduction, or diminution of any obligation which Indemnitor has or may have against Indemnitee, or any assignee or successor thereof shall be available hereunder.

**Section 3.06. Indemnitee's Rights to Proceed Against Indemnitor.** Indemnitee, in its sole discretion, shall have the right to proceed first and directly against Indemnitor under this Agreement, without proceeding against or exhausting any other remedies which it may have against any entity or Person which may have guaranteed or is otherwise responsible or liable for Liabilities or Damages.

**Section 3.07. Waivers.** Except as specifically set forth herein, Indemnitor expressly waives demand, presentment, protest, and notice of the acceptance of this Agreement or other action taken in reliance hereon and all other demands and notices of any description in connection with this Agreement, the Liabilities, Damages or otherwise.

5

20271005.2

LEFEVERT-EM001-00214458.0001_0005

## ARTICLE IV
## NOTICES AND DEFENSE OF CLAIMS

**Section 4.01. Notice of Indemnification**. Indemnitee shall notify the Indemnitor in writing of any matter with respect to which Indemnitee and/or an Indemnitee Party intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to Indemnitor shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding or matter for which indemnification is sought. The failure by Indemnitee to notify Indemnitor will not relieve the Indemnitor from any liability which it may have to Indemnitee and/or any Indemnitee Party hereunder or other than under this Agreement, and any delay in so notifying the Indemnitor shall not constitute a waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Indemnitor.

**Section 4.02. Assumption of Defense**. In the event the Indemnitor may be obligated to indemnify Indemnitee and/or any Indemnitee Party, Indemnitor shall be entitled assume the defense of such matter with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of Indemnitor's election to do so. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Indemnitor, the Indemnitor will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Indemnitor's assumption of the defense of any such Proceeding, the Indemnitor shall be obligated to pay the fees and expenses of Indemnitee's counsel in the event of any of the following: (i) to the extent the employment of counsel by Indemnitee is authorized by the Indemnitor, (ii) counsel for the Indemnitor or Indemnitee shall have reasonably concluded that there is a conflict of interest between Indemnitor and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the fees and expenses are non-duplicative and reasonably incurred in connection with Indemnitee's role in the Proceeding despite the Indemnitor's assumption of the defense, (iv) the Indemnitor is not financially or legally able to perform its indemnification obligations, or (v) the Indemnitor shall not have retained, or shall not continue to retain, such counsel to defend such Proceeding. The Indemnitor shall have the right to conduct such defense as it sees fit in its sole discretion. Regardless of any provision in this Agreement, Indemnitee shall have the right to employ counsel in any Proceeding at Indemnitee's personal expense.

**Section 4.03. Cooperation**. Indemnitee shall give the Indemnitor such information and cooperation in connection with the Proceeding as may be reasonably appropriate; provided that such cooperation is at no cost or Expense to Indemnitee or any Indemnitee Party.

**Section 4.04. Delivery of Notices.** Unless specifically stated otherwise in this Agreement, all notices, waivers, and demands required or permitted hereunder shall be in writing and delivered to the addresses set forth below, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered United States mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third (3rd) business day following deposit with the United States Postal Service; or (d) electronic transmission (email) provided that the

6

20271005.2

LEFEVERT-EM001-00214458.0001_0006

transmission is completed no later than 4:00 p.m. Pacific on a business day and the original also is sent via overnight courier or United States Mail, whereby delivery is deemed to have occurred at the end of the business day on which electronic transmission is completed.

| To Indemnitor: | Address: | 6359 Auburn Blvd., Suite B |
| | | Citrus Heights, CA 95621 |
| | Attention: | Ken Mattson |
| | Email: | mrskwm@hotmail.com |
| | | |
| To Indemnitee: | Address: | 6359 Auburn Blvd., Suite B |
| | | Citrus Heights, CA 95621 |
| | Attention: | Tim LeFever |
| | Email: | tlefever@lefma.com |

Any Party may change its address for purposes of this Section 4.04 by giving written notice as provided in this Section 4.04. All notices and demands delivered by a Party's attorney on a Party's behalf shall be deemed to have been delivered by said Party. Notices shall be valid only if served in the manner provided in this Section 4.04.

## ARTICLE V
## INDEMNIFICATION PROCESS

**Section 5.01. Entitlement To Indemnification**. Upon written request by Indemnitee for indemnification pursuant to Section 4.01(a), a determination with respect to Indemnitee Party's entitlement thereto shall be made in the specific case (A) by a majority vote of the Disinterested Directors, even though constituting less than a quorum of the Board, or (B) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee. If it is determined that an Indemnitee Party is entitled to indemnification, payment to Indemnitee shall be made within thirty (30) days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be considered Expenses, to the extent permitted by applicable law.

**Section 5.02. Independent Counsel**. In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 5.01, the Independent Counsel shall be selected as provided in this Section 5.02. Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to Indemnitor advising it of the identity of the Independent Counsel so selected. Within ten (10) days after such written notice of selection shall have been given, Indemnitor may deliver to the Indemnitee a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of **"Independent Counsel"** as defined in Article I of this Agreement, and the objection shall set forth with particularity the factual

7

20271005.2

basis of such assertion. Absent a proper and timely objection, the person so selected by Indemnitee shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within twenty (20) days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 4.01(a) hereof, and (ii) the final disposition of the Proceeding, the parties have not agreed upon an Independent Counsel, the Indemnitee may petition a court of competent jurisdiction for resolution of any objection and for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 5.01 hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 6.01 of this Agreement, the Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

Section 5.03. **Burden of Proof**. In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 4.01(a) of this Agreement, and the Indemnitor shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption in connection with the making by such person, persons or entity of any determination contrary to that presumption.

Section 5.04. **Expenses**. The Indemnitor agrees to pay the reasonable fees and expenses of any Independent Counsel and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

## ARTICLE VI
## REMEDIES

Section 6.01. **Commencement of Action**. In the event that (i) a determination is made pursuant to Section 5.01 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 3.02 or 5.04 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 5.01 of this Agreement within ninety (90) days after the later of the receipt by the Indemnitor of the request for indemnification or the final disposition of the Proceeding, (iv) payment of indemnification pursuant to this Agreement is not made within thirty (30) days after a determination has been made that an Indemnitee Party is entitled to indemnification, or (v) the Indemnitor or any other person or entity takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of Indemnitee's entitlement to such indemnification or advancement of Expenses. Alternatively, Indemnitee, at his, her or its option, may seek an award in arbitration with respect to Indemnitee's entitlement to such indemnification or advancement of Expenses, to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration

8

20271005.2

LEFEVERT-EM001-00214458.0001_0008

Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within one hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 6.01(a). The Indemnitor shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration in accordance with this Agreement.

**Section 6.02. Effect of Determination of Availability of Indemnification**. Neither (i) the failure of to have made a determination in accordance with Section 5.01 above that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination in accordance with Section 5.01 above that Indemnitee has not met the applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has or has not met the applicable standard of conduct. In the event that a determination shall have been made that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Article VI shall be conducted in all respects as a de novo trial, or arbitration, on the merits, and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Article VI, the Indemnitor shall, to the fullest extent not prohibited by law, have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be.

**Section 6.03. Defenses**. To the fullest extent not prohibited by law, the Indemnitor shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Article VI that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Indemnitor is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Article V of this Agreement that Indemnitee is entitled to indemnification, the Indemnitor shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Article VI, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

**Section 6.04.** Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of a Proceeding.

**ARTICLE VII**
**GENERAL PROVISIONS**

**Section 7.01. Term**. This Agreement shall continue until and terminate upon the later of (a) seven (7) years after the Effective Date; or (b) one (1) year after the final termination of any Proceeding, including any appeal, then pending in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any proceeding commenced by Indemnitee pursuant to this Agreement relating thereto.

**Section 7.02. Final Expression; Modifications.** Each Party hereto acknowledges that this writing is intended as a final expression and a complete and exclusive statement respecting

9

20271005.2

LEFEVERT-EM001-00214458.0001_0009

the subject matter hereof. This Agreement supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to this Agreement. No course of prior dealing between or among any Party or Parties, no usage of trade, and no parol or extrinsic evidence of any nature shall be used to supplement or modify any terms, and there are no conditions to the full effectiveness, of this Agreement.

**Section 7.03.  No Remedy Exclusive; Effect of Waiver.** No remedy conferred in this Agreement upon or reserved to any Party hereto is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any default, omission, or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. No waiver, amendment, release, or modification of this Agreement shall be established by conduct, custom, or course of dealing, but solely by an instrument in writing duly executed by the Parties hereto. A waiver on one occasion shall not be a bar to or waiver of any right on any other occasion.

**Section 7.04.  Expenses.** The non-prevailing party agrees to pay all out-of-pocket costs and expenses of the prevailing party (as determined by a final, non-appealable judgment), including reasonable attorneys' fees, incurred by the prevailing party in connection with any dispute or enforcement proceedings under this Agreement.

**Section 7.05.  Benefit and Assignment.** This Agreement is binding upon and inures to the benefit of each Party hereto, and their respective successors and assigns.  No Party may assign all or any part of this Agreement without the prior written consent of all other Parties hereto.

**Section 7.06.  Severability.** The invalidity or unenforceability of any one or more phrases, sentences, clauses, or sections contained in this Agreement shall not affect the validity or enforceability of the remaining portions of this Agreement, or any part thereof.

**Section 7.07.  Waiver; Amendment.** This Agreement and any term, covenant, or condition hereof may not be changed, waived, discharged, modified, or terminated except by a writing executed by the Parties hereto. No waiver by any Party of any default hereunder shall operate as a waiver of any term or covenant of any other agreement or of any other default or of the same default on any prior or subsequent occasion, unless otherwise consented to by the Party entitled to enforce the default.

**Section 7.08.  Interpretation.** Whenever used herein, the singular shall include the plural, the plural the singular, and the use of any gender shall include all genders

**Section 7.09.  Further Assurances.** Each Party shall each execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and do all such other acts and things, as may be required by law or as may be necessary or advisable to carry out the intent and purpose of this Agreement. Without limiting the generality of the foregoing, each Party shall execute such documents and file such instruments or notices as may be necessary or desirable.

10

202771005.2

LEFEVERT-EM001-00214458.0001_0010

**Section 7.10.  JURY TRIAL WAIVER.** INDEMNITOR AND INDEMNITEE EACH WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION, OR PROCEEDING OR ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT OF ANY PARTY'S RIGHTS AND REMEDIES AND ACKNOWLEDGE THAT SUCH PARTY MAKES THE WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THE WAIVER WITH SUCH PARTY'S ATTORNEYS.

**Section 7.11.  GOVERNING LAW; SUBMISSION TO JURISDICTION.** THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. ANY LEGAL SUIT, ACTION, OR PROCEEDING RELATING TO THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF CALIFORNIA, EACH PARTY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

**Section 7.12.  No Third-Party Beneficiaries.** The provisions of this Agreement are not intended for the benefit of and shall not confer any rights to any creditor (including Lender) or other person to whom any debts, liabilities, or obligations are owed by any of the Parties hereto.

**Section 7.13.  Non-Exclusivity.**  Except as expressly set forth herein, the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

**Section 7.14.  Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same agreement. Counterparts may be executed and delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

**Section 7.15.  Captions.** The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

[SIGNATURE PAGE FOLLOWS]

11

20271005.2

LEFEVERT-EM001-00214458.0001_0011

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date set forth above.

**INDEMNITOR**

By:
Name: Kenneth W. Mattson

**INDEMNITEE**

LeFever

By:
Name: Timothy LeFever

LeFever Mattson, a California corporation

By:
Name: Kenneth W. Mattson
Title: Chief Executive Officer

20271005.2

LEFEVERT-EM001-00214458.0001_0012

# EXHIBIT 3

1  HANSON BRIDGETT LLP
   JOHN T. CU, SBN 207402
2  jcu@hansonbridgett.com
   LAWRENCE M. CIRELLI, SBN 114710
3  lcirelli@hansonbridgett.com
   ANTHONY J. DUTRA, SBN 277706
4  adutra@hansonbridgett.com
   425 Market Street, 26th Floor
5  San Francisco, California 94105
   Telephone:    (415) 777-3200
6  Facsimile:    (415) 541-9366

7  Attorneys for Plaintiffs
   Timothy LeFever, LeFever Mattson, Divi Divi
8  Tree, L.P., and Windscape Apartments, LLC

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
6/6/2024 4:36 PM
By: Kristin Breeden, Deputy Clerk

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        COUNTY OF SONOMA

11

12  TIMOTHY LEFEVER, LEFEVER          Case No.  24CV03485
    MATTSON, DIVI DIVI TREE, L.P., AND
13  WINDSCAPE APARTMENTS, LLC,
                                      COMPLAINT FOR:
14          Plaintiffs,
                                      (1)  BREACH OF CONTRACT;
15      v.
                                      (2)  BREACH OF FIDUCIARY DUTY;
16  KENNETH W. MATTSON AND KS         (3)  BREACH OF DUTY OF GOOD
    MATTSON PARTNERS L.P.,                 FAITH AND FAIR DEALING;
17
            Defendants.               (4)  CONVERSION;
18
                                      (5)  CONSTRUCTIVE FRAUD;
19
                                      (6)  FRAUDULENT CONCEALMENT;
20
                                      (7)  RECEIVING STOLEN PROPERTY
21                                         IN VIOLATION OF CAL. PEN.
                                           CODE § 496;
22
                                      (8)  DECLARATORY RELIEF; AND
23
                                      (9)  REMOVAL OF DIRECTOR
24                                         PURSUANT TO CALIFORNIA
                                           CORPORATIONS CODE § 304
25

26

27

28

1        Plaintiffs Timothy LeFever ("LeFever"), LeFever Mattson ("LM"), Divi Divi Tree, L.P.

2 ("Divi"), and Windscape Apartments, LLC ("Windscape," and together with LeFever, LM, and

3 Divi, the "Plaintiffs") hereby allege as follows:

4                           **SUMMARY OF THE DISPUTE**

5      1.       LeFever and Defendant Kenneth W. Mattson ("Mattson") have been close personal

6 friends for over five decades. They met in elementary school when they were eight years old; they

7 attended the same middle school, high school, and university; and each was the best man in the

8 other's wedding. LeFever considered Mattson his best friend.

9      2.       In 1990, LeFever and Mattson became not merely good friends, but also business

10 partners, when LeFever acquired a 50% interest in what is now LM. At all times since then,

11 LeFever and Mattson have each owned 50% of LM's shares.

12      3.       By all accounts, Mattson is a very wealthy man. He owns multiple homes. One

13 home located in Piedmont takes up the front of a block. Another home located in Sonoma was

14 featured in the Wall Street Journal before Mattson bought it, fully furnished. He has vacation

15 homes located in Del Mar that touch the sand. He drives luxury cars. He has owned Bentleys and

16 at least one Rolls Royce. He even owns an exotic car company, although it was recently shut

17 down by the DMV. In 2021, Mattson claimed a net worth in excess of $250 million.

18      4.       Mattson is also a thief. He stole money directly from LM, the company that bears

19 his name. He stole money from the retirement accounts of senior citizens when he promised but

20 did not actually give them an ownership interest in numerous LM-managed real estate

21 partnerships. And he stole the identity and reputation of LM when he used the company's name

22 without its knowledge or consent in conjunction with his fraud.

23      5.       Mattson is also a liar. He lied to the purported investors he swindled, and when the

24 fraudulent scheme he perpetrated for more than a decade was disclosed, he lied to the public,

25 falsely claiming, among other things that "Any transfer of an interest in Divi Divi over the years

26 by LeFever-Mattson to [the purported Divi investors] was documented and approved by me. All

27 proceeds from such sales were deposited with and used by LeFever-Mattson, not me." Intended as

28 a boast, Mattson's statement was also an admission. Prior to 2015, Mattson would have needed

1 the written authorization of not only an LM affiliate, LeFever Mattson I, LLC, but also an
2 unaffiliated nonprofit that served as Divi's Managing General Partner, and Mattson did not have
3 the consent of that nonprofit. Mattson lacked the authority to provide consent on behalf of LM or
4 any of its affiliates. Mattson was also self-dealing in violation of his fiduciary duties. And his
5 documentation was nothing more than a second set of books that he used to convince IRA
6 custodians that his activities were legitimate.

7       6.     Mattson also lied to the putative Divi investors he conned and to the public by
8 falsely stating that Divi had been making distributions to those putative investors and that
9 Plaintiffs were responsible for stopping those distributions. To the contrary, Divi had never made
10 any distributions to these putative investors because they were never limited partners of record.
11 Plaintiffs are informed and believe and, on that basis, allege that Mattson was secretly making
12 payments to or for the benefit of these putative investors from an account he alone controlled.
13 Plaintiffs are further informed and believe and, on that basis, allege that the payments Mattson
14 made to these putative investors was from funds that Mattson received from other putative
15 investors he swindled and that these payments bore no relation to the amount or timing of
16 distributions Divi had made to its limited partners of record.

17       7.     Mattson studied economics and was, for 25 years, a stockbroker. But he also found
18 time to have multiple side businesses, including K. W. M. Enterprises, Inc. ("KWM"), a real
19 estate investment company that would change its name to LeFever Mattson when LeFever,
20 Mattson's childhood friend, became half owner of the business in 1990. As LM and its real estate
21 portfolio grew, LeFever, an attorney and real estate broker, built and operated the related property
22 management company, LeFever Mattson Property Management ("LMPM"), and the real estate
23 brokerage company, California Investment Properties. Mattson continued to run LM as CEO and
24 CFO and offered real estate investments to a growing group of investors drawn largely from his
25 stock brokerage client list.

26       8.     Mattson also has a family partnership, KS Mattson Partners L.P. ("KSMP," and
27 with Mattson, "Defendants"), through which Mattson also buys and sells real estate. Mattson
28 sometimes abused his authority to sell KSMP's properties to limited partnerships and limited

liability companies that LM managed (each such partnership or limited liability company, an "LM Investment"), with Mattson signing for both the LM Investment as buyer and KSMP as seller, and many times with a significant profit to KSMP.

9.    In the past, Mattson was regarded by many as a financial genius.  This reputation was at least partially based on Mattson's real estate and investment portfolio.  But it was also based on his uncanny ability to predict the economic future.  Despite that reputation, Mattson's fondness for other people's money apparently caused him to do economically risky things, like finance much of his real estate portfolio with seller carry back loans that have huge annual balloon payments and with "hard money," high interest loans.  Unfortunately, many of those risky loans have become the responsibility of others when Mattson abused his power by making the unauthorized property sales from KSMP to various LM Investments.  Often the loans and the terms were not fully disclosed upon transfer, and many of those loans are now in default as Mattson has missed payments.

10.    Because Mattson has a degree in economics and had been working at a financial services firm when LeFever and Mattson began running LM together, LeFever trusted Mattson to oversee LM's finances and investor relations.

11.    But Mattson abused LeFever's trust and Mattson's control over LM.

12.    Mattson created and operated what amounted to a secret division of LM for his own exclusive benefit by, among other things, committing numerous acts of self-dealing, secretly funneling at least $75 million to himself and KSMP, his wholly owned company, to the detriment of LeFever, LM, Divi, Windscape, and other LM Investments.

13.    Mattson purported to cause LM and/or other LM affiliates to enter into numerous poorly crafted agreements without LeFever's knowledge or consent and without LM's knowledge or consent.

14.    Mattson secretly caused LM, Divi, and/or other LM Investments to purchase real estate from KSMP at inflated prices so that Mattson could obtain secret profits from LM, Divi, and/or other LM Investments.

15.     Through his fraudulent scheme, Mattson duped more than one hundred putative investors into giving him tens of millions of dollars – most of which came from their Individual Retirement Accounts or from other funds they had saved for retirement – for what they believed were interests in various LM Investments.  But those putative investors received nothing in exchange: Mattson did not own the limited partnership interests or membership interests he purportedly sold them, did not have authority to sell those limited partnership interests or membership interests, and/or those limited partnership interests or membership interests may not have even existed.  Mattson took tens of millions of dollars from hundreds of people in exchange for nothing.

16.     Despite having legal and contractual obligations to disclose in advance all of these transactions to Plaintiffs, Mattson did not disclose any.  Instead, he actively concealed them from Plaintiffs to hide his misconduct and prevent Plaintiffs from stopping Mattson's fraudulent scheme and self-dealing. Mattson's concealment in many instances lasted longer than a dozen years.

17.     When Plaintiffs recently started to uncover Defendants' misconduct, Plaintiffs immediately confronted Mattson and began investigating and then reported Mattson's fraudulent conduct to the authorities. Mattson gradually admitted to much of Defendants' misconduct but provided an ever-changing story in an attempt to justify his actions. Mattson nonetheless entered into an agreement (the "Indemnity Agreement") under which he admitted to his wrongdoing and agreed that Defendants would indemnify and hold Plaintiffs harmless from the damage Defendants have already caused them and from the harm and expenses Plaintiffs will suffer in the future because of Defendants' wrongdoing.

18.     Plaintiffs entered into the Indemnity Agreement, among other reasons, to help minimize the harm Defendants caused to the dozens – if not hundreds – of investors that Defendants swindled out of their retirement savings through Defendants' misconduct and to hold Defendants accountable for the harm they caused.

19.     Plaintiffs have demanded that Defendants indemnify Plaintiffs as promised and that Defendants compensate Plaintiffs in full for the harm Defendants caused, but Defendants have refused to do so.

20.     Plaintiffs have therefore been forced to bring this action to stop Defendants from committing further acts of fraud, self-dealing, breaches of fiduciary duty, and breaches of contract; to hold Defendants accountable for the harm they have caused Plaintiffs and their investors; and to ensure that Defendants abide by their obligations to indemnify and hold Plaintiffs harmless from any further harm they might suffer on account of Defendants' misconduct.  It is only through this action that Plaintiffs can address and remedy the harm Mattson's conduct has caused by deceiving putative investors into paying him for what they believed were partnership interests in Divi and the other LM Investments.

21.     Plaintiffs' investigation into Defendants' wrongdoing is still ongoing. Plaintiffs anticipate that their investigation will uncover additional wrongful acts by Defendants that have harmed Plaintiffs and their investors and putative investors.

**THE PARTIES**

22.     LeFever is and, at all relevant times mentioned herein, was an individual domiciled and residing in Solano County, California.

23.     LM is and, at all relevant times mentioned herein, was a corporation incorporated under the laws of the State of California. LM's headquarters and principal place of business is and, at all relevant times mentioned herein, was in Sacramento County, California.

24.     Divi is and, at all relevant times mentioned herein, was a limited partnership organized under the laws of the State of California. Divi's headquarters and principal place of business is and, at all relevant times mentioned herein, was in Sacramento County, California.

25.     Windscape is and, at all relevant times mentioned herein, was a limited liability company organized under the laws of the State of California. Windscape's headquarters and principal place of business is and, at all relevant times mentioned herein, was in Sacramento County, California.

26.     Plaintiffs are informed and believe and, on that basis, allege that Mattson is an individual domiciled and residing in Sonoma County, California.

27.     Plaintiffs are informed and believe and, on that basis, allege that KSMP is and, at all relevant times mentioned herein, was a limited partnership organized under the laws of the

COMPLAINT

State of California.  Plaintiffs are informed and believe and, on that basis, allege that KSMP's

headquarters and principal place of business is in Sonoma County, California.

### JURISDICTION AND VENUE

28.     The Superior Court for the County of Sonoma has subject matter jurisdiction over

this dispute pursuant to Article VI, Section 10 of the California Constitution and California Civil

Procedure Code Section 410.10 because the subject matter of this dispute falls within the general

jurisdiction of the Superior Courts of the State of California.

29.     The Superior Court for the County of Sonoma has personal jurisdiction over

Mattson and KSMP pursuant to Article VI, Section 10 of the California Constitution, Amendment

XIV of the United States Constitution, and California Civil Procedure Code Section 410.10

because Mattson and KSMP are each domiciled in the State of California and because Plaintiffs'

claims against Mattson and KSMP relate to and/or arise out of Mattson's and KSMP's respective

significant contacts with the State of California.

30.     The Superior Court for the County of Sonoma is the proper venue for this dispute

pursuant to California Civil Procedure Code Sections 395 and 395.5 because (a) Mattson resides

in the County of Sonoma; (b) KSMP's liability under the Agreement of  Limited Partnership of

Divi Divi Tree, L.P. (the "Original Divi LP Agreement") and the Amended and Restated

Agreement of Limited Partnership of Divi Divi Tree, L.P. (the "Amended Divi LP Agreement,"

and together with the Original Divi LP Agreement, the "Divi LP Agreements") arose in whole or

in part in the County of Sonoma; (c) one or more of KSMP's breaches of the Divi LP Agreement

occurred in the County of Sonoma; and (d) Mattson entered into the Indemnity Agreement with

LM and LeFever that is a subject of this action in the County of Sonoma and/or agreed to perform

under the Indemnity Agreement in the County of Sonoma.

### GENERAL ALLEGATIONS

#### A.     LeFever and Mattson Become Close Personal Friends.

31.     LeFever and Mattson both grew up in or around Rancho Cordova, California.  They

first met in elementary school when they were 8 years old, and although they attended different

elementary schools, they attended middle school and high school together.  After graduating from

1 | Cordova High School, LeFever and Mattson each attended U.C. Berkeley. LeFever graduated
2 | with a degree in political science. Mattson graduated with a degree in economics.

3 |     32.     After graduating from Berkeley, LeFever obtained a juris doctorate from what is
4 | now U.C. Law San Francisco.

5 |     33.     Mattson, meanwhile, became a securities broker. Plaintiffs are informed and
6 | believe and, on that basis, allege that Mattson began working as a securities broker at what is now
7 | Principal Securities, Inc. in late 1983, that he worked as a securities broker for Dean Witter
8 | Reynolds Inc. between October of 1984 and March of 1990, and that he then joined Prudential
9 | Securities Incorporated. Mattson continued working as a securities broker at Prudential, and then
10 | at Sutro & Company, Inc. and what is now RBC Capital Markets Corp. where Mattson remained
11 | until at least 2009.

12 |     34.     LeFever considered Mattson his best friend from early in his youth and afterward.
13 | Mattson introduced LeFever to the woman LeFever would eventually marry, and Mattson and
14 | LeFever were each the best man at the other's wedding.

15 |     **B.**     **LeFever and Mattson Form LM.**

16 |     35.     Plaintiffs are informed and believe and, on that basis, allege that Mattson formed
17 | KWM as Mattson's wholly owned corporation in or around August 1989.

18 |     36.     At or around that time, LeFever began discussing the idea of forming a real estate
19 | company with Mattson.

20 |     37.     This idea came into fruition in 1990 when LeFever acquired a 50% interest in
21 | KWM from Mattson. LeFever and Mattson then changed the name of the company to LM. At all
22 | times since then, LeFever and Mattson have each owned 50% of LM's shares.

23 |     38.     Mattson was still working as a securities broker at the time, and he told LeFever
24 | that his employer did not want him doing hands-on real estate work. Consequently, LeFever
25 | obtained a real estate brokers license for LM.

26 |     39.     Mattson had nearly seven years of experience as a securities broker when LeFever
27 | and Mattson began running LM together. As a result, Mattson had established financial and
28 | investor relationships at the time, but LeFever had not. Because of his economics and finance

COMPLAINT

background, his many years' experience as a securities broker, and his established financial and investor relationships, Mattson naturally took primary responsibility for managing LM's finances and investor relations. Because of their close personal friendship, LeFever completely and implicitly trusted Mattson handling virtually all financial and investor related matters for LM.

40. LeFever, who was a licensed attorney by the time he and Mattson formed LM, focused on real estate acquisitions, property management, and lender relations for LM.

41. In 1991, LeFever and Mattson formed another company, LMPM, to provide property management services. LM currently owns a majority interest in LMPM, with a third individual, Mark Bennett owning the remaining shares.

42. Separately, Mattson owns several other companies including KSMP, which is also a real estate investment company. Plaintiffs are informed and believe and, on that basis, allege that KSMP is directly or indirectly wholly owned by Mattson and is controlled solely by Mattson.

## C. LeFever and Mattson Grow LM's Real Estate Portfolio.

43. LM has grown substantially as a real estate investment company since 1990. Today, LM manages a portfolio of real estate valued at over $400 million.

44. Beginning in the late 1990s, LM began to offer certain real estate opportunities to outside investors by acquiring the real estate in a co-tenancy with the investors.

45. Eventually, LM's business model shifted so that it typically did not acquire real estate in its own name. Instead, LM's business model is to create the LM Investments – limited partnerships and limited liability companies that each purchase one or more commercial properties. Divi and Windscape are two of these LM Investments.

46. This structure allowed LM to pool more capital by selling limited partnership or LLC membership interests in the LM Investments to a small number of accredited investors while typically reserving an ownership interest in the LM Investments for itself as general partner or managing member, sometimes as limited partners or members as well. Most of these outside investors were Mattson's former clients or other contacts Mattson developed while he was working as a securities broker.

COMPLAINT

47. Because of this structure, each of the LM Investments has either a limited partnership agreement or an operating agreement (each such partnership or operating agreement, an "LM Investment Agreement") that provides LM and the investors a clear understanding about such things as how the LM Investment will be managed, under what circumstances investors might receive a distribution, and under what conditions the investors can sell or transfer their interest in the LM Investment.

48. LM manages each of the LM Investments by serving as its managing or general partner (if the LM Investment is a limited partnership) or as its manager (otherwise). LeFever's and Mattson's other company, LMPM, typically serves as property manager for the commercial properties that the LM Investments own and provides various back-office functions for LM and the LM Investments.

49. If the LM Investment generates operating profits (*e.g.*, from rent collected from the tenants of one of the LM Investment's properties) the LM Investment typically distributes a portion of that income to its respective investors. Historically, when an LM Investment sold a property, the LM Investment would usually use the sale proceeds to purchase another property through an exchange under Section 1031 of the Internal Revenue Code, rather than distributing the sale proceeds to investors.

**D.      LM Forms Divi to Purchase the Sienna Pointe Apartments in Moreno Valley.**

50. In or around late 2002, LM identified the Sienna Pointe apartment complex in Moreno Valley, California as a potentially lucrative real estate investment property.

51. The purchase of Sienna Pointe included the assumption of a loan that required the involvement of a nonprofit entity.

52. To facilitate the purchase of Sienna Pointe, LM formed Divi as a limited partnership between a Sacramento-based religious nonprofit corporation (the "Nonprofit") and LeFever Mattson I, LLC, one of LM's subsidiaries. The Nonprofit was named Divi's Managing General Partner.

53. Divi acquired the Sienna Pointe property in or around 2003.

1    54.    In or around September 2015, Divi refinanced the loan it assumed, on acquisition
2  of the Sienna Pointe property in 2003, and the Nonprofit and LeFever Mattson I, LLC, both
3  withdrew and resigned as Divi's Managing General Partner and Co-General Partner respectively.
4  Concurrently therewith, Divi's remaining partners executed the Amended Divi LP Agreement,
5  naming LM as Divi's general partner.

6    55.    Divi eventually sold the Sienna Pointe property in 2021 and reinvested the sale
7  proceeds into approximately 20 other properties through 1031 exchanges.

8    **E.    Mattson Orchestrates a Fraudulent Scheme to Unjustly Enrich Himself.**

9    56.    The Original Divi LP Agreement required the investors to obtain written consent of
10  both the Nonprofit and LeFever Mattson I, LLC before selling or otherwise transferring their
11  interests in Divi.  The Amended Divi LP Agreement and the other LM Investment Agreements
12  require the investors to obtain LM's written approval before selling or otherwise transferring their
13  interest in the LM Investment.

14    57.    Over time, some investors wanted to sell their interest in one or more of the LM
15  Investments.  Mattson oftentimes would buy those investors out by having KSMP acquire the
16  investors' LM Investment interests. Eventually, LeFever also bought out some investors and
17  acquired a portion of LM's Divi limited partnership interest so that he too acquired an individual
18  interest in some of the LM Investments.  Plaintiffs are informed and believe and, on that basis,
19  allege that all of these purchases by KSMP and LeFever were properly reported to and approved
20  by LM or its predecessors in accordance with the Divi LP Agreements.

21    58.    A number of such transactions have been properly effected with respect to Divi
22  since 2015.  Up until this time, Divi had a total of 19 limited partners, but LeFever, Mattson, and
23  KSMP were not Divi limited partners.  Over time since 2015, KSMP bought out most of these
24  Divi limited partners and LeFever bought a portion of LM's limited partnership interest, so that
25  Divi's current investors of record are: LM (16.473%); LeFever and his wife, Amy LeFever
26  (19.458%); Treakle Revocable Trust (14.442%); and KSMP (49.626%).  The Treakle Revocable
27  Trust and LM are the only remaining original investors in Divi.

28

59.     In addition to these known and approved acquisitions, Mattson was also secretly selling purported interests in LM Investments without LeFever's knowledge or LM's consent. Neither LeFever nor LM was informed of these sales at any time before or after their occurrence.

60.     LeFever and LM have now learned that, for more than a decade, Mattson surreptitiously sold purported Divi partnership interests to numerous putative investors and intentionally concealed these transactions from LeFever and LM. Some of these purported sales of Divi partnership interests occurred under the Original Divi LP Agreement. Mattson intentionally concealed these transactions from the Nonprofit as well.

61.     According to Mattson, some of the Divi partnership interests he purportedly sold were KSMP's. But Mattson has also acknowledged that some of his sales took place before KSMP owned any interest in Divi, and that he was therefore purporting to sell Divi partnership interest belonging to LM. However, Mattson did not have the authority to sell any of LM's Divi partnership interests based on his approval or action alone. Moreover, despite allegedly selling some of LM's interest in Divi, Mattson kept all of the money for himself and did not provide LeFever or LM any portion of the proceeds from these secret transactions.

62.     Plaintiffs are informed and believe and, on that basis, allege that Defendants purported to sell Divi interests to at least 177 different putative investors (the "Putative Divi Sales"), and received $55 million or more in connection with the Putative Divi Sales, which far exceeds the entire valuation for Divi, much less KSMP's 49.626% interest in Divi.

63.     Based on the prior transactions in which Mattson caused KSMP to acquire nearly half of the Divi partnership interests and in which Mattson provided approval of LeFever's acquisition of Divi limited partnership interests, Mattson not only knew how to, but also knew that he was required to: (a) use a purchase agreement to document the sale of Divi limited partnership interests and what exactly was being sold; (b) notify and obtain LM's advance written approval of the transaction by presenting the proposed transaction to LeFever, LM's only disinterested shareholder and director; and (c) record the transactions in Divi's books and records so that, among other things, Divi can properly accord to the new partner and all others (e.g., make

1 distributions to the correct investors and in the correct amounts, issue accurate K-1 statements to
2 the limited partners, etc.).

3      64.     Plaintiffs are informed and believe and, on that basis, allege that Defendants did not
4 execute purchase agreements or even specify the percentage interest sold for the overwhelming
5 majority of the Putative Divi Sales and that Defendants intentionally did this so that LeFever and
6 LM would not know about the Putative Divi Sales. Plaintiffs are also informed and believe and,
7 on that basis, allege that Mattson likely did not even intend to sell the putative investors Divi
8 limited partnership interests and instead merely intended to dupe them into falsely believing they
9 had purchased Divi limited partnership interests while providing them nothing in return for the
10 money they gave him.

11      65.     Plaintiffs are also informed and believe that Mattson falsified certain
12 documentation to further his fraudulent scheme. For example, Plaintiffs are informed and believe
13 and, on that basis, allege that Mattson documented certain Putative Divi Sales by having the
14 purported investor execute a signature page from the Original Divi LP Agreement even if the
15 transaction occurred after Divi adopted the Amended Divi LP Agreement and that Mattson
16 intentionally doctored the signature page so that it indicated LM was the Managing General
17 Partner even though only the Nonprofit ever held that title. Mattson has also admitted to creating
18 fake K-1 forms for certain purported investors, and Plaintiffs are informed and believe and, on that
19 basis, allege that Mattson provided fake K-1 forms to Divi investors to maintain the false
20 impression that they were actually Divi limited partners. Plaintiffs are informed and believe and,
21 on that basis, allege that Mattson fabricated these fraudulent K-1 forms, among other reasons, so
22 that the putative Divi investors would not realize Defendants had duped them and to minimize the
23 risk that Plaintiffs would learn of Defendants' fraudulent scheme from a putative investor asking
24 Plaintiffs to provide a K-1 form that the putative investor otherwise would have expected to
25 receive.

26      66.     To conceal their wrongdoing, Defendants also intentionally failed to present any of
27 the Putative Divi Sales to LeFever, LM's only disinterested shareholder and director, failed to
28 obtain LM's written approval of the Putative Divi Sales, failed to obtain the Nonprofit's written

1   approval of the Putative Divi Sales under the Original Divi LP Agreement, and intentionally

2   omitted any record of the Putative Divi Sales from Divi's books and records and from LM's books

3   and records. As a result, neither LeFever nor LM knew anything about the Putative Divi Sales

4   until Mattson's fraudulent schemes finally began to come to light in March of this year.

5       67.    Mattson took additional steps to hide the Putative Divi Sales from LeFever and

6   LM. For example, Mattson opened a bank account for LM (the "Covert Account") with Bank of

7   the West (which was subsequently acquired by Bank of Montreal) that Mattson ensured he alone

8   could access, allowing Mattson to execute and manage the Putative Divi Sales and other self-

9   dealing transactions without leaving a paper trail of bank records that LeFever or LM could find.

10      68.    Plaintiffs are informed and believe and, on that basis, allege that Mattson had the

11  putative Divi investors transfer their purchase money for the Putative Divi Sales to the Covert

12  Account, falsely representing to them that it was a Divi bank account, and that Mattson also used

13  the Covert Account for other unauthorized transactions. Plaintiffs are informed and believe and,

14  on that basis, allege that all money deposited in the Covert Account – including the $55 million or

15  more that Defendants received in the Putative Divi Sales and an additional $20 million in

16  estimated funds Defendants received from the purported sale of interests in the other LM

17  Investments – was ultimately transferred to and spent by Mattson for his own personal benefit.

18      69.    Plaintiffs are also informed and believe and, on that basis, allege that when

19  conducting the Putative Divi Sales, Mattson did not use LM's address, but instead used a post

20  office box he had obtained for his own use and for KSMP's use and represented to the putative

21  Divi investors, that it was LM's post office box. Plaintiffs are informed and believe and, on that

22  basis, allege that Mattson alone had access to this post office box, and that he intentionally used

23  this post office box address for the Putative Divi Sales to actively conceal the Putative Divi Sales

24  form Plaintiffs by ensuring that any correspondence regarding the Putative Divi Sales would be

25  diverted away from LM and instead be routed directly to him.

26      70.    Because Defendants had concealed the existence of the Putative Divi Sales from

27  Plaintiffs, Divi never made any distributions to the putative Divi investors. Plaintiffs are informed

28  and believe and, on that basis, allege that to further hide the Putative Divi Sales from Plaintiffs and

COMPLAINT

1  to maintain the false impression he had given the putative Divi investors, Mattson would cause
2  KSMP to pay distributions to or for the benefit of certain of the putative Divi investors so that they
3  would falsely believe that Divi was instead making partnership distributions to them.  Plaintiffs
4  are informed and believe and, on that basis allege, however, that the distributions paid by KSMP
5  to or for the benefit of the putative Divi investors bore no relation (both in terms of timing and
6  amount) to the distributions paid by Divi to KSMP and that Mattson instead caused KSMP to pay
7  whatever was necessary to maintain the front that the putative Divi investors were investors in
8  Divi.

9      71.    After Mattson's wrongdoing came to light, Divi stopped making distributions to
10  Mattson and all other investors of record.  Plaintiffs are informed and believe and, on that basis,
11  allege that Mattson thereafter stopped making payments to many of the putative Divi investors and
12  then, to maintain his deception, falsely blamed Plaintiffs for terminating the payments to the
13  putative Divi investors and continued to mislead the public about Defendants' fraudulent conduct.
14  Plaintiffs are informed and believe and, on that basis allege, that Mattson has in some instances
15  continued to cause KSMP or other entities controlled by Mattson to make distributions to putative
16  Divi investors as though they are from Divi, telling the putative Divi investors not to be alarmed
17  and that their "investments" in Divi are safe.

18      72.    Mattson's self-dealing was not limited to these secret Putative Divi Sales.  Mattson
19  has also surreptitiously caused LM to pay millions of dollars for properties that Mattson titled in
20  his own name or in KSMP's name.  For example, Mattson secretly used more than $6 million of
21  LM's money to purchase a lavish home for himself in Sonoma, which he now uses as his primary
22  residence.  Mattson hid from LeFever the fact that Mattson had used LM's money to purchase
23  these properties by, among other things, using the Covert Account to wire LM's funds into the
24  escrow account for real estate purchases that exclusively benefitted Mattson.

25      73.    Mattson also used KSMP to facilitate numerous other self-dealing transactions by
26  diverting corporate opportunities away from LM and LM Investments to KSMP, Mattson's wholly
27  owned company.  For example, Plaintiffs are informed and believe and, on that basis, allege that in
28  September 2022, Mattson caused KSMP to purchase real estate in Sonoma for $6.5 million.  Five

1  weeks later, Mattson caused KSMP to sell that same property without any change to Windscape
2  for $7.5 million, netting Defendants $1,000,000 in the process and causing Windscape to pay
3  $1,000,000 more for the property than it should have.

4      74.    Mattson has also caused LM Investments to purchase underperforming, heavily
5  encumbered commercial properties from KSMP without LeFever's knowledge or approval so that
6  the LM Investments would be stuck with these indebted and underperforming assets rather than
7  KSMP, his wholly owned company.

8      75.    Plaintiffs are informed and believe and, on that basis, allege that KSMP finances
9  both its real estate purchases and Mattson's distributions to his putative investors using high
10  interest, hard money loans and loans requiring large balloon payments.  Upon obtaining such debt
11  proceeds, Mattson has thereafter caused LM Investments to purchase many of those properties
12  from KSMP without LeFever's knowledge or approval.  These acquisitions by the LM
13  Investments were completed subject to the aforementioned loans without LeFever's knowledge or
14  approval with the result that these LM Investments were saddled with unknown debt obligating
15  LM to make balloon payments soon after acquisition.  In many instances, these are the non-
16  performing or under-developed properties that LM finds itself left with, described immediately
17  above.

18      76.    At least three of the properties that KSMP recently sold to the LM Investments are
19  currently in default and at least two more have significant balloon payments due, meaning that the
20  LM Investments and their investors are at risk of suffering significant financial losses.  KSMP,
21  meanwhile, took the money and ran.

22      **F.    Mattson Enters Into the Indemnity Agreement and Admits Wrongdoing.**

23      77.     After LeFever and LM confronted Mattson regarding his unauthorized Divi
24  transactions and other misconduct, Mattson entered into the Indemnity Agreement with LeFever
25  and LM.

26      78.    Mattson made several key admissions in the Indemnity Agreement including
27  acknowledging that:

28

COMPLAINT

- "none of the [Putative Divi Sales] were presented to the Board or shareholders of Lefever Mattson prior to the date that the [Putative Divi Sales] were entered into";

- "none of the [Putative Divi Sales] were authorized or approved by the Board or shareholders of LeFever Mattson at any time prior to or after the date that the [Putative Divi Sales] were entered into";

- "neither LeFever nor LeFever Mattson is in any way a party to or obligated in connection with any of the [Putative Divi Sales]"; and

- "neither LeFever nor LeFever Mattson received any benefit, directly or indirectly, economic or otherwise, in connection with or as a result of the [Putative Divi Sales]."

79.    Mattson agreed in the Indemnity Agreement that he and KSMP would indemnify and hold harmless LeFever, LM, and the LM Investments from any expenses they might incur, including attorney's fees, or claims they might face in connection with Mattson's or KSMP's misconduct.

80.    Mattson also agreed in the Indemnity Agreement to assist LM and LeFever by providing them information they might request about Mattson's actions. Thus far, however, Mattson has refused to provide LM and LeFever the information they have requested and LM and LeFever believe there may be hundreds of unauthorized sales by Mattson in other LM Investments that have yet to be accounted for. Mattson also has not reimbursed LM and LeFever fully for the expenses they have already incurred and will shortly further incur in connection with investigating and addressing the impact of Mattson's actions.

**FIRST CAUSE OF ACTION**

**(Breach of Contract – LeFever, LM, and Divi against All Defendants)**

81.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 80.

82.    KSMP and LeFever are each limited partners in Divi.

83.    LM is Divi's general partner.

84.    Mattson, KSMP, LeFever, LM, and Divi have each entered into and agreed to be bound by the terms of the Divi LP Agreements.

85. The Original Divi LP Agreement prohibits limited partners from transferring Divi limited partnership interests without both the Nonprofit's written approval and LM's written approval. The Amended Divi LP Agreement prohibits limited partners from transferring Divi limited partnership interests without LM's written approval.

86. In order to obtain LM's approval, there must be a consent vote from a majority of LM's board of directors; in the case of LM, in all relevant times, only LeFever and Mattson served as board of directors of LM and thus both LeFever and Mattson had to approve any transfer of limited partnership interests.

87. The Nonprofit has fully performed all of its obligations under the Original Divi LP Agreement by, among other things, acting as Divi's Managing General Partner. LM has fully performed all of its obligations under the Divi LP Agreements by, among other things, acting as Divi's general partner. LeFever has fully performed all of his obligations under the Divi LP Agreements by, among other things, obtaining LM's written approval and, if needed, the Nonprofit's written approval for any transfer of any Divi limited partnership interests to him or from him. Divi has fully performed all of its obligations under the Divi LP Agreements by, among other things, paying or reimbursing all direct expenses incurred in connection with the administration and operation of Divi.

88. Defendants contend that KSMP has transferred Divi limited partnership interests to numerous parties through the Putative Divi Sales.

89. KSMP did not at any time obtain LM's written approval for any of the Putative Divi Sales and did not at any time obtain the Nonprofit's written approval for any of the Putative Divi Sales that occurred prior to the adoption of the Amended Divi LP Agreement.

90. Plaintiffs contend that Divi limited partnership interests are only transferred under the Original Divi LP Agreement if the transfer is authorized in writing in advance by both the Nonprofit and LM and only transferred under the Amended Divi LP Agreement if the transfer is authorized in writing in advance by LM. Plaintiffs further contend that because the Putative Divi Sales were not authorized in writing in advance by LM and/or the Nonprofit, no Divi limited partnership interests were actually transferred through the Putative Divi Sales, but Plaintiffs plead

1 in the alternative that if KSMP transferred Divi limited partnership interests to numerous third
2 parties through the Putative Divi Sales, KSMP breached the applicable Divi LP Agreement by
3 making the Putative Divi Sales without obtaining LM's and, if applicable, the Nonprofit's prior
4 written approval.

5      91.     The amount (by value) of Divi limited partnership interests that KSMP purportedly
6 sold likely exceeded the amount (by value) of Divi limited partnership interests that KSMP and
7 LM together owned, and indeed may have exceed the total amount (by value) of Divi limited
8 partnership interests that Divi issued.

9      92.     Thus, to the extent that KSMP transferred more Divi limited partnership interests in
10 percentage terms than 100%, LeFever, LM and Divi have each been harmed by KSMP's transfer
11 of additional Divi limited partnership interests in violation of the Divi LP Agreements through the
12 Putative Divi Sales because any such transfer diluted the respective ownership interests of all
13 owners of record in Divi.

14      93.     LeFever and LM have also been harmed by KSMP's transfer of Divi limited
15 partnership interests in violation of the Divi LP Agreements through the Putative Divi Sales
16 because Defendants contend that certain of the Putative Divi Sales involved KSMP selling Divi
17 limited partnership interests that belonged to LM and neither LeFever nor LM received anything
18 in return for these unauthorized sales of LM's Divi limited partnership interests.

19      94.     Each of Divi, LeFever, and LM has also been harmed by KSMP's transfer of Divi
20 limited partnership interests in violation of the Divi LP Agreements through the Putative Divi
21 Sales because Divi, LeFever, and LM have each incurred significant expenses in connection with
22 the investigation into the Putative Divi Sales and responding to related issues concerning the
23 unauthorized Putative Divi Sales. Divi, LeFever, and LM would not have incurred these expenses
24 if KSMP had not transferred Divi limited partnership interests in violation of the Divi LP
25 Agreement.

26      95.     As a result of KSMP's breaches of the Divi LP Agreements, as alleged, Divi,
27 LeFever, and LM have suffered and continue to suffer damages, all in an amount to be determined
28 according to proof at trial, but which Plaintiffs estimate to be at least $100 million.

COMPLAINT

1    96.    After Defendants' wrongful conduct finally came to light, LeFever, LM, and

2 Mattson entered into the Indemnity Agreement under which Mattson agreed that Defendants

3 would indemnify and hold Plaintiffs harmless from the damage Defendants have already caused

4 Plaintiffs and from the harm Plaintiffs will suffer in the future because of Defendants'

5 wrongdoing. Mattson also agreed to assist LM and LeFever by providing them information they

6 might request about Mattson's actions so that LM and LeFever could help identify the putative

7 investors that Defendants had swindled and help ensure that Defendants remedied the harm they

8 caused to these putative investors.

9    97.    Plaintiffs have fully performed under the Indemnity Agreement by, among other

10 things, tendering to Mattson indemnification demands for expenses covered by the Indemnity

11 Agreement and tendering to Mattson demands that Mattson advance funds for indemnifiable

12 expenses that Plaintiffs expected to incur.

13    98.    Mattson has breached the Indemnity Agreement by, among other things failing to

14 pay for indemnifiable expenses that Divi, LeFever, and LM have tendered to Mattson and failing

15 to advance funds for indemnifiable expenses that Divi, LeFever, and LM expect to incur.  Mattson

16 has also breached the Indemnity Agreement by failing to provide Plaintiffs information regarding

17 Defendants' misconduct that Plaintiffs requested from him.

18    99.    Divi, LeFever, and LM have been harmed as a result of Mattson's breaches of the

19 Indemnity Agreement because Divi, LeFever, and LM have each incurred expenses that Mattson

20 is required to pay for or reimburse Divi, LeFever, and LM for but has not.  Divi, LeFever, and LM

21 have also been harmed by Mattson's breaches of the Indemnity Agreement because they have each

22 incurred additional expenses to obtain information that Mattson was required to provide but did

23 not.

24    100.    Plaintiffs are informed and believe and, on that basis, allege that there is a unity of

25 interest between Mattson and KSMP because Mattson wholly owns KSMP, Mattson has used

26 KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has failed to

27 observe partnership formalities, Mattson has transferred significant assets to KSMP such that

28

COMPLAINT

1  Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal
2  equivalent of an empty shell corporation.

3      101.   It would be inequitable to recognize KSMP's separate existence as a partnership
4  because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he
5  can escape liability for his wrongdoing and be unable to satisfy creditors.

6      102.   KSMP is therefore equally liable for Mattson's breaches of the Indemnity
7  Agreement under a reverse veil piercing theory.

8      103.   Mattson, LM, and LeFever agreed in the Indemnity Agreement that the prevailing
9  party in any action arising out of the Indemnity Agreement is entitled to recover their attorneys'
10  fees from the opposing party.  Mattson and LM are therefore entitled to recover from Defendants
11  any attorneys' fees that Mattson and LM incur in connection with this cause of action.

12                            **SECOND CAUSE OF ACTION**

13              **(Breach of Fiduciary duty – LM and LeFever against All Defendants)**

14      104.   Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth
15  in full, the allegations contained in Paragraphs 1 through 103.

16      105.   At all times relevant herein, Mattson served as one of LM's officers and one of its
17  directors.  In this capacity, Mattson owed LM and LeFever fiduciary duties, including the duty of
18  care, duty of loyalty, and the duty to disclose all material information to LM and LeFever.

19      106.   Mattson breached the fiduciary duties he owed LM and LeFever by, among other
20  things, engaging in self-dealing transactions such as (1) causing LM to pay for real estate that
21  Mattson acquired in his own name and/or KSMP's name and not LM's including, but not limited
22  to, a lavish mansion in Sonoma that Mattson purchased for himself and which he now uses as his
23  primary residence, (2) misappropriating LM's corporate opportunities for KSMP, his wholly
24  owned company, (3) selling Divi partnership interests without authorization to do so, and retaining
25  the proceeds from the sales of LM's Divi partnership interests and any new or additional Divi
26  partnership interests solely for himself, (4) selling property owned by LM to a buyer who partially
27  funded the purchase by issuing a $4 million promissory note and causing the promissory note to
28

1 be in favor of one of Mattson's wholly-owned entities instead of LM, (5) failing to disclose the
2 secret Divi transactions; and (6) concealing his illicit transactions with the Covert Account.

3    107.    Mattson's breaches of his fiduciary duties, as alleged, directly and proximately
4 harmed LM and LeFever by, among other things, causing LM to pay millions of dollars for
5 property at inflated prices that exclusively benefitted Mattson and/or KSMP, causing LM to sell
6 millions of dollars of valuable property and receiving nothing in return, diluting LM's and
7 LeFever's ownership interests in Divi, clouding title of LM's and LeFever's ownership interests in
8 Divi, and causing LM and LeFever to incur significant sums of money to investigate and
9 remediate the harm Mattson's conduct caused the third parties who believed they purchased Divi
10 partnership interests.  Again and again, Mattson has placed his own personal interests above those
11 of LeFever and LM, benefiting himself to LeFever's and LM's detriment and in breach of the
12 fiduciary duties Mattson owed.

13    108.    As a result of Mattson's conduct, as alleged, LM and LeFever have suffered and
14 continue to suffer damages, all in an amount to be determined according to proof at trial, but
15 which Plaintiffs estimate to be at least $100 million.

16    109.    Plaintiffs are informed and believe and, on that basis, allege that there is a unity of
17 interest between Mattson and KSMP because Mattson wholly owns and controls KSMP, Mattson
18 has used KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has
19 failed to observe partnership formalities, Mattson has transferred significant assets to KSMP such
20 that Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal
21 equivalent of an empty shell corporation.

22    110.    It would be inequitable to recognize KSMP's separate existence as a partnership
23 because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he
24 can escape liability for his wrongdoing and be unable to satisfy creditors.

25    111.    KSMP is therefore equally liable for Mattson's breaches of fiduciary duty under a
26 reverse veil piercing theory.

27    112.    Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP,
28 Mattson's knowledge is imputed to KSMP, and KSMP therefore knew that Mattson owed LM and

1  LeFever fiduciary duties and that Mattson's conduct would violate the fiduciary duties Mattson
2  owed LM and LeFever.

3      113.    To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially
4  assisted Mattson's breaches of the fiduciary duties Mattson owed LM and LeFever by, among
5  other things pursuing corporate opportunities Mattson diverted away from LM, purchasing
6  property that Mattson paid for using LM's funds, transferring said property to LM Investments at
7  inflated prices and only after, in many instances, heavily encumbering such property with debt
8  subject to extremely deleterious terms, and selling Divi limited partnership interests in transactions
9  KSMP knew were not authorized by LM.

10      114.    KSMP's conduct was a substantial factor in causing LM's and LeFever's harm
11  because, among other things, Mattson could not have misappropriated LM's corporate
12  opportunities if KSMP did not pursue the opportunities that Mattson wrongfully diverted away
13  from LM, Mattson could not have caused LM to pay for property that was titled in KSMP's name
14  if KSMP did not acquire those properties, and Mattson could not have sold KSMP's Divi interests
15  without proper authorization unless KSMP agreed to sell those Divi limited partnership interests.

16      115.    To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially
17  assisted Mattson's wrongful conduct individually for its own individual advantage.

18      116.    As a result, and as an alternative to liability under a reverse veil piercing theory,
19  KSMP is jointly and severally liable for Mattson's breaches of his fiduciary duties because KSMP
20  aided and abetted those breaches.

21      117.    Defendants' conduct, as alleged, was done with an intentional and conscious
22  disregard of LM's and LeFever's rights and with oppression, fraud, and malice as defined under
23  Civil Code Section 3294, entitling LM and LeFever to an award of punitive and exemplary
24  damages assessed against Defendants in a sum according to proof at trial, as a means of deterring
25  Defendants from committing similar acts and omissions in the future and punishing them for their
26  wrongful conduct.

27

28

COMPLAINT

## THIRD CAUSE OF ACTION

### (Breach of Duty of Good Faith and Fair Dealing – All Plaintiffs against KSMP)

118. Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 117.

119. As one of Divi's limited partners and one of Windscape's members, KSMP owed Divi, Windscape, LM, and LeFever statutory duties of good faith and fair dealing.

120. KSMP breached the duties of good faith and fair dealing by, among other things, misappropriating corporate opportunities from Divi and Windscape for its own benefit and to the detriment of Plaintiffs.

121. For example, Plaintiffs are informed and believe and, on that basis, allege that in September 2022, Mattson caused KSMP to purchase real estate in Sonoma for $6.5 million. Five weeks later, Mattson caused KSMP to sell that property to Windscape for $7.5 million, netting Defendants $1,000,000 in the process and causing Windscape to pay $1,000,000 more for the property than it should have.

122. KSMP also breached its duties of good faith and fair dealing by selling the LM Investments properties which KSMP used as security for high interest, hard money loans or loans with large balloon payments in the future and then making the LM Investments' acquisition of those properties subject to those loans notwithstanding that in many instances substantial portions of the principal of these loans was paid to KSMP (each such sale subject to a hard money loan or a loan with a large balloon payment, a "Hard Money/Balloon Payment Loan Sale"). KSMP knew that Mattson concealed these Hard Money/Balloon Payment Loan Sale transactions from Plaintiffs and that Mattson did not have authority to cause the LM Investments to enter into the Hard Money/Balloon Payment Loan Sale transactions, but KSMP nonetheless consummated the Hard Money Loan Sale transactions so that KSMP could obtain a secret profit from the LM Investments and saddle them with high interest, hard money loans and loans with large balloon payments without Plaintiffs' knowledge or consent.

123. KSMP also breached its duties of good faith and fair dealing through the secret Putative Divi Sales.

1    124.    KSMP knew that it was required to disclose to LM and seek advance written

2    approval from LM to transfer any Divi limited partnership interests, but KSMP secretly conducted

3    the Putative Divi Sales without ever obtaining LM's written approval for any of the Putative Divi

4    Sales or ever even notifying LM that they had purportedly taken place.

5    125.    Plaintiffs contend that Divi limited partnership interests are only transferred if the

6    transfer is authorized in writing by LM and/or the Nonprofit and that because the Putative Divi

7    Sales were not authorized in writing by LM or the Nonprofit (as applicable), no Divi limited

8    partnership interests were actually transferred through the Putative Divi Sales, but Plaintiffs plead

9    in the alternative that if KSMP did, in fact, transfer Divi limited partnership interests to numerous

10   parties through the Putative Divi Sales without obtaining LM's written approval, then LeFever and

11   LM have each been harmed by KSMP's transfer of Divi limited partnership interests through the

12   Putative Divi Sales because any such transfer diluted LeFever's and LM's respective ownership

13   interests in Divi.

14   126.    LM has also been harmed by KSMP's transfer of Divi limited partnership interests

15   in the Putative Divi Sales because Defendants contend that certain of the Putative Divi Sales

16   involved KSMP selling Divi limited partnership interests that belonged to LM and LM did not

17   receive anything in return for these unauthorized sales of LM's Divi limited partnership interests.

18   127.    Each of Divi, LeFever, and LM has also been harmed by KSMP's transfer of Divi

19   limited partnership interests through the Putative Divi Sales because Divi, LeFever, and LM have

20   each incurred significant expenses in connection with the investigation into the Putative Divi Sales

21   and responding to related issues concerning the unauthorized Putative Divi Sales. Divi, LeFever,

22   and LM would not have incurred these expenses if KSMP had not transferred Divi limited

23   partnership interests in violation of the Divi LP Agreements.

24   128.    Plaintiffs have also been harmed by the Hard Money/Balloon Payment Loan Sale

25   transactions because they have been forced to pay KSMP above-market rates for the respective

26   properties while at the same time being saddled with high interest, hard money loans, many of

27   which are already in default and face potential foreclosure and/or loans with large future balloon

28   payments. All principal of these loans paid or received by KSMP constitutes additional theft in

COMPLAINT

1  that the LM Investments are reduced in value on a dollar-for-dollar basis by the amount of
2  principal paid or received by KSMP.

3      129.    As a result of KSMP's breaches of its duties of good faith and fair dealing, as
4  alleged, Divi, Windscape, LeFever, and LM have suffered and continue to suffer damages, all in
5  an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least
6  $100 million.

7      130.    Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP,
8  Mattson has knowledge of all facts that KSMP knows and Mattson therefore knew that KSMP
9  owed Divi, Windscape, LM, and LeFever statutory duties of good faith and fair dealing and that
10 KSMP's conduct would violate the duties of good faith and fair dealing that KSMP owed Divi,
11 Windscape, LM and LeFever.

12     131.    To the extent that KSMP is not the alter-ego of Mattson, Mattson substantially
13 assisted KSMP's breaches of the duties of good faith and fair dealing that KSMP owed Divi,
14 Windscape, LM and LeFever by, among other things diverting Divi's and Windscape's corporate
15 opportunities to KSMP and causing KSMP to sell Divi limited partnership interests in transactions
16 KSMP and Mattson knew were not authorized by LM.

17     132.    Mattson's conduct was a substantial factor in causing Divi's, Windscape's, LM's
18 and LeFever's harm because, among other things, KSMP could not have misappropriated Divi's
19 and Windscape's corporate opportunities if Mattson did not divert them to KSMP and KSMP
20 could not have sold its Divi interests without proper authorization unless Mattson concealed those
21 sales from LM, LeFever, and Divi.

22     133.    To the extent that KSMP is not the alter-ego of Mattson, Mattson substantially
23 assisted KSMP's wrongful conduct individually for his own individual advantage and not merely
24 by acting on KSMP's behalf.

25     134.    As a result, Mattson is jointly and severally liable with KSMP for KSMP's
26 breaches of its statutory duty of good faith and fair dealing because Mattson aided and abetted
27 those breaches.

28

COMPLAINT

1    135.    Defendants' conduct, as alleged, was done with an intentional and conscious

2  disregard of Plaintiffs' rights and with oppression, fraud, and malice as defined under Civil Code

3  Section 3294, entitling Plaintiffs to an award of punitive and exemplary damages assessed against

4  each of the Defendants in a sum according to proof at trial, as a means of deterring the Defendants

5  from committing similar acts and omissions in the future and punishing the Defendants for their

6  wrongful conduct.

7                **FOURTH CAUSE OF ACTION**

8            **(Conversion – LM against All Defendants)**

9    136.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth

10  in full, the allegations contained in Paragraphs 1 through 135.

11    137.    LM had an ownership interest in, among other things, real property on Butcher

12  Road in Vacaville, California (the "Butcher Road Property").

13    138.    Defendants substantially interfered with LM's ownership interest in the Butcher

14  Road Property by, among other things, selling the Butcher Road Property.

15    139.    The sales proceeds from the sale of the Butcher Road Property included a $4

16  million promissory note (the "Note"). Because of LM's ownership interest in the Butcher Road

17  Property, LM likewise had an ownership interest in the proceeds from any sale of that property,

18  including the Note. Plaintiff is informed and believes and, on that basis alleges, that Defendants

19  substantially interfered with LM's interest in the Note without LM's authorization by causing the

20  Note to be exclusively in favor of KSMP and not in LM's favor.

21    140.    Defendants contend that some of the Divi limited partnership interests they sold in

22  the Putative Divi Sales were owned by LM.

23    141.    Plaintiffs contend that Divi limited partnership interests are only transferred if the

24  transfer is authorized in writing by LM and/or the Nonprofit and that because the Putative Divi

25  Sales were not authorized in writing by LM or the Nonprofit (as applicable), no Divi limited

26  partnership interests were actually transferred through the Putative Divi Sales, but Plaintiffs plead

27  in the alternative that if KSMP did, in fact, transfer Divi limited partnership interests to numerous

28  third parties through the Putative Divi Sales without obtaining LM's written approval, then

COMPLAINT

1 Defendants substantially interfered with LM's Divi limited partnership interests by purportedly
2 selling them in the Putative Divi Sales without LM's authorization.

3     142.    Plaintiffs are informed and believe and, on that basis allege, that Mattson
4 transferred more than $6 million of LM's money (the "Escrowed Funds") into an escrow account.
5 The Escrowed Funds are a specific and identifiable sum that LM owned. Defendants substantially
6 interfered with LM's ownership interest in the Escrowed Funds without LM's authorization by
7 causing the escrow agent to pay the Escrowed Funds for Mattson's palatial home in Sonoma that
8 that Defendants titled exclusively in Mattson's or KSMP's name.

9     143.    Defendants' interference with LM's ownership interest in the Note, the Escrowed
10 Funds, and LM's Divi limited partnership interests (collectively, the "Converted Property) and
11 disposition of the Converted Property, as alleged, was not authorized by LM and was wrongful.

12     144.    Defendants' wrongful conversion directly and proximately caused LM significant
13 harm because LM no longer has access to or possession of the Converted Property.

14     145.    As a result of Defendants' conversion, as alleged, LM has suffered and continues to
15 suffer damages, all in an amount to be determined according to proof at trial, but which Plaintiffs
16 estimate to be at least $10 million.

17     146.    Defendants' conduct, as alleged, was done with an intentional and conscious
18 disregard of LM's rights and with oppression, fraud, and malice as defined under Civil Code
19 Section 3294, entitling LM to an award of punitive and exemplary damages assessed against each
20 of the Defendants in a sum according to proof at trial, as a means of deterring them from
21 committing similar acts and omissions in the future and punishing them for their wrongful
22 conduct.

23 **FIFTH CAUSE OF ACTION**

24 **(Constructive Fraud – LM and LeFever against All Defendants)**

25     147.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth
26 in full, the allegations contained in Paragraphs 1 through 146.

27

28

COMPLAINT

1    148.    At all times relevant herein, Mattson has served as one or more of LM's officers
2    and one of its directors. In this capacity, Mattson owed LM and LeFever fiduciary duties,
3    including a duty to disclose all material information to LM.

4    149.    Mattson breached his fiduciary duty to disclose all material information to LM and
5    LeFever by, among other things, failing to disclose the Putative Divi Sales, failing to disclose the
6    corporate opportunities that he diverted to KSMP and allowed KSMP to misappropriate, and
7    failing to disclose that he was causing LM and the LM Investments to pay inflated prices for
8    heavily indebted real estate that Mattson was purchasing in his own name and/or in KSMP's name
9    keeping for himself the more desirable properties (including, but not limited to, the lavish Sonoma
10   home Mattson bought himself using LM's funds) and unloading the undesirable and/or
11   unprofitable ones on LM and the LM investments.

12   150.    LM and LeFever would have taken steps to prevent Mattson's aforementioned
13   wrongful conduct on their own behalf and on behalf of the LM Investments as their respective
14   general partners and/or managing members if Mattson had complied with his fiduciary duties and
15   disclosed these facts to LM and LeFever before Mattson completed his wrongful misconduct.

16   151.    LM and LeFever were harmed by Mattson wrongful suppression of the
17   aforementioned facts and constructive fraud because LM and LeFever have each incurred
18   significant expenses in connection with the investigation of the Putative Divi Sales and, to the
19   extent the Putative Divi Sales involved actual sales of Divi limited partnership interests that had
20   not been previously issued, because the Putative Divi Sales diluted LM's and LeFever's
21   ownership interest in Divi.

22   152.    LM was also harmed by Mattson's wrongful suppression of the aforementioned
23   facts and constructive fraud because LM paid more than $6 million for the lavish Sonoma home
24   that Mattson titled in his own name and/or in KSMP's name and because LM did not obtain the
25   profit or financial benefit it would have received from the corporate opportunities that Mattson
26   wrongfully diverted to KSMP.

27   153.    LM has also been harmed by Mattson's wrongful suppression of the
28   aforementioned facts and constructive fraud because LM and the LM Investments unwittingly

took title to properties subject to the Hard Money/Balloon Payment Loan Sale transactions and thereby have been forced to pay KSMP above-market prices for the respective properties while at the same time being saddled with high interest, hard money loans and/or loans with large future balloon payments, many of which are already in default and face foreclosure.

154.     As a result of Mattson constructive fraud, as alleged, LeFever and LM have suffered and continue to suffer damages, all in an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least $100 million.

155.     Plaintiffs are informed and believe and, on that basis, allege that there is a unity of interest between Mattson and KSMP because Mattson wholly owns KSMP, Mattson has used KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has failed to observe partnership formalities, Mattson has transferred significant assets to KSMP such that Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal equivalent of an empty shell corporation.

156.     It would be inequitable to recognize KSMP's separate existence as a partnership because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he can escape liability for his wrongdoing and be unable to satisfy creditors.

157.     KSMP is therefore equally liable for Mattson's breaches of fiduciary duty under a reverse veil piercing theory.

158.     Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP, Mattson's knowledge is imputed to KSMP, and KSMP therefore knew that Mattson owed LM and LeFever fiduciary duties and that Mattson's concealment of material facts would violate the fiduciary duties Mattson owed LM and LeFever and be constructively fraudulent conduct.

159.     To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's constructive fraud by, among other things pursuing corporate opportunities Mattson concealed from and diverted away from LM and LeFever, purchasing property that Mattson paid for using LM's funds knowing that Mattson concealed the transactions from LM and LeFever, completing the Hard Money/Balloon Payment Loan Sale transactions knowing that Mattson had concealed the transactions from LM, LeFever, and the LM Investments, and selling

1 | Divi limited partnership interests in transactions KSMP knew Mattson had not disclosed to LM
2 | and LeFever and that were not authorized by LM.

3 |     160.    KSMP's conduct was a substantial factor in causing LM's and LeFever's harm
4 | because, among other things, Mattson could not have misappropriated LM's corporate
5 | opportunities if KSMP did not pursue the opportunities that Mattson wrongfully diverted away
6 | from LM, Mattson could not have caused LM to pay for property that was titled in KSMP's name
7 | if KSMP did not acquire those properties, Mattson could not have caused LM and the LM
8 | Investments to enter into the Hard Money/Balloon Payment Loan Sale transactions if KSMP was
9 | not the willing counterparty to those transactions, and Mattson could not have sold KSMP's Divi
10 | interests without proper authorization unless KSMP agreed to sell those Divi limited partnership
11 | interests.

12 |     161.    To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially
13 | assisted Mattson's wrongful conduct individually for its own individual advantage.

14 |     162.    As a result, and as an alternative to liability under a reverse veil piercing theory,
15 | KSMP is jointly and severally liable for Mattson's constructive fraud because KSMP aided and
16 | abetted those breaches.

17 |     163.    Defendants' conduct, as alleged, was done with an intentional and conscious
18 | disregard of LM's and LeFever's rights and with oppression, fraud, and malice as defined under
19 | Civil Code Section 3294, entitling LM and LeFever to an award of punitive and exemplary
20 | damages assessed against each of the Defendants in a sum according to proof at trial, as a means
21 | of deterring them from committing similar acts and omissions in the future and punishing them for
22 | their wrongful conduct.

23 | **SIXTH CAUSE OF ACTION**

24 | **(Fraudulent Concealment – LM and LeFever against All Defendants)**

25 |     164.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth
26 | in full, the allegations contained in Paragraphs 1 through 163.

27 |

28 |

1    165.    At all times relevant herein, Mattson has served as one or more of LM's officers
2    and one of its directors. In this capacity, Mattson owed LM and LeFever fiduciary duties,
3    including a duty to disclose all material information to LM.

4    166.    Despite having a duty to disclose all relevant information to LM and LeFever,
5    Mattson actively concealed and failed to disclose to LM and LeFever, among other things, the
6    Putative Divi Sales, the Hard Money/Balloon Payment Loan Sales, the corporate opportunities
7    that he diverted to KSMP and allowed KSMP to misappropriate, and that he was causing LM to
8    pay for real estate that Mattson was purchasing in his own name and/or in KSMP's name
9    including, but not limited to, the lavish Sonoma home Mattson bought himself using LM's funds.

10    167.    Mattson's fraudulent concealment was not limited to mere nondisclosure of facts he
11    was legally obligated to disclose to LM and LeFever: Mattson actively concealed the above facts
12    by, among other things, using the Covert Account to hide the transactions from LM and LeFever,
13    using his own post office box and not LM's address so that that any correspondence regarding the
14    Putative Divi Sales would be diverted away from LM and instead be routed directly to him, failing
15    to report to LM any of the activities and transactions effected utilizing the Covert Account,
16    prohibiting any LM employees or anyone else to access the Covert Account, failing to document
17    the Putative Divi Sales with purchase agreements and other records Mattson knew he was
18    supposed to use to document the transactions so that there was no paper trail documenting his
19    wrongful conduct, maintain a separate email account independent of LM servers and using this
20    email account exclusively for all business dealings, maintaining all of his records on a personal
21    laptop and sharing none of those records with LM, and by instructing his assistant not to disclose
22    to LM and LeFever the existence of and facts concerning Mattson's wrongful conduct and illicit
23    transactions.

24    168.    Mattson intentionally concealed these facts from LM and LeFever so that they
25    would not discover or ever be in a position to take steps to prevent Mattson's aforementioned
26    wrongful misconduct.

27    169.    LM and LeFever relied on the nonexistence of the facts Mattson concealed from
28    them because LM and LeFever would have taken steps on their own behalf and on behalf of the

COMPLAINT

1   LM Investments as their respective general partners and/or managing members to prevent

2   Mattson's aforementioned wrongful conduct if Mattson had not actively concealed the facts and

3   instead disclosed these facts to LM and LeFever before Mattson completed his wrongful

4   misconduct.

5        170.   LM and LeFever's reliance on the nonexistence of the facts Mattson concealed

6   from them was reasonable because Mattson was LeFever's close personal friend, LeFever trusted

7   Mattson completely and would therefore have no reason to believe that Mattson was concealing

8   information from him or trying to harm him, and because Mattson was an officer and director of

9   LM and was under a legal obligation to disclose material facts to LM and LeFever.

10      171.   LM and LeFever were harmed by Mattson's wrongful suppression of the

11   aforementioned facts and fraudulent concealment because LM and LeFever have each incurred

12   significant expenses in connection with the investigation of the Putative Divi Sales and, to the

13   extent the Putative Divi Sales involved actual sales of Divi limited partnership interests (which

14   Plaintiffs contend did not occur because LM and/or the Nonprofit did not approve the sales) and to

15   the extent that such limited partnership interests had not been previously issued, LM and LeFever

16   were harmed because the Putative Divi Sales diluted LM's and LeFever's ownership interest in

17   Divi.

18      172.   LM was also harmed by Mattson's wrongful suppression of the aforementioned

19   facts and fraudulent concealment because LM paid more than $6 million for lavish Sonoma home

20   that Mattson titled in his own name and/or in KSMP's name and because LM did not obtain the

21   profit or financial benefit it would have received from the corporate opportunities that Mattson

22   wrongfully diverted to KSMP.

23      173.   LM has also been harmed by Mattson's wrongful suppression of the

24   aforementioned facts and fraudulent concealment because LM and the LM Investments

25   unwittingly entered into the Hard Money/Balloon Payment Loan Sale transactions and thereby

26   have been forced to pay KSMP above-market rates for the respective properties while at the same

27   time being saddled with high interest, hard money loans and/or loans with large balloon payments,

28   many of which are already in default and face foreclosure.

COMPLAINT

174.    As a result of Mattson fraudulent concealment, as alleged, LeFever and LM have suffered and continue to suffer damages, all in an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least $100 million.

175.    Plaintiffs are informed and believe and, on that basis, allege that there is a unity of interest between Mattson and KSMP because Mattson wholly owns KSMP, Mattson has used KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has failed to observe partnership formalities, Mattson has transferred significant assets to KSMP such that Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal equivalent of an empty shell corporation.

176.    It would be inequitable to recognize KSMP's separate existence as a partnership because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he can escape liability for his wrongdoing and be unable to satisfy creditors.

177.    KSMP is therefore equally liable for Mattson's fraudulent concealment under a reverse veil piercing theory.

178.    Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP, Mattson's knowledge is imputed to KSMP, and KSMP therefore knew that Mattson owed LM and LeFever fiduciary duties, that Mattson was under a duty to disclose all material facts to LM and LeFever, and that Mattson's concealment of material facts would violate the fiduciary duties Mattson owed LM and LeFever and be constructively fraudulent conduct.

179.    To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's fraudulent concealment by, among other things pursuing corporate opportunities Mattson concealed from and diverted away from LM, purchasing property that Mattson paid for using LM's funds knowing that Mattson concealed the transactions from LM, completing the Hard Money/Balloon Payment Loan Sale transactions knowing that Mattson concealed the transactions from LM, LeFever, and the LM Investments, and selling Divi limited partnership interests in transactions KSMP knew Mattson had not disclosed to LM and that were not authorized by LM.

COMPLAINT

180. KSMP's conduct was a substantial factor in causing LM's and LeFever's harm because, among other things, Mattson could not have misappropriated LM's corporate opportunities if KSMP did not pursue the opportunities that Mattson wrongfully diverted away from LM, Mattson could not have caused LM to pay for property that was titled in KSMP's name if KSMP did not acquire those properties, Mattson could not have sold KSMP's Divi interests without proper authorization unless KSMP agreed to sell those Divi limited partnership interests, LM and LeFever would not have had to incur costs investigating the secret Putative Divi Sales unless KSMP agreed to sell the respective Divi limited partnership interests, and Mattson could not have caused LM and the LM Investments to enter into the Hard Money/Balloon Payment Loan Sale transactions if KSMP was not the willing counterparty to those transactions.

181. To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's wrongful conduct individually for its own individual advantage.

182. As a result, and as an alternative to liability under a reverse veil piercing theory, KSMP is jointly and severally liable for Mattson's fraudulent concealment because KSMP aided and abetted those breaches.

183. Defendants' conduct, as alleged, was done with an intentional and conscious disregard of LM's and LeFever's rights and with oppression, fraud, and malice as defined under Civil Code Section 3294, entitling LM and LeFever to an award of punitive and exemplary damages assessed against each of the Defendants in a sum according to proof at trial, as a means of deterring them from committing similar acts and omissions in the future and punishing them for their wrongful conduct.

## SEVENTH CAUSE OF ACTION

**(Receiving Stolen Property in Violation of Cal. Pen. Code § 496 – LM against All Defendants)**

184. Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 183.

185. Defendants obtained the Converted Property from LM through theft by false pretenses.

COMPLAINT

1      186.    Defendants each had actual or constructive possession of the Converted Property

2 after they stole it from LM, concealed the Converted Property from LM, and/or withheld the

3 Converted Property from LM, knowing that the Converted Property was stolen from LM.

4      187.    Pursuant to California Penal Code Section 496(c), LM is entitled to recover from

5 Defendants three times the amount of damages LM suffered in connection with Defendants'

6 violation of California Penal Code Section 496 and recover from Defendants the attorneys' fees

7 LM incurs in connection with this civil action.

8 **EIGHTH CAUSE OF ACTION**

9 **(Declaratory Relief – All Plaintiffs against All Defendants)**

10      188.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth

11 in full, the allegations contained in Paragraphs 1 through 187.

12      189.    An actual controversy has arisen and now exists between Plaintiffs, on the one

13 hand, and Defendants, on the other, concerning the following issues:

14          A.     Whether the Indemnity Agreement obligates Mattson to reimburse Plaintiffs

15 for any payments they make in satisfaction of any claims that the putative investors from the

16 Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales. Plaintiffs contend

17 that the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they

18 make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert

19 against Plaintiffs concerning the Putative Divi Sales. Plaintiffs are informed and believe and, on

20 that basis, allege that Defendants contend that the Indemnity Agreement does not obligate Mattson

21 to reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative

22 investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales.

23          B.     Whether the Indemnity Agreement obligates Mattson to advance to

24 Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any

25 claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning

26 the Putative Divi Sales. Plaintiffs contend that the Indemnity Agreement obligates Mattson to

27 advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction

28 of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs

85
COMPLAINT

1 | concerning the Putative Divi Sales. Plaintiffs are informed and believe and, on that basis, allege
2 | that Defendants contend that the Indemnity Agreement does not obligate Mattson to advance to
3 | Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any
4 | claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning
5 | the Putative Divi Sales.

6 |          C.         Whether the Indemnity Agreement obligates Mattson to reimburse Plaintiffs
7 | for any payments they make in satisfaction of any claims asserted against Plaintiffs by putative
8 | investors to whom Defendants purportedly sold partnership interests or membership interests in
9 | other LM Investments without obtaining LM's prior written authorization. Plaintiffs contend that
10 | the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in
11 | satisfaction of any claims asserted against Plaintiffs by putative investors to whom Defendants
12 | purportedly sold partnership interests or membership interests in other LM Investments without
13 | obtaining LM's prior written authorization. Plaintiffs are informed and believe and, on that basis,
14 | allege that Defendants contend that the Indemnity Agreement does not obligate Mattson to
15 | reimburse Plaintiffs for any payments they make in satisfaction of any claims asserted against
16 | Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or
17 | membership interests in other LM Investments without obtaining LM's prior written authorization.

18 |          D.         Whether the Indemnity Agreement obligates Mattson to advance to
19 | Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any
20 | claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold
21 | partnership interests or membership interests in other LM Investments without obtaining LM's
22 | prior written authorization. Plaintiffs contend that the Indemnity Agreement obligates Mattson to
23 | advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction
24 | of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly
25 | sold partnership interests or membership interests in other LM Investments without obtaining
26 | LM's prior written authorization. Plaintiffs are informed and believe and, on that basis, allege that
27 | Defendants contend that the Indemnity Agreement does not obligate Mattson to advance to
28 | Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any

COMPLAINT

1  claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold
2  partnership interests or membership interests in other LM Investments without obtaining LM's
3  prior written authorization.

4          E.      Whether Divi is permitted to offset any payments Divi might make in
5  satisfaction of any claims that the putative investors from the Putative Divi Sales assert against
6  Divi concerning the Putative Divi Sales against distributions Defendants might otherwise receive
7  or be entitled to.  Plaintiffs contend that Divi is permitted to offset any payments Divi might make
8  in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against
9  Divi concerning the Putative Divi Sales against distributions Defendants might otherwise receive
10  or be entitled to.  Plaintiffs are informed and believe and, on that basis, allege that Defendants
11  contend that Divi is not permitted to offset any payments Divi might make in satisfaction of any
12  claims that the putative investors from the Putative Divi Sales assert against Divi concerning the
13  Putative Divi Sales against distributions Defendants might otherwise receive or be entitled to.

14          F.      Whether the other LM Investments are permitted to offset any payments
15  they might make in satisfaction of claims asserted against them by putative investors to whom
16  Defendants purportedly sold partnership interests or membership interests in such LM Investments
17  without obtaining LM's prior written authorization against the LM Investments' distributions that
18  Defendants might otherwise receive or be entitled to.  Plaintiffs contend that the other LM
19  Investments are permitted to offset any payments they might make in satisfaction of claims
20  asserted against them by putative investors to whom Defendants purportedly sold partnership
21  interests or membership interests in such LM Investments without obtaining LM's prior written
22  authorization against the LM Investments' distributions that Defendants might otherwise receive
23  or be entitled to.  Plaintiffs are informed and believe and, on that basis, allege that Defendants
24  contend that the other LM Investments are not permitted to offset any payments they might make
25  in satisfaction of claims asserted against them by putative investors to whom Defendants
26  purportedly sold partnership interests or membership interests in such LM Investments without
27  obtaining LM's prior written authorization against the LM Investments' distributions that
28  Defendants might otherwise receive or be entitled to.

COMPLAINT

G.      Whether LM is permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.  Plaintiffs contend that LM is permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.  Plaintiffs are informed and believe and, on that basis, allege that Defendants contend that LM is not permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.

190.    Plaintiffs desire a judicial determination of the parties' respective rights and interest as to the foregoing matters, and a judicial declaration that (a) the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales; (b) the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales; (c) the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or membership interests in other LM Investments without obtaining LM's prior written authorization; (d) the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might

1  make in satisfaction of any claims asserted against Plaintiffs by putative investors to whom
2  Defendants purportedly sold partnership interests or membership interests in other LM
3  Investments without obtaining LM's prior written authorization; (e) Divi is permitted to offset any
4  payments Divi might make in satisfaction of any claims that the putative investors from the
5  Putative Divi Sales assert against Divi concerning the Putative Divi Sales against distributions
6  Defendants might otherwise receive or be entitled to; (f) the other LM Investments are permitted
7  to offset any payments they might make in satisfaction of claims asserted against them by putative
8  investors to whom Defendants purportedly sold partnership interests or membership interests in
9  such LM Investments without obtaining LM's prior written authorization against the LM
10 Investments' distributions that Defendants might otherwise receive or be entitled to; and (g) LM is
11 permitted to offset any payments it might make in satisfaction of claims asserted against LM by
12 putative investors to whom Defendants purportedly sold partnership interests or membership
13 interests in Divi or the LM Investments without obtaining LM's prior written authorization against
14 any dividends LM might declare and/or any other amounts that Defendants might otherwise
15 receive or be entitled to from LM.

16     191.    A judicial declaration is necessary and appropriate at this time to avoid continuing
17 disputes and future litigation between the parties and the uncertainty such disputes have created
18 and will create in the future.

19                          **NINTH CAUSE OF ACTION**

20     **(Removal of Director Pursuant to California Corporations Code § 304 – LM & LeFever**
21                                **against Mattson)**

22     192.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth
23 in full, the allegations contained in Paragraphs 1 through 191.

24     193.    Because LeFever owns 50% of the outstanding shares of LM's stock, California
25 Corporations Code Section 304 authorizes the Court to remove Mattson as a director and to bar
26 him from reelection to LM's board of directors.

27

28

COMPLAINT

1     194.    Mattson has grossly abused his authority and/or discretion through his self-dealing,

2 conversion, violations of the fiduciary duties he owes LM, his fraudulent concealment and

3 constructive fraud, all as alleged above.

4     195.    As a result of Mattson's gross abuse of authority and/or gross abuse of discretion,

5 this Court should remove Mattson from his position as one of LM's directors and should bar him

6 from serving as one of LM's directors in the future.

7     196.    Mattson has committed fraudulent and dishonest acts against LM through his self-

8 dealing, conversion, violations of the fiduciary duties he owes LM, his fraudulent concealment

9 and constructive fraud, all as alleged above.

10     197.    As a result of Mattson's fraudulent and dishonest acts, this Court should remove

11 Mattson from his position as one of LM's directors and should bar him from serving as one of

12 LM's directors in the future.

13 **PRAYER FOR RELIEF**

14     **WHEREFORE**, Plaintiffs pray for judgment as follows:

15 **On the First Cause of Action**

16     1.     For compensatory damages as the proof at trial may show;

17     2.     For disgorgement of Defendants' ill-gotten gains; and

18     3.     For recovery of LM's and LeFever's attorneys' fees.

19 **On the Second Cause of Action**

20     1.     For compensatory damages as the proof at trial may show;

21     2.     For disgorgement of Defendants' ill-gotten gains; and

22     3.     For punitive and exemplary damages as alleged and as the proof at trial may show.

23 **On the Third Cause of Action**

24     1.     For compensatory damages as the proof at trial may show;

25     2.     For rescission of the Hard Money/Balloon Payment Loan Sale transactions;

26     3.     For disgorgement of Defendants' ill-gotten gains; and

27     4.     For punitive and exemplary damages as alleged and as the proof at trial may show.

28

COMPLAINT

| | |
|---|---|
| 1 | **On the Fourth Cause of Action** |
| 2 | 1.   For compensatory damages as the proof at trial may show; |
| 3 | 2.   For disgorgement of Defendants' ill-gotten gains; and |
| 4 | 3.   For punitive and exemplary damages as alleged and as the proof at trial may show. |
| 5 | **On the Fifth Cause of Action** |
| 6 | 1.   For compensatory damages as the proof at trial may show; |
| 7 | 2.   For rescission of the Hard Money/Balloon Payment Loan Sale transactions; |
| 8 | 3.   For disgorgement of Defendants' ill-gotten gains; and |
| 9 | 4.   For punitive and exemplary damages as alleged and as the proof at trial may show. |
| 10 | **On the Sixth Cause of Action** |
| 11 | 1.   For compensatory damages as the proof at trial may show; |
| 12 | 2.   For rescission of the Hard Money/Balloon Payment Loan Sale transactions; |
| 13 | 3.   For disgorgement of Defendants' ill-gotten gains; and |
| 14 | 4.   For punitive and exemplary damages as alleged and as the proof at trial may show. |
| 15 | **On the Seventh Cause of Action** |
| 16 | 1.   For compensatory damages as the proof at trial may show; |
| 17 | 2.   For recovery from Mattson and KSMP of three times LM's damages as the proof at |
| 18 | trial may show; and |
| 19 | 3.   For recovery of LM's attorneys' fees. |
| 20 | **On the Eighth Cause of Action** |
| 21 | 1.   For a judicial declaration that the Indemnity Agreement obligates Mattson to |
| 22 | reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative |
| 23 | investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales; |
| 24 | 2.   For a judicial declaration that the Indemnity Agreement obligates Mattson to |
| 25 | advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction |
| 26 | of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs |
| 27 | concerning the Putative Divi Sales; |
| 28 | |

1       3.     For a judicial declaration that the Indemnity Agreement obligates Mattson to
2 reimburse Plaintiffs for any payments they make in satisfaction of any claims asserted against
3 Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or
4 membership interests in other LM Investments without obtaining LM's prior written authorization;

5       4.     For a judicial declaration that the Indemnity Agreement obligates Mattson to
6 advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction
7 of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly
8 sold partnership interests or membership interests in other LM Investments without obtaining
9 LM's prior written authorization;

10      5.     For a judicial declaration that Divi is permitted to offset any payments Divi might
11 make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert
12 against Divi concerning the Putative Divi Sales against distributions of capital or income that
13 Defendants might otherwise receive or be entitled to; and

14      6.     For a judicial declaration that the other LM Investments are permitted to offset any
15 payments they might make in satisfaction of claims asserted against them by putative investors to
16 whom Defendants purportedly sold partnership interests or membership interests in such LM
17 Investments without obtaining LM's prior written authorization against the LM Investments'
18 distributions of capital or income that Defendants might otherwise receive or be entitled to.

19      7.     For a judicial declaration that LM is permitted to offset any payments it might
20 make in satisfaction of claims asserted against LM by putative investors to whom Defendants
21 purportedly sold partnership interests or membership interests in Divi or the LM Investments
22 without obtaining LM's prior written authorization against any dividends LM might declare and/or
23 any other amounts that Defendants might otherwise receive or be entitled to from LM.

24 **On the Ninth Cause of Action**

25      1.     For an order removing Mattson as one of LM's directors; and

26      2.     For an injunction barring Mattson as one of LM's directors in the future.

27 **On All Causes of Action**

28      1.     For costs of suit herein; and

1       2.      For such other and further relief as the Court deems just and proper.

2   DATED: June 6, 2024                 HANSON BRIDGETT LLP

3

4                               By: _____

5                                  JOHN T. CU
                                 LAWRENCE M. CIRELLI
6                                  ANTHONY J. DUTRA
                                 Attorneys for Timothy LeFever, LeFever Mattson,
7                                  Divi Divi Tree, L.P., and Windscape Apartments,
                                 LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT 4

| From: | Tim LeFever <lefever96@aol.com> |
|---|---|
| Sent: | Thursday, June 27, 2024 9:14 PM |
| To: | Ken Mattson |
| Subject: | Indemnity payments |
| Attachments: | Mattson Matter Legal and Accounting Expenses 6 27 24.docx; KS Mattson Evergreen Account ExpenseDistribution06_27_2024 (2).pdf |

Ken,

Thank you for your $200,000 payment under the Indemnity Agreement received on May 10, 2024. Its been applied towards a number of different expenses we've incurred as a result of your improper actions.

Attached please find a receipt for your earlier payment, and a statement of expenses paid and now owing.

Pursuant to the Indemnity Agreement, demand is hereby made for payment of **$420,146.23** towards indemnification expenses on or before July 27, 2024.

Please wire to the same LeFever Mattson account that you did for your first payment under the Indemnity Agreement.

Please let me know if you have any questions.

Tim LeFever

Chief Executive Officer, LeFever Mattson

---

## Tim LeFever · Attorney at Law · Real Estate Broker
### DRE License 01081702

### PRESIDENT

### LEFEVER MATTSON PROPERTY MANAGEMENT

### CALIFORNIA INVESTMENT PROPERTIES

### SONOMA'S BEST HOSPITALITY GROUP

**707.330.5001 · fax 707.678.4266 · TLeFever@LeFeverMattson.com**
**LeFever Mattson · 6359 Auburn Blvd · Citrus Heights, CA 95621**

This communication, including all attachments, is intended solely for the use of addressed individual/(s)and privileges apply. Any unauthorized use is strictly prohibited. If you have received this communication in error, please immediately notify the sender and permanently delete all copies.

Mattson Legal and Accounting Expenses

As of 6/27/24

| | |
|---|---|
| Legal (various firms) | $518,476.23 |
| Accounting | $75,000.00 |
| Forensic Accounting | $26,670.00 |
| TOTAL EXPENSES: | $620,146.23 |
| Amount Paid: | -$200,000.00 |
| **TOTAL OWING:** | **$420,146.23** |

# Expense Distribution

ksevgr lmdist

Period: From 02/2024 to 06/2024

| Account Code | Account Name | Payee Code | Remittance Vendor | Payee Name | Payable Control | Batch | Property | Invoice Date | Period | syment meth | Amount | Unpaid Amount | Check Control | Check # | Check Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9500-0000 | Legal & Accounting | | | | | | | | | | | | | | |
| | | greefl | | Green Flash Forensics | P-1501165 | 81817 | ksevgr | 4/15/2024 | 05-2024 | Check | 18,010.00 | 0.00 | K-477534 | 3877 | 5/31/2024 |
| | | bpmllp | | BPM LLP | P-1503882 | 82105 | lmdist | 5/2/2024 | 05-2024 | Check | 25,000.00 | 0.00 | K-478516 | 3912 | 5/2/2024 |
| | | scotsm | | Law Offices of Scott C Smith | P-1499248 | 81516 | lmdist | 5/8/2024 | 05-2024 | Check | 10,000.00 | 0.00 | K-476721 | 50824 | 5/8/2024 |
| | | greefl | | Green Flash Forensics | P-1501141 | 81815 | ksevgr | 5/8/2024 | 05-2024 | Check | 8,660.00 | 0.00 | K-477534 | 3877 | 5/31/2024 |
| | | kellbe | | Keller Benvenutti Kim | P-1503881 | 82105 | lmdist | 5/29/2024 | 05-2024 | Check | 25,000.00 | 0.00 | K-478517 | 3913 | 5/2/2024 |
| | | donada | | Law Office of Donald S Davison, P.C. | P-1502169 | 81961 | ksevgr | 5/31/2024 | 06-2024 | Check | 6,840.00 | 0.00 | K-478198 | 3902 | 6/14/2024 |
| | | donada | | Law Office of Donald S Davison, P.C. | P-1502170 | 81961 | ksevgr | 6/2/2024 | 06-2024 | Check | 28,000.00 | 0.00 | K-478198 | 3902 | 6/14/2024 |
| | | kellbe | | Keller Benvenutti Kim | P-1502172 | 81961 | ksevgr | 6/6/2024 | 06-2024 | Check | 31,480.00 | 31,480.00 | | | |
| | | smitscpr | | Smith | P-1503879 | 82105 | ksevgr | 6/11/2024 | 06-2024 | Check | 10,000.00 | 0.00 | K-478518 | 3914 | 6/11/2024 |
| | | kellbe | | Keller Benvenutti Kim | P-1503877 | 82103 | ksevgr | 6/14/2024 | 06-2024 | Check | 300,000.00 | 0.00 | K-478529 | 3917 | 6/14/2024 |
| | | bpmllp | | BPM LLP | P-1503905 | 82107 | ksevgr | 6/26/2024 | 06-2024 | Check | 50,000.00 | 50,000.00 | | | |
| **Total 9500-0000** | | | | | | | | | | | **513,590.00** | **81,480.00** | | | |
| | | | | | | | | | | | | | | | |
| **Grand Total** | | | | | | | | | | | **513,590.00** | **81,480.00** | | | |

Case: 24-10714   Doc# 24-2   Filed: 12/20/24   Entered: 12/20/24 19:36:18   Page 102 of 135

# EXHIBIT 5

1  **KELLER BENVENUTTI KIM LLP**
   TOBIAS S. KELLER (Cal. Bar No. 151445)
2  (tkeller@kbkllp.com)
   DAVID A. TAYLOR (Cal. Bar No. 247433)
3  (dtaylor@kbkllp.com)
   THOMAS B. RUPP (Cal. Bar No. 278041)
4  (trupp@kbkllp.com)
   425 Market Street, 26th Floor
5  San Francisco, California 94105
   Telephone: (415) 496-6723
6  Facsimile: (650) 636-9251

7  *Proposed Attorneys for the Debtors and*
   *Debtors in Possession*

8

9             **UNITED STATES BANKRUPTCY COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                  **SANTA ROSA DIVISION**

12

13  In re:                                    Lead Case No. __-_____ (CN)

14  LEFEVER MATTSON, a California             (Joint Administration Requested)
    corporation, *et al.*,[1]
15                                            Chapter 11

16                         Debtors.           **DECLARATION OF BRADLEY D.**
                                              **SHARP IN SUPPORT OF CHAPTER**
17                                            **11 PETITIONS AND FIRST DAY**
                                              **MOTIONS**
18
                                              **Date:** TBD
19                                            **Time:** TBD
                                              **Place:** United States Bankruptcy Court
20                                                       1300 Clay Street, Courtroom 215
                                                         Oakland, CA 94612
21

22

23

24

25
    _____
26  [1]      The last four digits of LeFever Mattson's tax identification number are 7537.  Due to the
    large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the
27  last four digits of their federal tax identification numbers is not provided herein.  A complete list
    of such information may be obtained on the website of the Debtors' proposed claims and noticing
28  agent at https://veritaglobal.net/LM.  The address for service on the Debtors is 6359 Auburn Blvd.,
    Suite B, Citrus Heights, CA 95621.

I, Bradley D. Sharp, do hereby declare as follows:

1.     I am the President and Chief Executive Officer of Development Specialists, Inc. ("DSI"), a leading provider of management consulting and financial advisory services, including turnaround consulting, fiduciary roles, and financial restructuring services, with numerous offices throughout the country.

2.     I have more than 30 years of experience providing crisis management, financial advisory, and third-party fiduciary services. I have operated and sold publicly and privately-held troubled companies in and out of bankruptcy. I have also served as an expert witness with respect to banking, finance, and securitizations. Some of my relevant experience includes the following matters:

     a.     Chief Restructuring Officer of Woodbridge Group of Companies, LLC, a real estate development company, through its 305 related debtors with more than 8,000 investors and claims of $1 billion.

     b.     Chapter 11 Trustee for Namco Capital Group, Inc., a West Los Angeles-based real estate investment company through which $3 billion flowed between 2003 and 2008 with investments in over 100 real estate projects.

     c.     Chief Restructuring Officer of Variant Holding Company, LLC, a parent company controlling 26 different multi-family properties with more than 8,000 units in five states.

Each of the above engagements included allegations of fraud and required a significant forensic accounting analysis performed under my supervision.

3.     Prior to joining DSI, I was a vice president and senior commercial loan collection officer with Bank of America, NT&SA. I had been with the bank, through its acquisition of Security Pacific National Bank, since 1985. I have a Bachelor's of Science in accounting, with an emphasis in business computer information systems, from Colorado Mesa University in Grand Junction, Colorado.

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4.      I am a director and member of the Executive Committee for the American Bankruptcy Institute.  I am also a fellow of the American College of Bankruptcy as well as the Assistant Treasurer of the International Insolvency Institute.

***

5.      LeFever Mattson, a California corporation ("LeFever Mattson"), manages a large real estate portfolio.  Timothy LeFever and Kenneth W. Mattson each own 50% of the equity in LeFever Mattson.

6.      LeFever Mattson directly or indirectly controls or has ownership interests in 50 limited partnerships (collectively, the "LPs") and eight limited liability companies (collectively, the "LLCs").  LeFever Mattson, CIP (as defined below), the Property Manager (as defined below), and the 56 LPs and LLCs that are listed on the List of Affiliated Debtors (filed with each voluntary petition) are referred to collectively herein as the "Debtors."[2]  An organizational chart for LeFever Mattson is attached hereto as **Exhibit 1**.

7.      The Debtors intend to file a Motion to employ me as Chief Restructuring Officer of all of the Debtors, effective as of the Petition Date.

8.      On the date hereof (the "Petition Date"), LeFever Mattson and 57 other Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

9.      To minimize the adverse effects of filing for bankruptcy protection on their business, the Debtors have filed several motions requesting various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value,

---

[2] One of the LLCs, Debtor Windscape Apartments, LLC, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 6, 2024.  Two LPs have not yet filed chapter 11 petitions.

(b) constitutes a critical element in achieving a successful resolution to these Chapter 11 Cases, and (c) best serves the Debtors' estates and creditors' interests.

10.     I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the First Day Motions.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge; information supplied to me by other members of the Debtors' management, employees, and professionals; information learned from my review of relevant documents; or my opinion given my experience and my knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized by the Debtors to submit this declaration.

11.     Part I of this declaration describes the Debtors' business, their secured and unsecured debt, and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

I.      **THE DEBTORS' BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11**

A.      **Overview of the Debtors' Corporate Structure, History, and Business**

12.     In 1990, Mr. LeFever purchased 50% of a real estate investment business owned by Mr. Mattson, creating LeFever Mattson.  The company's business was the ownership of investment real estate—single family homes as well as multi-unit properties.  Properties were owned by LeFever Mattson alone or as a tenant in common with other investors.  Eventually the business model shifted to creating limited liability companies, and then limited partnerships, to purchase multi-family or other commercial properties.  This structure allowed LeFever Mattson to pool more capital by selling limited interests to a small number of accredited investors while typically reserving an ownership interest in the investment entity for itself as general partner or managing member.

13.     LeFever Mattson also has ownership interests in four California corporations: Debtor Home Tax Service of America, Inc., dba LeFever Mattson Property Management (the "Property Manager"), which provides property management services, including to those properties

owned by the LPs and the LLCs; Debtor California Investment Properties ("CIP"), a California corporation, which is a real estate brokerage; and non-debtors Pineapple Bear, a California corporation (which offers hospitality and catering services) and Harrow Cellars, a California corporation (which operates a winery and related businesses).

14.     LeFever Mattson has grown substantially since 1990 and today manages a portfolio of more than 200 properties (the "Properties"), comprised of commercial, residential, office, and mixed-use real estate, as well as vacant land, located throughout Northern California, primarily in Sonoma, Sacramento, and Solano Counties.  The Debtors generate income from the Properties through rents (the "Rents") and use the proceeds to fund their operations.

15.     LeFever Mattson has no employees.  The Property Manager has 45 employees.   It provides property management services for the Properties through a set of management agreements, and it holds bank accounts in trust for the LLCs and LPs, for rents and expenses.  CIP is a real estate brokerage that has provided services in connection with the Properties and others purchased or sold by LeFever Mattson, the LPs, and the LLCs.  CIP, the LPs, and LLCs have no employees.

**B.     The Mattson Transactions**

16.     Since my engagement on July 18, 2024, I have worked closely with LeFever Mattson and the other Debtors in their efforts to maximize enterprise value in the wake of what, in retrospect and on information and belief, was a decade or more of financial misconduct by Mr. Mattson.

17.     Mr. Mattson appears to have used LeFever Mattson and many of the LPs and LLCs to facilitate a years-long campaign of self-serving transactions, many of which were not recorded in the books and records of LeFever Mattson, the Debtor, or any of the other LPs or LLCs (collectively, the "Mattson Transactions").  Investigation into the Mattson Transactions is ongoing. However, on information and belief, the transactions took two primary forms.

18.     *First*, Mr. Mattson purported to sell equity interests in over 25 of the LPs and LLCs to hundreds of investors through transactions that, on information and belief, were unknown to Mr. LeFever and not recorded in the books and records of LeFever Mattson or the appropriate LP

or LLC (collectively, the "<u>Mattson Interest Sales</u>").  The proceeds of the Mattson Interest Sales—which, based on initial investigation, appear to have amounted to over $45 million during the period of May 2017 through March 2024—appear to have gone ultimately to Mr. Mattson, rather than to LeFever Mattson or the appropriate LP or LLC.  LeFever Mattson, the Property Manager, and 12 of the LPs and LLCs are now defendants in lawsuits, including a putative class action, by investors claiming to have purchased legitimate LP or LLC interests through transactions with Mr. Mattson—though, on information and belief, those alleged transactions and interests were unknown to Mr. LeFever and not recorded in the books and records of LeFever Mattson, the Debtor, or any of the other LPs or LLCs.  The Debtors do not know how many additional LPs and LLCs may have been affected by Mattson Interest Sales.

19.     ***Second***, on information and belief, Mr. Mattson caused certain of the LPs and LLCs to purchase properties owned by Mr. Mattson's own investment company—by executing the transactions himself on behalf of both buyer and seller (collectively, the "<u>Mattson Property Sales</u>").  Some of the Mattson Property Sales were at inflated prices, and some conveyed properties encumbered by high-interest loans with balloon payments, which Mr. Mattson took out through his own investment company and on Ih he has now defaulted.  The Mattson Property Sales have clouded title on a significant portion of the LeFever Mattson real estate portfolio, and a number of LPs and LLCs now hold properties, obtained through Mattson Property Sales, that are encumbered by loans that are in default.

20.     The Debtors believe that these Chapter 11 Cases are necessary to fairly and transparently resolve the uncertainty that the Mattson Transactions have created for the Debtors and their stakeholders.

**C.     The Debtors' Secured and Unsecured Debt**

21.     As shown in the Debtors' consolidated *List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (the "<u>Top-30 List</u>"), the Debtors have unsecured debt in the form of trade debt, unsecured notes payable, prepaid rent or security deposits held for tenants of the Properties, and litigation claims.  The Debtors also owe some unsecured debt to insiders,

including other Debtors, that they have incurred in the ordinary course of business to meet expenses.

22.     Approximately 29 secured lenders (the "Lenders") appear to hold deeds of trust and assignments of rents on the Properties.  As discussed further below, the Lenders include both institutional and individual lenders that have made loans to the Debtors on a variety of terms.

23.     The Debtors have not completed a thorough review and analysis of the entirety of the Lenders' loan documents.  As mentioned above, the original borrower on many of the loans was an entity controlled by Mr. Mattson, such that final loan documents may not be in the Debtors' possession.

**D.      Events Leading Up to Chapter 11 Filing**

24.     LeFever Mattson, the Property Manager, and 12 of the LPs and LLCs are defendants in lawsuits, including a putative class action, by investors alleging that they were parties to Mattson Interest Sales.  A primary purpose of these Chapter 11 Cases is to consolidate those claims—and any similar claims against the Debtors yet to be filed—for fair and transparent resolution.

25.     A second purpose of these Chapter 11 Cases is to address the Mattson Property Sales, many of which involved loans from a particular lender, Socotra Capital ("Socotra").

26.     On information and belief, from approximately 2019 through 2023, Mr. Mattson caused KS Mattson Partners L.P. (the "Mattson Partnership"), a partnership that he beneficially owns, to purchase numerous properties (the "Mattson Properties") that were financed by loans issued by Socotra (the "Socotra Loans"), and then caused the Mattson Partnership to sell the Mattson Properties, sometimes at inflated prices, to the LPs and LLCs—still encumbered by the Socotra Loans.

27.     On information and belief, the Mattson Partnership has not made required payments on the Socotra Loans, such that the Mattson Properties, now all held by the LPs and LLCs, are subject to foreclosure proceedings by Socotra.

28.     The Debtors have thus far successfully negotiated forbearances with Socotra prior to the foreclosure sale of any of the Mattson Properties.  However, absent a stay, the Debtors believe that foreclosure sales of Mattson Properties are likely.

29.     The Debtors believe that there may be meaningful equity value in the Mattson Properties and intend to engage one or more brokers to market and sell the properties.

30.     Accordingly, the Debtors have filed these Chapter 11 Cases to facilitate the fair and transparent resolution of claims arising from Mattson Interest Sales, to stay foreclosure sales of Mattson Properties, and to otherwise preserve and maximize value for the benefit of the Debtor's stakeholders.

31.     As of the Petition Date, Mr. LeFever and Mr. Mattson have resigned from any director or officer positions with any of the Debtors, and the Board of Directors of LeFever Mattson is comprised of two independent directors: Rishi Jain and Lance Miller.

## II.     FIRST DAY MOTIONS[3]

### A.     Joint Administration Motion

32.     The Debtors, including Windscape Apartments, LLC,[4] are affiliates of each other, and LeFever Mattson is the parent entity of the other Debtors.  Through this First Day Motion, the Debtors seek entry of an order directing the joint administration of the Chapter 11 Cases for procedural purposes only.  The Debtors respectfully request that the Court maintain one file and one docket for the Chapter 11 Cases under the case of LeFever Mattson, and that the Chapter 11 Cases be administered under the consolidated caption set forth in the Motion.

### B.     Motion Regarding Consolidated Creditor List

33.     Through this First Day Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (b) file a consolidated list of the Debtors' thirty (30) largest unsecured

---

[3]     Capitalized terms used in Part II of this Declaration but not otherwise defined shall have the meanings given to them in the First Day Motion to which the paragraphs relate.

[4]     Windscape Apartments, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 6, 2024

creditors in lieu of filing a separate top twenty creditor list for each Debtor; (ii) implementing certain procedures for the mailing of the Notice of Commencement; and (iii) granting related relief.

34.     The Property Manager handles operations for nearly all of the Debtors.  It uses a single software program, Yardi Systems, to manage all of the Properties owned by the Debtors. The Debtors use many of the same vendors and suppliers for the Properties.  While the Debtors are able to separate their creditors by entity, due to the consolidated nature of the Debtors' operations, a significant number of their creditors overlap among the various LLCs and LPs.  It would be unduly burdensome to create a separate mailing matrix for each of the nearly 60 debtors.

**C.     Application to Retain Claims Agent**

35.     Through this First Day Motion, the Debtors seek entry of an order engaging and appointing Verita as the Debtors' claims and noticing agent in the Chapter 11 Cases, effective as of the Petition Date.  Among other things, Verita will be responsible for the distribution of notices, the maintenance of a case website, and the administration, maintenance, processing, and docketing of proofs of claim in the Chapter 11 Cases.  The terms of Verita's retention are set forth in the Standard Claims Administration and Noticing Agreement (the "<u>Engagement Agreement</u>"), which is attached as Exhibit 1 to the Proposed Order on the Motion.  For the avoidance of doubt, Verita is seeking approval of its engagement based solely on the terms and provisions as set forth in this Application and the Proposed Order attached hereto.

36.     By a separate application, the Debtors will seek authorization to retain and employ Verita as administrative advisor in these Chapter 11 Cases pursuant to section 327(a) of the Bankruptcy Code, because the administration of these Chapter 11 Cases will require Verita to perform duties outside the scope of 28 U.S.C. § 156(c).

37.     The Debtors include nearly 60 entities, each of which is associated with a diverse set of creditors.  The individual mailing matrices would include investors in, trade creditors of, and tenants of all of these entities.  The complexity of these matrices further arises from the interconnections between the Debtors and their creditors, resulting in overlapping claims.  These records require extensive work and time from staff to analyze and prepare into individual matrices.

It would be unduly burdensome to require the Debtors' limited staff to prepare mailing matrices and notices to all parties for each of the Debtors.

**D.    Motion to Extend Time to File Schedules and Statements**

38.    Through this First Day Motion, the Debtors request entry of an order extending the Schedules and Statements Deadline by 32 days, to October 28, 2024, granting the Debtors a total of 46 days after the Petition Date to file their Schedules and Statements, without prejudice to the Debtors' right to request additional time if necessary.  The requested extension will allow the Debtors time to prepare the Statements and Schedules properly given their limited number of employees.[5]

39.    The Debtors have computerized records of the information required for the Schedules and Statements in the Chapter 11 Cases.  However, these records require work and time from experienced staff to analyze and consolidate into the Schedules and Statements required by Section 521 of the Bankruptcy Code.  These same employees manage the day-to-day business of operating over 200 Properties with nearly 1,000 individual rental units.  The individual Debtors do not have their own teams available to assist them with the reporting requirements of the Bankruptcy Code.

**E.    Cash Management Motion**

40.    Through this First Day Motion, the Debtors request authorization to continue using their Cash Management System, Bank Accounts, and Business Forms.  This will benefit the Debtors' estates by maintaining consistency in their receipt of Rents and prevent disruption for their tenants and creditors, aiding the consistency of the Debtors' cash flow as they begin these Chapter 11 Cases.  A diagram of the Cash Management System is attached hereto as **Exhibit 2**.

41.    The Debtors have approximately 54 accounts, the Bank Accounts,[6] approximately 43 of which are maintained with Citizens Business Bank N.A. ("CB Bank").   The remaining

---

[5]    Windscape Apartments, LLC, which is a Debtor included in the relief sought herein, previously received an extension to September 19, 2024.  The Debtors are requesting that it be extended further to October 28 so that all Schedules and Statements may be prepared together in an efficient uniform process.

[6]    The Bank Accounts include the account (the "Windscape Account") held by the Property Manager on behalf of Windscape Apartments, LLC ("Windscape"), debtor in case number 24-

accounts are with Exchange Bank, Umpqua Bank, Wells Fargo Bank, N.A., BMO Bank, N.A. dba Bank of the West, California Bank of Commerce, N.A., and First Bank (collectively, the "<u>Banks</u>"). Attached hereto as **<u>Exhibit 3</u>** is a schedule of the Debtors' Bank Accounts in existence as of the Petition Date, including the titles and last four digits of the numbers of each (the "<u>Bank Account Schedule</u>").

42.     CB Bank, Exchange Bank, Umpqua Bank, Wells Fargo Bank and BMO Bank are all FDIC-insured institutions and U.S. Trustee Authorized Depositories for debtors in possession in the Northern District of California.  The Debtors have two Bank Accounts, one at California Bank of Commerce and one at First Bank, that are not authorized depositories (collectively, the "<u>Unauthorized Depository Accounts</u>").  The Debtors are in the process of closing the Unauthorized Depository Accounts and transferring the funds to newly opened CB Bank accounts, which they expect will be accomplished within 30 days of the Petition Date.

43.     The Property Manager holds a bank account in trust for its non-debtor, non-LeFever Mattson related management clients.  Those accounts are not debtor in possession accounts and, as such, are not included on the Bank Account Schedule.

44.     Each of the LLCs and LPs with operating income has a trust account held by the Property Manager, a Debtor in these Chapter 11 Cases, for that LLC's or LP's benefit.  The Rents are deposited into the Bank Account for the LLC or LP owner of that particular Property.  This is done through one of four methods: (1) automated clearing house ("<u>ACH</u>") deposits; (2) credit or debit card payments; (3) checks; or (4) third-party payment systems.[7]  Over half of the Debtors' apartment residents make automatic monthly payments through ACH or by credit or debit card.

---

10417 (CN).  That account, ending in 3175, was the subject of Windscape's *Motion of Debtor for Order Approving Continued Use of Cash Management System, Bank Account, and Business Forms* [Windscape Dkt. No. 23] (the "<u>Windscape Cash Management Motion</u>") which was granted on an interim basis.  This First Day Motion includes the Windscape Account and is intended to encompass and supersede the Windscape Cash Management Motion.

[7]     These include the walk-in payment system, WIPS, which allows residents to pay rent with cash and Flexible Finance Inc. which is a rent-financing system that allows residents to pay in two installments over the course of a month instead of the traditional monthly payment.

1   Those payments are (and must be) set up through the Property Manager's online tenant portal and
2   are thereby automatically allocated to the appropriate Property and unit.

3       45.     Disbursements are made from the Bank Accounts after being reviewed and
4   approved by the Property Manager.  Essentially, each of the Bank Accounts acts as an operating
5   account for the beneficiary LLC or LP.

6       46.     Closing the Bank Accounts would break the automated connection between those
7   Banks and the tenants' bank accounts, the credit and debit card companies, or third-party payment
8   systems.  Tenants would then have to manually pay their rent by mailing checks to the Property
9   Manager, which would take longer to receive and add to the risk of payments being denied for
10  insufficient funds.  Those without printed checks would need to go to the expense and hassle of
11  purchasing money orders or cashier's checks.  Eventually, residents would be able to reconnect to
12  the automated system, but they would have to reinitiate the process themselves.  All of the
13  foregoing would slow the Property Manager's receipt of the Rents, thus disturbing and delaying
14  the Debtors' cash flow.

15      47.     Closing the Bank Accounts would also be a significant administrative burden for
16  the Debtors.  With over 50 accounts collecting income from over 946 individual units, closing the
17  existing Bank Accounts and opening new ones would take a potentially overwhelming amount of
18  staff time, in addition to the time necessary to reestablish the automated receipts and payments.
19  At a time when the Debtors' employees are already taxed with the chapter 11 reporting
20  requirements, recreating the Debtors' entire Cash Management System would unnecessarily
21  hamper the Debtors' ability to smoothly transition into Chapter 11.

22      48.     From time to time, and in the ordinary course of business, the Debtors incur certain
23  obligations for the maintenance of the Cash Management System.  These obligations primarily
24  consist of amounts owed to the Banks for the maintenance of and services related to the Bank
25  Accounts (the "Cash Management Fees").  The Cash Management Fees for the Bank Accounts are
26  withdrawn from the Bank Accounts periodically throughout the month depending on the service
27  needed.  The total of the Cash Management Fees averages approximately $2,000 per month.  The
28  Debtors estimate that, other than the September prepetition Cash Management Fees, there are no

other accrued, unpaid, and undisputed prepetition amounts outstanding as of the date hereof on account of the Cash Management Fees. Accordingly, the Debtors seek authorization to pay any Cash Management Fees up to an aggregate amount of $5,000 on an interim basis.

49.     In the ordinary course of business, the Debtors issue checks and use a variety of business forms, including, but not limited to, leases and invoices (collectively, the "Business Forms"). To prevent disruption to residents, tenants, suppliers, and other vendors from new forms or otherwise complying with Bankruptcy Local Rule 2015-1(a), pursuant to this Motion, the Debtors seek authority to continue using its Business Forms substantially in the form used immediately prior to the Petition Date, without reference therein to the Debtors' status as "Debtors in Possession." The Debtors do not believe that any prejudice will be suffered by any party if this relief is granted.

## F.     Employee Wages and Benefits Motion

50.     Through this First Day Motion, the Debtors seek authority to continue to honor their Prepetition Employee Obligations up to the Section 507 Cap so as to minimize the disruption to their employees. The Debtors further request that the Court authorize the Banks to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the disbursement accounts to the extent that such checks or electronic fund transfers relate to any Prepetition Employee Obligations.

51.     As of the Petition Date, the Debtors have 45 employees, all of whom are employed by the Property Manager. The Debtors could not operate without these employees. They are critical to maximizing the value of the Debtors' estates for the benefit of their creditors. The employees' skills, knowledge, and understanding of the Debtors' infrastructure, operations, and real property assets are essential to the value of the Debtors' business. They also maintain the Properties in good and habitable condition under the terms of their various leases. These employees manage the Debtors' rental properties and have relationships with the Debtors' tenants that are critical to, among other things, effective communication with tenants as the Debtors transition into the Chapter 11 Cases. Furthermore, the employees have the knowledge of the

Properties needed to sell them at the highest possible price. Without them, the Debtors would have difficulty realizing, let alone maximizing, the value of their substantial real estate portfolio.

52. The Debtors' employees receive their paychecks twice a month, in arrears. They receive checks on the third day of a month for work done from the 15th through the 28th of the prior month, and they receive checks on the 18th day of a month for work done from the 29th day of the prior month through the 14th day of the month (the "Wages"). Anticipating the filing of the bankruptcy petitions, the Debtors prepaid their employees on September 11, 2024, for work performed through and including September 13, 2024. The next regularly scheduled payroll is on October 3, 2024, for entirely postpetition work performed from September 14 through September 27. As a result, the Debtors believe that all prepetition wages have been paid. However, in an abundance of caution, the Debtors seek authority to pay any unpaid prepetition wages not to exceed $15,150 to any applicable employee (the maximum priority claim under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, hereafter the "Section 507 Cap").

53. The Debtors offer vacation benefits (the "Vacation Benefits") to their full-time employees. Employees accrue vacation time each pay period. As of the Petition Date, the Debtors do not believe that any employees are owed compensation for Vacation Benefits; however, to the extent they are, the Debtors seek authority to pay the Vacation Benefits up to the amount of the Section 507 Cap, per employee. The Debtors further seek authority to honor accrued vacation pay in the ordinary course of business.

54. The Debtors take deductions from their employees' paychecks to make payments on behalf of the employees for or with respect to, among other things, the Debtors' Prepetition Benefits, amounts due to federal, state and local taxing authorities for the Employee Taxes, and garnishments under court order. As of the Petition Date, the Debtors' payroll processor, I Human Capital Management ("I"), may be holding amounts deducted from their employees' Prepetition Compensation that have not yet been remitted to the taxing authorities, benefits providers, or courts (collectively, the "Prepetition Obligations"). Such withheld funds, to the extent that they remain in the Debtors' or OnePoint's possession, constitute moneys held in trust and, therefore, are not property of the Debtors' estates. Thus, directing such funds to the appropriate parties should not

require Court approval. Nevertheless, the Debtors seek authority to direct that any Prepetition Obligations withheld from the employees' paychecks and owed to third party taxing authorities, benefits providers, or courts, including those incurred prior to the Petition Date, be delivered as required.

55. In the ordinary course of business, the Debtors maintain certain benefits for their employees, including the following: (a) health-related benefits, such as medical, dental, vision; and insurance benefits such as life insurance and accidental death and dismemberment insurance (collectively, the "Health Benefits") and (b) provide access to a 401(k) plan (the "Voluntary Benefits," and jointly with the Health Benefits, the "Employee Compensation and Benefit Programs").

56. The Debtors provide their employees with various health-related benefits. They offer medical insurance through Kaiser Foundation Health Plan ("Kaiser"). Employees may choose from one of three plans with varying deductible amounts. Employees receive credit for reimbursements in the amount set by their chosen plan at the start of the calendar year unless they have chosen the full reimbursement plan in which case their reimbursements are not capped. The Debtors pay for the Kaiser premium and, depending on the plan chosen by the employee, part or all of the deductible. The employees use health care debit cards to pay for treatment so that funds are drawn directly from the Debtors' bank accounts. However, if the employee does not use the debit card for a service and instead pays out of pocket, they must submit a request for reimbursement from the Debtors. The Debtors seek authority to honor any prepetition reimbursement requests for services incurred but not paid prior to the Petition Date.

57. The Debtors offer dental and vision coverage through Humana Inc. ("Humana") and life and accidental death and dismemberment insurance through The Guardian Life Insurance Company of America ("Guardian"). Approximately $18,762 is owed to Kaiser, approximately $3,017 is owed to Humana, and approximately $830 is owed to Guardian for the September premium payments. Those payments were sent by check to the respective insurers but may not have cleared the Debtors' accounts prior to the Petition Date. In the event that those premiums

have not been paid, the Debtors seek authority to pay the foregoing, all to the extent that they fall within the Section 507 Cap.

58. The Debtors believe that they are current on their other obligations under the Health Benefits. However, out of an abundance of caution, the Debtors seek authority, without being required, to pay all prepetition amounts under the Health Benefits that are discovered to be outstanding, including any that were incurred but not reported prepetition, in order to ensure that there is no disruption to employees' health-related coverage, subject only to the Section 507 Cap.

59. The Debtors offer employees access to a 401(k) plan (the "401(k) Plan") where the participants' portions are funded through deductions from their paychecks. The Debtors match the participants' contributions up to 4% of that participant's salary. Empower Annuity Insurance Company of America administers the 401(k) Plan.

60. The Debtors believe that they are current on all of their other obligations under the 401(k) Plan. However, out of an abundance of caution, the Debtors seek authority, without being required, to pay all prepetition amounts under the 401(k) Plan that may be outstanding, including any that were incurred but not paid prepetition, subject only to the Section 507 Cap.

61. The Debtors, as employers, are required by law to withhold federal, state, and local taxes (the "Employee Taxes") from wages for remittance to appropriate taxing authorities. These withheld funds, to the extent that they are in the Debtors' possession, constitute monies held in trust and are not property of the Debtors' bankruptcy estates. In addition to the Employee Taxes, the Debtors are required to pay, from their own funds, social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "Payroll Tax Obligations"), and remit the same to the appropriate state and federal taxing authorities. The Debtors should be authorized to pay all Payroll Tax Obligations as they come due, including any obligations arising from payment of the Prepetition Compensation pursuant to the Interim and Final Orders on this Motion.

/ / /

/ / /

62.     The Debtors' employees pay for certain expenses for which the Debtors reimburse them.  The Debtors customarily reimburse their employees for a variety of business expenses incurred in the ordinary course of their business, including milage and cell phone service (the "Reimbursable Expenses").  To obtain reimbursement of business expenses, an employee is required to submit a request, accompanied by itemized receipts or milage report for approval by the employee's supervisors and/or management.  Once approved, reimbursements are paid directly to the employee's bank account.  In a typical month, the Debtors reimburse employees for approximately $7,100 of expenses in the aggregate.

63.     It is likely that certain employees have not been reimbursed for Reimbursable Expenses incurred prior to the Petition Date.  It is difficult for the Debtors to determine the exact amount of Reimbursable Expenses that are outstanding because, among other things, employees may not have submitted reimbursement forms for all accrued expenses.  The Debtors request that they be authorized to reimburse all such expenses when the reports are submitted, in order to assure such employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment.

64.     The Debtors do not expect that their obligations for Reimbursable Expenses as of the Petition Date will exceed $10,000 in the aggregate.

**G.     Utilities Motion**

65.     Through this First Day Motion, the Debtors propose that, upon the request of any Utility Company pursuant to the procedures set forth in the Motion, the Debtors provide an adequate assurance deposit in the amount of the average of two weeks' worth of fees over the year prior to the request by the Utility Company (the "Proposed Adequate Assurance"), and that requests and deposits be accounted for each account used by the Debtors.  The Debtors propose to adopt and follow defined procedures (the "Adequate Assurance Procedures") to address the right of any Utility Company under section 366I(3) of the Bankruptcy Code to request the Proposed Adequate Assurance or to modify the proposed amount of adequate assurance.

66.     The Debtors rely on utility services, including, but not limited to, telephone, internet, gas and electric, and waste removal services (collectively, the "Utility Services") provided

by the Utility Companies, including those identified on Exhibit C to the Motion, to operate their businesses. As discussed above, the Debtors own and operate a variety of investment properties, including residential, multifamily, mixed-use, office, commercial, industrial, and agricultural, and rely critically on the Utility Services for their operations. Many of the underlying accounts involve very small monthly charges which have been paid consistently on a timely basis. Moreover, given the nature of the Debtors' business, providing uninterrupted service from the Utility Companies is essential to maintaining value and administering these Chapter 11 Cases. The Debtors are prepared to provide additional deposits as necessary to maintain the continuity of the Utility Services. In the meantime, any temporary or permanent discontinuation of Utility Services could irreparably disrupt the orderly administration of these cases, damage the Debtors' assets, and, as a result, diminish recoveries to the Debtors' stakeholders.

**H.      Motion to Authorize Payment of Certain Prepetition Taxes**

67.      Through this First Day Motion, the Debtors seek authority to pay, in their discretion, the Taxes and Assessments, in order to, among other things, prevent the Taxing Authorities from taking actions that may interfere with the administration of the Chapter 11 Cases and impede the Debtors' ability to successfully sell Properties, including, in some instances, asserting liens on the Debtors' property and imposing penalties and/or significant interest on past-due taxes.

68.      Ample authority and cause exist to authorize the payment of the Taxes and Assessments, including, without limitation, that: (i) certain of the Taxes and Assessments may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code or result in the imposition of liens on the Debtors' property if unpaid, and (ii) interest and penalties may accrue on certain unpaid Taxes and Assessments, even after the Petition Date. Further, the Court has authority to grant the relief requested in the Motion pursuant to section 363(b) and 105(a) of the Bankruptcy Code.

69.      In the ordinary course of operating their businesses, the Debtors incur a variety of Taxes and Assessments that they remit periodically to various federal, state, and local taxing, licensing, and other governmental authorities. As set forth in further detail below, the Debtors

generally pay the Taxes and Assessments semi-annually or annually, as required by applicable laws. As of the Petition Date, the Debtors estimate that an aggregate amount of approximately $219,059 in Taxes and Assessments are due and owing to the various taxing authorities (the "Taxing Authorities"), the entire amount of which relates to the prepetition period.

70. The Debtors operate numerous investment properties throughout Northern California and pay annual taxes to various Taxing Authorities on account of the Debtors' real property (collectively, the "Real Property Taxes"). As of the Petition Date, the Debtors owe approximately $173,581 in Real Property Taxes, which were due as of September 30, 2024, and which will be delinquent if not paid by that date, and therefore are all due and payable within the interim period. The Debtors therefore to be authorized, but not directed, to pay, on both an interim and final basis, an amount not to exceed $219,059 in prepetition Real Property Taxes. The Debtors will also pay postpetition Real Property Taxes as they come due, subject to any agreement or order with respect to cash collateral.

## I. Motion to Authorize Use of Cash Collateral

71. Through this First Day Motion, the Debtors seek authority for emergency use of the Cash Collateral of Accepting Lenders for Property Level Expenses as set forth in the Property Budget; and reserve the right to supplement the Motion to use the Cash Collateral of any Nonaccepting Lender upon an evidentiary presentation demonstrating that such Nonaccepting Lender is adequately protected.

72. For Accepting Lenders, the Debtors further seek authority to provide adequate protection to such Accepting Lenders by (A) making monthly debt service payments in accordance with pre-filing practices, (B) paying Property Level Expenses in order to maintain the value of the Property or Properties subject to such Accepting Lender's mortgage(s), and (C) providing continuing reporting consistent with pre-filing practices. Accepting Lenders will not receive additional or replacement liens, and cash generated by the underlying Property will be maintained in a concentration account, by Debtor, in accordance with past and continuing practices of the Property Manager.

73. For Lenders that wish to opt out, *i.e.*, Nonaccepting Lenders, the Debtors do not seek authority to use their Cash Collateral on an interim basis, unless and except to the extent that such Nonaccepting Lender consents to such use.

74. The Debtors have identified twenty-nine (29) lenders (the "Lenders") that hold mortgages on the vast majority of the more than two hundred (200) Properties owned by the Debtors. Most of the Properties are generating rents or other cash proceeds (hereafter, "Cash Collateral") that are subject to the Lenders' mortgages. The Debtors' preliminary analysis suggests that (1) the amount of each mortgage is, on average, less than 60% of the corresponding Property's value; and (2) the average aggregate net cash flow from the Properties is well in excess of $100,000 per week before debt service and more than $50,000 per week after debt service. The Debtors have historically had no difficulty making debt service payments on their Properties and, but for the Mattson Transactions, the Debtors would not have had cash flow issues or the need to commence these Chapter 11 Cases.

75. The Debtors have been unable to negotiate the use of Cash Collateral with the Lenders. Based on their discussions with certain of the Lenders and their understanding of the interests of other Lenders, they believe that several will be Accepting Lenders (as hereafter defined) that will free sufficient Cash Collateral for the Debtors to manage their affairs until the final hearing on this Motion. With respect to Cash Collateral generated by a Property owned by a Nonaccepting Lender (as hereafter defined), the Debtors reserve the right to use their Cash Collateral without consent by presenting evidence that the interest of such Nonaccepting Lender is or will be adequately protected, *e.g.*, by an equity cushion, monthly payments, or other forms of protection contemplated by section 361 of the Bankruptcy Code.

76. The Debtors require the use of Cash Collateral to operate their businesses as set forth in the collection of 13-week budgets (each, a "Property Budget") attached hereto as **Exhibit 4**, reflecting cash flows for each Property, along with an index to assist Lenders in identifying the Properties in which each maintains an interest. Each Property Budget is comprised of expenses directly related to the operation of the Properties and subject to certain mortgages, such as maintenance, property insurance, debt service, utilities, and property management.

77. LeFever Mattson, as a managing member and/or limited partner of many of the Debtors, has a continuing equity interest in those Debtors. Subject to further developments in these Chapter 11 Cases, it is anticipated that LeFever Mattson will pay the majority of the restructuring costs relating to these Chapter 11 Cases out of its interest in the various Properties owned by the other Debtors. To the extent that other Debtors accumulate cash after paying expenses permitted hereby, that cash will remain on the books of such Debtor and not be used for the benefit of LeFever Mattson or the other Debtors absent a noticed motion and further Court order authorizing the use of such accumulated cash.

**J. Motion to Maintain Insurance Programs**

78. Through this First Day Motion the Debtors seek authority to (i) maintain the Insurance Programs; (ii) pay the Insurance Obligations; and (iii) modify the automatic stay imposed by section 362 of the Bankruptcy Code to permit employees to proceed with their claims under Debtors' programs established in compliance with the Workers Compensation Program.

79. In connection with the operation of their businesses, the Debtors maintain numerous property and liability insurance programs that provide the Debtors with insurance coverage for claims relating to, among other things, workers' compensation, property liability, and employee health (collectively, the "Insurance Programs") through different insurance carriers (the "Insurance Carriers"). The Debtors maintain numerous Insurance Programs to cover their Properties in the ordinary course of their business.

80. The Debtors are required to pay, either directly or through the Debtors' insurance brokers, premiums and other sums for coverage under the Insurance Programs (collectively, the "Insurance Obligations"). The Insurance Obligations are based upon a fixed rate established and billed by each Insurance Carrier. The premiums for most of the Insurance Programs are determined annually and are paid at the inception of each policy, on a monthly basis, or pursuant to the terms of the applicable insurance premium financing agreement.

81. One of the Insurance Programs is the Debtors' policy of directors' and officers' liability insurance ("D&O Insurance"), which was purchased prior to the Petition Date and for

which payments will be due post-petition, pursuant to a financing agreement with the Insurance Carrier.

82.     The Debtors owe approximately $60,000 in Insurance Obligations due as of the Petition Date or coming due in the period thirty days after the Petition Date, but are unaware of any other outstanding amounts owed with respect to any Insurance Program (the "Interim Insurance Obligations").  However, it is possible that Debtors may identify outstanding Interim Insurance Obligations as of the Petition Date.

83.     More critically, certain of the Insurance Programs will expire imminently (the "Expiring Programs").  The renewal and continuation of the Expiring Programs is critical to a successful administration of these Chapter 11 Cases and required of chapter 11 debtors, as discussed below.  Failure to maintain the Insurance Programs would pose a risk to the estates or to the public.  Therefore, the Debtors request authority to renew the Expiring Programs and pay the premiums associated with the Expiring Programs when they become owing and due.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 12, 2024.

/s/ Bradley D. Sharp
Bradley D. Sharp

# EXHIBIT 6

# UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF California

In Re. LeFever Mattson, a California corporation

§
§
§
§

Debtor(s)

Case No. 24-10545

Lead Case No. 24-10545

☒ Jointly Administered

# Monthly Operating Report

Chapter 11

Reporting Period Ended: 09/30/2024

Petition Date: 09/12/2024

Months Pending: 1

Industry Classification: 5 3 1 3

Reporting Method: Accrual Basis ○   Cash Basis ⦿

Debtor's Full-Time Employees (current): 0

Debtor's Full-Time Employees (as of date of order for relief): 0

## Supporting Documentation (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒  Statement of cash receipts and disbursements
☒  Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒  Statement of operations (profit or loss statement)
☒  Accounts receivable aging
☒  Postpetition liabilities aging
☒  Statement of capital assets
☐  Schedule of payments to professionals
☒  Schedule of payments to insiders
☒  All bank statements and bank reconciliations for the reporting period
☐  Description of the assets sold or transferred and the terms of the sale or transfer

/s/ Thomas B. Rupp

Signature of Responsible Party

12/12/2024

Date

Thomas B. Rupp

Printed Name of Responsible Party

Keller Benvenutti Kim LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 11-MOR (12/01/2021)

| Debtor's Name LeFever Mattson, a California corporation | Case No. 24-10545 |
|---|---|

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. Cash balance beginning of month | $1,040,574 | |
| b. Total receipts (net of transfers between accounts) | $20,201 | $20,201 |
| c. Total disbursements (net of transfers between accounts) | $142,560 | $142,560 |
| d. Cash balance end of month (a+b+c) | $918,215 | |
| e. Disbursements made by third party for the benefit of the estate | $0 | $0 |
| f. Total disbursements for quarterly fee calculation (c+e) | $142,560 | $142,560 |

| Part 2: Asset and Liability Status (Not generally applicable to Individual Debtors. See Instructions.) | Current Month |
|---|---|
| a. Accounts receivable (total net of allowance) | $15,114 |
| b. Accounts receivable over 90 days outstanding (net of allowance) | $0 |
| c. Inventory     (Book ⦿   Market ◯   Other ◯   (attach explanation)) | $0 |
| d Total current assets | $30,832,824 |
| e. Total assets | $66,685,146 |
| f. Postpetition payables (excluding taxes) | $35,207 |
| g. Postpetition payables past due (excluding taxes) | $0 |
| h. Postpetition taxes payable | $0 |
| i. Postpetition taxes past due | $0 |
| j. Total postpetition debt (f+h) | $35,207 |
| k. Prepetition secured debt | $13,374,056 |
| l. Prepetition priority debt | $0 |
| m. Prepetition unsecured debt | $25,624,843 |
| n. Total liabilities (debt) (j+k+l+m) | $39,034,106 |
| o. Ending equity/net worth (e-n) | $27,651,040 |

| Part 3: Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b. Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c. Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4: Income Statement (Statement of Operations) (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. Gross income/sales (net of returns and allowances) | $2,005 | |
| b. Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. Gross profit (a-b) | $2,005 | |
| d. Selling expenses | $0 | |
| e. General and administrative expenses | $2,323 | |
| f. Other expenses | $0 | |
| g. Depreciation and/or amortization (not included in 4b) | $0 | |
| h. Interest | $1,367 | |
| i. Taxes (local, state, and federal) | $0 | |
| j. Reorganization items | $0 | |
| k. Profit (loss) | $-1,685 | $-1,685 |

UST Form 11-MOR (12/01/2021)

## Part 5:  Professional Fees and Expenses

|  |  | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* |  |  |  |  |
|  | *Itemized Breakdown by Firm* |  |  |  |  |
|  | Firm Name | Role |  |  |  |  |
| i | 0 |  |  |  |  |  |
| ii |  |  |  |  |  |  |
| iii |  |  |  |  |  |  |
| iv |  |  |  |  |  |  |
| v |  |  |  |  |  |  |
| vi |  |  |  |  |  |  |
| vii |  |  |  |  |  |  |
| viii |  |  |  |  |  |  |
| ix |  |  |  |  |  |  |
| x |  |  |  |  |  |  |
| xi |  |  |  |  |  |  |
| xii |  |  |  |  |  |  |
| xiii |  |  |  |  |  |  |
| xiv |  |  |  |  |  |  |
| xv |  |  |  |  |  |  |
| xvi |  |  |  |  |  |  |
| xvii |  |  |  |  |  |  |
| xviii |  |  |  |  |  |  |
| xix |  |  |  |  |  |  |
| xx |  |  |  |  |  |  |
| xxi |  |  |  |  |  |  |
| xxii |  |  |  |  |  |  |
| xxiii |  |  |  |  |  |  |
| xxiv |  |  |  |  |  |  |
| xxv |  |  |  |  |  |  |
| xxvi |  |  |  |  |  |  |
| xxvii |  |  |  |  |  |  |
| xxviii |  |  |  |  |  |  |
| xxix |  |  |  |  |  |  |
| xxx |  |  |  |  |  |  |
| xxxi |  |  |  |  |  |  |
| xxxii |  |  |  |  |  |  |
| xxxiii |  |  |  |  |  |  |
| xxxiv |  |  |  |  |  |  |
| xxxv |  |  |  |  |  |  |
| xxxvi |  |  |  |  |  |  |

| | | | | | |
|---|---|---|---|---|---|
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy) *Aggregate Total* | | | | | |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | | | | | | |
| ii | | | | | | |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |

UST Form 11-MOR (12/01/2021)

| | | | | | | |
|---|---|---|---|---|---|---|
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |
| xxxvii | | | | | | |
| xxxvii | | | | | | |
| xxxix | | | | | | |
| xl | | | | | | |
| xli | | | | | | |
| xlii | | | | | | |
| xliii | | | | | | |
| xliv | | | | | | |
| xlv | | | | | | |
| xlvi | | | | | | |
| xlvii | | | | | | |
| xlviii | | | | | | |
| xlix | | | | | | |
| l | | | | | | |
| li | | | | | | |
| lii | | | | | | |
| liii | | | | | | |
| liv | | | | | | |
| lv | | | | | | |
| lvi | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| lvii | | | | | | |
| lviii | | | | | | |
| lix | | | | | | |
| lx | | | | | | |
| lxi | | | | | | |
| lxii | | | | | | |
| lxiii | | | | | | |
| lxiv | | | | | | |
| lxv | | | | | | |
| lxvi | | | | | | |
| lxvii | | | | | | |
| lxviii | | | | | | |
| lxix | | | | | | |
| lxx | | | | | | |
| lxxi | | | | | | |
| lxxii | | | | | | |
| lxxiii | | | | | | |
| lxxiv | | | | | | |
| lxxv | | | | | | |
| lxxvi | | | | | | |
| lxxvii | | | | | | |
| lxxvii | | | | | | |
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |

| | xcix | | | | | | |
|---|---|---|---|---|---|---|---|
| | c | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | | | |

## Part 6:  Postpetition Taxes

| | | Current Month | Cumulative |
|---|---|---|---|
| a. | Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. | Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c. | Postpetition employer payroll taxes accrued | $0 | $0 |
| d. | Postpetition employer payroll taxes paid | $0 | $0 |
| e. | Postpetition property taxes paid | $0 | $0 |
| f. | Postpetition other taxes accrued (local, state, and federal) | $0 | $0 |
| g. | Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

## Part 7: Questionnaire - During this reporting period:

| | | | |
|---|---|---|---|
| a. | Were any payments made on prepetition debt?  (if yes, see Instructions) | Yes ● | No ○ |
| b. | Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions) | Yes ○ | No ● |
| c. | Were any payments made to or on behalf of insiders? | Yes ● | No ○ |
| d. | Are you current on postpetition tax return filings? | Yes ● | No ○ |
| e. | Are you current on postpetition estimated tax payments? | Yes ● | No ○ |
| f. | Were all trust fund taxes remitted on a current basis? | Yes ● | No ○ |
| g. | Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions) | Yes ○ | No ● |
| h. | Were all payments made to or on behalf of professionals approved by the court? | Yes ○   No ○   N/A ● | |
| i. | Do you have:        Worker's compensation insurance? | Yes ○ | No ● |
| | If yes, are your premiums current? | Yes ○   No ○   N/A ●  (if no, see Instructions) | |
| | Casualty/property insurance? | Yes ● | No ○ |
| | If yes, are your premiums current? | Yes ○   No ○   N/A ○  (if no, see Instructions) | |
| | General liability insurance? | Yes ● | No ○ |
| | If yes, are your premiums current? | Yes ●   No ○   N/A ○  (if no, see Instructions) | |
| j. | Has a plan of reorganization been filed with the court? | Yes ○ | No ● |
| k. | Has a disclosure statement been filed with the court? | Yes ○ | No ● |
| l. | Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? | Yes ● | No ○ |

UST Form 11-MOR (12/01/2021)

## Part 8: Individual Chapter 11 Debtors (Only)

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |
| l. | Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C § 101(14A)? | Yes ◯  No ◉ |
| m. | If yes, have you made all Domestic Support Obligation payments? | Yes ◯  No ◯  N/A ◉ |

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6). The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith. This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.**

/s/ Bradley D. Sharp
_____
Signature of Responsible Party

Bradley D. Sharp
_____
Printed Name of Responsible Party

Chief Restructuring Officer
_____
Title

12/12/2024
_____
Date