**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (Cal. Bar No. 151445)
David A. Taylor (Cal. Bar No. 247433)
Dara L. Silveira (Cal. Bar No. 274923)
Thomas B. Rupp (Cal. Bar No. 278041)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone: (415) 496-6723
E-mail:    tkeller@kbkllp.com
           dtaylor@kbkllp.com
           dsilveira@kbkllp.com
           trupp@kbkllp.com

Counsel to the LFM Debtors

**PACHULSKI STANG ZIEHL & JONES LLP**
Debra I. Grassgreen (Cal Bar. No. 169978)
John D. Fiero (Cal. Bar No. 136557)
Jason H. Rosell (Cal. Bar No. 269126)
Steven W. Golden (*pro hac vice* forthcoming)
Brooke E. Wilson (Cal. Bar No. 354614)
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: (415) 263-7000
Email:     LFMCommittee@pszjlaw.com

Counsel to the Official Committee of Unsecured
Creditors of the LFM Debtors and KSMP

**HOGAN LOVELLS US LLP**
Richard L. Wynne (Cal. Bar No. 120349)
Erin N. Brady (Cal. Bar No. 215038)
Edward J. McNeilly (Cal. Bar No. 314588)
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Email:     richard.wynne@hoganlovells.com
           erin.brady@hoganlovells.com
           edward.mcneilly@hoganlovells.com

Counsel to KSMP

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SANTA ROSA DIVISION

| | |
|---|---|
| In re<br><br>KENNETH W. MATTSON,<br><br>Debtor. | Case No. 24-10714-CN<br><br>Chapter 11<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OBJECTION OF THE LFM DEBTORS, KSMP, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PETITIONING DEFENSE COUNSEL'S MOTION FOR RELIEF OF PRESERVATION ORDER UNDER 11 U.S.C. § 303(f)**<br><br>Date:   September 19, 2025<br>Time:  11:00 a.m.<br>Place: (In Person or Via Zoom)<br>        United States Bankruptcy Court<br>        1300 Clay Street, Courtroom 215<br>        Oakland, CA 94612<br>Judge: Honorable Charles Novak |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

LeFever Mattson and its affiliated debtors in possession (collectively, the "LFM Debtors"), KS Mattson Partners, LP ("KSMP"), and the Official Committee of Unsecured Creditors (the "Committee" and, together with the LFM Debtors and KSMP, the "Objecting Estate Fiduciaries") hereby request that the Court take judicial notice pursuant to Federal Rule of Evidence 201 of the documents identified herein and referenced in the *Objection of the LFM Debtors, KSMP, and the Official Committee of Unsecured Creditors to Petitioning Defense Counsel's Motion for Relief of Preservation Order Under 11 U.S.C. § 303(f)* (the "Objection"),[1] filed concurrently herewith.

The Court may take judicial notice of the documents identified in paragraphs 1-11 below—documents filed in *United States v. Mattson*, Case No. 25-cr-00126-JST-1 (N.D. Cal.) (the "Mattson Criminal Proceeding") pending in the United States District Court for the Northern District of California (the "District Court")—because they are not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "Documents on file in federal or state courts are considered undisputed matters of public record." *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

1. The *Indictment* [Docket No. 1][2] filed in the Mattson Criminal Proceeding, a true and correct copy of which is attached hereto as Exhibit A.

2. The *Motion to Modify Pre-Trial Asset Restraints* [Docket No. 44], a true and correct copy of which is attached hereto as Exhibit B.

3. The *Declaration of Kenneth W. Mattson in Support of Defendant's Motion to Modify Pre-Trial Asset Restraints* [Docket No. 44-1], a true and correct copy of which is attached hereto as Exhibit C.

4. The *United States' Opposition to Defendant's Motion to Modify Pre-Trial Asset Restraints* [Docket No. 51], a true and correct copy of which is attached hereto as Exhibit D.

---

[1] Capitalized terms used but not defined herein are intended to have the meanings ascribed to them in the Objection.

[2] References to docket entries herein are to those found on the docket of the Mattson Criminal Proceeding.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

5.     The *Reply Brief in Support of Defendant's Motion to Modify Pre-Trial Asset Restraints* [Docket No. 65], a true and correct copy of which is attached hereto as <u>Exhibit E</u>.

6.     The *Order Denying Motion to Modify Pretrial Asset Restraint* [Docket No. 68], a true and correct copy of which is attached hereto as <u>Exhibit F</u>.

7.     The *Defendant Kenneth W. Mattson's Emergency Ex Parte Motion for a Hearing on Defendant's Motion to Modify Pre-Trial Asset Restraint* [Docket No. 70], a true and correct copy of which is attached hereto as <u>Exhibit G</u>.

8.     The *Supplemental Declaration of Kenneth W. Mattson in Support of Defendant's Motion to Modify Pre-Trial Asset Restraint* [Docket No. 70-1], a true and correct copy of which is attached hereto as <u>Exhibit H</u>.

9.     The *United States' Response in Opposition to Defendant's Emergency Ex Parte Motion for a Hearing on Defendant's Motion to Modify Pre-Trial Asset Restraint* [Docket No. 73], a true and correct copy of which is attached hereto as <u>Exhibit I</u>.

10.     The *Defendant Kenneth W. Mattson's Reply Brief in Support of Emergency Ex Parte Motion for a Hearing on Defendant's Motion to Modify Pre-Trial Asset Restraint* [Docket No. 76], a true and correct copy of which is attached hereto as <u>Exhibit J</u>.

11.     The *Order Denying Defendant's Motion for Hearing on Motion to Modify Pretrial Asset Restraint* [Docket No. 78], a true and correct copy of which is attached hereto as <u>Exhibit K</u>.

*[Remainder of page intentionally left blank]*

Dated:  September 10, 2025

PACHULSKI STANG ZIEHL & JONES LLP

By    */s/ Jason H. Rosell*
         Jason H. Rosell

      Attorneys for The Official Committee of
      Unsecured Creditors

Dated:  September 10, 2025

KELLER BENVENUTTI KIM LLP

By    */s/ Dara Levinson Silveira*
         Dara Levinson Silveira

      Attorneys for the LFM Debtors

Dated:  September 10, 2025

HOGAN LOVELLS US LLP

By    */s/ Erin N. Brady*
         Erin N. Brady

      Attorneys for KSMP

# EXHIBIT A

# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE:  SAN FRANCISCO

CR25-00126 CRB

UNITED STATES OF AMERICA,

V.

KENNETH W. MATTSON,

<div style="border:1px solid">

**FILED**

May 13 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

</div>

DEFENDANT(S).

# INDICTMENT

Counts 1-7: 18 U.S.C. § 1343 – Wire Fraud
Count 8: 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from
Specified Unlawful Activity (Money Laundering)
Count 9: 18 U.S.C. § 1519 – Destruction/Alteration of Records in a Federal Investigation
(Obstruction of Justice)
18 U.S.C.§§ 981, 982; 28 U.S.C. § 2461(c) – Forfeiture

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this ____13th____ day of

May, 2025_____.

S. Ybarra

Clerk

Bail, $ Warrant

Hon. Alex G. Tse, U.S. Magistrate Judge

**FILED**

May 13 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR25-00126 CRB |
| Plaintiff, | <u>VIOLATIONS:</u> |
| | 18 U.S.C. § 1343 – Wire Fraud; |
| v. | 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (Money Laundering); |
| KENNETH W. MATTSON, | 18 U.S.C. § 1519 – Destruction/Alteration of Records in a Federal Investigation (Obstruction of Justice); |
| Defendant. | 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) and (b)(1) and 28 U.S.C. § 2461(c) – Forfeiture Allegation |
| | SAN FRANCISCO VENUE |
| | <u>UNDER SEAL</u> |

<u>I N D I C T M E N T</u>

The Grand Jury charges:

<u>INTRODUCTORY ALLEGATIONS</u>

At all times relevant to this Indictment:

1.      For more than a decade, defendant KENNETH W. MATTSON orchestrated and operated a scheme whereby he fraudulently solicited and obtained millions of dollars in investments from hundreds of investors—many of whom were nearing or in retirement—in what he represented were legitimate and safe interests in limited partnerships that owned real estate.  Although MATTSON was a

INDICTMENT

part-owner of a company that formed and managed partnerships that owned real estate, the victim

investor funds did not go to that company or to the partnerships managed by that company. Instead,

MATTSON siphoned those victim investor funds into a scheme in which the investors had no legal

interest in the properties in which they believed they were investing, and any distributions they received

were in part funded by money from new investors—a Ponzi scheme. The scheme collapsed when

MATTSON was no longer able to raise new investor money to pay existing investors.

2.     Through oral and written false statements, misrepresentations, half-truths, and omissions,

MATTSON falsely represented to these victims that their investments gave them partnership interests

and corresponding legal rights in certain real estate-holding limited partnerships (LPs) managed by

LeFever Mattson, a California Corporation (LM). In fact, MATTSON never intended to make those

victims true and legal partners in the LM LPs. Instead of using the victims' funds to buy an ownership

interest in the LM LPs, as he represented, MATTSON used victim money for personal expenses, to

purchase and fund properties held in the name of his personal real estate holding entity, and to make

payments to existing investors. Instead of communicating to LM that the investors had purchased

interests in LM LPs and ensuring that the investors were recorded as official owners of the LM LPs,

MATTSON concealed the existence of the investors and their investments from LM. In doing so,

MATTSON breached his fiduciary duty to LM and the partners of the LM LPs.

3.     To perpetuate the scheme and ensure that victim investors and officers and employees of

LM and a related entity that kept LM's official books and records did not discover the fraud,

MATTSON manufactured records he knew were false and falsely represented to investors that LM

managed their partnership stakes. He also utilized a bank account in the name of LM to issue checks to

victim investors, issued and caused paperwork to be issued in the name of LM and LM LPs purporting

to reflect the value of the purported investments, and provided fictitious tax forms to investors that

falsely reflected LP ownership interests and other material information. All of these were false

statements designed to make investors believe they had invested in and owned legitimate shares of real

LM-managed LPs and to induce future investments with MATTSON.

4.     MATTSON also laundered money by using proceeds of the scheme—specifically victim

investments—to fund personal expenditures and real estate ventures that benefitted himself, not victim

INDICTMENT

investors.

5.      MATTSON also engaged in similar fraudulent conduct through another real-estate holding entity over which he exercised sole business control—KS Mattson Partners, LP (KSMP).

6.      After MATTSON learned that federal authorities were investigating his scheme, and two days before the execution of a federal search warrant at his residence in Sonoma, California, MATTSON obstructed justice by, among other things, deleting from his personal computer thousands of documents related to the scheme and victim investors.

<u>RELEVANT INDIVIDUALS AND ENTITIES</u>

7.      Defendant KENNETH W. MATTSON resided in Sonoma County and Alameda County in the Northern District of California.  MATTSON was previously a registered financial advisor and broker.  He was also a tax preparer who possessed an Internal Revenue Service (IRS) Preparer Tax Identification Number (PTIN), which he used to prepare and submit federal tax returns.

8.      LM was a California corporation with its principal place of business in Citrus Heights, California.  MATTSON was the President of LM and owned 50 percent of its shares.  LM, and related and subsidiary entities owned and/or controlled by LM, owned and managed commercial and residential properties, including in the Northern District of California.

9.      MATTSON, as President of LM, had primary responsibility for soliciting investments for LM projects and finding and acquiring real estate for LM LPs.

10.     Home Tax Service of America, Inc. d/b/a LeFever Mattson Property Management (Home Tax), majority-owned by LM, acted as the property manager for properties owned by LM and LM-managed LPs.  Home Tax's duties included collecting rents, property maintenance, and paying distributions owed to limited partners in LM LPs.  Home Tax also acted as the official keeper of books and records for LM LPs and other entities over which it exercised control.  In that role, Home Tax tracked and updated information about those limited partnerships and other entities, including names and contact information of the initial limited partners, changes in ownership, and monthly distributions owed to record limited partners.  Home Tax also submitted IRS Form 1065 partnership returns for the LM LPs and provided K-1 partnership distribution forms to record limited partners of the LM LPs.

11.     Divi Divi Tree, LP (Divi Divi) was a California limited partnership.  Divi Divi was

1    formed in 2002.  Divi Divi was formed to acquire and maintain a large multi-unit apartment community

2    called the "Sienna Pointe Apartments."  Divi Divi had approximately 19 original investors and limited

3    partners, who contributed more than $10,000,000 in initial capital.  LM was the General Partner.  Over

4    time, LM, KSMP, and others purchased the interests of other investors, such that by December 2023, the

5    official books and records maintained by Home Tax reflected only four partners with interests in Divi

6    Divi.

7        12.    Heacock Park Apartments, LP (Heacock Park) was a California limited partnership that

8    was formed in 2013 to acquire and maintain a large multi-unit apartment community called the

9    "Heacock Park Apartments."  Heacock Park initially had 19 investors who contributed nearly

10   $3,500,000 in initial capital.  LM was the General Partner.

11       13.    LENDING ENTITY 1 was a hard money lender headquartered in Sacramento,

12   California.  LENDING ENTITY 1 described itself as a premier private lender with over 2,000 loan

13   transactions totaling over $2 billion worth of loans.  Between 2011 and 2024, LENDING ENTITY 1

14   provided more than $180,000,000 in loans to KSMP for various properties across California.

15                                  THE SCHEME TO DEFRAUD

16       14.    Beginning at a time unknown but no later than in or about May 2009, and continuing

17   through in or about May 2024, MATTSON, knowingly and with the intent to defraud, participated in,

18   devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain

19   money and property by means of materially false and fraudulent pretenses, representations, half-truths,

20   and promises, and by means of omission and concealment of material facts.

21       15.    As part of the scheme to defraud, MATTSON offered and sold to investors what he stated

22   were interests in LM partnerships, promising regular returns in the form of rent distributions and the

23   security of being a partner in an entity that owned valuable real estate.  In fact, MATTSON kept these

24   investments "off books"—that is, MATTSON kept these investments secret from LM, Home Tax, other

25   owners and principals, and the record limited partners of the LM LPs.  MATTSON deceived investors

26   into believing they were, through their investment and the signing of false agreements, becoming true

27   limited partners in LM LPs, with certain legally enforceable rights and privileges, access to regular

28   monthly distributions derived from rents on the properties, and the ability to withdraw their principal on

INDICTMENT

1   request.  In fact, MATTSON knew these investors never actually acquired interests in those LM LPs.

2   MATTSON concealed these "off-books" transactions from LM and Home Tax.  In doing so,

3   MATTSON breached the fiduciary duties he owed to LM, Home Tax, other owners and principals, and

4   to the record limited partners in the LM LPs.  In addition, MATTSON owed a duty of candor and

5   loyalty to the "off-books" investors based on MATTSON's control of the information that investors

6   would need to make an informed investment choice, and his representations to them that he was an

7   authorized representative of the general partner of the LPs at issue.  He also breached these duties, and

8   omitted material information from investors to obtain their investments.

9       16.    MATTSON executed the fraud scheme through a web of false representations and

10  material omissions to these "off-books" investors, which included (1) falsely identifying the entity in

11  which they were investing, (2) falsely representing that they had purchased a specific percentage of an

12  LM LP that owned identified real estate, (3) creating and providing false documents that indicated "off-

13  books" investors had certain legally enforceable rights and privileges that were significant to the

14  decision to invest, (4) false statements about the security of the investments, and (5) falsely representing

15  that the investment would generate distributions from rents of the underlying real property assets.

16                  <u>"Off-Books" Divi Divi Tree LP Investors</u>

17      17.    As part of the scheme, MATTSON persuaded investors to roll over funds from their

18  existing tax-advantaged retirement accounts to MATTSON-controlled "self-directed" individual

19  retirement accounts (IRAs) managed by various third-party custodians.

20      18.    MATTSON represented to these individuals that by rolling over their retirement funds,

21  they were purchasing ownership interests in Divi Divi.  These representations were false.

22      19.    MATTSON also represented to these investors that their investments would earn

23  approximately six percent returns every year and they could withdraw their principal investment at any

24  time.

25      20.    Between 2019 and 2024, MATTSON obtained at least $24,000,000 from at least 75

26  victims by falsely promising them that they were purchasing interests in Divi Divi.  MATTSON did not

27  disclose the existence of these "investors" to LM or Home Tax.

28      21.    To assure investors that their money was safe, and throughout the course of the scheme,

INDICTMENT

MATTSON caused third-party IRA custodians to generate and provide to the "off-books" investors false and fraudulent statements reflecting that the value of their purported investments increased annually.

22.    MATTSON, a sophisticated finance expert and registered tax preparer, knew that because IRAs and similar tax-advantaged retirement accounts grow tax-free, Divi Divi investors were unlikely to withdraw their principal investments or demand regular distribution payments.  Rather, owing to retirement accounts' tax-advantaged status, those investors were likely to only withdraw the "required minimum distribution" (RMD) after they reached the age provided by law.  MATTSON knew that this made his scheme more difficult to detect and delayed his payment obligations.

23.    Some investors—including those of retirement age—who sought their distributions (or in the rare case, principal withdrawals) from their purported investments received payments from MATTSON.  Between 2019 and 2024, MATTSON wired or caused to be wired more than $10,000,000 to a third-party IRA custodian for distributions, fees, minimum account balances, and other payments related to "off-books" Divi Divi investors.  But those wires were not funded by rents or other profits generated by any Divi Divi assets.  Rather, they were funded by co-mingled funds controlled by MATTSON and by purported investments from new victims MATTSON recruited into the scheme.

24.    In order to conceal the scheme, MATTSON caused to be created false and fraudulent IRS Forms 5498 reflecting the fictitious fair market value of the victims' purported ownership interests and false and fraudulent IRS Forms 1099-R reporting distributions from the "off-books" Divi Divi investments.  MATTSON provided these tax forms to investors.

<u>MATTSON's Misrepresentations to Divi Divi "Off-Books" Investors</u>

25.    D.R. and K.R. were unwitting "off-books" investors in Divi Divi who invested more than $3 million with MATTSON between 2007 and 2022, including at least $1.74 million in Divi Divi.  In 2009, D.R. and K.R. invested more than $200,000 with MATTSON by transferring funds from their retirement accounts to a third-party custodian controlled by MATTSON at MATTSON's direction.  On or about May 22, 2009, MATTSON provided D.R. with an "Agreement of Limited Partnership of Divi Divi Tree, L.P.," which purported to give D.R. a percentage ownership in Divi Divi.  In or about October 2022, at MATTSON's urging, D.R. rolled over another $1.54 million in retirement funds into what MATTSON represented to be an additional investment in Divi Divi.

INDICTMENT

26.     K.B. was also an unwitting "off-books" investor in Divi Divi who invested approximately $1.5 million with MATTSON.  K.B. began investing with MATTSON in 2006.  K.B. invested $500,000 in Divi Divi by rolling over funds from his existing retirement accounts—$200,000 in 2012 and $300,000 in 2022.

27.     MATTSON made material false statements, misrepresentations, half-truths and omissions to induce victims to unknowingly invest in the "off-books" Divi Divi scheme.  These included, but were not limited to the following:

a)      MATTSON misrepresented to "off-books" Divi Divi investors that they were purchasing from LM a "percent ownership" and legitimate interest in Divi Divi; MATTSON, in fact, never communicated to LM or to Home Tax—which kept the official books and records for Divi Divi—that he had sold "off-books" shares in Divi Divi.  MATTSON represented to investors that he was acting on behalf of LM and selling a portion of LM's ownership in Divi Divi to them.  This was false.  By hiding his sale of "off-books" Divi Divi investments that were not recorded on LM or Divi Divi's books and records, MATTSON concealed his lack of authority to engage in the transactions and breached his fiduciary duty to LM and Divi Divi's record limited partners;

b)      MATTSON provided written documents to memorialize the purported sale of these fictitious limited partnerships, such as the actual 2002 "Agreement of Limited Partnership for Divi Divi Tree L.P.;" these Agreements contained false statements as to the "off-books" investors, including misstating the off-books investors' legal rights and privileges since the investors never became limited partners in Divi Divi;

c)      MATTSON provided false tax documents to the "off-books" investors related to their purported Divi Divi investment;

d)      MATTSON misrepresented the underlying asset and financial soundness of the purported Divi Divi investment.  MATTSON misrepresented to investors that Divi Divi's primary asset was the Sienna Pointe Apartments in Riverside County, a multi-unit apartment community that generated monthly rental income.  Prior to August 2021, Divi Divi owned that asset and record investors received distributions from its rental income.  But the "off-books"

INDICTMENT

investors never had any right to receive rent from the Sienna Pointe Apartments and could not receive such rents because they were unknown to LM;

e)    MATTSON concealed the 2021 sale of the Sienna Pointe Apartments from existing and subsequent "off-books" Divi Divi investors.  MATTSON and LM caused the Sienna Pointe Apartments, the property underlying Divi Divi, to be sold in August 2021 for $86,513,600, resulting in net proceeds of $33,625,829.  Notwithstanding MATTSON's prior representations to "off-books" investors that they would be notified upon sale and be entitled to share in profits proportionate to their ownership stake, MATTSON concealed the existence of the sale from existing "off-books" Divi Divi investors and omitted that the primary asset of Divi Divi had, in fact, been sold when recruiting new investments for Divi Divi;

f)    MATTSON misrepresented the safety and security of the victims' purported investments by representing that their distribution flowed from rents secured by an income-generating, LM-backed asset when in fact, the distributions were funded in part by monies from new investors, including later investors, in the manner of a Ponzi scheme;

g)    MATTSON made misrepresentations to the "off-books" Divi Divi investors about their ability to share in the profits from the sale of the underlying Divi Divi asset and to withdraw their principal investment at any time, subject to a 60-to-90 day waiting period;

h)    MATTSON omitted information material to the "off-books" investors' decision to invest in Divi Divi.  For example, MATTSON omitted and failed to disclose, in violation of his duty of candor, that he was selling "off-books" investments that were untethered and unknown to LM, that he was doing so without legal authorization, and that "off-books" investors were investing personally with MATTSON, who omitted the true financial condition of the entities into which they were investing.  MATTSON concealed and failed to disclose that the "off-books" Divi Divi investors were not actually investing in a LM LP, but instead in a MATTSON-controlled Ponzi scheme.

28.    "Off-Books" Divi Divi investors, including D.R. and K.B., invested in Divi Divi based on MATTSON's material false statements, misrepresentations, half-truths and omissions.

INDICTMENT

<u>"Off-Books" Heacock Park Apartments LP Investors</u>

29.    MATTSON also recruited investors to invest directly in purported LM limited partnerships such as Heacock Park.  Between approximately 2019 and approximately April 2024, MATTSON sold at least $4,000,000 in purported partnership interests in Heacock Park to at least 26 "off-books" investors.  None of the "off-books" Heacock Park investments appear on any of the LM books and records maintained by Home Tax, or in the tax filings MATTSON caused to be filed on behalf of LM and Heacock Park.  In fact, MATTSON provided some of these "off-books" investors with false IRS Form K-1s.  Between 2019 and 2024, MATTSON paid at least $1.4 million in distributions to these "off-books" investors.  MATTSON convinced many of these "off-books" investors to enter into an "Agreement of Transfer and Purchase of Partnership Interest," ostensibly between LM and the investor, in exchange for a direct payment, usually in the form of a personal check.

<u>MATTSON's Misrepresentations to Heacock Park "Off-Books" Investors</u>

30.    K.A. and her spouse, R.A., are longtime residents of Sonoma County, in the Northern District of California, who were introduced to MATTSON through neighbors who had previously invested with MATTSON.

31.    In 2017, MATTSON promised K.A. and R.A. that a $500,000 investment with him would ensure $2,500 per month for the rest of the life of their special-needs dependent.  They started investing with MATTSON in February 2018, and by August 2022, had invested $350,000 with MATTSON across four purported LM LPs.  MATTSON guaranteed a six percent annual return, described the property that was subject to the investment, and promised that they would be notified if the property sold and that they would be paid their fair share of profit from any sale.

32.    On September 23, 2020, K.A. and R.A. met with MATTSON.  Based on MATTSON's promises, they signed a Transfer and Purchase of Partnership Interest that purported to grant them a 0.611 percent partnership interest in Heacock Park and gave MATTSON a check for $100,000.

33.    In August 2022, K.A. asked MATTSON if it was too late for her to make an additional investment in Heacock Park since she understood the underlying asset was to be sold soon.  MATTSON assured her that it was not too late.

34.    On August 11, 2022, K.A. and R.A. met with MATTSON at a MATTSON-owned deli in

INDICTMENT

1   Sonoma.  MATTSON again made the same promises he made in 2020 regarding Heacock Park.  As a

2   result of these representations, K.A. and R.A. gave MATTSON a check for another $50,000 for a

3   purported additional investment in Heacock Park.  During this meeting, MATTSON concealed the fact

4   that LM had sold the apartment building underlying Heacock Park in 2021.  In fact, MATTSON never

5   notified K.A. or R.A. that the underlying asset had sold, despite his September 2020 promises that he

6   would notify K.A. and R.A. of any sale and provide them an opportunity to share in profits from the sale

7   of the apartments at that time.

8       35.    MATTSON made the following material misrepresentations and omissions to victim

9   investors to induce "off-books" investments in Heacock Park:

10          a)     MATTSON misrepresented to "off-books" Heacock Park investors that they were

11      purchasing from LM a "percent ownership" and legitimate limited partnership interest in

12      Heacock Park from LM; MATTSON, in fact, never communicated to LM or to Home Tax—

13      which kept the official books and records for Heacock Park—that he had sold "off-books" shares

14      in Heacock Park.  MATTSON misrepresented to investors that he was acting on behalf of LM

15      and selling a portion of LM's ownership in Heacock Park to them.  By hiding his sale of "off-

16      books" Heacock Park investments that were not recorded on LM or Heacock Park's books and

17      records, MATTSON concealed his lack of authority to engage in the transactions and breached

18      his fiduciary duty to LM and Heacock Park's record limited partners;

19          b)     MATTSON provided agreements titled "Agreement of Transfer and Purchase of

20      Partnership Agreement" containing false statements, including statements purporting to transfer

21      a percentage ownership interest in Heacock Park from LM to the "off-book" investor.  The

22      agreement also provided the "off-books" Heacock Park investor would become a limited partner

23      and would receive all the corresponding rights and benefits;

24          c)     MATTSON concealed the "off-books" Heacock Park investors and their

25      purported percentage ownership investments from LM and Home Tax, which kept the official

26      books and records for Heacock Park.  As a result, the "off-books" investors were never recorded

27      in the LM ownership records for Heacock Park, the software that tracked and processed official

28      distributions, or the tax reporting for Heacock Park.

INDICTMENT

d)      Yet, MATTSON provided false statements to "off-books" Heacock Park investors in the form of fictitious tax forms that depicted the "off-books" investors as true "limited partners" in Heacock Park.  In at least some instances, these forms included a beginning capital account balance, and a record of "withdrawals and contributions" that corresponded to the "off-book" distribution payments MATTSON made during the calendar year.  But the actual Heacock Park Form 1065 tax returns for these years which were filed under MATTSON's supervision do not reflect the "off-books" investors as limited partners;

e)      MATTSON told "off-books" investors prior to their Heacock Park investment that the distributions they were to receive on their investment came from the rents paid by tenants in the apartments.  But because the "off-books" investors were not record investors or owners in Heacock Park, their "distributions" from MATTSON were not from underlying rental income.  Rather, their distributions were financed by the payments of other investors, including later investors, in the manner of a Ponzi scheme;

f)      MATTSON concealed the 2021 sale of the Heacock Park Apartments from the "off-books" investors.  MATTSON and LM caused the apartment building asset underlying Heacock Park to be sold in August 2021 for $20,731,418, resulting in net proceeds of $8,440,189.  Notwithstanding MATTSON's prior representations to "off-books" investors that they would be notified upon sale and be entitled to share in profits proportionate to their ownership stake, MATTSON concealed the existence of the sale from existing "off-books" Heacock Park investors and omitted that the primary asset of Heacock Park had, in fact, been sold when recruiting new investments for Heacock Park; and

g)      MATTSON omitted information material to the "off-books" investors' decision to invest in Heacock Park.  MATTSON omitted and failed to disclose, in violation of his duty of candor, that he was selling "off-books" investments that were untethered and unknown to LM, that he was doing so without legal authorization, and that such investors were investing personally with MATTSON, with MATTSON omitting the true financial condition of the entities into which they were investing.  MATTSON concealed and failed to disclose that the "off-books" Heacock Park investors were not actually investing in an LM LP, but instead in a

1    MATTSON-controlled Ponzi scheme.

2    36.    "Off-books" Heacock Park investors, including R.A. and K.A., invested in Heacock Park

3    based on MATTSON's material, false statements, misrepresentations, half-truths and omissions.

4                                              MANNER AND MEANS

5    37.    In furtherance of the scheme to defraud, MATTSON used a variety of means and

6    methods, including by making materially false and fraudulent pretenses, representations, half-truths and

7    promises, as well as omissions and concealment of material facts to induce investments from "off-

8    books" investors, including but not limited to the following:

9    a.    misrepresenting the party with whom they were investing (MATTSON personally as

10           opposed to LM);

11    b.    concealing that their "off-books" investments would not be recorded in LM's official

12           books and records as true investors, thus depriving the "off-books" investors of the legal

13           rights and privileges of true limited partners;

14    c.    misrepresenting the nature of their investments by stating they were buying a percentage

15           of certain LM limited partnerships, invested in specific real property,

16    d.    misrepresenting the property in which they were invested (since they were never

17           recognized as actual limited partners in the official LM books and records);

18    e.    misrepresenting that they would be notified upon sale of the properties underlying the

19           LPs and enjoy profit sharing in proportion to their ownership interest upon sale, as well

20           the return of their initial investment;

21    f.    misrepresenting the overall safety and security of the investments (*e.g.* that the investors

22           could withdraw their principal at any time);

23    g.    making false statements, and omitting true facts that MATTSON had a duty to disclose,

24           regarding the fair market value of the properties in which investors believed they were

25           partners and in which their money had been invested;

26    h.    misrepresenting distribution payments to "off-books" investors as returns generated from

27           rent of the underlying assets, but which were, in fact, payments made possible only by

28           MATTSON's ability to recruit new investors to infuse his low-balance accounts, and the

INDICTMENT

1     sale of unrelated properties and loans, including from LENDING ENTITY 1;

2     i.     misrepresenting the nature of the investment on the distribution checks by noting they

3            were "owner withdrawals" from the purported LM;

4     j.     utilizing these distributions to perpetuate the ongoing scheme, dampen investor suspicion,

5            and prevent detection;

6     k.     making false statements by providing false tax documentation such as fair market value

7            reports and IRS Forms K-1 to create the impression that "off-books" investors were

8            deriving legitimate partnership distributions;

9     l.     using a personally controlled checking account in the name of LM but corresponding to a

10           P.O. Box controlled solely by MATTSON; and

11    m.     concealing and failing to disclose that the "off-books" investors were investing in a

12           MATTSON-controlled Ponzi scheme, and one which was not financially viable and in

13           fact progressively teetered on insolvency absent new investor monies.

14         38.     In addition, from a time unknown but no later than January 1, 2019, MATTSON knew

15    that MATTSON's own share of rents and revenue from LM owned and managed properties was

16    insufficient to meet obligations to pay interest payments and distributions to existing "off-books"

17    investors for Divi Divi and Heacock Park.

18         39.     MATTSON also knew that new investor funds would be required to continue to pay

19    interest payments and distributions owed to previous investors.

20         40.     In a bank account which MATTSON maintained in the name of LM with an account

21    number ending in 1059 (the 1059 Account), MATTSON co-mingled funds, including investor money,

22    with money from at least two other accounts: one that he held in the name of KSMP and a third account

23    he controlled.  For example, MATTSON transferred funds between the accounts and used the 1059

24    Account to pay for millions of dollars of personal expenses, such as mortgages on homes owned by

25    KSMP in Piedmont, California and Del Mar, California.  Between 2019 and 2024, the 1059 Account had

26    declining cash balances on January 1 of each year, such that without new investments, the 1059 Account

27    would have had a cumulative net negative balance of approximately $26,000,000.  Between 2019 and

28    2024, these three accounts alone had total debits of approximately $346,000,000 and total credits of

INDICTMENT

$341,000,000, resulting in net activity of nearly negative $5,000,000.

41.    MATTSON, however, made false representations and concealed material facts by telling investors that the purported LM investment opportunities he offered were profitable, and that the asset value and cash flow were sufficient to repay the distributions and cash out investors upon request.  To assure investors that their investments were safe and sound, MATTSON touted the fact that he had investors waiting to buy in, that the investments were backed by LM, that investors would share in the profits upon sale, and that investors could withdraw their principal amount at any time.  In fact, as MATTSON knew, in order to make continued payments of distributions and interest and to repay investors who sought withdrawals, MATTSON needed to continue to collect new investor funds, obtain loans, and sell properties.  Contrary to his representations about the use of funds, MATTSON used new investor funds to pay interest and distributions owed to previous investors in the scheme.

42.    Throughout the scheme, under California law, Home Tax, as the manager for the general partner of the LM LPs, was required to maintain a dedicated trust bank account for the deposit of rents from the properties and the distributions to limited partners.  MATTSON knew that to the extent he was paying money to the "off-books" investors as false distributions of rents, these amounts were not being paid from a trust bank account.  By promising distributions to victim investors from their ownership interests in the partnerships, and by making payments that appeared to be such distributions, MATTSON used false representations, promises and pretenses regarding the nature of the investments.  MATTSON also, while he had a duty to disclose, failed to tell investors that he was violating or circumventing the law and failed to tell investors that any distributions to investors were not derived from rents, trust accounts, or proceeds from the sale of properties, and were in fact from money MATTSON obtained from new investors or other sources not associated with the LM LPs.

43.    Between 2019 and 2024, MATTSON obtained at least $28 million from investors for "off-books" investments in Divi Divi and Heacock Park alone.

COUNTS ONE THROUGH SEVEN:        (18 U.S.C. § 1343 – Wire Fraud)

44.    Paragraphs 1 through 43 of this Indictment are re-alleged and incorporated as if fully set forth herein.

INDICTMENT

15

45. Beginning on a date unknown to the Grand Jury, but no later than in or about May 2009, and continuing through in or about May 2024, in the Northern District of California and elsewhere, the defendant,

KENNETH W. MATTSON,

knowingly and with the intent to defraud, participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, half-truths, and promises, and by means of omission and concealment of material facts.

<div align="center">Execution of the Scheme</div>

46. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant,

KENNETH W. MATTSON,

did knowingly transmit and cause to be transmitted, in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically, the uses of wires on or about the dates set forth below:

| COUNT | DATE | DESCRIPTION OF WIRE | AMOUNT |
|---|---|---|---|
| 1 | October 17, 2022 | Wire from account at Capital One N.A. to the 1059 Account | $300,000.00 |
| 2 | October 18, 2022 | Wire from account at Capital One N.A. to the 1059 Account | $1,540,000.00 |
| 3 | September 23, 2020 | Transmission of information related to processing of check no. 6447 from K.A. and R.A.'s account at Exchange Bank deposited in the 1059 Account | $100,000.00 |
| 4 | August 11, 2022 | Transmission of information related to processing of check no. 6910 from K.A. and R.A.'s account from Exchange Bank deposited in the 1059 Account | $50,000.00 |
| 5 | February 3, 2024 | Transmission of information related to processing of check no. 72805 from the 1059 Account deposited in K.A. and R.A.'s Exchange Bank account | $750.00 |
| 6 | January 23, 2024 | Wire transfer from the 1059 Account to an account at Capital One N.A. | $114,789.50 |
| 7 | February 28, 2024 | Wire transfer from the 1059 Account to an account at Capital One N.A. | $100,972.50 |

INDICTMENT

each execution of such scheme being in violation of Title 18, United States Code, Section 1343.

<u>COUNT EIGHT:</u>    (18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)

47.    Paragraphs 1 through 46 of this Indictment are re-alleged and incorporated as if fully set forth here.

48.    As described above, MATTSON solicited "off-books" investments in Divi Divi for $300,000 from K.B. on October 17, 2022 and for $1.54 million D.R. on October 18, 2022.  The third-party custodian received these victim funds and, at MATTSON's direction, wired the funds to MATTSON's 1059 Account.

49.    On October 21, 2022, MATTSON sent a wire transfer of $400,000 from the 1059 Account to a construction company.  More than $10,000 of this wire transfer is traceable to MATTSON's fraud.

50.    On or about October 21, 2022, in the Northern District of California, the Eastern District of California, and elsewhere, the defendant,

KENNETH W. MATTSON,

did knowingly engage in and attempt to engage in a monetary transaction, by, through, and to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Wire Fraud in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1957.

<u>COUNT NINE:</u>    (18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in Federal Investigation)

51.    Paragraphs 1 through 50 of this Indictment are re-alleged and incorporated as if fully set forth here.

52.    On April 19, 2024, an enforcement attorney at the U.S. Securities and Exchange Commission (SEC) sent MATTSON an e-mail.  The e-mail bore the subject line "In the Matter of LeFever Mattson (SF-04674)" and stated, in part, "I am going to send you a document preservation letter through the SEC's secure email system."  It also advised MATTSON that the SEC would mail the

INDICTMENT

1    same letter to his residence in Sonoma, California.

2          53.    The SEC attorney subsequently sent MATTSON an e-mail that included a document

3    preservation letter wherein the SEC advised MATTSON that he may "possess documents and data that

4    are relevant to an ongoing investigation being conducted by the staff of the United States Securities and

5    Exchange Commission," identified documents and communications from 2012 to the present related to

6    LM, Divi Divi, and investors, provided notice that such evidence "should be reasonably preserved and

7    retained until further notice," and clarified that "failure to do so could give rise to civil and criminal

8    liability."

9          54.    On April 30, 2024, the SEC issued a subpoena *duces tecum* to MATTSON for, among

10   other things, documents concerning Divi Divi, LM, and KSMP.

11         55.    On May 7, 2024, the SEC sent a copy of that subpoena to MATTSON via Certified Mail,

12   Return Receipt Requested, to MATTSON at his Sonoma residence.

13         56.    On May 8, 2024, the U.S. Postal Service attempted to deliver the subpoena to

14   MATTSON's Sonoma, California residence, but that delivery was unsuccessful because no authorized

15   recipient was available.

16         57.    On May 10, 2024, at approximately 9:45 a.m., MATTSON went to the Sonoma Post

17   Office and picked up the envelope containing the subpoena.

18         58.    On the same day, May 10, 2024, an attorney representing MATTSON contacted the SEC

19   on MATTSON's behalf.  The SEC attorney who had sent MATTSON the initial document preservation

20   request and the subpoena sent MATTSON's attorney a copy of that subpoena.  The same day, May 10,

21   2024, MATTSON's attorney confirmed receipt.

22         59.    On May 22, 2024, well after he had been placed on notice of the SEC's investigation and

23   instructed to preserve data, MATTSON deleted more than 10,000 files from his personal computer.

24   These files related to "off-books" investors and limited partnerships in the scheme to defraud, tax

25   documentation such as Form K-1s, partnership agreements, as well as financial and real estate

26   documents.  For example, the names of more than 280 of the deleted files contained the word "Divi," or

27   "DDT," more than 125 file names contained "Heacock" or "HPLP," 13 file names contained the last

28   name of D.R., at least three file names that contained the last name of K.B., and at least three file names

INDICTMENT

1    that contained the last name of K.A.  The names of several of the deleted files referenced LM or KSMP.

2    60.    At the time these files were deleted, MATTSON was at or near 1111 Broadway in

3    Oakland, California, in the Northern District of California.

4    61.    MATTSON deleted the files and changed his mobile phone on the same day—two days

5    before federal law enforcement officers executed a search warrant at his Sonoma residence, where they

6    seized both his computer and his mobile phone, amongst other items.

7    62.    On or about May 22, 2024, in the Northern District of California, the defendant,

8                                KENNETH W. MATTSON,

9    knowingly altered, destroyed, concealed, and falsified a record, document, and tangible object,

10    specifically electronic files from his laptop computer, with the intent to impede, obstruct, and influence

11    an actual and contemplated investigation of a matter within the jurisdiction of any department and

12    agency of the United States, namely the U.S. Securities and Exchange Commission and the U.S.

13    Department of Justice.

14    All in violation of Title 18, United States Code, Section 1519.

15    <u>FORFEITURE ALLEGATION</u>:    (18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c))

16    The allegations contained in this Indictment are re-alleged and incorporated by reference for the

17    purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), Section

18    982(a)(1), and Title 28, United States Code, Section 2461(c).

19    Upon conviction for any of the offenses set forth in Counts One through Seven, the defendant,

20                                KENNETH W. MATTSON,

21    shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and

22    Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived

23    from proceeds the defendant obtained directly and indirectly, as the result of those violations, including

24    but not limited to the real properties located at the following addresses:

25        a.  62 Farragut Avenue, Piedmont, California 94610;

26        b.  1834-1836 Ocean Front, Del Mar, California 92014; and

27        c.  1716 Ocean Front, Del Mar, California 92014.

28    Upon conviction for any of the offenses set forth in Count Eight, the defendant,

1                                    KENNETH W. MATTSON,

2    shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all

3    property, real or personal, involved in those violations, including but not limited to the real properties

4    located at the following addresses:

5                       a.   62 Farragut Avenue, Piedmont, California 94610;

6                       b.   1834-1836 Ocean Front, Del Mar, California 92014; and

7                       c.   1716 Ocean Front, Del Mar, California 92014.

8            If any of the property described above, as a result of any act or omission of the defendant:

9                       a.       cannot be located upon exercise of due diligence;

10                      b.       has been transferred or sold to, or deposited with, a third party;

11                      c.       has been placed beyond the jurisdiction of the court;

12                      d.       has been substantially diminished in value; or

13                      e.       has been commingled with other property which cannot be divided without

14                              difficulty,

15   the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

16   United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

17           All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code,

18   Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

19

20   DATED: May 13, 2025                               A TRUE BILL.

21                                                     */s/ Foreperson of the Grand Jury*

22                                                _____

23                                                FOREPERSON
     PATRICK D. ROBBINS

24   Acting United States Attorney

25   _____/s/_____

26   CHRISTOFFER LEE
     NIKHIL BHAGAT

27   Assistant United States Attorneys

28

# EXHIBIT B

1  RANDY SUE POLLOCK (CA SBN 64493)
   rsp@rspollocklaw.com
2  LAW OFFICE OF RANDY SUE POLLOCK
   286 Santa Clara Avenue,
3  Oakland, CA 94610-2624
   Telephone:    510.763.9967
4  Facsimile:    510.380.6551

5  Attorney for Defendant
   KENNETH W. MATTSON
6

7

8                   UNITED STATES DISTRICT COURT

9
                 NORTHERN DISTRICT OF CALIFORNIA
10

11

12  UNITED STATES OF AMERICA,              Case No. 4:25-cr-00126-JST

13                 Plaintiff,              **NOTICE OF MOTION AND MOTION
                                           TO MODIFY PRE-TRIAL ASSET
14          v.                             RESTRAINT**

15  KENNETH W. MATTSON,
                                           Date:    July 18, 2025
16                 Defendant.              Time:    2:00 p.m.
                                           Judge:   Hon. Jon S. Tigar
17                                         Ctrm:    6 – 2nd Floor

18
                                           Indictment Filed:  May 13, 2025
19                                         Trial Date:        None set

20

21

22

23

24

25

26

27

28

1   **NOTICE OF MOTION AND MOTION TO MODIFY PRE-TRIAL ASSET RESTRAINT**

2   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3       PLEASE TAKE NOTICE that on July 18, 2025, at 2:00 p.m. or as soon thereafter as the

4   matter may be heard, before the Honorable Jon S. Tigar of the United States District Court for the

5   Northern District of California (Courtroom 6), located at 1301 Clay Street, Oakland, California

6   94612, Defendant Kenneth W. Mattson will, and hereby does, move the Court to modify the

7   government's pre-trial asset restraints.

8       The grounds for this Motion include that the pre-trial asset restraints violate the

9   defendant's Sixth Amendment right to counsel, as explained in the accompanying Memorandum

10   of Points and Authorities.

11       This Motion is based on this Notice of Motion and Motion, the Memorandum of Points

12   and Authorities and Declaration in support thereof, the pleadings and other files herein, and such

13   other written and oral argument as may be presented to the Court.

14

15   Dated: June 25, 2025          LAW OFFICE OF RANDY SUE POLLOCK

16

17                 By:   */s/ Randy Sue Pollock*

18                    RANDY SUE POLLOCK

19                    Attorney for Defendant
                       KENNETH W. MATTSON

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2    I.    INTRODUCTION ......................................................................................................... 1
     II.   BACKGROUND ........................................................................................................... 1
3    III.  LEGAL STANDARDS.................................................................................................. 4
4    IV.   ARGUMENT ................................................................................................................. 5
5          A.    The Pre-Trial Restraint on Untainted Assets Implicates Mr. Mattson's Sixth
                 Amendment Right to Counsel. ........................................................................... 5
6                1.    Mr. Mattson's Assets Are Untainted.......................................................... 5
7                2.    But for the Restraint on Mr. Mattson's Assets, Mr. Mattson Can Afford
                       to Hire Counsel of His Choice. .................................................................. 7
8          B.    In the Event of a Hearing, the Government Cannot Show Probable Cause............. 9
     V.    CONCLUSION .............................................................................................................. 9
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Bundy*,
    852 F.3d 945 (9th Cir. 2017)..................................................................................... 4

*Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.*,
    67 F.3d 766 (9th Cir. 1995)........................................................................................ 8

*Kaley v. United States*,
    571 U.S. 320 (2014)............................................................................................... 4, 9

*Luis v. United States*,
    578 U.S. 5 (2016)............................................................................................... 4, 6, 8

*Mangaoang v. Special Default Servs., Inc.*,
    427 F. Supp. 3d 1195 (N.D. Cal. 2019) ..................................................................... 8

*Matter of Seizure of: Any & all funds held in Republic Bank of Arizona Accts.*,
    No. 2:18-cv-06742-RGK-PJW, 2019 WL 8892585 (C.D. Cal. Dec. 20, 2019) ...................... 5

*United States v. Lacey*,
    No. CR-18-00422-001-PHX-DJH, 2021 WL 5882638 (D. Ariz. Dec. 10, 2021) ............... 4, 9

*United States v. Shelton*,
    No. 23-CR-00258-JSC-1, 2024 WL 4520944 (N.D. Cal. Oct. 17, 2024)................................ 8

*United States v. Unimex, Inc.*,
    991 F.2d 546 (9th Cir. 1993)...................................................................................... 4

*Wheat v. United States*,
    486 U.S. 153 (1988)............................................................................................... 4, 8

**Statutes**

18 U.S.C.
    §152(7).................................................................................................................... 2
    § 981(a)(1)(C) ........................................................................................................ 2
    § 982(a)(1).............................................................................................................. 2
    § 1343 .................................................................................................................... 2
    § 1519 .................................................................................................................... 2
    § 1957 .................................................................................................................... 2

28 U.S.C.
    § 2461(c) ................................................................................................................ 2

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 30 of 355

1    **I.     INTRODUCTION**

2            The Sixth Amendment to the Constitution guarantees a criminal defendant the counsel of

3    his choice.  Nonetheless, the government has imposed improper pre-trial asset restraints that

4    impair Kenneth Mattson's constitutional right to counsel.  While attempting to keep Mr. Mattson

5    behind bars pending trial, the government simultaneously moved to record notices of lis pendens

6    against Mr. Mattson's properties.  Doing so has deprived Mr. Mattson of the means to pay his

7    counsel.  Mr. Mattson seeks to use these assets to fund his legal defense against the criminal

8    charges against him.  While Mr. Mattson should be able to hire counsel of his choice through

9    trial, the notices of lis pendens effectively freeze Mr. Mattson's untainted assets and constrain his

10   financial ability to defend himself.  Moreover, the government seeks to have an entirely separate

11   property at 210 La Salle Avenue in Piedmont, California, posted as bail, which would further

12   restrain Mr. Mattson's available assets.  The Court can avoid asset restraint issues as to this

13   property by accepting the posting of an alternative property.

14           The government's theory for its pre-trial restraint on assets is that the properties will be

15   subject to forfeiture if it proves its allegations.  To date, however, the government has failed to

16   provide *any* evidence that the restrained properties are traceable to the allegations in the

17   indictment.  The indictment contains no allegations that investor funds were used to purchase or

18   finance any of the restrained assets.  Nor does the indictment allege that Mr. Mattson improperly

19   attempted to shield these assets from post-trial forfeiture proceedings.  The government has failed

20   to establish probable cause that the assets should be restrained pending trial.  As it stands, these

21   unsupported pre-trial restraints will impair Mr. Mattson's ability to afford his counsel of choice

22   through trial.  The Court should modify the pre-trial asset restraints to protect Mr. Mattson's Sixth

23   Amendment rights.

24   **II.    BACKGROUND**

25           The government alleges that Mr. Mattson engaged in a Ponzi scheme involving

26   investments in dozens of properties.  On the government's theory, Mr. Mattson made

27   misrepresentations to investors who believed they were investing in limited partnerships managed

28   by LeFever Mattson LP ("LM"), while instead Mr. Mattson used their investments for other

purposes.  ECF No. 1, ¶¶ 1-2.  On May 22, 2025, Mr. Mattson was arrested and the indictment

against him was unsealed.  ECF No. 4.  Mr. Mattson was charged with seven counts of wire fraud

under 18 U.S.C. § 1343, ECF No. 1, ¶¶ 44–46; one count of money laundering under 18 U.S.C.

§ 1957, *id.* ¶¶ 47–50; and one count of destruction of evidence under 18 U.S.C. § 1519, *id.* ¶¶ 51–

62.

      The government also alleges forfeiture upon conviction under 18 U.S.C. §§ 981(a)(1)(C),

982(a)(1), and 28 U.S.C. § 2461(c) for two properties owned or controlled by Mr. Mattson:

      a.  62 Farragut Avenue, Piedmont, California 94610; and

      b.  1834-1836 Ocean Front, Del Mar, California 92014 (together, the "Forfeiture

           Properties").  *See* ECF No. 1 at 18–19.

      The indictment alleges, among other things, co-mingling of funds between LM, investor

money, and "millions of dollars of personal expenses, such as mortgages on homes owned by

KSMP in Piedmont, CA and Del Mar, CA."  ECF No. 1, ¶ 40.  The indictment, however, contains

no specific allegations regarding any of the Forfeiture Properties.  The indictment alleges only

that funds relating to the Forfeiture Properties were co-mingled, but not that any investor funds

were actually used to purchase or maintain any of the Forfeiture Properties.

      Prior to Mr. Mattson's arrest, the government executed search warrants in connection with

and describing the government's understanding of the Forfeiture Properties.  In a warrant dated

May 23, 2024, the agent acknowledged that Mr. Mattson's "principal residence for many years

had been 62 Farragut Avenue in Piedmont, California (in the Northern District of California).  The

basis for this understanding is, in part, that open-source property records indicate this is a current

and active address for MATTSON and he has owned this residence since the year 1999."  Ex. A,

¶ 46.  Like the indictment, that warrant did not contain specific allegations relating to the

Piedmont property.

      An April 30, 2025, warrant concerned two Del Mar properties, including 1834-1836

Ocean Front, and detailed suspicions that Mr. Mattson transferred these properties to fraudulently

conceal ownership in violation of 18 U.S.C. Section 152(7).  Ex. B, ¶¶ 4, 43–59.  Though the

warrant was ultimately executed, Mr. Mattson was not charged with fraudulent concealment in

1    connection with 1834-1836 Ocean Front.  *Cf.* ECF No. 1.

2          The government moved for a detention hearing following Mr. Mattson's arrest.  ECF

3    No. 6.  As a result, Mr. Mattson remained in custody pending the detention hearing over a long

4    holiday weekend.  While Mr. Mattson was in custody, the government submitted and recorded

5    notices of lis pendens against each of the Forfeiture Properties.  ECF Nos. 11, 12.  These notices

6    act as a functional freeze on assets.  At the detention hearing, the government failed to marshal

7    evidence sufficient to show that Mr. Mattson should remain detained pending trial.  The Court

8    ordered Mr. Mattson released following a determination that he could be released with conditions.

9    ECF No. 22.  As part of his release conditions, Mr. Mattson must notify the Court each time he

10   spends over $5,000 in a transaction.

11         At a status conference on June 11, 2025, the government asked that an additional property,

12   titled in the name of Mr. Mattson's wife, be posted as security for Mr. Mattson's bail.  The value

13   of this property, located at 210 La Salle Avenue, Piedmont, California 94610 (together with the

14   Forfeiture Properties, the "Restrained Properties"), would otherwise also be available to fund

15   Mr. Mattson's legal defense.  As with the Forfeiture Properties, the indictment contains no

16   allegations related to the property located at 210 La Salle Avenue.

17         Due to the government's measures to impose pre-trial restraints on Mr. Mattson's assets,

18   Mr. Mattson currently has access to only nominal – and grossly insufficient – funds to support his

19   legal defense.  Ex. C, ¶ 8.  Moreover, Mr. Mattson's property investment and management

20   company, KS Mattson Partners LP ("KSMP"), has entered bankruptcy.  ECF No. 35-1.  KSMP is

21   now controlled by a court-appointed Responsible Individual, Robbin L. Itkin.  ECF No. 35-1, 35-

22   2. Mr. Mattson currently has no authority to liquidate assets of KSMP in furtherance of his

23   defense.

24         At the present stage, Mr. Mattson's ability to retain his longstanding counsel of choice is

25   jeopardized by his extremely limited, unfrozen assets.  Mr. Mattson retained Randy Sue Pollock

26   in approximately April 2024 to represent him in connection with civil and criminal investigations.

27   Mr. Mattson subsequently retained William Frentzen of Morrison & Foerster LLP as counsel

28   beginning in February 2025 in connection with civil and criminal investigations.  Both

1    Ms. Pollock and Mr. Frentzen have entered an appearance in this proceeding and Mr. Mattson has

2    been in regular contact with both counsel since his arrest.  Mr. Mattson relies on both attorneys

3    and seeks to have them represent him through trial.

4    **III.    LEGAL STANDARDS**

5         The Sixth Amendment guarantees a defendant the fundamental "right to be represented by

6    an otherwise qualified attorney whom that defendant can afford to hire." *Luis v. United States*,

7    578 U.S. 5, 12 (2016) (citing *Caplin & Drysdale,* 491 U.S. 617, 624 (1989)).  The Sixth

8    Amendment right to assistance of counsel includes the right "to select and be represented by

9    one's preferred attorney." *Wheat v. United States*, 486 U.S. 153, 159 (1988).  Moreover, "a

10   defendant's Sixth Amendment right to counsel 'is not exhausted once [the defendant] has one

11   competent criminal defense lawyer.'" *In re Bundy*, 852 F.3d 945, 953 (9th Cir. 2017).

12        Restraints on "untainted" property—that which "belongs to the defendant" and "not

13   traceable to a criminal offense"—implicate the Sixth Amendment if they prevent the defendant

14   from hiring counsel of his choice. *Luis*, 578 U.S. at 10, 12.  If the defendant shows necessity,

15   then access to the "untainted assets needed to retain counsel of choice" is protected by the Sixth

16   Amendment. *Luis*, 578 U.S. at 10.  A defendant establishes necessity by showing that his "net

17   financial resources and income are insufficient to pay for counsel." *United States v. Lacey*, No.

18   CR-18-00422-001-PHX-DJH, 2021 WL 5882638, at *9 (D. Ariz. Dec. 10, 2021).  To impose a

19   constitutional restraint on a defendant's property, the government bears the burden of establishing

20   probable cause that the assets in dispute are traceable to the crime charged in the indictment. *See*

21   *Luis*, 578 U.S. at 23 (citing *Kaley v. United States*, 571 U.S. 320, 324 and n.3 (2014)).

22        Once a defendant makes a prima facie showing that his Sixth Amendment rights are

23   implicated, the Court must hold a hearing to determine whether release of funds is necessary.

24   *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) (citing *Cohen v. United*

25   *States* 378 F.2d 751, 761 (9th Cir. 1967)).  Such a hearing may be heard by the District Judge.

26   *See, e.g.*, *Kaley*, 571 U.S. at 325 ("The District Court then concluded that it should hold a hearing,

27   but only as to whether the restrained assets are traceable to or involved in the alleged criminal

28   conduct.") (internal quotation marks omitted).  A prima facie showing exists where "the moving

1    papers filed, including affidavits, are sufficiently definite, specific, detailed, and nonconjectural,

2    to enable the court to conclude that a substantial claim is presented." *Matter of Seizure of: Any &*

3    *all funds held in Republic Bank of Arizona Accts.*, No. 2:18-cv-06742-RGK-PJW, 2019 WL

4    8892585, at *8 (C.D. Cal. Dec. 20, 2019).  This is not a high bar but requires "some showing that

5    [a defendant] lacks other funds to pay counsel."  *Id.* (citing *United States v. Jones*, 160 F.3d 641,

6    647 (10th Cir. 1998) ("[a]s a preliminary matter, a defendant must demonstrate to the court's

7    satisfaction that she has no assets, other than those restrained, with which to retain private

8    counsel[.]"); *United States v. Bonventre*, 720 F.3d 126, 128 (2d Cir. 2013) ("[A] defendant

9    seeking a . . . hearing must demonstrate, beyond the bare recitation of the claim, that he or she has

10   insufficient alternative assets to fund counsel of choice.")).

11   **IV.    ARGUMENT**

12       **A.    The Pre-Trial Restraint on Untainted Assets Implicates Mr. Mattson's Sixth
13           Amendment Right to Counsel.**

14           Mr. Mattson's Sixth Amendment right is implicated by the government's unconstitutional

15   restraint on his untainted assets.  The government has not alleged that the Restrained Properties

16   are tainted by the alleged criminal activity of Mr. Mattson.  Without the ability to sell the

17   Restrained Properties, Mr. Mattson lacks the financial means to fund his legal defense.  The

18   government has not established any connection between the properties and the allegations in the

19   indictment, and thus cannot establish probable cause for the continuation of the lis pendens

20   against the properties.

21               **1.    Mr. Mattson's Assets Are Untainted.**

22           As a threshold matter, the Restrained Properties are untainted assets.  Mr. Mattson has

23   owned his home at 62 Farragut Avenue, Piedmont, since 1999—well before any fraud is alleged

24   to have occurred.  The same is true of 210 La Salle Avenue, Piedmont, which Mr. Mattson's wife

25   has owned since 2000.  In fact, the indictment does not even mention the Forfeiture Properties

26   except to allege forfeiture upon conviction for other, unrelated charges, and does not mention the

27   210 La Salle Avenue property at all.  Moreover, the government does not allege that the assets

28   were obtained because of the conduct alleged in the indictment.  Only the search warrants

Case 2:24-10714   Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 35 of
355

1    referred to 1834-1836 Ocean Front.  Despite that search, Mr. Mattson was not charged in

2    connection with 1834-1836 Ocean Front, which further indicates that no Restrained Properties

3    bear any connection to the allegations at issue in the case.  Simply put, the properties are

4    untainted funds that "belong[] to the defendant."  *Luis*, 578 U.S. at 12.  The government has

5    provided no evidence to indicate otherwise.

6          Even though the government seeks forfeiture of the Restrained Properties, the government

7    has failed to even establish that a pre-trial asset restraint is appropriate.  Mr. Mattson cannot use

8    the Restrained Properties for any improper means.  Mr. Mattson is currently on supervised

9    release.  He must report any transactions over $5,000 to the Court, which will verify that proceeds

10   are used for legitimate purposes, including payments to his counsel of choice.  A continued

11   restraint would prevent Mr. Mattson from retaining the counsel of his choice.

12         Serious questions have already emerged regarding the sufficiency of the government's

13   evidence.  The government alleges that Mr. Mattson used the LM "1059 Account" to pay for

14   "millions of dollars in personal expenses."  ECF No. 1, ¶ 40.  Yet preliminary analysis shows

15   approximately $15 million more flowing from KSMP's accounts to the 1059 Account than

16   flowing out.  That analysis, of course, cannot be reconciled with an allegation that Mr. Mattson

17   siphoned investor money out of the 1059 Account to pay personal expenses.  Mr. Mattson has

18   requested the government's analysis to trace funds into and out of the 1059 account and requested

19   that if the government has a different analysis to share that analysis with the defendant.  So far,

20   the government has refused to provide such analysis. In fact, when confronted with Mr. Mattson's

21   analysis in open court the government has been unable to refute it.  While the government may

22   argue about co-mingling of the proceeds of fraud, if there are more funds going into the business

23   venture from the defendant than coming out of the venture, then the co-mingling loses its

24   character.  In other words, the defendant is actually funding the business venture with his own

25   money rather than stealing the money.  While the government may still argue diversion and fraud

26   in a convoluted theory, in real economic terms it will not be able to show use of investor funds for

27   personal gain.

28         On top of that, the government's allegation that Mr. Mattson deleted files from his laptop

Case: 24-10714  Doc#: 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 36 of
355

1  when under a preservation order is now on extremely shaky footing.  The government has been

2  utterly unable to describe its theory of the charge or that it was Mr. Mattson who made the alleged

3  deletions.  This allegation formed the basis of the destruction of evidence charge in the indictment

4  and was the alleged centerpiece of the government's argument for pre-trial detention.  *See* ECF

5  No. 1, ¶¶ 59-61; ECF No. 6 at 6-7.  Here, too, preliminary evidence undercuts the government's

6  case.  As described at the detention hearing, forensic analysis and privileged actions and

7  communications show that at exactly the same time as the government alleges the files were

8  deleted from the laptop Mr. Mattson was at his counsel's office and the laptop was being copied

9  for preservation.  *See* ECF No. 33-1 at 6.  While this analysis remains ongoing, it is clear that the

10  government's theory that it was Mr. Mattson who deleted the files will not be supported by the

11  government's evidence.[1]

### 2.  But for the Restraint on Mr. Mattson's Assets, Mr. Mattson Can Afford to Hire Counsel of His Choice.

14  First, Mr. Mattson seeks to retain qualified attorneys.  Mr. Mattson desires to be

15  represented by Ms. Pollock and Mr. Frentzen as his defense counsel. Ex. C, ¶ 7.  Ms. Pollock and

16  Mr. Frentzen are each qualified attorneys admitted to the State Bar of California and the bar of

17  the Northern District of California.  Both have represented Mr. Mattson in connection with the

18  civil and criminal investigations, as well as these proceedings, and are familiar with the facts of

19  the case.

20  Second, Mr. Mattson can afford to hire Ms. Pollock and Mr. Frentzen.  The properties

21  currently restrained by the lis pendens notices are worth an estimated $21 million. Ex. C, ¶ 2.

---

[1] The government has thus far refused to produce evidence regarding its own searches for files that it alleged Mr. Mattson deleted from the laptop.  Likewise, the government has thus far refused to produce its communications with the LM bankruptcy creditors' committee, LM and related entities, Tim LeFever, Scott Smith, or other potential cooperating entities and individuals. Not only are these communications and the evidence related to the government's search for files producible under *Brady v. Maryland*, 373 U.S. 83 (1963), they are directly relevant to this motion.  If the government's communications with these entities and individuals reflects efforts to prevent Mr. Mattson from use of his properties, they shed light on potential violations of Mr. Mattson's Sixth Amendment right to counsel.  Similarly, evidence regarding searches for files allegedly deleted from Mr. Mattson's laptop is directly relevant to the government's destruction of evidence charge, which, in turn, formed a primary basis for its detention motion and the Court's conditions of release.

1    The property at 210 La Salle Avenue is worth an estimated $4 million.  *Id.*, ¶ 4.  The value of Mr.

2    Mattson's untainted assets is anticipated to be more than sufficient to cover legal services that he

3    would require through trial.  As such, Ms. Pollock and Mr. Frentzen are each counsel that Mr.

4    Mattson "can afford to hire."  *Luis*, 578 U.S. at 19 (citing *Caplin & Drysdale,* 491 U.S. at 624).

5         The restraints on Mr. Mattson's property prevent him from hiring counsel of his choice.

6    The lis pendens notices act as a bar on the sale of Mr. Mattson's properties, and effectively freeze

7    assets that he could otherwise use to fund his legal defense.  *See Mangaoang v. Special Default*

8    *Servs., Inc.*, 427 F. Supp. 3d 1195, 1210 (N.D. Cal. 2019) ("Once a lis pendens is filed, it clouds

9    the title and effectively prevents the property's transfer until the litigation is resolved or the lis

10   pendens is expunged.")  Although Mr. Mattson or his wife retains title over the Restrained

11   Properties, he is unable to utilize their value to defend himself.

12        Currently, Mr. Mattson has access to only nominal funds in unfrozen assets.  Ex. C, ¶ 8.

13   That is plainly insufficient.  With access to the funds from the untainted Restrained Properties,

14   however, Mr. Mattson could afford to pay for his legal representation.  The restraints on his assets

15   will ultimately prevent Mr. Mattson from hiring legal counsel of his choice in violation of the

16   Sixth Amendment.  *Wheat*, 486 U.S. at 159.

17        Moreover, the defendant's Sixth Amendment rights precede the government's interest in

18   preserving untainted assets in the event of a conviction.  In a case involving one of the same

19   prosecutors here, a court in this District recently held that the government violated the

20   defendant's Sixth Amendment rights and that the government's pre-trial interest in preserving the

21   defendant's untainted assets for payment of forfeiture and restitution to the victims of healthcare

22   fraud did not outweigh the defendant's Sixth Amendment rights.  *See United States v. Shelton*,

23   No. 23-CR-00258-JSC-1, 2024 WL 4520944, at *2 (N.D. Cal. Oct. 17, 2024) (citing *Luis*, 578

24   U.S. at 19 ("[D]espite their importance, compared to the right to counsel of choice, these interests

25   [ensuring funds for forfeiture/restitution] would seem to lie somewhat further from the heart of a

26   fair, effective criminal justice system.")).  To the extent there is any doubt, the Court may utilize

27   its discretion in assessing modifications to the asset restraints.  *Commodity Futures Trading*

28   *Comm'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (district court must exercise

1    discretion in awarding fee applications when wrongdoing is not yet proven).

2    **B.    In the Event of a Hearing, the Government Cannot Show Probable Cause.**

3    Given that the government has not yet established any link between the Restrained

4    Properties and the allegations, no hearing may be required to modify the asset restraints.  To the

5    extent any dispute about traceability exists, however, Mr. Mattson is entitled to a pre-trial hearing

6    to determine whether the continued pre-trial restraint on his assets is appropriate.  *Kaley,* 571 U.S.

7    320, 324, and n. 3, (2014) ("Since *Monsanto,* the lower courts have generally provided a

8    hearing . . . [to determine] whether probable cause exists to believe that the assets in dispute are

9    traceable . . . to the crime charged in the indictment").  Because Mr. Mattson has already

10   demonstrated the need for the assets, if any question remains regarding the traceability of assets,

11   the court must hold a hearing to resolve that dispute.

12   With Mr. Mattson's need of the Restrained Properties having been established, the burden

13   shifts to the government to show probable cause that the assets are traceable to the alleged fraud.

14   *Lacey*, 2021 WL 5882638, at *5 ("If the government cannot meet its burden to demonstrate

15   probable cause that the property is traceable to the crime, the court may modify the [pre-trial

16   restraint] and/or release of the funds.").  The evidence presented to date indicates that the

17   government cannot establish probable cause.  The government has failed to allege that the

18   Restrained Properties are traceable to the alleged conduct.  The indictment contains no facts to

19   indicate traceability.  Moreover, the record indicates that the government previously considered

20   charging Mr. Mattson in connection with 1834-1836 Ocean Front but declined to do so.  The only

21   reasonable conclusion is that the government lacked sufficient evidence connecting the properties

22   to the conduct alleged in the indictment.

23   **V.    CONCLUSION**

24   For the foregoing reasons, Mr. Mattson respectfully requests modification of the pre-trial

25   restraints imposed against his untainted assets or, in the alternative, a hearing before the District

26   Judge to determine probable cause.

27

28

1    Dated: June 25, 2025                    LAW OFFICE OF RANDY SUE POLLOCK

2

3                                            By:  _/s/ Randy Sue Pollock_
                                                  RANDY SUE POLLOCK
4
                                             Attorney for Defendant
5                                            KENNETH W. MATTSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

# EXHIBIT C

1  RANDY SUE POLLOCK (CA SBN 64493)
   rsp@rspollocklaw.com
2  LAW OFFICE OF RANDY SUE POLLOCK
   286 Santa Clara Avenue,
3  Oakland, CA 94610-2624
   Telephone:   510.763.9967
4  Facsimile:   510.380.6551

5  Attorney for Defendant
   KENNETH W. MATTSON
6

7

8                    UNITED STATES DISTRICT COURT

9

10                   NORTHERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,              Case No. 4:25-cr-00126-JST

13              Plaintiff,                 **DECLARATION OF KENNETH W.
                                           MATTSON IN SUPPORT OF
14        v.                               DEFENDANT'S MOTION TO MODIFY
                                           PRE-TRIAL ASSET RESTRAINT**
15  KENNETH W. MATTSON,

16              Defendant.                 Date:    July 18, 2025
                                           Time:    2:00 p.m.
17                                         Judge:   Hon. Jon S. Tigar
                                           Ctrm:    6 – 2nd Floor
18
                                           Indictment Filed:  May 13, 2025
19                                         Trial Date:      None set

20

21        I, Kenneth W. Mattson, declare as follows:

22        1.     I own or control residential properties at the following addresses:

23               a.   62 Farragut Avenue, Piedmont, California 94610; and

24               b.   1834-1836 Ocean Front, Del Mar, California 92014.

25        2.     These two properties have an estimated, combined value of approximately $21

26  million.

27        3.     Another residential property titled in my wife's name is located at 210 La Salle

28  Avenue, Piedmont, California 94610.

4.      The La Salle Avenue property has an estimated value of approximately $4 million.

5.      I am not able to dispose of or otherwise control assets held by KS Mattson Partners LP ("KSMP") because KSMP is currently in bankruptcy proceedings.

6.      I understand that KSMP is controlled by Robbin L. Itkin, a court-appointed independent director and Responsible Individual.

7.      I desire to have Randy Sue Pollock and William Frentzen represent me as my defense counsel during the course of these criminal proceedings and through trial.

8.      At present, I have access only to assets of a nominal value to pay for counsel. These assets are insufficient to pay my chosen counsel through trial.  I am unable to retain the counsel of my choice with the assets currently available to me.

9.      I can only afford to hire counsel if I am able to sell one or more of the properties that I own or control or that my wife owns or controls.  Lis pendens on the properties I own or control and the government's request to post a property as bail currently impair or prevent me from attempting to sell these properties.

10.     As part of my release conditions, I am required to notify the Court within 24 hours of every transaction exceeding $5,000.  I understand that this means I will need to notify the Court within 24 hours every time that I pay my attorneys.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: June 25, 2025

Kenneth W. Mattson

# EXHIBIT D

1    CRAIG H. MISSAKIAN (CABN 125202)
     United States Attorney
2
     MARTHA BOERSCH (CABN 126569)
3    Chief, Criminal Division

4    CHRISTOFFER LEE (CABN 280360)
     NIKHIL BHAGAT (CABN 279892)
5
         450 Golden Gate Avenue, Box 36055
6        San Francisco, California 94102-3495
         Telephone: (415) 436-7200
7        FAX: (415) 436-7234

8    Attorneys for United States of America

9                          UNITED STATES DISTRICT COURT

10                      NORTHERN DISTRICT OF CALIFORNIA

11                                OAKLAND DIVISION

12   UNITED STATES OF AMERICA,              )   NO. CR25-00126 JST
                                            )
13        Plaintiff,                        )   UNITED STATES' OPPOSITION TO
                                            )   DEFENDANT'S MOTION TO MODIFY PRE-
14        v.                                )   TRIAL ASSET RESTRAINT
                                            )
15   KENNETH W. MATTSON,                    )   Date:  July 31, 2025
                                            )   Time: 9:30 a.m.
16        Defendant.                        )   Judge: Hon. Jon S. Tigar
                                            )
17   _____)
                                            )
18

19

20

21

22

23

24

25

26

27

28

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST                          1

1

## <u>TABLE OF CONTENTS</u>

2  I.     INTRODUCTION ......................................................................................................1

3  II.    FACTUAL AND PROCEDURAL BACKGROUND............................................2

4  A.     The Indictment and Filing of *Lis Pendens* .........................................................2

5  B.     The Defendant's Arrest and Bail Proceedings...................................................2

6  C.     The Bankruptcy Proceedings ..............................................................................4

7  D.     The Subject Assets ................................................................................................5

8         1.      62 Farragut and 1834–1836 Ocean Front .......................................  5

9         2.      210 La Salle.........................................................................................6

10 E.     Additional Information About the Defendant's Acquisition and Disposition of Assets .................8

11 III.   DISCUSSION .........................................................................................................9

12 A.     A *Lis Pendens* is Not a "Pretrial Restraint" At All ........................................10

13 B.     Even if a *Lis Pendens* is a Pretrial Restraint on Assets, the Defendant Has Not Met
   His Heavy Burden for a Hearing .......................................................................11
14
15        1.      The Defendant Does Not Have a Constitutional Right to Use Tainted Assets to
                  Fund His Criminal Defense .............................................................11

16        2.      The Defendant Has Failed to Carry His Burden of Showing that He Has
                  Insufficient Assets to Retain Counsel of His Choice.....................12
17
18        3.      The Defendant is Also Not Entitled to a Hearing Because He Has Failed to
                  Make a Prima Facie Showing that the Government Lacks Probable Cause for
                  the Restraint. ....................................................................................16
19
20 C.     Even if *Jones-Farmer* Permitted a Hearing, the Subject Properties Are Traceable to
   Tainted Funds Related to the Scheme, Foreclosing Relief..............................17

21 D.     In the Event the Court Construes the Defendant's Motion as an Appeal of the
   Magistrate Judge's Order Under 18 U.S.C. § 3145(a), Absent the Posting of 210 La Salle or
22 other Adequate Asset, the $4,000,000 Bond Is Insufficient and the Court Should Re-Evaluate
   the Release Conditions.......................................................................................17
23
   IV.    CONCLUSION....................................................................................................19

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**STATUTES**

3     11 U.S.C. § 363(a)                                                                          6

4     11 U.S.C. § 364(a)                                                                          6

5     18 U.S.C. § 3142(f)(2)                                                                      3

6     18 U.S.C. § 3145                                                                           19

7     18 U.S.C. § 3771(a)(4)                                                                  4, 19

8     18 U.S.C. § 981                                                                            7

9     18 U.S.C. § 982                                                                            7

10

**CASES**

11    *Aronson v. City of Akron*, 116 F.3d 804 (6th Cir. 1997)                                   12

12    Caplin & Drysdale, Chartered v. United States, 491 U.S. 617 (1989)                         12

13    *Cohen v. United States*, 378 F.2d 751 (9th Cir. 1967)                                     10

14    *In re KS Mattson Partners LP*, No. 24-10715 (CN) (Bankr. N.D. Cal.)                        6

15    *In re Mattson*, No. 24-10714 (CN) (Bankr. N.D. Cal.)                                       5

16    *In re Seizure of: Any and All Funds held in Republic Bank of Arizona
      Accounts*, No. 2:18-cv-06742, 2019 WL 8892585 (C.D. Cal. Dec. 20,
17    2019)                                                                                      14

18    *Kaley v. United States*, 571 U.S. 320 (2014)                                          11, 18

19    *Luis v. United States*, 578 U.S. 5 (2016)                                             12, 17

20    *United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013)                                  14

21     *United States v. Calderon*, No. 24CR502-JM-2, 2024 WL 2892321 (S.D.
      Cal. June 10, 2024)                                                                        19
22
      *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001)                                *passim*
23
      *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993)                        12
24
      *United States v. Johnson*, No. 18CR4955-H, 2020 WL 2092904 (S.D. Cal.
25    May 1, 2020)                                                                               19

26    *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998),                              *passim*

27    *United States v. Kirschenbaum*, 156 F.3d 784  (7th Cir. 1998)                            14

28    *United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990)                                   19

i

*United States v. Lacey*, No. CR 18-00422, 2021 WL 5882638 (D. Ariz. Dec. 10, 2021) .......... 15, 17

*United States v. Li*, No. 3:16-CR-00194, 2018 WL 1299724 (M.D. Pa. Mar. 13, 2018) .......... 13, 17

*United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991) (en banc) .......... 10

*United States v. Omidi*, 125 F.4th 1283) (9th Cir. 2025) .......... 18

*United States v. Omidi*, No. CR 17-661(A)-DMG, 2021 WL 7629897 (C.D. Cal. June 15, 2021) .......... 15

*United States v. Patel*, 888 F.Supp.2d 760, 771 (W.D. Va. 2012) .......... 14

*United States v. Register*, 182 F.3d 830, 836 (11th Cir. 1999) .......... 12

*United States v. Swenson*, No. 1:13-CR-00091-BLW, 2013 WL 3322632 (D. Idaho Jul. 1, 2013) .......... 15, 17

*United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) .......... *passim*

*United States v. Wetselaar*, No. 2:11-cr-00347, 2013 WL 8206582, report and recommendation adopted, 2014 WL 1366722 (D. Nev. 2014) .......... 17

1

2

### I.    <u>**INTRODUCTION**</u>

Defendant Mattson's motion, ECF No. 44, styled as a Motion to Modify Pre-Trial Asset Restraint (the Motion), conflates two completely different types of relief.  It seeks two things: (1) a modification of the terms of the defendant's pretrial release to remove certain property as collateral securing bond and (2) expungement of the Government's *lis pendens* on two wholly separate properties in Piedmont and Del Mar, California.

As to the request for modification of the defendant's terms of pretrial release—involving 210 LaSalle in Piedmont—that is an issue ordinarily evaluated by the judicial officer who conducted the detention hearing: in this case, the Magistrate Judge.  To the extent the defendant is seeking to appeal the Magistrate Judge's order on conditions, this Court should decline to modify the Magistrate Judge's order, but if it does reconsider the conditions set by the Magistrate Judge, it should do so *de novo* and take into account all the information in the record, including that discovered after the hearing before the Magistrate Judge.

As to the request for expungement of the *lis pendens*, even assuming that the government's *lis pendens* implicate the defendant's ability to retain and hire criminal counsel at all, he has failed to show that the assets involved—62 Farragut in Piedmont and 1834–1836 Ocean Front in Del Mar—are "untainted" and that he lacks other assets to fund his defense.  The defendant is required to make a sufficiently definite, specific, detailed, and nonconjectural showing to enable the court to conclude that a substantial claim is presented.  The defendant's threadbare declaration, which is replete with material omissions and contradictions, and is further belied by extrinsic evidence, is woefully insufficient to meet the standard to obtain a hearing under the relevant framework.  Moreover, even if he *were* to obtain the relief he ultimately seeks—a hearing, and then an order expunging the government's *lis pendens* on the Farragut and Ocean Front properties—that would not allow him to sell them to fund his criminal defense, because as described below, both properties are partially or wholly owned by KS Mattson Partners, LP, an entity over which he no longer has any control.

For the reasons that follow, the Court should deny the motion without an evidentiary hearing.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Indictment and Filing of *Lis Pendens*

The grand jury returned an indictment charging the defendant with wire fraud, money laundering, and destruction of documents in a government investigation.  ECF No. 1.  The indictment provided notice to the defendant that his interests in certain real property, including properties located at 62 Farragut Avenue in Piedmont and 1834–1836 Ocean Front in Del Mar, were subject to forfeiture upon conviction.  The government thereafter recorded notices in the appropriate county recorders' offices to alert individuals or entities that may want to transact in the properties of its potential claims. ECF Nos. 10–12.

### B.    The Defendant's Arrest and Bail Proceedings

The defendant was arrested pursuant to an arrest warrant and made an initial appearance on May 23, 2025.  ECF No. 19 (minute entry).  At the hearing, the government moved for the defendant's pretrial detention, citing a risk of flight and an economic danger to the community.  *Id.*; ECF No. 6 (written motion for pretrial detention).  Following a nearly 90-minute initial appearance, the Honorable Alex G. Tse, United States Magistrate Judge, found that the government had met its burden to justify a detention hearing and ordered that one be held.  *Id.  See also* 18 U.S.C. § 3142(f)(2) (judicial officer shall hold a detention hearing in a case that involves serious risk that a defendant will flee or obstruct justice).

At the Magistrate Judge's direction, Pretrial Services conducted a bail study and made two important findings: (1) the defendant posed a risk of non-appearance based on the nature of the offense and possible significant assets reflected in public records, and (2) the defendant posed a "financial danger to the community."  Pretrial Services Report, ECF No. 15 at 10.  Pretrial Services concluded that those dangers could be mitigated by a combination of release conditions, including a $4,000,000 bond fully secured by the defendant's multimillion dollar residence in Sonoma, as well as the property and assets of third parties.  *Id.* at 11.  Notably, according to the Pretrial Services officer, both the defendant and his wife, Stacy Mattson, "declined to discuss" financial resources.  *Id.* at 9.  Pretrial Services also noted that public records searches reflected the defendant was associated with 64 properties, sales of 23

properties with a total value in excess of $28,000,000, 11 property loans, and 24 properties possibly

owned by the defendant with an assessed value, sale value, or loan amount totaling over $34,000,000.

*Id.*

On May 28, 2025, following an approximately five-hour detention hearing where nine victims

spoke about the impact of the defendant's actions on their lives, and after considering the written

statements of over 75 victims,[1] the Magistrate Judge adopted pretrial services' view that the defendant

posed a risk of flight and a danger to the community, but ultimately concluded that those risks could be

mitigated with strict conditions.  Those conditions included:

- a $4,000,000 bond partially secured by the posting of a property on Caballo Alto Court in
  Reno, Nevada owned by the defendant's sister-in-law, and 210 LaSalle Avenue in Piedmont,
  to be posted by June 11, 2025;

- Further security to be provided by the posting of $100,000 in cash from the defendant's
  sister-in-law and another $100,000 in cash from R.L., a friend of the defendant's;

- The defendant's daughter, son, sister-in-law, and brother-in-law as sureties;

- The defendant's wife Stacy Mattson as a surety and custodian;

- Location restrictions, including a GPS device and restriction to the Northern and Eastern
  Districts of California.

Importantly, one of the reasons that the Magistrate Judge ultimately decided against requiring the

posting of the defendant's $7 million Sonoma residence as recommended by Pretrial Services is because

it was titled in the name of KS Mattson Partners (KSMP), an entity that was mired in bankruptcy

proceedings, as described below.

On June 11, 2025, the Magistrate Judge held a further hearing on conditions of the defendant's

release.  The defendant submitted a status report in advance, ECF No. 33; the government submitted a

brief in opposition, ECF No. 35.  At that hearing, the Magistrate Judge revised the defendant's

conditions of release to restrict his movement to the Northern District of California and Solano County,

---

[1] Under the Crime Victims' Rights Act, victims have a statutory right to participate in public
proceedings related to a defendant's release.  *See* 18 U.S.C. § 3771(a)(4).

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST

3

and imposed a condition that the defendant may not solicit investments or act as a fiduciary or manage

the finances of others.  ECF No. 37.  During the hearing, the Magistrate Judge issued a superseding bond

reflecting these changes but maintaining several of the original conditions, including the requirement to

post the LaSalle property and the total of $200,000 cash in additional security.  *Id.*

Despite the Court's prior order, at the time of the June 11 hearing, the defendant had taken no

steps to post the LaSalle property with the Clerk of Court, and during the hearing, counsel suggested to

the Magistrate Judge that there was an unspecified "Sixth Amendment" issue with posting it.  The

Magistrate Judge set a briefing schedule and ordered the defendant to file a brief on the issue within two

weeks, *see* ECF No. 25.  In response, the defendant filed this omnibus motion.

## C.    The Bankruptcy Proceedings

As of the May 28, 2025 detention hearing before the Magistrate Judge, the defendant and KSMP

were both resisting efforts to enter involuntary bankruptcy.  Mattson is not currently in bankruptcy, but

the Bankruptcy Court has ordered him to comply with Sections 363 and 364 of the Bankruptcy Code.

Preservation Order Under 11 U.S.C. § 303(f), ECF No. 91, *In re Mattson*, No. 24-10714 (Bankr. N.D.

Cal. May 11, 2025).  That means that he may not engage in any transactions "other than in the ordinary

course of business," 11 U.S.C. § 363(a), but it allows him to "obtain unsecured credit and incur

unsecured debt in the ordinary course of business." 11 U.S.C. § 364(a).[2]

On June 9, 2025, the Bankruptcy Court entered a stipulated order, prepared by Mattson's

counsel, that placed KSMP into Chapter 11 bankruptcy proceedings.  Stipulated Ord. for Relief in an

Involuntary Case, ECF No. 131, *In re KS Mattson Partners LP*, No. 24-10715 (CN) (Bankr. N.D. Cal.

Jun. 9, 2025).  The Court appointed an independent director—Robbin Itkin—to "solely be responsible

for the duties and obligations of [KSMP]" and vested her "with the authority to operate [KSMP's]

business."  *Id.* at 2.   In seeking the Order, Ms. Itkin told the Bankruptcy Court that she intended to hire

a third party to serve as KSMP's Chief Restructuring Officer, "with primary responsibility for managing

---

[2] At the detention hearing, Mattson's counsel raised the issue of whether the LaSalle property could be posted, given the defendant's possible community property interest in it and the Bankruptcy Court's orders.  Whether or not that is the case, Mattson has not sought any relief from the Bankruptcy Court to enable him to comply with the Magistrate Judge's orders.

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST                                          4

1   [KS Mattson]'s real estate portfolio, including rent collection, property oversight, asset preservation,

2   analysis and implementation of asset sales and potential financing opportunities."  Decl. of Robbin L.

3   Itkin in Supp. of Debtor's Mot. for Ord. Authorizing Designation of Robbin L. Itkin as Responsible

4   Individual Pursuant to B.L.R. 4002-1 at 5, ECF No. 134, *In re KS Mattson Partners, LP*, No. 24-10715

5   (CN) (Bankr. N.D. Cal. Jun. 9, 2025).  *See also* Final Ord. Auth. Designation of Robbin L. Itkin as

6   Responsible Individual Pursuant to B.L.R. 4002-1, ECF No. 172, *In re KS Mattson Partners, LP*, No.

7   24-10715 (CN) (Bankr. N.D. Cal. Jun. 24, 2025).  In appointing Ms. Itkin, the Bankruptcy Court

8   expressly directed that "[n]one of Kenneth Mattson, Stacy Mattson or K.S. Mattson Company, LLC

9   shall have any authority, express or implied, to act on behalf of [KSMP], bind [KSMP], operate the

10  Debtor's business, access any of the Debtor's assets or any property of the estate.  Any such actions

11  shall be void ab initio and a violation of this Order."  *Id.* at 3.

12          In summary, Mattson himself is still not in bankruptcy, but subject to a preservation order.

13  KSMP is now in Chapter 11 bankruptcy and is under the control of Ms. Itkin and the Bankruptcy Court.

14  Mattson has no control over KSMP's assets.

15          **D.      The Subject Assets**

16                  **1.      62 Farragut and 1834–1836 Ocean Front**

17          As described above, the Motion implicates two different classes of assets: the property the

18  Magistrate Judge ordered Mattson to post to secure his bond (210 LaSalle) and the properties the

19  indictment alleges are subject to forfeiture (Farragut and Ocean Front).  What follows is some

20  background information about those properties.

21          The indictment notices forfeiture of three properties alleged to be property constituting or

22  derived from proceeds the defendant obtained directly and indirectly as a result of the violations charged

23  in the indictment:  62 Farragut Avenue in Piedmont, 1834–1836 Ocean Front in Del Mar, and 1716

24  Ocean Front in Del Mar.  ECF No. 1 at 19.  The defendant's Motion seeks to challenge the forfeiture of

25  only two of those: 62 Farragut and 1834–1836 Ocean Front.[3]

26

27          [3] The indictment also alleges that 1716 Ocean Front may be subject to forfeiture, but the Motion
    does not appear to challenge the *lis pendens* on this property, presumably because the defendant

28  transferred title to 1716 Ocean Front in Del Mar to a third party in July 2024, after the search warrant
    execution in this case, via a $19 million seller carry-back financing note.

The residence at 62 Farragut consists of two parcels with separate Assessor Parcel Numbers: one titled in the name of the defendant and the other titled in the name of KSMP.[4]  Declaration of AUSA Christoffer Lee ("Lee Decl."), Exs A and B.  In July 2024, 1834–1836 Ocean Front was transferred from KSMP to the same third party who now owns 1716 Ocean Front.  In April 2025, however, it appears that the third party transferred title to 1834–1836 Ocean Front back to KSMP.  Lee Decl., Ex. C (reflecting chain of title and July 2024 transfer from KSMP), Ex. D (reflecting transfer of both 1716 Ocean Front and 1834-36 Ocean Front), and Ex. E (reflecting correction to remove transfer of 1834-1836 Ocean Front, confirming that KSMP holds title).  Thus, as of this writing, part of 62 Farragut and all of 1834–1836 Ocean Front are under the control of KSMP's Responsible Officer Robbin Itkin, and not Mattson.

### 2.    210 La Salle

210 La Salle is differently situated.  The indictment did not expressly notice forfeiture of 210 La Salle.[5]  210 La Salle is titled in the name of Stacy Mattson.  At the May 28, 2025 detention hearing, given limitations on the defendant's ability to control KSMP properties, and the fact that 210 La Salle appeared to be a property not owned by KSMP but controlled by the defendant and his wife Stacy Mattson,[6] the Magistrate Judge ordered that 210 La Salle be posted to partially secure the $4,000,000 bond.  ECF No. 23.

The defendant filed the instant Motion on June 25, 2025, seeking amongst other relief, an order that the defendant "shall not be required to post as security for his bail the property located at 210 La Salle."  ECF No. 44-2.  The defendant submitted a sworn declaration in support of the Motion.  ECF 44-1 ("Mattson Decl.").  The government has subsequently learned additional information—omitted from the defendant's declaration and Motion—that may be relevant to the Court's analysis.  For example, the

---

[4] It is unclear whether the defendant could dispose of one parcel at 62 Farragut without disposing of the other; the two parcels appear to be inextricably intertwined.

[5] The indictment did not expressly notice 210 LaSalle, but the government's continuing investigation has revealed that Mattson has used at least some investor funds to fund mortgage payments for this property, which means that it may too well be subject to forfeiture under 18 U.S.C. §§ 981, 982.

[6] Stacy Mattson was also ordered to be a custodian for the defendant, and thus the requirement that 210 La Salle be posted as collateral helped to increase the moral suasion on the defendant to comply with the conditions.

1   defendant asserts 210 La Salle is "titled in my wife [Stacy Mattson]'s name." That is technically true,

2   but the government has subsequently learned that an unrelated individual (WITNESS-1) is a one-third

3   owner of the property and the property is heavily indebted—facts the defendant omitted from his

4   declaration.

5         On June 26, 2025, federal agents interviewed WITNESS-1, who reported the following. *See*

6   *generally* Lee Decl. Exs. F and G (FBI 302 Interview Memoranda of WITNESS-1) (filed under seal).

7   On or about November 17, 2003, WITNESS-1 entered into a "co-ownership agreement" with Mattson

8   (acting on behalf of KSMP)[7] under which WITNESS-1 invested $333,000 with the defendant in

9   exchange for a 33.33% interest in 210 LaSalle. WITNESS-1 maintains he still holds that ownership

10  interest. Pursuant to the terms of the agreement, WITNESS-1's interest in the property is secured by a

11  $460,000 deed of trust that is on file with the Alameda County Recorder's Office. The written

12  agreement between Mattson and WITNESS-1 contemplates that the parties may transfer interest in the

13  property "[u]pon mutual agreement" but does not appear to provide for a unilateral transfer by either

14  party. Lee Decl. Ex. H at Section 1.08 (filed under seal).

15        WITNESS-1 has lived at 210 La Salle for over 20 years and has paid and has continued to pay

16  the defendant his share of expenses and property taxes for the property. WITNESS-1 asserts that the

17  property is subject to a $2 million mortgage with an estimated balance of $1 million. While WITNESS-

18  1 is aware that Stacy Mattson's name is on the title to 210 LaSalle, WITNESS-1 has only ever dealt with

19  the defendant and never with Stacy. Although WITNESS-1 has repeatedly asked Mattson to put

20  WITNESS-1 on the title, Mattson has not done so. The property is currently in foreclosure. Lee Decl.,

21  Ex. F at 3.

22        WITNESS-1, who has paid Mattson at least hundreds of thousands of dollars in property taxes

23  and mortgage payments on the property, believes that the property has an approximate market value of

24  $3.5 million. After the $1 million loan is paid off, WITNESS-1 would be entitled to one-third of the

25  remaining equity. *Id.*

26

27  _____

    [7] At the time, 210 LaSalle was titled in the name of KSMP and only later transferred to Stacy
28  Mattson.

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST                                    7

According to WITNESS-1, the defendant never contacted him regarding the Magistrate Judge's order that 210 La Salle be posted as security for the defendant's bond or regarding the defendant's filing of the instant Motion.  Lee Decl., Ex. G.  Nor has he been served with the instant Motion or been given any notice of the defendant's attempts to use this property—WITNESS-1's home for over 20 years, in which he holds a significant financial interest—to pay attorneys' fees in the defendant's criminal case.

**E.    Additional Information About the Defendant's Acquisition and Disposition of Assets**

In September 2024, Stacy Mattson purchased two brand new vehicles, in cash paid-in-full—one for $105,059.163 (less $10,000 in trade-in value) and one for $84,473.50, one of which the defendant was driving on the day of his arrest.  ECF 6 at 10; Lee Decl., Exs. I and J (filed under seal).  The defendant's declaration omits reference to this property—which appears to be of more than mere "nominal value," *Cf.* Mattson Decl. ¶ 8—and does not attempt to explain why it could not be sold to fund his defense.  The government does not have access to the defendant's reporting to Pretrial Services of any transactions over $5,000, but any such transactions—if reported—would also help to inform the analysis about his lack of present funds.  Such reporting is also absent from the defendant's declaration.

There are also large tranches of assets that appear to have been sold in 2024, the proceeds of which could presumably fund the defendant's defense.  Between August 27, 2024 and February 14, 2025, the defendant (both personally and through his then alter-ego, KSMP) received $2,924,775.34 in relation to the sale of approximately 40 classic cars.  Lee Decl., Ex. K (filed under seal).  The individual who assisted the defendant with the sales is one of the sureties on his bond (SURETY 1).  *Id.*  The declaration is silent as to whether these funds, for example, could be used to fund his defense.

Finally, on June 20, 2025, federal agents interviewed two witnesses who told them that Ken and Stacy Mattson anticipated the May 2024 execution of a search warrant at their home and "started preparing for it at least the week of the raid in May of 2024."  Specifically, according to these witnesses, in anticipation of the search warrant execution, Mattson and his wife began to sell off assets, including personal luxury items and jewelry with the assistance of SURETY 1.  Moreover, the witnesses reported that the defendant and Stacy Mattson gave SURETY 1 valuables to store at their home.  SURETY 1 also set up a bank account in SURETY 1's own name for Stacy Mattson's use so that Stacy could have

1   money "stashed away" in case the defendant went "away forever" when the FBI came.  Lee Decl., Ex. L
2   (filed under seal).

### III.   DISCUSSION

4       A criminal defendant may challenge the forfeitability of his assets if he presents a "sufficiently
5   definite, specific, detailed, and nonconjectural" argument that demonstrates seized funds are untainted
6   **and** necessary to mount a legal defense.  *See United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir.
7   1993) (quoting *Cohen v. United States*, 378 F.2d 751, 761 (9th Cir. 1967)) (internal quotation marks
8   omitted and emphasis added).

9       Only if the defendant makes the required showing can the court schedule a hearing on the non-
10  forfeitability of assets.  Such a hearing is often referred to as a *Monsanto* hearing after *United States v.*
11  *Monsanto*, 924 F.2d 1186, 1191 (2d Cir. 1991) (en banc) ("*Monsanto IV*"), *abrogated on other grounds*
12  *by Kaley v. United States*, 571 U.S. 320 (2014).  In *Monsanto IV*, the Second Circuit held that, if assets
13  are restrained, "a pre trial adversary hearing is required where the question of attorney's fees is
14  implicated."  924 F.2d at 1191.  The vast majority of the cases that have examined *Monsanto IV* have
15  adopted what is often called the *Jones-Farmer* rule, so named after the Tenth and Fourth Circuits'
16  decisions in *United States v. Jones*, 160 F.3d 641, 647–48 (10th Cir. 1998), and *United States v. Farmer*,
17  274 F.3d 800, 804–05 (4th Cir. 2001).  Because of the strong interest in preserving assets for the return
18  to victims, under the *Jones-Farmer* rule, a defendant is not entitled to a *Unimex*/*Monsanto* hearing
19  unless and until the defendant establishes **both**: (1) an actual need for the restrained assets for attorneys'
20  fees or living expenses; and (2) that there is some substantial evidence that the assets are not
21  forfeitable—*i.e.* cannot be traced to tainted funds.  Only then is he entitled to have the Court hold a
22  *Unimex*/*Monsanto* hearing wherein the government must demonstrate probable cause that the property is
23  traceable to the crime.  *Jones*, 160 F.3d at 647–48.  And even at such a hearing, the defendant may not
24  relitigate or challenge the grand jury's probable cause determination that the defendant committed an
25  offense permitting forfeiture.  *Kaley v. United States*, 571 U.S. 320, 323–24, 398 (2014).

26      While framed as a general Sixth Amendment challenge to pretrial "restraint of assets," the
27  defendant's motion actually seeks two distinct forms of relief governed by different legal standards:  (1)

28

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST

1    modification of the order setting conditions of release and a ruling that 210 La Salle—a property titled in

2    the name of Stacy Mattson—not be posted as security in support of the defendant's $4,000,000 release

3    bond; and (2) a motion to expunge the government's *lis pendens* on certain properties so that the

4    defendant can sell those properties and use the money to pay two criminal defense lawyers.

5         To the extent the defendant seeks to remove *lis pendens* and prevent subsequent forfeiture of 62

6    Farragut and 1834–1836 Ocean Front (the "Subject Properties" or "Subject Assets"), he has failed to

7    meet his burden for so much as a hearing on the matter, let alone for ultimate relief.  Dispositively, the

8    defendant has failed to satisfy his burden under the two-step *Jones-Farmer* framework—which governs

9    Sixth Amendment claims like his—to show that he has no other untainted assets available to fund his

10   legal defense.  Thus, the defendant is not entitled to a *Unimex/Monsanto* hearing and the Court must

11   deny the motion given the defendant's failure at Step One.  Moreover, he has failed to make a

12   substantial claim that the subject assets are untainted, and thus also fails at Step Two.  Finally, even if

13   the Court were to hold such a hearing, the government would be able to show probable cause that the

14   Subject Assets are subject to forfeiture.

15        **A.    A Lis Pendens is Not a "Pretrial Restraint" At All**

16        The government has recorded a *lis pendens* as to the Farragut property and a *lis pendens* as to the

17   Ocean Front property.  The defendant seeks an order lifting these, calling them "pre-trial restraints."

18   Mot. at 7:5-6 (arguing *lis pendens* "notices act as a functional freeze on assets.")  But a *lis pendens* is not

19   a pretrial restraint at all.  It places no legal restrictions on the disposition of property by its lawful owner.

20   Instead, it is simply a notice—a notice to the public that the United States may have some interest in the

21   property due to pending litigation.  Although that notice may have the practical effect of impairing the

22   property's value or its alienability, several courts have concluded that it is not ultimately a legal

23   restraint, at least not one of Constitutional dimension.  "In short, a filing of a *lis pendens* pursuant to

24   state statute does not constitute a 'seizure' and does not affect property interests to an extent significant

25   enough to implicate the Due Process Clause of the Fifth Amendment."  *United States v. Register*, 182

26   F.3d 830, 836 (11th Cir. 1999).  The filing of a *lis pendens* is fundamentally different than cases in

27   which the government *actually* restrains property pretrial, such as by seizing it pursuant to a warrant.

28

The Supreme Court recognized this important distinction in *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993), where, in affirming a ruling that held that the government had violated due process by seizing a property pursuant to a seizure warrant, it observed that the filing of a *lis pendens* was a less restrictive method of asserting the government's interests in forfeitable property. *Id.* at 58. *See also Aronson v. City of Akron*, 116 F.3d 804, 812 (6th Cir. 1997) ("The mere filing of an ordinary lien or *lis pendens* notice simply does not represent the sort of 'grievous loss' that necessitates prior notice and an opportunity to be heard" (cleaned up)). A *lis pendens* is not a pretrial restraint. But as described below, even if the Court assumes it is, it should still deny the defendant a hearing because Mattson has failed to meet the requisite showing.

### B.    Even if a Lis Pendens is a Pretrial Restraint on Assets, the Defendant Has Not Met His Heavy Burden for a Hearing

#### 1.    The Defendant Does Not Have a Constitutional Right to Use Tainted Assets to Fund His Criminal Defense

The Sixth Amendment's guarantee of legal representation is not absolute. A criminal defendant represented by retained counsel is limited to hiring an attorney whose fees he can afford. *Luis v. United States*, 578 U.S. 5, 12 (2016). Additionally, the Sixth Amendment does not guarantee a criminal defendant the right to expend illegally obtained assets on his defense. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989). Therefore, a criminal defendant's Sixth Amendment rights are not violated if he is prevented from expending forfeitable assets on his criminal defense. *United States v. Monsanto*, 491 U.S. 600, 615 (1989).

In *Luis*, the Supreme Court held that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Id.* at 10. But Mattson's reliance on *Luis* is misplaced, because he has not (and cannot) show that the Subject Assets are legitimate or untainted. *See United States v. Li*, No. 3:16-CR-00194, 2018 WL 1299724, at *10 (M.D. Pa. Mar. 13, 2018) ("The holding in *Luis* was limited: the Government may not restrict the property of a criminal defendant when there has been no finding of probable cause or property has not been traced to an offense contained within the indictment, and the Defendant wishes to use those funds to retain counsel").

The defendant's motion strangely claims that the "the government does not allege that the assets

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST

11

were obtained because of the conduct alleged in the indictment." Mot. at 5. But the grand jury's indictment specifically alleges that the Subject Assets are property constituting or derived from proceeds the defendant obtained directly and indirectly as a result of the violations charged in the indictment, and that they are subject to forfeiture. Indictment ¶ 19, ECF No. 1. Neither the defendant's motion nor his declaration rebut that allegation.

### 2. The Defendant Has Failed to Carry His Burden of Showing that He Has Insufficient Assets to Retain Counsel of His Choice.

The defendant asks for the expungement of the *lis pendens* on the Subject Properties, or alternatively, for a hearing. As noted above, a criminal defendant may challenge the forfeitability of his assets if he presents a "sufficiently definite, specific, detailed, and nonconjectural" argument that demonstrates seized funds are untainted and necessary to mount a legal defense. *See Unimex.*, 991 F.2d at 551 (citation and internal quotation marks omitted); *Jones*, 160 F.3d at 647-48; *Farmer*, 274 F.3d at 804-05. Because of the strong interest in preserving assets for return to victims, under the *Jones-Farmer* rule, courts will continue pre-trial restraints unless and until the defendant establishes both: (1) an actual need for the restrained assets for attorneys' fees or living expenses; and (2) that there is some substantial evidence that the assets are not forfeitable. In other words, "[d]ue process does not automatically require a hearing and a defendant may not simply ask for one." *Jones*, 160 F.3d at 647.

The right to a hearing is triggered *only* once those two elements have been satisfied. *Jones*, 160 F.3d at 647–48 (defendant challenging pre-trial restraint of assets alleged to be forfeitable has initial burden of showing that she has no funds other than the restrained assets to hire private counsel or to pay living expenses, and that there is a bona fide reason to believe the restraining order should not have been entered). The defendant has the burden of persuasion on the issue of whether he has insufficient unrestrained assets to pay an attorney. *Farmer*, 274 F.3d at 804 (defendant must make threshold showing of need to use restrained assets to pay attorney); *Jones*, 160 F.3d at 647.

Here, the defendant has submitted a threadbare declaration that claims, without more, that his "assets are insufficient to pay [his] chosen counsel." Mattson Decl. ¶ 8. That is simply not enough; courts routinely find such self-serving and conclusory affidavits insufficient to trigger a hearing. For example, in *United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013), the Court of Appeals sustained a

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST

12

1    district court's finding that the defendant failed to satisfy this threshold requirement where he "did not

2    disclose his net worth, provide a comprehensive list of his assets, or explain how he has been paying his

3    significant living expenses." *Id.* at 133.  Of relevance here, Mattson is currently residing in a 7600

4    square-foot residence on a nearly 50-acre lot which appears to be valued in excess of $7 million.  *See*

5    *generally* ECF No. 37 (identifying defendant's residence).  He has not attempted to explain how he is

6    funding the upkeep of that property.  *See also United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th

7    Cir. 1998) (defendant's "bare-bones affidavit asserting that he personally lacked sufficient funds to

8    obtain counsel of his choice" was inadequate); *In re Seizure of: Any and All Funds held in Republic*

9    *Bank of Arizona Accounts*, No. 2:18-cv-06742, 2019 WL 8892585, at *8 (C.D. Cal. Dec. 20, 2019) (no

10   hearing where claimants "have made no attempt" at showing a definite, specific, detailed, and

11   nonconjectural claim).  *Compare United States v. Patel*, 888 F.Supp.2d 760, 771 (W.D. Va. 2012)

12   (granting *Farmer* hearing where defendant submitted "numerous affidavits, documents, bills, and

13   checks, detailing his current financial situation and need for the restrained substitute assets in order to

14   pay his counsel").

15          Nor are the unsworn, vague and conjectural assertions in the Motion, *e.g.,* Mot. at 7–8  ("The

16   value of Mr. Mattson's untainted assets is anticipated to be more than sufficient to cover legal services

17   that he would require through trial . . . .With access to the funds from the untainted Restrained

18   Properties, however, Mr. Mattson could afford to pay for his legal representation") adequate to sustain

19   Mattson's burden.  "To determine whether a hearing is required, the court must decide whether the

20   moving papers filed, including affidavits, are sufficiently definite, specific, detailed, and nonconjectural,

21   to enable the court to conclude that a substantial claim is presented."  *Unimex*, 991 F.2d at 551.

22   "*Unimex* teaches that a court may be required to hold a pretrial hearing to determine whether all or some

23   of seized assets should be returned in order to protect a criminal defendant's constitutional rights—but

24   only if the defendant submits affidavits that are 'sufficiently definite, specific, detailed, and

25   nonconjectural, to enable the court to conclude that a substantial claim is presented.'"  *United States v.*

26   *Swenson*, No. 1:13-CR-00091-BLW, 2013 WL 3322632, at *7 (D. Idaho Jul. 1, 2013) (citing *Unimex,*

27   991 F.2d at 551).  "If criminal defendants fail to make this initial showing, then their private interests in

28

1   obtaining their counsel of choice are outweighed by the government's interests, including the

2   government's significant interest in preserving forfeitable assets." *Id.* (finding the defendant "failed to

3   show a hearing was warranted" where they "failed to put forth evidence that they have no assets to retain

4   private counsel without the seized funds, and that there was no probable cause to forfeit the funds.")

5         And here, the defendant's failure to make a showing of insufficient unrestrained assets is

6   amplified by the ample other evidence showing the existence of alternative assets, and the open

7   questions—unanswered by the defendant's declaration or his Motion—about where those assets went.

8   The defendant acknowledges retaining defense counsel Randy Sue Pollock in April 2024 and William

9   Frentzen in February 2025.  Mot. at 7.  Presumably, the defendant has paid criminal defense counsel,

10  who he retained in mid-2024, some funds to date.  But the defendant has failed to mention how much he

11  has expended to retain counsel and whether that retainer has been exhausted, or whether any family

12  members have sufficient assets to fund his defense—all key factors in determining whether there are

13  truly no other assets to pay counsel.  *See United States v. Lacey*, No. CR 18-00422, 2021 WL 5882638

14  at *9 (D. Ariz. Dec. 10, 2021) (finding that defendants failed to make requisite showing for a hearing

15  where they did not "attach any declarations from Defendants explaining how much they need to pay

16  counsel or prepare for trial, what their trial budget might be, what expenses they intend to pay from any

17  released funds, what would become of any unspent or excess funds not ultimately paid to counsel, or

18  even swearing that they will actually use any funds released to pay counsel"); *United States v. Omidi*,

19  No. CR 17-661(A)-DMG, 2021 WL 7629897, at *5–*9 (C.D. Cal. June 15, 2021) (finding defendant

20  failed to make threshold showing that he lacks funds and access to funds for his defense, including

21  failure to establish that prior access to funds for legal defense were depleted).

22        As described in the government's prior filings, *see, e.g.,* ECF No. 6 at 10, less than a year ago,

23  the defendant and his wife paid nearly $180,000 in cash for two brand-new cars, neither of which are

24  encumbered by a loan.  Lee Decl., Exs. I and J.  Records obtained by the government suggest that

25  Mattson sold $2.9 million in classic cars over the last year.  Between August 2024 and February 2025—

26  after his scheme had unraveled and after federal law enforcement had searched his house, but while

27  KSMP was still under Mattson's control—records from the Bonhams Auction House reveal that

28

1    $2,924,775.34 was paid to Mattson or KSMP.  Lee Decl., Ex. K.  The defendant's declaration does not

2    begin to touch on why these funds are unavailable for his defense.  Similarly, Mattson's failure to

3    answer standard financial questions from Pretrial Services means that the parties and the Court have no

4    basis on which to meaningfully evaluate his claims of indigence.

5           Moreover, the significant material omissions and contradictions in the declaration the defendant

6    *did* submit should cause the Court to reject it as unreliable.  While Mattson claims on the one hand to

7    "own or control" the 62 Farragut and 1834–1836 Ocean Front properties, Mattson Decl. ¶ 1, in the next

8    breath he acknowledges that he does not have control over KSMP properties.  *Id.*  ¶¶ 5-6.  Mattson's

9    sworn declaration fails to mention that 1834–1836 Ocean Front is currently titled in the name of KSMP

10   and that at least part of 62 Farragut is too— and thus both are out of his control.  The Motion does not

11   even broach the question of whether KSMP's responsible individual (or the Bankruptcy Court) would

12   ever assent to a plan in which Mattson would dispose of KSMP assets for his sole personal benefit at the

13   expense of creditors (including victim-investors)—a highly dubious proposition.  The claim that

14   Mattson needs the government's *lis pendens'* lifted because he needs to sell these properties to pay

15   multiple criminal defense lawyers is fatally flawed because it assumes that he has the ability to sell

16   them; that assumption is wrong.

17          Also, even accepting for the sake of argument the defendant's own unsupported "estimated"

18   value of "approximately" $21 million, that number fails to consider that both properties are both heavily

19   encumbered.  As of December 23, 2024, there was an outstanding loan balance on 62 Farragut of

20   approximately $3.34 million.  As to 1834–1836 Ocean Front, as of December 23, 2024, there was an

21   outstanding loan balance of approximately $5.167 million.  In sum, the defendant's declaration is not

22   only insufficient and incomplete; it is misleading.  The Court should disregard it.

23          Because the defendant has not met his threshold showing of demonstrating that he has no funds

24   other than the Subject Assets to pay his lawyers, the Court need not go any further—it should deny the

25   motion without a *Unimex/Monsanto* hearing.

26

27

28

1

### 3.    The Defendant is Also Not Entitled to a Hearing Because He Has Failed to Make a Prima Facie Showing that the Government Lacks Probable Cause for the Restraint.

2

3    The second *Jones-Farmer* requirement, that there be a prima facie showing that the Government

4    lacked probable cause for the restraint, protects against the defendant's use of the probable cause hearing

5    to gain pretrial access to witnesses and other evidence that the Government intends to use at trial. *Jones*,

6    160 F.3d at 647 (defendant must show at second prong that there is bona fide reason to believe the

7    restraining order should not have been entered). District courts interpreting *Unimex* have held that the

8    defendant must make a "substantial claim" supported by specific, detailed and nonconjectural

9    allegations, that the government lacked probable cause for the restraint. *See, e.g.*, *Swenson*, 2013 WL

10    3322632 at *8; *United States v. Wetselaar*, No. 2:11-cr-00347, 2013 WL 8206582, at *19–20, 22-24 (D.

11    Nev. 2013), report and recommendation adopted, 2014 WL 1366722 (D. Nev. 2014) (finding defendants

12    failed to meet showing); *see also Li*, 2018 WL 1299724 at *10 (Defendant does not proffer any reason

13    to believe that the grand jury erred in its determination that there was probable cause that the assets

14    seized were traceable to the crimes charged). This requirement did not change with the Supreme

15    Court's decision in *Luis*. *See Lacey*, 2021 WL 5882638 at *8 ("After *Luis*, Defendants argue all they

16    need to assert is that the funds are not traceable to the crimes in the indictment, i.e., are untainted. The

17    Court disagrees.").

18    The defendant's motion offers little in the way of challenging the probable cause determination

19    and the declaration offers less. For example, the Motion asserts that the defendant has owned 62

20    Farragut since 1999 "well before any fraud is alleged to have occurred." Mot. at 9. But much like the

21    defendant's incomplete declaration, the Motion omits that 62 Farragut is heavily mortgaged and that the

22    defendant used proceeds of the fraud to make payments on that mortgage. The Motion also asserts that

23    "the government does not allege that the assets were obtained because of the conduct alleged in the

24    indictment," Mot. at 5, but that seemingly ignores the black letter of the indictment's forfeiture

25    allegations. These two incomplete statements are not any indication, let alone a "substantial claim" that

26    is "sufficiently definite, specific, detailed, and nonconjectural" to establish that the Subject Assets are

27

28

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST

16

untainted. *Unimex*, 991 F.2d at 551.  Accordingly, the defendant has also failed to make the requisite showing at Step Two.  The Court should deny the motion without a *Unimex*/*Monsanto* hearing.

### C.    Even if *Jones-Farmer* Permitted a Hearing, the Subject Properties Are Traceable to Tainted Funds Related to the Scheme, Foreclosing Relief

As described above, the defendant's unspecific barebones allegations fail to meet the threshold for a *Unimex*/*Monsanto* hearing.  But even if the Court were to hold such a hearing, the government would show that funds used to finance the properties at issue can be traced to the scheme alleged in the indictment.  At a *Unimex*/*Monsanto* hearing, the Government must demonstrate that there is probable cause that the assets are indeed forfeitable upon conviction.  Generally, probable cause has two components: "(1) that the defendant has committed an offense permitting forfeiture," which is established by a grand jury's indictment, and "(2) that the property at issue has the requisite connection to that crime," in other words, that the property is traceable to the alleged offense.  *Kaley*, 571 U.S. at 323–24, 398.  A defendant may challenge probable cause only on the second ground during a *Monsanto* hearing. *Id.* at 398.  Here, at any such hearing, the government would show that proceeds of the scheme were used to make payments on mortgages at 62 Farragut and 1834-1836 Ocean Front which means there is probable cause for their forfeiture.  *Cf. United States v. Omidi*, 125 F.4th 1283, 1288–89) (9th Cir. 2025) ("we follow our sister circuits to conclude that in a forfeiture case seeking proceeds of a fraud scheme under § 981(a)(1)(C), there is no so-called "100% Fraud Rule." All proceeds directly or indirectly derived from a health care fraud scheme like Get Thin—even if a downstream legitimate transaction conceivably generated some of those proceeds—must be forfeited.")  But again, the Court need not hold such a hearing because the defendant has not met his burden to get one.

### D.    In the Event the Court Construes the Defendant's Motion as an Appeal of the Magistrate Judge's Order Under 18 U.S.C. § 3145(a), Absent the Posting of 210 La Salle or other Adequate Asset, the $4,000,000 Bond Is Insufficient and the Court Should Re-Evaluate the Release Conditions

If the Court construes the defendant's request regarding 210 La Salle as an appeal of the Magistrate Judge's order under 18 U.S.C. § 3145, this Court's review of a magistrate judge's bail order is *de novo*.  *See United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990).  The district court "is not required to start over in every case, and proceed as if the magistrate's decision and findings did not

1  exist." *Id.* at 1193. The district court should still "review the evidence before the magistrate and make

2  its own independent determination whether the magistrate's findings are correct, with no deference." *Id.*;

3  *United States v. Johnson*, No. 18CR4955-H, 2020 WL 2092904 at *1 (S.D. Cal. May 1, 2020)

4  (reviewing *de novo* Magistrate Judge's bail order); *see also United States v. Calderon*, No. 24CR502-

5  JM-2, 2024 WL 2892321, at *2 (S.D. Cal. June 10, 2024).

6      As described above, the defendant's request to remove 210 LaSalle from his bond is a request to

7  modify the terms of his release.  The Court should either decline to rule on the matter in the first

8  instance or construe the defendant's motion as an appeal pursuant to 18 U.S.C. § 3145(a) and conduct a

9  full review in it considers all available facts and evidence and determines *de novo* whether there are

10 actually sufficient terms and conditions that would reasonably assure the defendant's appearance as

11 required and sufficiently mitigate the defendant's danger to the community.[8]

12     The Magistrate Judge evaluated the factors under the Bail Reform Act and crafted stringent

13 conditions to reasonably assure the defendant's appearance as required and mitigate his danger to the

14 community, based on information known to the court at the time.  A surety posted her home in Reno,

15 Nevada and $100,000 in cash.  The combined value of those assets is approximately $780,000, far short

16 of the $4 million bond amount.[9]  Because 210 La Salle was held in title by Stacy Mattson, the

17 Magistrate Judge ordered—based on information known at that time—that 210 La Salle should be

18 posted to help secure the bond, in part, to assure that adequate moral suasion existed.  A bond without

19 the security of the LaSalle property or an adequate, untainted alternate asset would be insufficient to

20 secure the defendant's appearance.

21     Moreover, given the new information the government has learned since the detention hearing,

22 the adequacy of even those initial conditions—including choice of sureties and custodian (Stacy

23 Mattson) are in question.  The revelation that 210 La Salle appears to be co-owned by a third party—a

24

25     [8] If the Court determines that it should hold a *de novo* hearing on the defendant's conditions of
26 release, the United States respectfully requests notice sufficient to notify Mattson's victims, who are
   statutorily entitled to be reasonably heard at any "public proceeding . . . involving release."  18 U.S.C.
27 § 3771(a)(4).

       [9] The defense has subsequently informed the Magistrate Judge that the other surety who agreed
28 to post $100,000 on Mr. Mattson's behalf—R.L.—no longer wishes to do so.

U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
Case No. CR25-00126 JST

18

fact known to the defendant but never disclosed to the Magistrate Judge—may bear upon the Court's

analysis of whether conditions exist that can reasonably assure the defendant's appearance at future

court proceedings.  As noted above, the government has learned that the defendant sold $2.9 million in

classic cars between 2024 and 2025 with the assistance of SURETY 1, and a witness has reported that

SURETY 1 took possession of valuables, including jewelry, in anticipation of a federal search warrant

on the defendant's residence in May 2024.  SURETY 1 is a surety on the bond; these newly discovered

facts call into question whether SURETY 1 can exert sufficient moral suasion on the defendant to assure

his appearance in Court.  The defendant and Stacy Mattson declined to answer Pretrial Services'

financial questions; it is unclear to what extent SURETY 1 described the above transactions to Pretrial

Services in her interview, and therefore to what extent Pretrial Services had the benefit of this

information in recommending that SURETY 1 was an appropriate surety.  At the very least, the

discovery of this new information strongly militates against the defendant's request to remove 210

LaSalle from the bond.

If the Court revisits the Magistrate Judge's bond conditions, it should make a *de novo*

determination of whether conditions exist to adequately mitigate the defendant's risk of flight and his

danger to the community, considering all of the information currently known to it, including that which

came to light following the Magistrate Judge's determination.

### IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the defendant's "Motion to Modify Pre-Trial

Asset Restraint" and deny his request for a hearing.

DATED:  July 9, 2025                                    Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_____/s/_____
CHRISTOFFER LEE
NIKHIL BHAGAT
Assistant United States Attorneys

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTOFFER LEE (CABN 280360)
NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br><br>KENNETH W. MATTSON,<br><br>    Defendant. | **CASE NO. 4:25-CR-00126 JST**<br><br>**AUSA LEE DECLARATION ISO UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PRE-TRIAL ASSET RESTRAINT**<br><br><br>Date:  July 31, 2025<br>Time: 9:30 a.m.<br>Judge: Hon. Jon S. Tigar |

I, Christoffer Lee, declare and state as follows:

    1.    I am an Assistant United States Attorney in the Northern District of California, and I am assigned to represent the United States in the above-captioned matter.

    2.    I am informed and believe that the exhibits attached herein are what they purport to be.

    3.    Attached as **Exhibit A** is a RealQuest Property Detail Report for 62 Farragut Avenue A in Piedmont, CA, reflecting owner name Kenneth W. Mattson.

    4.    Attached as **Exhibit B** is a RealQuest Property Detail Report for 62 Farragut Avenue B

in Piedmont, CA, reflecting owner name K S Mattson Partners.

5.    Attached as **Exhibit C** is a RealQuest Property Detail Report for 1834-36 Ocean Front in Del Mar, CA.

6.    Attached as **Exhibit D** is a July 22, 2024 Deed of Trust with Assignment of Rents between Equitable Ocean Front LLC and KS Mattson Partners.

7.    Attached as **Exhibit E** is an April 25, 2025 Correction Deed of Trust with Assignment of Rents between Equitable Ocean Front LLC and KS Mattson Partners.

8.    Attached as **Exhibit F** and **Exhibit G** are Federal Bureau of Investigation Form 302 Memoranda of Interviews with WITNESS 1, which have been filed under seal.

9.    Attached as **Exhibit H** is a "Co-Ownership Agreement" for 210 La Salle between KS Mattson Partners LP and WITNESS 1, which has been filed under seal.

10.    Attached as **Exhibit I** is a sales contract between Buick GMC of Vacaville and Stacy Mattson for a 2024 GMC Yukon XL, which has been filed under seal.

11.    Attached as **Exhibit J** is a sales contract between Buick GMC of Vacaville and Stacy Mattson for a 2025 GMC Sierra 2500HD, which has been filed under seal.

12.    Attached as **Exhibit K** are records from Bonhams Auction House, including an email communication with SURETY 1 regarding the sale of vehicles and settlement statements reflecting the same, which have been filed under seal.

13.    Attached as **Exhibit L** is Federal Bureau of Investigation Form 302 Memoranda of Interview with two witnesses, which has been filed under seal.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  July 9, 2025                                             _____
                                                                                       */S/*
                                                                              CHRISTOFFER LEE

LEE DECL. ISO U.S. OPP. TO DEF.'S MOT. TO MODIFY PRE-TRIAL ASSET RESTRAINT
3:25-CR-00126-JST                                                2

# **<u>Exhibit A</u>**

# Property Detail Report

For Property Located At :
**62 FARRAGUT AVE A, OAKLAND, CA 94610-1256**



## Owner Information
| | |
|---|---|
| Owner Name: | **MATTSON KENNETH W** |
| Mailing Address: | **PO BOX 5490, VACAVILLE CA 95696-5490 B065** |
| Vesting Codes: | / / SE |

## Location Information
| | | | |
|---|---|---|---|
| Legal Description: | | | |
| County: | ALAMEDA, CA | APN: | 051-4786-007 |
| Census Tract / Block: | 4261.00 / 3 | Alternate APN: | 051478600700 |
| Township-Range-Sect: | | Subdivision: | PARCEL MAP 7471 |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | A | Tract #: | |
| Legal Block: | | School District: | PIEDMONT |
| Market Area: | | School District Name: | PIEDMONT |
| Neighbor Code: | | Munic/Township: | PIEDMONT INCORP |

## Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

## Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 09/24/1999 / 09/22/1999 | 1st Mtg Amount/Type: | $578,500 / CONV |
| Sale Price: | $578,500 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 363904 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $61.22 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | FIDELITY NATIONAL TITLE INSURA | | |
| Lender: | YOLO CMNTY BK | | |
| Seller Name: | LEFEVER-MATTSON | | |

## Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 12/05/1995 / | Prior Lender: | LENDER SELLER |
| Prior Sale Price: | $3,000,000 | Prior 1st Mtg Amt/Type: | $2,850,000 / CONV |
| Prior Doc Number: | 282250 | Prior 1st Mtg Rate/Type: | / FIXED RATE LOAN |
| Prior Deed Type: | CONTRACT OF SALE | | |

## Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Gross Area: | 9,449 | Parking Type: | GARAGE | Construction: | WOOD |
| Living Area: | 9,449 | Garage Area: | | Heat Type: | |
| Tot Adj Area: | | Garage Capacity: | 5 | Exterior wall: | |
| Above Grade: | | Parking Spaces: | 7 | Porch Type: | |
| Total Rooms: | 17 | Basement Area: | | Patio Type: | |
| Bedrooms: | | Finish Bsmnt Area: | | Pool: | POOL |
| Bath(F/H): | / | Basement Type: | | Air Cond: | |
| Year Built / Eff: | 1930 / 1930 | Roof Type: | | Style: | U-SHAPE |
| Fireplace: | / | Foundation: | | Quality: | EXCELLENT |
| # of Stories: | 2.5 | Roof Material: | | Condition: | |
| Other Improvements: | | | | | |

## Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | 0.95 | County Use: | SINGLE FAMILY RESIDENTIAL HOME (1100) |
| Lot Area: | 41,546 | Lot Width/Depth: | x | State Use: | |
| Land Use: | SFR | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

## Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $5,146,423 | Assessed Year: | 2024 | Property Tax: | $69,802.36 |
| Land Value: | $1,130,070 | Improved %: | 78% | Tax Area: | 18000 |
| Improvement Value: | $4,016,353 | Tax Year: | 2024 | Tax Exemption: | |
| Total Taxable Value: | $5,146,423 | | | | |

## Voluntary Lien Report
For Property Located At



### 62 FARRAGUT AVE A, OAKLAND, CA 94610-1256

APN: **051-4786-007**
Block:    Lot: **A**
### Summary of Transactions

| | RecDate # | Doc Type | Doc # | Buyer/Borrower | Seller | Lender | Orig Doc # |
|---|---|---|---|---|---|---|---|
| 1 | 01/21/2025 | ASSIGNMENT OF MORTGAGE | 10265 | MATTSON KENNETH W | | | 199139 |
| 2 | 01/21/2025 | ASSIGNMENT OF MORTGAGE | 10264 | MATTSON KENNETH W | | | 199139 |
| 3 | 09/09/2024 | ASSIGNMENT OF MORTGAGE | 109937 | MATTSON KENNETH W | | | 199139 |
| 4 | 12/08/2021 | MORTGAGE MODIFICATION AGREEMNT | 390655 | MATTSON KENNETH W | | AXOS BK | 199139 |
| 5 | 10/05/2017 | DEED OF RELEASE | 220609 | | | | 372343 |
| 6 | 10/03/2017 | DEED OF RELEASE | 217782 | | | | 330331 |
| 7 | 09/12/2017 | DEED OF TRUST | 199139 | MATTSON KENNETH W | | BOFI FED'L BK | |
| 8 | 04/01/2014 | RELEASE OF LIS PENDENS/NOTICE | 81154 | MATTSON KENNETH W | | | |
| 9 | 09/19/2012 | ASSIGNMENT OF MORTGAGE | 306546 | MATTSON KENNETH W | | E TRADE BK | 330331 |
| 10 | 09/04/2012 | LIS PENDENS | 288182 | MATTSON KENNETH W | | | |
| 11 | 10/19/2006 | DEED OF RELEASE | 392540 | | | | 318122 |
| 12 | 10/03/2006 | DEED OF TRUST | 372343 | MATTSON KENNETH W | | CHEVY CHASE BK FSB | |
| 13 | 08/09/2004 | DEED OF RELEASE | 362445 | | | | 302896 |
| 14 | 07/22/2004 | DEED OF RELEASE | 337224 | | | | 18931 |
| 15 | 07/20/2004 | EQUITY OR CREDIT LINE | 330331 | MATTSON KENNETH W | | GREENPOINT MTG FNDG | |
| 16 | 07/13/2004 | DEED OF TRUST | 318122 | MATTSON KENNETH W | | CHEVY CHASE BK FSB | |
| 17 | 01/17/2001 | DEED OF TRUST | 18931 | MATTSON KENNETH W | | GREENPOINT MTG FNDG | |
| 18 | 09/24/1999 | GRANT DEED | 363904 | MATTSON KENNETH W | LEFEVER-MATTSON | | |
| | 09/24/1999 | DEED OF TRUST | | MATTSON KENNETH W | | YOLO CMNTY BK | |
| 19 | 08/10/1999 | GRANT DEED | 302895 | MATTSON KENNETH W | MATTSON STACY | | |
| | 08/10/1999 | DEED OF TRUST | 302896 | MATTSON KENNETH W | | WASHINGTON MUTUAL BK FA | |
| 20 | 08/10/1999 | GRANT DEED | 302894 | MATTSON KENNETH W | LEFEVER-MATTSON INC VENDEE | | |
| | 08/10/1999 | | | MATTSON KENNETH W | | WASHINGTON MUTUAL BK | |
| 21 | 12/05/1995 | CONTRACT OF SALE | 282250 | LEFEVER-MATTSON INC CO | SOHEGIAN FRED JR;PATRICIA F | | |
| | 12/05/1995 | | | LEFEVER-MATTSON INC CO | | LENDER SELLER | |
| 22 | 12/02/1992 | GRANT DEED | 390455 | SOHEGIAN FRED JR & PATRICIA FITTRO | TOPA THRIFT & LOAN ASSOCIATION | | |
| | 12/02/1992 | | | SOHEGIAN FRED JR | | TOPA T&L | |
| 23 | 05/13/1992 | EXECUTOR'S DEED | 148071 | TOPA THRIFT & LOAN ASSOCIATION | VELASQUEZ JOHN R & DONNA E | | |

### Transaction Details

| | | | |
|---|---|---|---|
| **History Record #:** | **1** | | |
| **Assignment:** | | | |
| Recording Date: | **01/21/2025** | Orig. Recording Date: | **09/12/2017** |
| Document #: | **10265** | Orig. Document #: | **199139** |
| Document Type: | **ASSIGNMENT OF MORTGAGE** | Previous Lender: | **LAFM LOAN OWNER LLC** |
| New Lender: | | | |
| Borrower 1: | **MATTSON KENNETH W** | Borrower Vesting: | **MM / / SE** |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| **History Record #:** | **2** | | |
| **Assignment:** | | | |
| Recording Date: | **01/21/2025** | Orig. Recording Date: | **09/12/2017** |
| Document #: | **10264** | Orig. Document #: | **199139** |
| Document Type: | **ASSIGNMENT OF MORTGAGE** | Previous Lender: | **AXOS BK** |
| New Lender: | | | |
| Borrower 1: | **MATTSON KENNETH W** | Borrower Vesting: | **MM / / SE** |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| **History Record #:** | **3** | | |
| **Assignment:** | | | |
| Recording Date: | **09/09/2024** | Orig. Recording Date: | **09/12/2017** |
| Document #: | **109937** | Orig. Document #: | **199139** |
| Document Type: | **ASSIGNMENT OF MORTGAGE** | Previous Lender: | **BOFI FEDL BK** |
| New Lender: | | | |
| Borrower 1: | **MATTSON KENNETH W** | Borrower Vesting: | **MM / / SE** |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| **History Record #:** | **4** | | |
| **Finance:** | | | |
| Mtg Recording Date: | **12/08/2021** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | **390655** | Mtg Rate Type: | **FIXED** |
| Document Type: | **MORTGAGE MODIFICATION AGREEMNT** | Mtg Term: | **25 YEARS** |
| Lender: | **AXOS BK** | Mtg Rate: | **4.625** |
| Loan Amount: | **$4,400,313** | Borrower Vesting: | **/ /** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH** | Orig. Recording Date: | **09/02/2017** |
| Borrower 2: | | Orig. Document #: | **199139** |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| **History Record #:** | **5** | | |
| **Release:** | | | |
| Recording Date: | **10/05/2017** | Orig. Recording Date: | **10/03/2006** |
| Document #: | **220609** | Orig. Document #: | **372343** |
| Document Type: | **DEED OF RELEASE** | | |

| | | | |
|---|---|---|---|
| **History Record #:** | **6** | | |
| **Release:** | | | |
| Recording Date: | **10/03/2017** | Orig. Recording Date: | **07/20/2004** |
| Document #: | **217782** | Orig. Document #: | **330331** |
| Document Type: | **DEED OF RELEASE** | | |

Case: 24-10714   Doc# 134   Filed: 09/10/25   Entered: 09/10/25 14:37:33   Page 74 of 355

| | | | |
|---|---|---|---|
| History Record #: | **7** | | |
| **Finance:** | | | |
| Mtg Recording Date: | **09/12/2017** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 199139 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **30 YEARS** |
| Lender: | **BOFI FED'L BK** | Mtg Rate: | **5.5** |
| Loan Amount: | **$5,600,000** | Borrower Vesting: | **MM / / SE** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | **11.5** | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | **M** | ARM Index Type: | **LAM** |
| ARM Maximum Percentage Rate: | **11.5** | ARM Initial Rate Change Date: | **10/01/2022** |
| ARM Rate Change Margin: | **3.25** | ARM Rate Change Limit: | **2** |
| ARM Rate Change Interval: | **12** | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| History Record #: | **8** | | |
| **Foreclosure:** | | | |
| Recording Date: | **04/01/2014** | Trustee Sale #: | |
| Document #: | 81154 | Unpaid Balance: | |
| Document Type: | **RELEASE OF LIS PENDENS/NOTICE** | Vesting Codes: | **/ /** |
| Borrower 1: | **MATTSON KENNETH W** | Orig. Recording Date: | **09/04/2012** |
| Borrower 2: | **MATTSON STACY** | Orig. Document #: | 288182 |
| Borrower 3: | | Trustee Name: | **DANIEL J III GALVIN** |
| Borrower 4: | | Trustee Phone #: | |
| Title Company: | | Default Date: | |
| Lender: | | Default Amount: | |

| | | | |
|---|---|---|---|
| History Record #: | **9** | | |
| **Assignment:** | | | |
| Recording Date: | **09/19/2012** | Orig. Recording Date: | **07/20/2004** |
| Document #: | 306546 | Orig. Document #: | 330331 |
| Document Type: | **ASSIGNMENT OF MORTGAGE** | Previous Lender: | **MORTGAGE ELECTRONIC REGISTRATI** |
| New Lender: | **E TRADE BK** | | |
| Borrower 1: | **MATTSON KENNETH W** | Borrower Vesting: | **MM / /** |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| History Record #: | **10** | | |
| **Foreclosure:** | | | |
| Recording Date: | **09/04/2012** | Case #: | |
| Document #: | 288182 | Filing Date: | **08/23/2012** |
| Document Type: | **LIS PENDENS** | Vesting Codes: | **/ /** |
| Defendant 1: | **MATTSON KENNETH W** | Plaintiff 1: | **CALIFORNIA INVESTMENTS BUILDER** |
| Defendant 2: | **MATTSON STACY** | Plaintiff 2: | |
| Defendant 3: | | | |
| Defendant 4: | | | |

| | | | |
|---|---|---|---|
| History Record #: | **11** | | |
| **Release:** | | | |
| Recording Date: | **10/19/2006** | Orig. Recording Date: | **07/13/2004** |
| Document #: | 392540 | Orig. Document #: | 318122 |
| Document Type: | **DEED OF RELEASE** | | |

| | |
|---|---|
| History Record #: | **12** |

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 75 of 355

RealQuest.com Report

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **10/03/2006** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 372343 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **30 YEARS** |
| Lender: | **CHEVY CHASE BK FSB** | Mtg Rate: | **7.75** |
| Loan Amount: | **$3,000,000** | Borrower Vesting: | **/ /** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | **Y** |
| Payment Option Indicator: | **Y** | Negative Amortization Indicator: | **Y** |
| ARM Rate Change Frequency: | **M** | ARM Index Type: | **LIB** |
| ARM Maximum Percentage Rate: | **19.9** | ARM Initial Rate Change Date: | **11/01/2006** |
| ARM Rate Change Margin: | **2.45** | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | **1** | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| History Record #: | **13** | | |
| **Release:** | | | |
| Recording Date: | **08/09/2004** | Orig. Recording Date: | **08/10/1999** |
| Document #: | 362445 | Orig. Document #: | 302896 |
| Document Type: | **DEED OF RELEASE** | | |

| | | | |
|---|---|---|---|
| History Record #: | **14** | | |
| **Release:** | | | |
| Recording Date: | **07/22/2004** | Orig. Recording Date: | **01/17/2001** |
| Document #: | 337224 | Orig. Document #: | 18931 |
| Document Type: | **DEED OF RELEASE** | | |

| | | | |
|---|---|---|---|
| History Record #: | **15** | | |
| **Finance:** | | | |
| Mtg Recording Date: | **07/20/2004** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 330331 | Mtg Rate Type: | **FIXED** |
| Document Type: | **EQUITY OR CREDIT LINE** | Mtg Term: | **15 YEARS** |
| Lender: | **GREENPOINT MTG FNDG** | Mtg Rate: | |
| Loan Amount: | **$300,000** | Borrower Vesting: | **MM / /** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | |
|---|---|
| History Record #: | **16** |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **07/13/2004** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 318122 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **30 YEARS** |
| Lender: | **CHEVY CHASE BK FSB** | Mtg Rate: | **3.75** |
| Loan Amount: | **$3,000,000** | Borrower Vesting: | **MM / / SE** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | **Y** |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | **M** | ARM Index Type: | **LIB** |
| ARM Maximum Percentage Rate: | **19.9** | ARM Initial Rate Change Date: | **10/01/2004** |
| ARM Rate Change Margin: | **2.65** | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | **1** | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| History Record #: | **17** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **01/17/2001** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 18931 | Mtg Rate Type: | |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **15 YEARS** |
| Lender: | **GREENPOINT MTG FNDG** | Mtg Rate: | |
| Loan Amount: | **$500,000** | Borrower Vesting: | **/ / SE** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | |
|---|---|---|
| History Record #: | **18** | |

https://pro.realquest.com/jsp/report.jsp?action=confirm&type=getreport&recordno=0&reportoptions=0&1750962768774&1750962770398    6/9

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **09/24/1999** | Sale Price: | **$578,500** |
| Sale Date: | **09/22/1999** | Sale Price Type: | **FULL** |
| Rec. Document #: | 363904 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE INSURA** | | |
| Buyer: | **MATTSON KENNETH W** | | |
| Seller: | **LEFEVER-MATTSON** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **09/24/1999** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | |
| Lender: | **YOLO CMNTY BK** | Mtg Rate: | |
| Loan Amount: | **$578,500** | Borrower Vesting: | **MM / /** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| History Record #: | **19** |
|---|---|

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **08/10/1999** | Sale Price: | |
| Sale Date: | **07/27/1999** | Sale Price Type: | |
| Rec. Document #: | 302895 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE INSURA** | | |
| Buyer: | **MATTSON KENNETH W** | | |
| Seller: | **MATTSON STACY** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **08/10/1999** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 302896 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **30 YEARS** |
| Lender: | **WASHINGTON MUTUAL BK FA** | Mtg Rate: | |
| Loan Amount: | **$1,820,000** | Borrower Vesting: | **MM / /** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| History Record #: | **20** |
|---|---|

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | 08/10/1999 | Sale Price: | **$1,820,000** |
| Sale Date: | | Sale Price Type: | **PARTIAL** |
| Rec. Document #: | 302894 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE** | | |
| Buyer: | **MATTSON KENNETH W** | | |
| Seller: | **LEFEVER-MATTSON INC VENDEE** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | 08/10/1999 | Mtg Loan Type: | **CONV** |
| Mtg Document #: | | Mtg Rate Type: | **ADJ** |
| Document Type: | | Mtg Term: | **30 YEARS** |
| Lender: | **WASHINGTON MUTUAL BK** | Mtg Rate: | **9.95** |
| Loan Amount: | **$1,820,000** | Borrower Vesting: | **/ / SP** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | |
|---|---|
| History Record #: | **21** |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **12/05/1995** | Sale Price: | **$3,000,000** |
| Sale Date: | | Sale Price Type: | **FULL** |
| Rec. Document #: | 282250 | Multi/Split Sale: | |
| Document Type: | **CONTRACT OF SALE** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE** | | |
| Buyer: | **LEFEVER-MATTSON INC CO** | | |
| Seller: | **SOHEGIAN FRED JR;PATRICIA F** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | 12/05/1995 | Mtg Loan Type: | **CONV** |
| Mtg Document #: | | Mtg Rate Type: | **FIXED** |
| Document Type: | | Mtg Term: | |
| Lender: | **LENDER SELLER** | Mtg Rate: | |
| Loan Amount: | **$2,850,000** | Borrower Vesting: | **CO / /** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **LEFEVER-MATTSON INC CO** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | |
|---|---|
| History Record #: | **22** |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **12/02/1992** | Sale Price: | **$1,800,000** |
| Sale Date: | | Sale Price Type: | **FULL** |
| Rec. Document #: | 390455 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **NORTHWESTERN TITLE CO.** | | |
| Buyer: | **SOHEGIAN FRED JR & PATRICIA FITTRO** | | |
| Seller: | **TOPA THRIFT & LOAN ASSOCIATION** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **12/02/1992** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | | Mtg Rate Type: | **ADJ** |
| Document Type: | | Mtg Term: | |
| Lender: | **TOPA T&L** | Mtg Rate: | |
| Loan Amount: | **$1,791,504** | Borrower Vesting: | **/ / JT** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **SOHEGIAN FRED JR** | | |
| Borrower 2: | **SOHEGIAN PATRICIA FITTRO** | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| History Record #: | **23** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **05/13/1992** | Sale Price: | **$50,000** |
| Sale Date: | | Sale Price Type: | **FULL** |
| Rec. Document #: | 148071 | Multi/Split Sale: | |
| Document Type: | **EXECUTOR'S DEED** | Other Document #: | |
| Title Company: | **NORTH AMERICAN TITLE** | | |
| Buyer: | **TOPA THRIFT & LOAN ASSOCIATION** | | |
| Seller: | **VELASQUEZ JOHN R & DONNA E** | | |

### Recording Information for ALAMEDA, CA

| | Sales | Mortgages | Assignments | Releases | Foreclosures |
|---|---|---|---|---|---|
| **History Start Date** | 01/03/1900 | 08/12/1920 | 05/20/2025 | 04/22/1969 | 06/04/1985 |
| **Rec. thru. Date** | 05/22/2025 | 05/22/2025 | 05/22/2025 | 05/22/2025 | 05/20/2025 |

# **<u>Exhibit B</u>**

# Property Detail Report

For Property Located At :
**62 FARRAGUT AVE B, OAKLAND, CA 94610-1256**



## Owner Information
| | |
|---|---|
| Owner Name: | **K S MATTSON PARTNERS** |
| Mailing Address: | **PO BOX 5490, VACAVILLE CA 95696-5490 B065** |
| Vesting Codes: | / / LP |

## Location Information
| | | | |
|---|---|---|---|
| Legal Description: | | | |
| County: | ALAMEDA, CA | APN: | 051-4786-008 |
| Census Tract / Block: | 4261.00 / 3 | Alternate APN: | 051478600800 |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | PIEDMONT |
| Market Area: | | School District Name: | PIEDMONT |
| Neighbor Code: | | Munic/Township: | PIEDMONT INCORP |

## Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 11/13/2014 / 11/03/2014 | Deed Type: | GRANT DEED |
| Sale Price: | $187,500 | 1st Mtg Document #: | 273919 |
| Document #: | 273918 | | |

## Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 08/10/1999 / 07/14/1999 | 1st Mtg Amount/Type: | / |
| Sale Price: | $2,800,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | | 1st Mtg Document #: | |
| Document #: | 302892 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | FIDELITY NATIONAL TITLE INSURA | | |
| Lender: | | | |
| Seller Name: | SOHEGIAN FRED JR & PATRICIA F | | |

## Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

## Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

## Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | 0.24 | County Use: | VACANT RESIDENTIAL LAND, ZONED (1000) |
| Lot Area: | 10,427 | Lot Width/Depth: | x | State Use: | |
| Land Use: | RESIDENTIAL LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

## Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $412,387 | Assessed Year: | 2024 | Property Tax: | $7,982.96 |
| Land Value: | $412,387 | Improved %: | | Tax Area: | 18000 |
| Improvement Value: | | Tax Year: | 2024 | Tax Exemption: | |
| Total Taxable Value: | $412,387 | | | | |

# Voluntary Lien Report
For Property Located At



## 62 FARRAGUT AVE B, OAKLAND, CA 94610-1256

APN: **051-4786-008**
Block:    Lot:
## Summary of Transactions

| | RecDate # | Doc Type | Doc # | Buyer/Borrower | Seller | Lender | Orig Doc # |
|---|---|---|---|---|---|---|---|
| 1 | 02/25/2019 | DEED OF RELEASE | 34667 | | | | 273919 |
| 2 | 01/05/2015 | DEED OF RELEASE | 974 | | | | 279155 |
| 3 | 11/13/2014 | GRANT DEED | 273918 | K S MATTSON PARTNERS LP | LEFEVER-MATTSON | | |
| | 11/13/2014 | DEED OF TRUST | 273919 | K S MATTSON PARTNERS LP | | SOCOTRA FUND LLC | |
| 4 | 07/19/2006 | DEED OF TRUST | 279155 | LEFEVER MATTSON | | NORTH VLY BK | |
| 5 | 08/10/1999 | GRANT DEED | 302892 | LEFEVER-MATTSON | SOHEGIAN FRED JR & PATRICIA F | | |

## Transaction Details

| | |
|---|---|
| History Record #: | **1** |
| **Release:** | |

| | | | |
|---|---|---|---|
| Recording Date: | **02/25/2019** | Orig. Recording Date: | **11/13/2014** |
| Document #: | 34667 | Orig. Document #: | 273919 |
| Document Type: | **DEED OF RELEASE** | | |

| | |
|---|---|
| History Record #: | **2** |
| **Release:** | |

| | | | |
|---|---|---|---|
| Recording Date: | **01/05/2015** | Orig. Recording Date: | **07/19/2006** |
| Document #: | 974 | Orig. Document #: | 279155 |
| Document Type: | **DEED OF RELEASE** | | |

| | |
|---|---|
| History Record #: | **3** |

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 83 of 355

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **11/13/2014** | Sale Price: | **$187,500** |
| Sale Date: | **11/03/2014** | Sale Price Type: | |
| Rec. Document #: | 273918 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY TITLE** | | |
| Buyer: | **K S MATTSON PARTNERS LP** | | |
| Seller: | **LEFEVER-MATTSON** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **11/13/2014** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 273919 | Mtg Rate Type: | |
| Document Type: | **DEED OF TRUST** | Mtg Term: | |
| Lender: | **SOCOTRA FUND LLC** | Mtg Rate: | |
| Loan Amount: | **$375,000** | Borrower Vesting: | **/ / LP** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **K S MATTSON PARTNERS LP** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| History Record #: | **4** | | |
|---|---|---|---|

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **07/19/2006** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 279155 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | |
| Lender: | **NORTH VLY BK** | Mtg Rate: | |
| Loan Amount: | **$632,500** | Borrower Vesting: | **/ / CO** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **LEFEVER MATTSON** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| History Record #: | **5** | | |
|---|---|---|---|

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **08/10/1999** | Sale Price: | **$2,800,000** |
| Sale Date: | **07/14/1999** | Sale Price Type: | |
| Rec. Document #: | 302892 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE INSURA** | | |
| Buyer: | **LEFEVER-MATTSON** | | |
| Seller: | **SOHEGIAN FRED JR & PATRICIA F** | | |

**Recording Information for ALAMEDA, CA**

| | Sales | Mortgages | Assignments | Releases | Foreclosures |
|---|---|---|---|---|---|
| **History Start Date** | 01/03/1900 | 08/12/1920 | 05/20/2025 | 04/22/1969 | 06/04/1985 |
| **Rec. thru. Date** | 05/22/2025 | 05/22/2025 | 05/22/2025 | 05/22/2025 | 05/20/2025 |

# **Exhibit C**

# Property Detail Report

For Property Located At :
**1834 OCEAN 36, DEL MAR, CA 92014**



## Owner Information
| | |
|---|---|
| Owner Name: | **EQUITABLE OCEAN FRONT LLC** |
| Mailing Address: | **1819 COAST BLVD, DEL MAR CA 92014-2115 C011** |
| Vesting Codes: | / / CO |

## Location Information
| | | | |
|---|---|---|---|
| Legal Description: | **LOT 17 BLK 113 TR 1277** | | |
| County: | SAN DIEGO, CA | APN: | 299-147-05-00 |
| Census Tract / Block: | 172.01 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | DEL MAR RESUB |
| Legal Book/Page: | 299-14 | Map Reference: | 34-A2 / |
| Legal Lot: | 17 | Tract #: | 1277 |
| Legal Block: | 113 | School District: | SAN DIEGUITO UN |
| Market Area: | | School District Name: | SAN DIEGUITO UN |
| Neighbor Code: | | Munic/Township: | |

## Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 07/22/2024 / 07/02/2024 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | 187417 |
| Document #: | 187416 | | |

## Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 07/12/2004 / 06/22/2004 | 1st Mtg Amount/Type: | $5,525,000 / CONV |
| Sale Price: | $8,500,000 | 1st Mtg Int. Rate/Type: | 3.62 / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 642838 |
| Document #: | 642836 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $2,648.80 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | FIDELITY NATIONAL TITLE | | |
| Lender: | AMERICAS WHOLESALE LENDER | | |
| Seller Name: | MACNAUGHTON LIZA J | | |

## Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 04/20/1989 / 02/1989 | Prior Lender: | |
| Prior Sale Price: | $1,800,000 | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 205252 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

## Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Gross Area: | 3,209 | Parking Type: | GARAGE | Construction: | |
| Living Area: | 3,209 | Garage Area: | | Heat Type: | |
| Tot Adj Area: | | Garage Capacity: | 2 | Exterior wall: | |
| Above Grade: | | Parking Spaces: | | Porch Type: | |
| Total Rooms: | | Basement Area: | | Patio Type: | |
| Bedrooms: | 5 | Finish Bsmnt Area: | | Pool: | |
| Bath(F/H): | 4 / | Basement Type: | | Air Cond: | |
| Year Built / Eff: | 1951 / 1951 | Roof Type: | | Style: | |
| Fireplace: | / | Foundation: | | Quality: | |
| # of Stories: | | Roof Material: | | Condition: | |
| Other Improvements: | | | | | |

## Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | R2 | Acres: | 0.08 | County Use: | DUPLEX (212) |
| Lot Area: | 3,485 | Lot Width/Depth: | x | State Use: | |
| Land Use: | DUPLEX | Res/Comm Units: | 2 / | Water Type: | |
| Site Influence: | OCEAN | | | Sewer Type: | |

## Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $11,615,983 | Assessed Year: | 2024 | Property Tax: | $123,700.58 |
| Land Value: | $11,206,016 | Improved %: | 4% | Tax Area: | 11001 |
| Improvement Value: | $409,967 | Tax Year: | 2024 | Tax Exemption: | |
| Total Taxable Value: | $11,615,983 | | | | |

# Voluntary Lien Report
For Property Located At



## 1834 OCEAN 36, DEL MAR, CA 92014

APN: **299-147-05-00**
Block: **113**    Lot: **17**
### Summary of Transactions

| | RecDate | Doc Type | Doc # | Buyer/Borrower | Seller | Lender | Orig Doc # |
|---|---|---|---|---|---|---|---|
| 1 | 05/23/2025 | LIS PENDENS | 136795 | MATTSON KENNETH | | | |
| 2 | 10/02/2024 | NOTICE OF DEFAULT | 265981 | MATTSON KENNETH W | | | |
| 3 | 08/19/2024 | DEED OF TRUST | 219832 | EQUITABLE OCEAN FRONT LLC | | * OTHER INSTITUTIONAL LENDERS | |
| 4 | 07/22/2024 | GRANT DEED | 187416 | EQUITABLE OCEAN FRONT LLC | K S MATTSON PARTNERS LP | | |
| | 07/22/2024 | DEED OF TRUST | 187417 | EQUITABLE OCEAN FRONT LLC | | PRIVATE INDIVIDUAL | |
| 5 | 09/30/2020 | PARTIAL RELEASE | 587543 | | | | 416872 |
| 6 | 11/21/2017 | DEED OF RELEASE | 542711 | | | | 718495 |
| 7 | 09/12/2017 | DEED OF TRUST | 416872 | KS MATTSON PARTNERS LP | | BOFI FED'L BK | |
| 8 | 01/07/2016 | ASSIGNMENT OF MORTGAGE | 7258 | KS MATTSON PARTNERS | | | 718495 |
| 9 | 07/01/2015 | DEED OF RELEASE | 345835 | | | | 423384 |
| 10 | 04/10/2014 | ASSIGNMENT OF MORTGAGE | 141984 | MATTSON KENNETH W | | | 72748 |
| 11 | 11/14/2007 | EQUITY OR CREDIT LINE | 718495 | KS MATTSON PARTNERS | | WASHINGTON MUTUAL BK FA | |
| 12 | 04/03/2007 | GRANT DEED | 221060 | KS MATTSON PARTNERS | MATTSON KENNETH W & STACY L | | |
| 13 | 04/03/2007 | GRANT DEED | 221059 | MATTSON KENNETH W & STACY L | MATTSON KENNETH W | | |
| 14 | 02/13/2007 | DEED OF RELEASE | 99339 | | | | 642838 |
| 15 | 02/01/2007 | GRANT DEED | 72747 | MATTSON KENNETH W | KS MATTSON PARTNERS | | |
| | 02/01/2007 | DEED OF TRUST | 72748 | MATTSON KENNETH W | | WASHINGTON MUTUAL BK FA | |
| 16 | 02/01/2007 | INTERSPOUSAL DEED TRANSFER | 72746 | MATTSON KENNETH W | MATTSON STACY L | | |
| 17 | 05/19/2005 | GRANT DEED | 423383 | KS MATTSON PARTNERS | MATTSON KENNETH W | | |
| | 05/19/2005 | REVOLVING LINE OF CREDIT | 423384 | KS MATTSON PARTNERS | | NVB BUSN BK | |
| 18 | 07/12/2004 | GRANT DEED | 642837 | MATTSON KENNETH W | MATTSON STACY | | |
| 19 | 07/12/2004 | GRANT DEED | 642836 | MATTSON KENNETH W | MACNAUGHTON LIZA J | | |
| | 07/12/2004 | DEED OF TRUST | 642838 | MATTSON KENNETH W | | AMERICAS WHOLESALE LENDER | |
| 20 | 07/12/2004 | GRANT DEED | 642835 | MACNAUGHTON LIZA J | MACNAUGHTON MALCOLM | | |
| 21 | 04/20/1989 | QUIT CLAIM DEED | 205253 | MACNAUGHTON LIZA JANE | MACNAUGHTON MALCOM | | |
| 22 | 04/20/1989 | GRANT DEED | 205252 | MACNAUGHTON LIZA JANE | WHITTINGHAM CHARLES E | | |

### Transaction Details

| History Record #: | 1 |
|---|---|

**Foreclosure:**

| | | | |
|---|---|---|---|
| Recording Date: | **05/23/2025** | Case #: | **CR25-0126CRB** |
| Document #: | 136795 | Filing Date: | 05/13/2025 |
| Document Type: | **LIS PENDENS** | Vesting Codes: | / / |
| Defendant 1: | **MATTSON KENNETH** | Plaintiff 1: | **UNITED STATES OF AMERICA** |
| Defendant 2: | | Plaintiff 2: | |
| Defendant 3: | | | |
| Defendant 4: | | | |

---

| History Record #: | **2** | | |
|---|---|---|---|

**Foreclosure:**

| | | | |
|---|---|---|---|
| Recording Date: | **10/02/2024** | Trustee Sale #: | |
| Document #: | 265981 | Default Date: | **10/01/2024** |
| Document Type: | **NOTICE OF DEFAULT** | Default Amount: | **$333,195** |
| Borrower 1: | **MATTSON KENNETH W** | Vesting Codes: | **MA / / SE** |
| Borrower 2: | | Orig. Recording Date: | 02/01/2007 |
| Borrower 3: | | Orig. Document #: | 72748 |
| Borrower 4: | | | |
| Trustee Name: | **NATIONAL DEFAULT SERVICING COR** | Trustee Phone #: | |
| Lender: | | | |
| Title Company: | | | |

---

| History Record #: | **3** | | |
|---|---|---|---|

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **08/19/2024** | Mtg Loan Type: | |
| Mtg Document #: | 219832 | Mtg Rate Type: | |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **1 YEARS** |
| Lender: | **\* OTHER INSTITUTIONAL LENDERS** | Mtg Rate: | |
| Loan Amount: | **$320,000** | Borrower Vesting: | **/ / CO** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **EQUITABLE OCEAN FRONT LLC** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| History Record #: | **4** | | |
|---|---|---|---|

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | 07/22/2024 | Sale Price: | |
| Sale Date: | 07/02/2024 | Sale Price Type: | |
| Rec. Document #: | 187416 | Multi/Split Sale: | **MULTI** |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **CHICAGO TITLE CO** | | |
| Buyer: | **EQUITABLE OCEAN FRONT LLC** | | |
| Seller: | **K S MATTSON PARTNERS LP** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | 07/22/2024 | Mtg Loan Type: | **PRIVATE PARTY** |
| Mtg Document #: | 187417 | Mtg Rate Type: | |
| Document Type: | **DEED OF TRUST** | Mtg Term: | |
| Lender: | **PRIVATE INDIVIDUAL** | Mtg Rate: | |
| Loan Amount: | **$19,000,000** | Borrower Vesting: | **/ / CO** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **EQUITABLE OCEAN FRONT LLC** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| History Record #: | **5** | | |
|---|---|---|---|
| **Release:** | | | |
| Recording Date: | 09/30/2020 | Orig. Recording Date: | 09/12/2017 |
| Document #: | 587543 | Orig. Document #: | 416872 |
| Document Type: | **PARTIAL RELEASE** | | |

| History Record #: | **6** | | |
|---|---|---|---|
| **Release:** | | | |
| Recording Date: | **11/21/2017** | Orig. Recording Date: | **11/14/2007** |
| Document #: | 542711 | Orig. Document #: | 718495 |
| Document Type: | **DEED OF RELEASE** | | |

| History Record #: | **7** | | |
|---|---|---|---|
| **Finance:** | | | |
| Mtg Recording Date: | 09/12/2017 | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 416872 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **30 YEARS** |
| Lender: | **BOFI FED'L BK** | Mtg Rate: | **5.5** |
| Loan Amount: | **$5,600,000** | Borrower Vesting: | **/ / LP** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | **11.5** | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | **M** | ARM Index Type: | **LAM** |
| ARM Maximum Percentage Rate: | **11.5** | ARM Initial Rate Change Date: | **10/01/2022** |
| ARM Rate Change Margin: | **3.25** | ARM Rate Change Limit: | **2** |
| ARM Rate Change Interval: | **12** | ARM Payment Change Date: | |
| Borrower 1: | **KS MATTSON PARTNERS LP** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| History Record #: | **8** | | |
|---|---|---|---|

**Assignment:**

| | | | |
|---|---|---|---|
| Recording Date: | **01/07/2016** | Orig. Recording Date: | **11/14/2007** |
| Document #: | **7258** | Orig. Document #: | **718495** |
| Document Type: | **ASSIGNMENT OF MORTGAGE** | Previous Lender: | **WASHINGTON MUTUAL BK** |

| | | | |
|---|---|---|---|
| New Lender: | | | |
| Borrower 1: | **KS MATTSON PARTNERS** | Borrower Vesting: | **/ / LP** |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| | |
|---|---|
| History Record #: | **9** |

**Release:**

| | | | |
|---|---|---|---|
| Recording Date: | **07/01/2015** | Orig. Recording Date: | **05/19/2005** |
| Document #: | **345835** | Orig. Document #: | **423384** |
| Document Type: | **DEED OF RELEASE** | | |

---

| | |
|---|---|
| History Record #: | **10** |

**Assignment:**

| | | | |
|---|---|---|---|
| Recording Date: | **04/10/2014** | Orig. Recording Date: | **02/01/2007** |
| Document #: | **141984** | Orig. Document #: | **72748** |
| Document Type: | **ASSIGNMENT OF MORTGAGE** | Previous Lender: | **WASHINGTON MUTUAL BK** |

| | | | |
|---|---|---|---|
| New Lender: | | | |
| Borrower 1: | **MATTSON KENNETH W** | Borrower Vesting: | **MM / / SE** |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| | |
|---|---|
| History Record #: | **11** |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **11/14/2007** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | **718495** | Mtg Rate Type: | **ADJ** |
| Document Type: | **EQUITY OR CREDIT LINE** | Mtg Term: | **30 YEARS** |
| Lender: | **WASHINGTON MUTUAL BK FA** | Mtg Rate: | |
| Loan Amount: | **$250,000** | Borrower Vesting: | **/ / LP** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **KS MATTSON PARTNERS** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| | |
|---|---|
| History Record #: | **12** |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **04/03/2007** | Sale Price: | |
| Sale Date: | **02/02/2007** | Sale Price Type: | **PARTIAL** |
| Rec. Document #: | **221060** | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE CO** | | |
| Buyer: | **KS MATTSON PARTNERS** | | |
| Seller: | **MATTSON KENNETH W & STACY L** | | |

---

| | |
|---|---|
| History Record #: | **13** |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | 04/03/2007 | Sale Price: | |
| Sale Date: | 02/02/2007 | Sale Price Type: | **PARTIAL** |
| Rec. Document #: | 221059 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE CO** | | |
| Buyer: | **MATTSON KENNETH W & STACY L** | | |
| Seller: | **MATTSON KENNETH W** | | |

| | | | |
|---|---|---|---|
| History Record #: | **14** | | |

**Release:**

| | | | |
|---|---|---|---|
| Recording Date: | 02/13/2007 | Orig. Recording Date: | 07/12/2004 |
| Document #: | 99339 | Orig. Document #: | 642838 |
| Document Type: | **DEED OF RELEASE** | | |

| | | | |
|---|---|---|---|
| History Record #: | **15** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | 02/01/2007 | Sale Price: | |
| Sale Date: | **01/25/2007** | Sale Price Type: | **PARTIAL** |
| Rec. Document #: | 72747 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE** | | |
| Buyer: | **MATTSON KENNETH W** | | |
| Seller: | **KS MATTSON PARTNERS** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | 02/01/2007 | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 72748 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **40 YEARS** |
| Lender: | **WASHINGTON MUTUAL BK FA** | Mtg Rate: | 7.733 |
| Loan Amount: | **$6,000,000** | Borrower Vesting: | **MM / / SE** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | **Y** |
| ARM Rate Change Frequency: | **M** | ARM Index Type: | **MTA** |
| ARM Maximum Percentage Rate: | **9.95** | ARM Initial Rate Change Date: | 03/01/2007 |
| ARM Rate Change Margin: | **2.8** | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | **1** | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

| | | | |
|---|---|---|---|
| History Record #: | **16** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | 02/01/2007 | Sale Price: | |
| Sale Date: | **01/25/2007** | Sale Price Type: | **PARTIAL** |
| Rec. Document #: | 72746 | Multi/Split Sale: | |
| Document Type: | **INTERSPOUSAL DEED TRANSFER** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE CO** | | |
| Buyer: | **MATTSON KENNETH W** | | |
| Seller: | **MATTSON STACY L** | | |

| | | | |
|---|---|---|---|
| History Record #: | **17** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **05/19/2005** | Sale Price: | |
| Sale Date: | **05/11/2005** | Sale Price Type: | **UNKNOWN** |
| Rec. Document #: | 423383 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE** | | |
| Buyer: | **KS MATTSON PARTNERS** | | |
| Seller: | **MATTSON KENNETH W** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | **05/19/2005** | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 423384 | Mtg Rate Type: | **ADJ** |
| Document Type: | **REVOLVING LINE OF CREDIT** | Mtg Term: | |
| Lender: | **NVB BUSN BK** | Mtg Rate: | |
| Loan Amount: | **$1,000,000** | Borrower Vesting: | **/ / LP** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | | ARM Index Type: | |
| ARM Maximum Percentage Rate: | | ARM Initial Rate Change Date: | |
| ARM Rate Change Margin: | | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | | ARM Payment Change Date: | |
| Borrower 1: | **KS MATTSON PARTNERS** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| | | | |
|---|---|---|---|
| History Record #: | **18** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **07/12/2004** | Sale Price: | |
| Sale Date: | **06/22/2004** | Sale Price Type: | **UNKNOWN** |
| Rec. Document #: | 642837 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE CO** | | |
| Buyer: | **MATTSON KENNETH W** | | |
| Seller: | **MATTSON STACY** | | |

---

| | | | |
|---|---|---|---|
| History Record #: | **19** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **07/12/2004** | Sale Price: | **$8,500,000** |
| Sale Date: | **06/22/2004** | Sale Price Type: | **FULL** |
| Rec. Document #: | 642836 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE** | | |
| Buyer: | **MATTSON KENNETH W** | | |
| Seller: | **MACNAUGHTON LIZA J** | | |

**Finance:**

| | | | |
|---|---|---|---|
| Mtg Recording Date: | 07/12/2004 | Mtg Loan Type: | **CONV** |
| Mtg Document #: | 642838 | Mtg Rate Type: | **ADJ** |
| Document Type: | **DEED OF TRUST** | Mtg Term: | **30 YEARS** |
| Lender: | **AMERICAS WHOLESALE LENDER** | Mtg Rate: | **3.625** |
| Loan Amount: | **$5,525,000** | Borrower Vesting: | **MM / / SE** |
| ARM Rider Indicator: | | Pre Payment Penalty Indicator: | |
| Initial Rate Reset Cap: | | Interest Only Indicator: | **Y** |
| Payment Option Indicator: | | Negative Amortization Indicator: | |
| ARM Rate Change Frequency: | **M** | ARM Index Type: | **LIB** |
| ARM Maximum Percentage Rate: | **12** | ARM Initial Rate Change Date: | **09/01/2004** |
| ARM Rate Change Margin: | **2.625** | ARM Rate Change Limit: | |
| ARM Rate Change Interval: | **1** | ARM Payment Change Date: | |
| Borrower 1: | **MATTSON KENNETH W** | | |
| Borrower 2: | | | |
| Borrower 3: | | | |
| Borrower 4: | | | |

---

| | | | |
|---|---|---|---|
| History Record #: | **20** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **07/12/2004** | Sale Price: | |
| Sale Date: | **06/22/2004** | Sale Price Type: | **UNKNOWN** |
| Rec. Document #: | 642835 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **FIDELITY NATIONAL TITLE CO** | | |
| Buyer: | **MACNAUGHTON LIZA J** | | |
| Seller: | **MACNAUGHTON MALCOLM** | | |

---

| | | | |
|---|---|---|---|
| History Record #: | **21** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **04/20/1989** | Sale Price: | |
| Sale Date: | **02/1989** | Sale Price Type: | **FULL** |
| Rec. Document #: | 205253 | Multi/Split Sale: | |
| Document Type: | **QUIT CLAIM DEED** | Other Document #: | |
| Title Company: | **TICOR TITLE INSURANCE CO.** | | |
| Buyer: | **MACNAUGHTON LIZA JANE** | | |
| Seller: | **MACNAUGHTON MALCOM** | | |

---

| | | | |
|---|---|---|---|
| History Record #: | **22** | | |

**Sale:**

| | | | |
|---|---|---|---|
| Sale Recording Date: | **04/20/1989** | Sale Price: | **$1,800,000** |
| Sale Date: | **02/1989** | Sale Price Type: | **FULL** |
| Rec. Document #: | 205252 | Multi/Split Sale: | |
| Document Type: | **GRANT DEED** | Other Document #: | |
| Title Company: | **TICOR TITLE INSURANCE CO.** | | |
| Buyer: | **MACNAUGHTON LIZA JANE** | | |
| Seller: | **WHITTINGHAM CHARLES E** | | |

---

### Recording Information for SAN DIEGO, CA

| | Sales | Mortgages | Assignments | Releases | Foreclosures |
|---|---|---|---|---|---|
| **History Start Date** | 01/01/1900 | 01/10/1916 | 06/16/2025 | 07/30/1973 | 11/06/1935 |
| **Rec. thru. Date** | 06/18/2025 | 06/18/2025 | 06/18/2025 | 06/18/2025 | 06/16/2025 |

# **<u>Exhibit D</u>**

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO

Name

Street
Address    K S Mattson Partners LP
City &     131 WYKOFF
State      VACAVILLE, CA 95688
Zip

Title Order No.            Escrow No.

**DOC#   2024-0187417**

Jul 22, 2024   03:46 PM
OFFICIAL RECORDS
JORDAN Z. MARKS,
SAN DIEGO COUNTY RECORDER
FEES: $187.00   (SB2 Atkins: $150.00)
PCOR: N/A
PAGES: 4

Assessors Parcel Number: 299-232-09-00 & 299-147-05-00

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST WITH ASSIGNMENT OF RENTS

This DEED OF TRUST, made   July 2, 2024                                          between

EQUITABLE OCEAN FRONT LLC                                        herein called TRUSTOR,

whose address is   1819 Coast Boulevard, Del Mar, CA  92014

(Number and Street)          (City)          (State)          (Zip Code)

**CHICAGO TITLE COMPANY,** a California Corporation, herein called TRUSTEE, and

K S Mattson Partners LP

, herein called BENEFICIARY,

Trustor irrevocably grants, transfers and assigns to Trustee in Trust, with Power of Sale that property in

City of Del Mar,                          County of  San Diego                  , State of California, described as:

See Exhibit "A" attached hereto

Together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits.

For the Purpose of Securing (1) payment of the sum of $ 19,000,000.00          with interest thereon according to the terms of a promissory note or notes of even date herewith made by Trustor, payable to order of the Beneficiary, and extensions or renewals thereof; (2) the performance of each agreement of Trustor incorporated by reference or contained herein or reciting it is so secured; (3) Payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or his or her successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

A. To protect the security of this Deed of Trust, and with respect to the property above described, Trustor agrees:
   (1) To keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefore; to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

   (2) To provide maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon any indebtedness secured hereby and in such order as beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

   (3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, Including cost of evidence of title and attorney's fees in a reasonable sum, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed of Trust.

   (4) To pay: at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge, or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his or her reasonable fees.

(5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date, of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby, any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B. It is mutually agreed:

(1) That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him or her in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

(2) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his or her right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(3) That at any time or from time to time, without liability therefore and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: recovney any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4) That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall recovney, without warranty, the property then held hereunder, The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof, The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

(5) That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor In payment of any Indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable, Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his or her own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6) That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

(7) Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

(8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors, and assigns. The term Beneficiary shall mean the owner and holder, including pledges, of the note secured hereby, whether or not named as Beneficiary herein. In this Deed, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

(9) The Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

Beneficiary may charge for a statement regarding the obligation secured hereby, provided the charge thereof does not exceed the maximum allowed by laws.

The undersigned Trustor, requests that a copy of any notice of default and any notice of sale hereunder be mailed to him or her at his or her address hereinbefore set forth.

Dated   July 2, 2024

Signature of Trustor

STATE OF CALIFORNIA
COUNTY    OF    SAN DIEGO

On _____ before me,

Marc D. Lair, Manager   EQUITABLE OCEAMFront LLC

(here insert name and title of the officer)

, personally appeared   Marc D. Lair, Manager

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the state of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature _____

Page 2

(This area for official notarial seal)

# EXHIBIT "A"

All that certain real property situated in the City of Del Mar, County of San Diego, State of California, described as follows:

PARCEL A:

LOTS 13 AND 14, EXCEPTING THE NORTHERLY 10 FEET OF SAID LOT 14 IN BLOCK 112 OF DEL MAR RESUBDIVISION NO. 2, IN THE CITY OF DEL MAR, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1277, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, AUGUST 4, 1910.

ALSO, THOSE PORTIONS OF LOTS 21 AND 22 IN SAID BLOCK 112, LYING NORTHERLY OF THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF SAID LOT 13 IN SAID BLOCK 112 AND SOUTHERLY OF THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF THE NORTHERLY 10 FEET OF SAID LOT 14 IN SAID BLOCK 112.

APN: 299-232-09-00

PARCEL B:

LOT 17 IN BLOCK 113 OF DEL MAR RESUBDIVISION NO. 2, IN THE CITY OF DEL MAR, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1277, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, AUGUST 4, 1910.

APN: 299-147-05-00

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    **CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of _San Diego_ )

On _July 17, 2024_ before me, _Ki Hoon Choi, Notary Public_,
<div align="center">Date             Here Insert Name and Title of the Officer</div>

personally appeared _Marc D. Lair_
<div align="center">Name(s) of Signer(s)</div>

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

KI HOON CHOI
COMM. # 2469842
NOTARY PUBLIC • CALIFORNIA
San Diego County
My Commission Expires
December 1, 2027
RSC1   RSC1

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
<div align="center">Signature of Notary Public</div>

<div align="center"><em>Place Notary Seal Above</em></div>

―――――――――――――――――――― **OPTIONAL** ――――――――――――――――――――
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Deed of Trust with Assignment of Rents_
Document Date: _July 2, 2024_      Number of Pages: _—3—_
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2015 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

# **<u>Exhibit E</u>**

X
HP

**RECORDING REQUESTED BY**

AND WHEN RECORDED MAIL TO

Name

Street
Address  **K S Mattson Partners LP**
         **131 WYKOFF**
City &   **VACAVILLE, CA 95688**
State
Zip

Title Order No.                    Escrow No.

Assessors Parcel Number: 299-232-09-00 & 299-147-05-00

DOC# 2025-0109823

Apr 28, 2025  10:45 AM
OFFICIAL RECORDS
JORDAN Z. MARKS,
SAN DIEGO COUNTY RECORDER
FEES: $265.00   (SB2 Atkins: $225.00)
PCOR: N/A
PAGES: 4

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORRECTION DEED OF TRUST WITH ASSIGNMENT OF RENTS

This DEED OF TRUST, made  July 2, 2024                                                    between
EQUITABLE OCEAN FRONT LLC                                              herein called TRUSTOR,

whose address is  1819 Coast Boulevard, Del Mar, CA  92014
             (Number and Street)                (City)              (State)          (Zip Code)

**CHICAGO TITLE COMPANY,** a California Corporation, herein called TRUSTEE, and

K S Mattson Partners LP

, herein called BENEFICIARY,

Trustor irrevocably grants, transfers and assigns to Trustee in Trust, with Power of Sale that property in

City of Del Mar,                              County of  San Diego                     , State of California, described as:

See Exhibit "A" attached hereto - which corrects the erroneous legal description accidentally attached as Exhibit A to the Deed of Trust With Assignment Of Rents, recorded on July 22, 2024 by San Diego County Recorder as DOC# 2024-0187417

Together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits.

For the Purpose of Securing (1) payment of the sum of $ 19,000,000.00           with interest thereon according to the terms of a promissory note or notes of even date herewith made by Trustor, payable to order of the Beneficiary, and extensions or renewals thereof; (2) the performance of each agreement of Trustor incorporated by reference or contained herein or reciting it is so secured; (3) Payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or his or her successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust

A. To protect the security of this Deed of Trust, and with respect to the property above described, Trustor agrees:
    (1) To keep said property in good condition and repair; not to remove or demolish any building thereon, to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefore, to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general

    (2) To provide maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon any indebtedness secured hereby and in such order as beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice

    (3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed of Trust

    (4) To pay: at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, pay, purchase, contest or compromise any encumbrance, charge, or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his or her reasonable fees.

Page 1

(5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date, of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby, any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B. It is mutually agreed:

(1) That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him or her in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

(2) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his or her right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(3) That at any time or from time to time, without liability therefore and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4) That upon written request of beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof, The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

(5) That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable, Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his or her own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6) That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

(7) Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

(8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors, and assigns. The term Beneficiary shall mean the owner and holder, including pledges, of the note secured hereby, whether or not named as Beneficiary herein. In this Deed, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

(9) The Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

Beneficiary may charge for a statement regarding the obligation secured hereby, provided the charge thereof does not exceed the maximum allowed by laws.

The undersigned Trustor, requests that a copy of any notice of default and any notice of sale hereunder be mailed to him or her at his or her address hereinbefore set forth.

Dated ~~July 2, 2024~~ *April 28-2025*                          Signature of Trustor

STATE OF CALIFORNIA                          Marc D. Lair, Manager   *Equitable OceanFront LLC*
COUNTY   OF   SAN DIEGO

On _____ before me,

_____

(here insert name and title of the officer)

, personally appeared  Marc D. Lair, Manager

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the state of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature _____

*please see attached CA Acknowledgement (HB)*

Page 2

(This area for official notarial seal)

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____ San Diego _____ )

On _____ 04/28/2025 _____ before me, Krisitn L Brockman, Notary Public _____

(insert name and title of the officer)

personally appeared  Mark D. Lair ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

KRISTIN L. BROCKMAN
Commission # 2427257
Notary Public - California
San Diego County
Comm Expires DECEMBER 9, 2026

Signature _Kristin Y Brockman_ (Seal)

## EXHIBIT A" TO

### CORRECTION DEED OF TRUST WITH ASSIGNMENT OF RENTS

Legal Description of Property:

LOTS 13 AND 14, EXCEPTING THE NORTHERLY 10 FEET OF SAID LOT 14 IN BLOCK 112 OF DEL MAR RESUBDIVISION NO. 2, IN THE CITY OF DEL MAR, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1277, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, AUGUST 4, 1910.

ALSO, THOSE PORTIONS OF LOTS 21 AND 22 IN SAID BLOCK 112, LYING NORTHERLY OF THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF SAID LOT 13 IN SAID BLOCK 112 AND SOUTHERLY OF THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF THE NORTHERLY 10 FEET OF SAID LOT 14 IN SAID BLOCK 112.

EXCEPTING FROM SAID ABOVE DESCRIBED PROPERTY, THAT PORTION NOW OR HERETOFORE LYING BELOW THE MEAN HIGH TIDE LINE OF THE PACIFIC OCEAN.

# EXHIBIT E

1  RANDY SUE POLLOCK (CA SBN 64493)
   LAW OFFICES OF RANDY SUE POLLOCK
2  286 Santa Clara Avenue,
   Oakland, CA 94610-2624
3  Telephone:     510.763.9967
   Facsimile:     510.380.6551
4  rsp@rspollocklaw.com

5  Attorney for Defendant
   KENNETH W. MATTSON
6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11
   UNITED STATES OF AMERICA,              Case No. 4:25-cr-00126-JST
12
                 Plaintiff,               **REPLY BRIEF IN SUPPORT OF**
13                                         **DEFENDANT'S MOTION TO MODIFY**
                                           **PRE-TRIAL ASSET RESTRAINT**
         v.
14
                                          Date:     July 31, 2025
   KENNETH W. MATTSON,                    Time:     9:30 a.m.
15                                         Judge:    Hon. Jon S. Tigar
                 Defendant.               Ctrm:     6 – 2nd Floor
16

17
                                          Indictment Filed:  May 13, 2025
18                                         Trial Date:        None set

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF CONTENTS**

**Page**

3

4

5

6

7

8

9

10

11

I.    INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ..................................................................................................... 2

    A.    Legal Standard ........................................................................................ 2

    B.    Mr. Mattson Has Established a Prima Facie Sixth Amendment Violation and Satisfied His Burden for a Hearing ........................................................... 3

    C.    The Government Ignores the Sixth Amendment Implications Behind the Lis Pendens ................................................................................................... 6

    D.    The Government Has Still Not Provided Any Evidence That the Assets are Tainted and Cannot Establish Probable Cause ........................................... 8

    E.    If Any Tracing Dispute Exists, A Hearing Will Resolve This Issue .................. 10

    F.    Requesting A Substitution of Property Does Not Require a Full Review of Release Conditions ................................................................................. 10

III.    CONCLUSION ................................................................................................ 11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<center><u>**TABLE OF AUTHORITIES**</u></center>

2

<div align="right">**Page(s)**</div>

3

**Cases**

4

5

*Aronson v. City of Akron*,
   116 F.3d 804 (6th Cir. 1997).................................................................... 7

6

*Castro v. Saxon Mortg. Services, Inc.*,
   2009 WL 837589 (N.D. Cal. Mar. 27, 2009) ........................................... 6

7

8

*Luis v. United States*,
   578 U.S. 5 (2016) ......................................................................... 2, 10, 11

9

*Matter of Seizure of: Any & all funds held in Republic Bank of Arizona Accts.*,
   2019 WL 8892585 (C.D. Cal. Dec. 20, 2019) ..................................... 2, 3, 4

10

11

*United States v. Bonventre*,
   720 F.3d 126 (2d Cir. 2013)..................................................................... 3

12

13

*United States v. E-Gold, Ltd.*,
   521 F.3d 411 (D.C. Cir. 2008) ................................................................ 3

14

15

*United States v. Feathers*,
   2016 WL 7337518 (N.D. Cal. Dec. 19, 2016) ......................................... 3

16

*United States v. James Daniel Good Real Prop.*,
   510 U.S. 43 (1993).................................................................................. 7

17

18

*United States v. Monsanto*,
   924 F.2d 1186 (2d Cir. 1991) (en banc).................................................. 2

19

20

*United States. v. Omidi*,
   2021 WL 7629897 (C.D. Cal. June 15, 2021) ................................... 2, 3, 4, 8

21

*United States v. Pole No. 3172, Hopkinton*,
   852 F.2d 636 (1st Cir. 1988).................................................................... 8

22

*United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal.*
   *902655*,
   51 F.3d 1402 (9th Cir. 1995).................................................................... 8

23

24

*United States v. Shelton*,
   No. 23-cr-00258-JSC-1, 2024 WL 4520944 (N.D. Cal. Oct. 17, 2024) ............................ 7, 9

25

26

*United States v. Unimex, Inc.*,
   991 F.2d 546 (9th Cir. 1993).......................................................... 2, 3, 10

27

28

**I.    INTRODUCTION**

The government opposes Mr. Mattson's efforts to retain counsel of his choice and ignores the risk of a Sixth Amendment violation. Mr. Mattson filed his Motion to Modify Pre-Trial Asset Restraint, ECF No. 44 (the "Motion" or "Mot."), to modify the pre-trial restraints imposed on his and his wife's properties: 62 Farragut Avenue, Piedmont, California 94610; 1834–1836 Ocean Front, Del Mar, California 92014 (together, the "Forfeiture Properties); and 210 La Salle Avenue, Piedmont, California 94610 ("210 La Salle"). *See* ECF No. 44-1 ("Mattson Decl.") ¶¶ 1–4. Contrary to the government's characterization of Mr. Mattson's Motion, the request to remove the restraint on 210 La Salle implicates a constitutional right rather than modification of the terms of pre-trial release. In any event, the Sixth Amendment basis for the Motion was previously raised to the Magistrate Judge. The government's argument that the Motion appeals the Magistrate Judge's order ignores that context. Regardless, because of the restrictions placed on Mr. Mattson's assets due to both the government's forfeiture allegations and attempt to have 210 La Salle posted as bail, Mr. Mattson will not be able to retain the counsel of his choice, in violation of the Sixth Amendment.

In its opposition, the government seeks to impose an out-of-circuit burden on Mr. Mattson and require him to prove his innocence before trial. ECF No. 51, Opposition, ("Opp."). But Mr. Mattson has established a prima facie case that his assets are untainted and that he lacks adequate assets to retain counsel of his choice. Given the government's failure to show how the properties are tainted despite numerous opportunities to do so, the Court can decide the Motion without a hearing.

If the Court is inclined to hold a hearing, Mr. Mattson has more than satisfied the requirements for one. Preliminary analysis refutes that investor monies were used to finance or maintain Mr. Mattson's or KS Mattson Partners, LP ("KSMP") properties. That analysis shows nearly $15 million more flowing from KSMP to LeFever Mattson ("LM") than the reverse. For its part, the government points to speculative sources of funds, but this speculation does not stand up to scrutiny and only distracts from the ultimate issue: Mr. Mattson's current inability to retain the counsel of his choice. To the extent any factual dispute concerning the government's

1    probable cause exists, a hearing will resolve this issue.  Should the Court hold a hearing, Mr.

2    Mattson welcomes the opportunity to test the government's unsubstantiated tracing analysis.  As

3    for the government's attempts to distract from the Sixth Amendment violation by pointing to

4    various logistical concerns about disposing of real property, none of that is relevant to the

5    constitutional issue before this Court.  The Court should grant Mr. Mattson's Motion or, in the

6    alternative, hold a hearing to establish the government's probable cause.

7    **II.    ARGUMENT**

8         **A.    Legal Standard**

9         The Sixth Amendment right to counsel is implicated when the government places

10   restraints on "untainted property"—that is, property that "belongs to the defendant" and is "not

11   traceable to a criminal offense"—and those restraints prevent the defendant from hiring counsel

12   of his choice. *Luis v. United States*, 578 U.S. 5, 10–12 (2016) (citing *Caplin & Drysdale,* 491

13   U.S. 617, 624 (1989)).  If a defendant shows necessity, then the Sixth Amendment protects access

14   to the "untainted assets needed to retain counsel of choice." *Luis*, 578 U.S. at 10, 12.

15        A defendant may challenge the pre-trial restraints of his assets if "the moving papers filed,

16   including affidavits, are 'sufficiently definite, specific, detailed, and nonconjectural, to enable the

17   Court to conclude that a substantial claim is presented[.]'" *United States v. Unimex, Inc.*, 991

18   F.2d 546, 551 (9th Cir. 1993) (citing *Cohen v. United States* 378 F.2d 751, 761 (9th Cir. 1967)).

19   In the Ninth Circuit, a defendant is only required to make a "threshold showing demonstrating his

20   or her lack of funds and access to funds" to merit a pre-trial hearing. *United States. v. Omidi*,

21   2021 WL 7629897, at *5 (C.D. Cal. June 15, 2021).

22        Once a defendant provides sufficient evidence to support a "substantial claim" that his

23   Sixth Amendment rights are implicated and moves for a pre-trial restraint hearing, the "Court

24   must hold a hearing on whether release of funds is necessary" to pay counsel. *Matter of Seizure*

25   *of: Any & all funds held in Republic Bank of Arizona Accts.*, 2019 WL 8892585, at *8 (C.D. Cal.

26   Dec. 20, 2019) (citing *Unimex*, 991 F.2d at 551); *see also United States v. Monsanto*, 924 F.2d

27   1186, 1191 (2d Cir. 1991) (en banc), *abrogated on other grounds by Kaley v. United States*, 571

28   U.S. 320 (2014)) ("[A] pre trial adversary hearing is required where the question of attorney's

1   fees is implicated."). This hearing is referred to as a *Monsanto* hearing, where "the government

2   has the burden to show probable cause" that the assets in question are tainted. *United States v.*

3   *Feathers*, 2016 WL 7337518, at *6 (N.D. Cal. Dec. 19, 2016).

4          The government's reliance on the *Jones-Farmer* rule is misplaced—that rule does not

5   apply in the Ninth Circuit.[1]  Under the government's formulation, a criminal defendant must

6   establish his financial need for the restrained assets *and* provide the evidence that the assets in

7   question cannot be traced to tainted funds. *See* Opp. at 12 (citing *United States v. Jones,* 160 F.3d

8   641, 647–48 (10th Cir. 1998); *United States v. Farmer*, 274 F.3d 800, 804–805 (4th Cir. 2001)).

9   But to the contrary, district courts in California routinely grant *Monsanto* hearings—without

10  mention or acknowledgement of the *Jones-Farmer* rule's two-step analysis—to determine

11  whether there is probable cause that the assets in dispute are tainted or whether a defendant has a

12  financial need for the restrained assets. *See, e.g., Feathers*, 2016 WL 7337518, at *5–6; *Republic*

13  *of Arizona Accts.*, 2019 WL 8892585, at *8; *Omidi,* 2021 WL 7629897, at *4.

14        **B.     Mr. Mattson Has Established a Prima Facie Sixth Amendment Violation and
              Satisfied His Burden for a Hearing**
15

16         Mr. Mattson has satisfied his burden for a *Monsanto* hearing by making a "prima facie

17  showing" that his "Sixth Amendment rights are implicated." *Republic Bank of Arizona Accts.*,

18  2019 WL 8892585, at *8 (citing *Unimex*, 991 F.2d at 551).  As required, Mr. Mattson's Motion,

19  including his declaration, is "sufficiently definite, specific, detailed, and nonconjectural" to

20  establish that a "substantial claim" is presented. *Unimex, Inc.*, 991 F.2d at 551 (citation and

21  internal quotation marks omitted).  Mr. Mattson has sufficiently pointed out that the government

22  has not shown the Forfeiture Properties are tainted and attested that he has insufficient assets to

23  retain counsel for a nonconjectural reason: assets of KSMP, to which he formerly had access, are

24

25  _____

26  [1] Notably, the Second and D.C. Circuits have rejected the *Jones-Farmer* rule.  *See United States*
    *v. Bonventre,* 720 F.3d 126, 131 (2d Cir. 2013) (holding that a defendant was not required to
27  make a showing that assets were illegitimately restrained to obtain a *Monsanto* hearing); *United*
    *States v. E-Gold, Ltd.*, 521 F.3d 411, 419 (D.C. Cir. 2008), *abrogated on other grounds by Kaley*
28  *v. United States*, 571 U.S. 320 (2014) ("We thus join the Second Circuit in holding that
    defendants have a right to an adversary post-restraint, pretrial hearing.").

1  in bankruptcy proceedings.  Mattson Decl. ¶ 9.  Thus, the "Court must hold a hearing to

2  determine whether the release of funds is necessary."  *Republic Bank of Arizona Accts.*, 2019 WL

3  8892585, at *8 (citing *Unimex*, 991 F.2d at 551).

4       First, Mr. Mattson has established a sufficiently definite, specific, detailed, and

5  nonconjectural claim that the assets are untainted.  The Mattsons have owned their Piedmont

6  homes—62 Farragut Avenue and 210 La Salle—well before any fraud is alleged to have

7  occurred.  Moreover, 1834–1836 Ocean Front was identified in a search warrant, but Mr. Mattson

8  was not charged in connection with that property—suggesting that the government failed to

9  uncover evidence connecting it to a crime.  The government has failed to provide any

10  particularized evidence that the properties are tainted by the alleged fraud.  In fact, the defense's

11  preliminary analysis shows nearly $15 million more flowing from KSMP's bank account to LM's

12  "1059 Account" (*see* ECF No. 1, ¶ 40) than flowing in the opposite direction in the period 2020-

13  2023.  Pollock Decl. ¶¶ 6-8.  That fact alone refutes any notion that investor monies were

14  somehow funneled into KSMP's or Mr. Mattson's properties.  When confronted with

15  Mr. Mattson's analysis in open court, the government has been unable to rebut it.  The

16  government now claims that Mr. Mattson failed to refute its conclusory forfeiture allegation, ECF

17  No. 1 at 18–19, but plainly ignores Mr. Mattson's evidence disputing those allegations.  Thus,

18  Mr. Mattson presents a prima facie case that the Forfeiture Properties are untainted.

19       Second, Mr. Mattson has established a sufficiently definite, specific, detailed, and

20  nonconjectural claim that he lacks sufficient assets to hire counsel of his choice.  This is not a

21  high bar.  Even the authority the government cites explains that a defendant need only make a

22  "threshold showing demonstrating his or her lack of funds and access to funds."  *Omidi*, 2021 WL

23  7629897, at *5.  Mr. Mattson declared, under penalty of perjury, that he has "access only to assets

24  of a nominal value to pay for counsel."  Mattson Decl. ¶ 8.  Those funds are insufficient to pay

25  his chosen counsel through trial.  *Id.*  Moreover, KSMP, which holds substantially all of

26  Mr. Mattson's assets, is currently in involuntary bankruptcy.  *Id.* ¶ 5.  Mr. Mattson has no control

27  over KSMP.  *Id.* ¶ 6.  Mr. Mattson presents a prima facie case that he lacks other funds to pay

28  counsel because nearly all his funds are unavailable to him.

REPLY BRIEF ISO DEFENDANT'S MOTION TO                4                CASE NO.: 4:25-CR-00126-JST
MODIFY PRE-TRIAL ASSET RESTRAINT

1    The government's scattered objections do not diminish Mr. Mattson's showing that he

2    lacks sufficient assets.  The government contends that Mr. Mattson possesses two cars worth

3    $180,000, "neither of which are encumbered by a loan."  Opp. at 14.  But this figure falls apart on

4    basic scrutiny.  Cars are a notoriously depreciating asset.  Even assuming the value of those

5    vehicles remains the same today as when they were purchased, $180,000 is inadequate to retain

6    defense counsel through trial.  The government's additional figures are similarly unpersuasive.

7    The government asserts that Mr. Mattson sold $2.9 million in classic cars between August 2024

8    and February 2025, and that the funds were "paid to Mattson *or* KSMP."  Opp. at 15 (emphasis

9    added).  The government's brief ignores that, as the remittances and wire confirmations submitted

10   in connection with the opposition attest, the proceeds from the sales were directed to KSMP.  *See*

11   ECF No. 51, Ex. K (filed under seal).  Mr. Mattson has no control over KSMP assets.  Mattson

12   Decl. ¶¶ 5-6.  As for allegations that the Mattsons attempted to sell jewelry and other luxury

13   items, including to a retailer of secondhand goods, the government includes no details as to

14   whether the items in fact sold or, if they did, the proceeds realized.  *See* ECF No. 51 at 8-9 &

15   Ex. L at 3 (filed under seal).

16       Other concerns find even less support.  The government implies that Mr. Mattson has

17   additional real property assets that he could use for his defense, claiming that "public records

18   searches reflected the defendant was associated with 64 properties, sales of 23 properties. . . and

19   24 properties *possibly* owned by the defendant."  Opp. at 2 (emphasis added).  It should come as

20   no surprise that Mr. Mattson would be associated with numerous properties through LM and

21   KSMP.  But properties titled in those entities' names are not presently available to fund

22   Mr. Mattson's defense.

23       The remainder of the government's objections only distract from the constitutional issue

24   before the Court.  The government argues that it may not be possible to sell one parcel at 62

25   Farragut without selling the other.  Opp. at 6.  It argues that WITNESS-1 maintains an ownership

26   interest in 210 La Salle.  Opp. at 7-8.  It argues that the Forfeiture Properties are "heavily

27   encumbered."  *Id.* at 15.  These objections point to logistical challenges with disposing of real

28   property, not to any legal shortcoming with Mr. Mattson's Sixth Amendment challenge.  The

REPLY BRIEF ISO DEFENDANT'S MOTION TO            5                    CASE NO.: 4:25-CR-00126-JST
RELEASE PRE-TRIAL ASSETS

ultimate proceeds that properties may generate are not at issue here. Mr. Mattson's constitutional

rights are the primary issue the Court need consider. Hurdles that are not the government's

making and that Mr. Mattson must clear before selling properties are beyond the relief sought

from the Court.

The government also complains that Mr. Mattson has failed to provide an accounting of

his defense expenses. Mr. Mattson has incurred litigation expenses thus far, including in hiring

consultants to review the government's unsubstantiated allegations. The government alleged

Mr. Mattson deleted files from his laptop. This allegation formed the basis of the destruction of

evidence charge in the indictment and was the centerpiece of the government's argument for pre-

trial detention. *See* ECF No. 1, ¶¶ 59-61; ECF No. 6 at 6-7. To review the evidence that would

support such an allegation, Mr. Mattson hired a digital forensics consultant, who has determined

that at exactly the same time as the government alleges the files were deleted from the laptop,

Mr. Mattson was at his counsel's office and files were being copied for preservation. *See* ECF

No. 33-1 at 6. Likewise, Mr. Mattson has incurred expenses in hiring a forensic accountant to

analyze flows of money into and out of relevant bank accounts. Notwithstanding the

government's distractions, Mr. Mattson has adequately demonstrated that he lacks sufficient

funds to retain his counsel of choice and, as such, is entitled to an evidentiary hearing.

To the extent that the Court requires an estimate of defense costs or specific details about

assets available to Mr. Mattson to fund his defense before deciding the Motion, counsel can

provide that information ex parte and under seal to protect Mr. Mattson's Fifth Amendment and

attorney-client privileges. For context, LM incurred $1 million in professional fees connected

with its bankruptcy in May 2025 alone. Pollock Decl. ¶ 13.

## C.    The Government Ignores the Sixth Amendment Implications Behind the Lis Pendens

In opposing the Motion, the government contends that a lis pendens is not a seizure and

therefore does not implicate the Fifth Amendment, much less the Sixth. Opp. at 10–11. But this

misstates Mr. Mattson's position and understates the severe restrictions that lis pendens impose

on noticed properties. *Castro v. Saxon Mortg. Services, Inc.*, 2009 WL 837589, at *2 (N.D. Cal.

1    Mar. 27, 2009) ("[T]he practical effect of a recorded lis pendens is to render a defendant's

2    property unmarketable and unsuitable as security for a loan. . . . The potential for abuse is

3    obvious.").  As the government concedes, the notices of lis pendens operate as a *functional* freeze

4    on Mr. Mattson's assets.  Opp. at 10 (citing Mot. at 7).  This remains true, as the lis pendens

5    effectively eliminate Mr. Mattson's ability to sell, mortgage, or otherwise utilize the value of the

6    properties in support of his defense.  Even if they do not amount to a seizure—which is not the

7    constitutional issue before the Court—they nevertheless operate as a pre-trial restraint on Mr.

8    Mattson's financial ability to retain counsel he could otherwise afford.  Regardless, Mr. Mattson's

9    Sixth Amendment right takes priority over the government's interest in preserving assets for

10   potential forfeiture.  *United States v. Shelton*, No. 23-cr-00258-JSC-1, 2024 WL 4520944, at *2

11   (N.D. Cal. Oct. 17, 2024) [Pollock Decl., Ex. B] (citing *Luis*, 578 U.S. at 19) ("[D]espite their

12   importance, compared to the right to counsel of choice, these interests [ensuring funds for

13   forfeiture/restitution] would seem to lie somewhat further from the heart of a fair, effective

14   criminal justice system.").

15           The government's cases are distinguishable.  Mr. Mattson is not disputing that the filing

16   of a lis pendens is "less restrictive" than wholesale seizure of property.  *Cf. United States v.*

17   *James Daniel Good Real Prop.*, 510 U.S. 43, 58 (1993).  Nor is Mr. Mattson seeking a hearing

18   simply to address the lis pendens notices alone—although he may be entitled to do so if the

19   government fails to substantiate its forfeiture allegations.  *Cf. Aronson v. City of Akron*, 116 F.3d

20   804, 813 (6th Cir. 1997) ("[W]e do not read the contemporary caselaw as suggesting that a

21   prosecutor is free to encumber a citizen's property interests on the strength of a forfeiture

22   specification procured with knowledge that there was no factual basis for it.").  Rather,

23   Mr. Mattson contends that the functional effect of the notices reduces his available pre-trial assets

24   and jeopardizes his right to counsel.  As such, an evidentiary hearing is warranted to assess the

25   probable cause of the forfeiture allegations and to vindicate Mr. Mattson's Sixth Amendment

26   right.

27

28

1

**D.    The Government Has Still Not Provided Any Evidence That the Assets are Tainted and Cannot Establish Probable Cause**

2

3    The government asserts that its conclusory forfeiture allegations are sufficient to establish

4    that the properties are tainted and thus provide probable cause for forfeiture.  Despite the

5    government's misguided efforts to shift the burden to Mr. Mattson, the government, for its part,

6    has still failed to provide any evidence that the assets are tainted.  To date, the government has

7    been unable or unwilling to produce a tracing analysis supporting its allegations that the

8    Forfeiture Properties are tainted.

9    The government relies on *United States v. Omidi* to argue that "proceeds of the scheme

10   were used to make payments on mortgages at 62 Farragut and 1834-1836 Ocean Front which

11   means there is probable cause for their forfeiture."  Opp. at 17 (citing 125 F.4th 1283, 1288–89

12   (9th Cir. 2025)).  But *Omidi* is markedly different.  There, the court held that proceeds *derived*

13   *from* a fraudulent scheme must be forfeited.  *See Omidi,* 125 F.4th at 1288–89.  Mr. Mattson has

14   requested the pre-trial release of property that was acquired *before* the scheme alleged by the

15   government, and the government has not credibly demonstrated otherwise.  Property interests

16   Mr. Mattson "purchased with legitimate assets" before any fraud is alleged to have occurred are

17   not "forfeitable because [they are] not proceeds traceable to a [fraudulent] transaction."  *United*

18   *States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655,* 51 F.3d 1402, 1411

19   (9th Cir. 1995) (citation and internal quotation marks omitted); *see also United States v. Pole No.*

20   *3172, Hopkinton,* 852 F.2d 636, 639 (1st Cir. 1988) ("We do not believe, however, that

21   forfeitability spreads like a disease from one infected mortgage payment to the entire interest in

22   the property acquired prior to the payment.").

23   As for payments on mortgages that occurred after the alleged fraud, preliminary analysis

24   shows nearly $15 million more in net transfers from KSMP's bank account to LM's "1059

25   Account" than net transfers the other way during the period 2020-2023.  Pollock Decl. ¶¶ 6-8.

26   That refutes any notion that allegedly illicit funds acquired from investors were used for mortgage

27   payments on Mr. Mattson's or KSMP's properties.  Rather than taking money out of LM,

28   Mr. Mattson, through KSMP, put money in.  If the government has evidence refuting that analysis

1    or substantiating some other theory by which Mr. Mattson used ill-gotten gains for mortgage

2    payments, it has not shared it.

3        Mr. Mattson, through his counsel, asked for the government's tracing analysis at his

4    arraignment and detention hearings. Pollock Decl. ¶¶ 2, 4. The government failed to provide that

5    analysis even as it attempted to keep Mr. Mattson behind bars pending trial. Pollock Decl. ¶¶ 3,

6    5. It still has not been provided even as the government seeks to deprive Mr. Mattson of his

7    ability to retain his counsel of choice.

8        Despite its earlier refusal to provide any evidence of tracing of allegedly fraudulent funds,

9    the government now contends that it can "show that proceeds of the scheme were used to make

10   payments on mortgages" for the Forfeiture Properties. Opp. at 17. If that is the case, then the

11   government should be required to put its analysis forward at a hearing. To the extent that the

12   government continues to assert that Mr. Mattson has failed to establish the untainted nature of the

13   assets, the defense agrees only that it is impossible for Mr. Mattson to rebut conclusory

14   allegations in the absence of evidence.

15       Moreover, Mr. Mattson believes that potentially exculpatory materials are in the

16   government's possession, including communications from LM, Timothy LeFever, Scott Smith,

17   KSMP, and the LM creditors' committee. Any collusion or coordination with cooperators and

18   LM creditors designed to deprive Mr. Mattson of funds to defend his case would be a direct and

19   improper violation of Mr. Mattson's Sixth Amendment rights. In *United States v. Shelton*, the

20   government – including an AUSA now prosecuting this case – coordinated with the defendant's

21   former employer to dismiss select counts to deprive the defendant of indemnification rights on

22   which he had relied to pay his attorney. 2024 WL 4520944, at *2–3 [Pollock Decl., Ex. B]. The

23   court there found that dismissal of those counts would constitute a Sixth Amendment violation.

24   *Id.* at *5. To the extent that analogous communications between the government and third parties

25   exist here, such communications may give rise to a similar constitutional violation. The

26   documents and communications sought by the government from third parties may form the basis

27   of the government's tracing analysis and, given their potential for exculpation, should be provided

28   to Mr. Mattson's counsel immediately to test the validity of the analysis. The government,

1    however, has refused to produce those documents to Mr. Mattson.  The Court should find that the

2    government has not established probable cause as to the Restrained Properties.

3         **E.    If Any Tracing Dispute Exists, A Hearing Will Resolve This Issue**

4              To the extent a factual dispute exists, and the Court seeks to verify the government's

5    probable cause, a hearing will resolve this issue.  The government acknowledges that it bears the

6    burden of demonstrating probable cause at a hearing.  Opp. at 17.  The government claims it

7    "would show that proceeds of the scheme were used to make payments on mortgages" and

8    establish probable cause for forfeiture if a hearing is held.  *Id.*  Mr. Mattson welcomes that

9    opportunity because the government has repeatedly failed to provide its tracing analysis,

10    generating serious doubts that it has probable cause for forfeiture.  Conclusory allegations cannot

11    be sufficient to prevent a criminal defendant from exercising his Sixth Amendment right to

12    counsel of his choice.  Further, it is the courts "[that] have experience separating tainted assets

13    from untainted assets."  *Luis*, 578 U.S. at 7 (2016).  Here, Mr. Mattson's allegations are

14    "sufficient, and factual issues are raised [as to the forfeitability of the assets in question, so] a

15    hearing is required."  *Unimex*, *Inc.* 991 F.2d at 551 (reversing the defendant's conviction because

16    "[t]he government prevented [the defendant] from hiring counsel by taking all [his] property, and

17    there was no showing at an adversary hearing at which [the defendant] could be heard that the

18    property belong[ed] to the government.").

19         **F.    Requesting A Substitution of Property Does Not Require a Full Review of**
           **Release Conditions**
20

21              The government contends that Mr. Mattson seeks an appeal of the Magistrate Judge's

22    release conditions.  Opp. at 17.  But both parties stipulated that this matter was properly before

23    this Court.  *See* ECF No. 43.  The stipulation contemplated that Mr. Mattson would "file an

24    opening brief regarding any potential Sixth Amendment violations," and the parties stipulated that

25    "the Sixth Amendment issue should properly be brought to the District Judge."  *Id.* at 1.  The

26    government now walks back that agreement by claiming that the Sixth Amendment question

27    somehow implicates all aspects of Mr. Mattson's release conditions and requires a *de novo*

28    review.  Opp. at 1.  But that is not the purpose of the Motion.  Instead, Mr. Mattson seeks a

REPLY BRIEF ISO DEFENDANT'S MOTION TO                    -10-                    CASE NO.: 4:25-CR-00126-JST

1   determination of whether his Sixth Amendment right is violated by the posting of 210 La Salle.

2   Mr. Mattson should not be deprived of his right to counsel by forcing him to post an untainted

3   property that would result in him lacking adequate resources to mount a defense.  Given that the

4   government concedes that 210 La Salle is untainted and argues that the other properties *are*

5   tainted, forcing Mr. Mattson to post the only allegedly untainted asset of any size to which he

6   currently has access would violate his Sixth Amendment right.  *Luis*, 578 U.S. at 18 ("[I]nsofar as

7   innocent (*i.e.,* untainted) funds are needed to obtain counsel of choice, we believe that the Sixth

8   Amendment prohibits the court order that the Government seeks.").

9       The government has all but conceded that 210 La Salle is an untainted asset.  For

10  example, unlike the Forfeiture Properties, the government has not alleged that 210 La Salle is

11  subject to forfeiture upon conviction.  *Compare* ECF No. 1 at 18–19.  Nor did the government

12  object to the posting of 210 La Salle as security.  The government's current objection is curious

13  because the government previously contemplated, in good faith, the substitution of an alternative

14  property as security as recently as June 25, 2025.  *See* Pollock Decl. ¶ 10.  At that time,

15  prosecutors indicated that they "continue to be open to other substitute properties" instead of 210

16  La Salle.  *Id.* ¶ 9.  The government made no indication at that time that substitution of security

17  would require a renewed hearing before the Magistrate Judge.  It is not clear to the defense why

18  the government has suddenly changed its position on the propriety of substitute properties.  Nor is

19  it clear why the government seeks to impose a greater bond on Mr. Mattson's release even as

20  Mr. Mattson seeks relief to retain his counsel of choice.

21  **III.    CONCLUSION**

22      For the reasons included in the Motion and in this reply, Mr. Mattson respectfully requests

23  modification of the pre-trial restraints imposed against his untainted assets or, in the alternative, a

24  hearing before the District Judge to determine probable cause.

25

26

27

28

REPLY BRIEF ISO DEFENDANT'S MOTION TO                                    11                                    CASE NO.: 4:25-cr-00126-JST
MODIFY PRE-TRIAL ASSET RESTRAINTS

DATED: July 18, 2025                    LAW OFFICES OF RANDY SUE POLLOCK


                                        By: */s/ RANDY SUE POLLOCK*
                                        _____
                                            RANDY SUE POLLOCK

                                        Attorney for Defendant
                                        KENNETH W. MATTSON

1   RANDY SUE POLLOCK (CA SBN 64493)
    LAW OFFICES OF RANDY SUE POLLOCK
2   286 Santa Clara Avenue,
    Oakland, CA 94610-2624
3   Telephone:    510.763.9967
    Facsimile:    510.380.6551
4   rsp@rspollocklaw.com

5   Attorney for Defendant
    KENNETH W. MATTSON
6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11

12   UNITED STATES OF AMERICA,          **Case No. 4:25-cr-00126-JST**

13              Plaintiff,              **DECLARATION OF RANDY SUE**
                                        **POLLOCK IN SUPPORT OF**
14        v.                           **DEFENDANT'S MOTION TO MODIFY**
                                        **PRE-TRIAL ASSET RESTRAINT**
15   KENNETH W. MATTSON,
                                        Date:    July 31, 2025
16              Defendant.             Time:    9:30 a.m.
                                        Judge:   Hon. Jon S. Tigar
17                                      Ctrm:    6 – 2nd Floor

18
                                        Indictment Filed:  May 13, 2025
19                                      Trial Date:    None set

20

21        I, Randy Sue Pollock, declare as follows:

22        1.     I am an attorney licensed to practice law in the State of California and am the

23   principal attorney of the law firm of the Law Offices of Randy Sue Pollock, counsel for

24   Defendant Kenneth Mattson.  I submit this declaration in support of Mr. Mattson's Motion to

25   Modify Pre-Trial Asset Restraint.  I have knowledge of the facts set forth herein, and if called

26   upon as a witness thereto, I could testify competently under oath.

27        2.     At Mr. Mattson's May 23, 2025 arraignment, my co-counsel, William Frentzen,

28   requested that the government provide its tracing analysis in support of its forfeiture allegations.

DECL. OF RANDY SUE POLLOCK IN SUPPORT OF
DEFENDANT'S MOTION TO MODIFY PRE-TRIAL          1          CASE NO.: 4:25-CR-00126-JST
ASSET RESTRAINT

1    3.    The government did not produce any analysis after that request.

2    4.    Five days later, at Mr. Mattson's May 28, 2025 detention hearing, Mr. Frentzen

3    again requested that the government provide its tracing analysis.

4    5.    The government again failed to produce any analysis after that request.

5    6.    The defense's preliminary analysis conducted by a forensic accountant shows

6    nearly $15 million more in net transfers from the KS Mattson Partners, LP ("KSMP") bank

7    account to LeFever Mattson's ("LM") "1059 Account" than net transfers in the opposite direction

8    between 2020 and 2023.

9    7.    This preliminary analysis identified approximately $23.3 million in transfers from

10    LM's "1059 Account" to KSMP's bank account during the period January 1, 2020 through

11    September 1, 2023.  During that same period, KSMP transferred approximately $37.9 million to

12    LM's "1059 Account."

13    8.    Defense counsel has raised this analysis multiple times since Mr. Mattson's initial

14    arraignment hearing, asked the government whether it has analysis to dispute that finding, and the

15    government has declined to produce any analysis to dispute it.

16    9.    Defense counsel raised a potential Sixth Amendment violation before Magistrate

17    Judge Tse at a June 11, 2025 conference in connection with the posting of 210 La Salle Avenue,

18    Piedmont, California ("210 La Salle") as bond security.

19    10.    On June 25, 2025, during communications about the stipulation and briefing, the

20    parties discussed the substitution of an alternative property as security instead of 210 La Salle.

21    Attached hereto as **Exhibit A** is a true and correct copy of an email chain among defense counsel

22    and the government, dated June 23-25, 2025.

23    11.    At that time, Assistant United States Attorney Christoffer Lee stated that the

24    government attorneys "continue to be open to other substitute properties" instead of 210 La Salle.

25    12.    The government made no indication at that time that substitution of security would

26    require a renewed hearing before the Magistrate Judge and agreed that "Judge Tigar is probably

27    the correct court for motion practice and a hearing."

28

Decl. of Randy Sue Pollock In Support of
Defendant's Motion to Modify Pre-Trial                    2                    Case No.: 4:25-cr-00126-JST
Asset Restraint

1        13.     According to public filings on the docket of the bankruptcy proceeding involving

2    LM, captioned *In re: LeFever Mattson*, Lead Case No. 24-10545 (CN) (Bankr. N.D. Cal.),

3    professional fees incurred by LM totaled over $1 million for the month of 2025.

4        14.     Attached hereto as **Exhibit B** is a true and correct copy of Order Denying

5    Government's Request to Dismiss Counts 1-8 of the Indictment, filed in the criminal case

6    captioned *United States v. Shelton*, Case No. 23-cr-00258-JSC-1 (N.D. Cal.) as docket entry 99

7    on October 17, 2024.

8

9        I declare under penalty of perjury of the laws of the United States of America that the

10   foregoing is true and correct.

11

12   Dated: July 18, 2025                  */S/ RANDY SUE POLLOCK*

13                                     RANDY SUE POLLOCK

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

| From: | Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov> |
|---|---|
| Sent: | Wednesday, June 25, 2025 10:33 AM |
| To: | Frentzen, William; Randy Sue Pollock |
| Cc: | Bhagat, Nikhil (USACAN); Komorowski, Michael |
| Subject: | [EXT] RE: Mattson Bond |

Wil and Randy Sue,

We evaluated in good faith your proposed substitute property—531/533 Camino Del Mar.  It's hard to see how a proposed substitute property that appears to be the subject of a $6 million debt owed by KSMP is a realistic or viable substitute.  As you know, Judge Tse and Pretrial Services found Mr. Mattson was a flight risk, albeit one that could be mitigated with a $4 million secured bond.  Part of the court's analysis is whether the posted property could exert moral suasion on the defendant to secure his attendance.  With all due respect, it's not clear how the proposed substitute property at 531/533 Camino Del Mar—which is owned by KSMP and therefore under the control of Robbin Itkin as KSMP's Responsible Individual and which appears to be heavily indebted—could practically be used a secured property or be sufficient to disincentivize and mitigate the risk of flight.  That said, we continue to be open to other substitute properties.

Please send over the proposed briefing schedule stip/PO.

Thanks,
Christoffer

**From:** Frentzen, William <WFrentzen@mofo.com>
**Sent:** Tuesday, June 24, 2025 4:28 PM
**To:** Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov>; Randy Sue Pollock <rsp@rspollocklaw.com>
**Cc:** Bhagat, Nikhil (USACAN) <Nikhil.Bhagat@usdoj.gov>; Komorowski, Michael <MKomorowski@mofo.com>
**Subject:** [EXTERNAL] RE: Mattson Bond

Christoffer, you have indicated you believe our Sixth Amendment motion should go to Judge Tigar. Our research is that similar motions have gone to the District Court as well. Our proposal is that we file a joint stipulation with the Court that the parties will submit briefing to Judge Tigar with a proposed briefing schedule (e.g., 2 weeks for your opposition and 1 week to reply).

Because of your apparent unwillingness to accept any substitute property, we are prepared to file and demand the necessary hearing tomorrow.

If you are agreeable, we will send you a draft stipulation and proposed briefing schedule.

Of course, alternatively we believe we can avoid this issue by simply posting a substitute asset – or by agreeing that $800,000 is sufficient security – and we may be able to avoid this issue altogether.

Please let us know asap. I'm also happy to jump on a call if that is better.

Thanks, WF.

**From:** Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov>
**Sent:** Tuesday, June 24, 2025 1:43 PM
**To:** Randy Sue Pollock <rsp@rspollocklaw.com>
**Cc:** Bhagat, Nikhil (USACAN) <Nikhil.Bhagat@usdoj.gov>; Frentzen, William <WFrentzen@mofo.com>
**Subject:** RE: Mattson Bond

<mark>External Email</mark>

Hi Randy Sue,

Upon looking into this more, it appears 531 and 533 Camino Del Mar are encumbered by a $6 million loan (perhaps cross-collateralized with 1716 Ocean Front, which is subject to forfeiture).  See AXOS-00006427 attached (produced June 9, 2025) and screenshots below.

# DEED OF TRUST

MIN: 1007359-0003405320-8                                                  MERS Phone: 888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated     JUNE 28, 2018     , together with all Riders to this document.
**(B)  "Borrower"** is   K S MATTSON PARTNERS, LP, A CALIFORNIA LIMITED PARTNERSHIP
BORROWER'S ADDRESS IS PO BOX 5490, VACAVILLE, CALIFORNIA 95696.

Borrower is the trustor under this Security Instrument.
**(C)  "Lender"** is  BOFI FEDERAL BANK

**Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)  "Note"** means the promissory note signed by Borrower and dated   JUNE 28, 2018
The Note states that Borrower owes Lender  SIX MILLION AND 00/100
<mark>Dollars (U.S. $ 6,000,000.00</mark> ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JULY 1, 2048
**(G)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I)  "Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of SAN DIEGO :
[Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 299-232-09-00
COLLATERAL A.P.N.: 300-331-1402
COLLATERAL A.P.N.: 300-331-1401

which currently has the address of

1716 OCEAN FRONT, DEL MAR, CALIFORNIA 92014    ("Property Address"):
531 CAMINO DEL MAR, DEL MAR, CALIFORNIA 92014    ("Collateral Address"):
533 CAMINO DEL MAR, DEL MAR, CALIFORNIA 92014    ("Collateral Address"):
[Street]            [City]                [Zip Code]

TOGETHER WITH all the

---

**From:** Randy Sue Pollock <rsp@rspollocklaw.com>
**Sent:** Monday, June 23, 2025 4:01 PM
**To:** Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov>
**Cc:** Bhagat, Nikhil (USACAN) <Nikhil.Bhagat@usdoj.gov>; William Frentzen <wfrentzen@mofo.com>
**Subject:** [EXTERNAL] Re: Mattson Bond

There's one loan on the duplex for $1.2m


Randy Sue Pollock
Attorney at Law
286 Santa Clara Avenue
Oakland, CA 94610
T: 510-763-9967
F: 510-380-6551
C: 510-703-3370
www.rspollocklaw.com

Sent from my iPhone...

Please excuse autocorrect non sequiturs and typos

On Jun 23, 2025, at 6:57 PM, Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov> wrote:

I think you mentioned those were Zillow estimates.  Do you know if the properties are encumbered or if there is that much equity available?

---

**From:** Randy Sue Pollock <rsp@rspollocklaw.com>
**Sent:** Monday, June 23, 2025 3:54 PM
**To:** Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov>
**Cc:** Bhagat, Nikhil (USACAN) <Nikhil.Bhagat@usdoj.gov>; William Frentzen <wfrentzen@mofo.com>
**Subject:** [EXTERNAL] Re: Mattson Bond

In my email Thursday I think I said one is $2.5 and one is a little over $1.

Randy Sue Pollock
Attorney at Law
286 Santa Clara Avenue
Oakland, CA 94610
T:  510-763-9967
F:  510-380-6551
C:  510-703-3370
www.rspollocklaw.com

Sent from my iPhone...

Please excuse autocorrect non sequiturs and typos

> On Jun 23, 2025, at 6:45 PM, Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov> wrote:
>
> Hi Randy Sue,
>
> For the substitute properties you proposed, 531 and 533 Camino Del Mar, do you know how much equity is in each?
>
> My sense is that Judge Tigar is probably the correct court for motion practice and a hearing.
>
> Thanks,
> Christoffer

**From:** Randy Sue Pollock <rsp@rspollocklaw.com>
**Sent:** Monday, June 23, 2025 2:08 PM
**To:** Lee, Christoffer (USACAN) <Christoffer.Lee@usdoj.gov>; Bhagat, Nikhil (USACAN) <Nikhil.Bhagat@usdoj.gov>; William Frentzen <WFrentzen@mofo.com>
**Subject:** [EXTERNAL] Mattson Bond

Christoffer and Nikhil
Any decision about the substitute properties I proposed last week?
Also any thoughts on whether this goes to Tigar or Alex for hearing if we go that route.

Rsp

Randy Sue Pollock
Attorney at Law
286 Santa Clara Avenue
Oakland, CA 94610
T: 510-763-9967
F: 510-380-6551
C: 510-703-3370
www.rspollocklaw.com

Sent from my iPhone...

Please excuse autocorrect non sequiturs and typos

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# EXHIBIT B

1

2

3

4                      UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7   UNITED STATES OF AMERICA,           Case No.  23-cr-00258-JSC-1

8              Plaintiff,
                                         **ORDER DENYING GOVERNMENT'S**
9         v.                             **REQUEST TO DISMISS COUNTS 1-8**
                                         **OF THE INDICTMENT**
10  AUBREY JACKSON SHELTON,
                                         Dkt. Nos. 65, 76, 83, & 84
11             Defendant.

12

13         Pursuant to Federal Rules of Criminal Procedure 48(a), the government moves for leave to

14  dismiss Counts 1-8 of the indictment charging Aubrey Shelton with wire and mail fraud arising

15  out of his alleged embezzlement from his then employer.  (Dkt. No. 65.)[1]  The government seeks

16  to proceed on four remaining counts of tax evasion. The government's admitted purpose in

17  dismissing the Counts is to avoid having Mr. Shelton's former employer advance Mr. Shelton's

18  legal fees, as a Delaware court ordered that it do.  Having carefully considered the parties'

19  submissions, and having had the benefit of oral argument on October 16, 2024, the Court DENIES

20  the government leave to dismiss Counts 1-8.  To permit the government to do so would violate

21  Mr. Shelton's Sixth Amendment right to counsel of his choice.

22                            **BACKGROUND**

23         On August 15, 2023, the government indicted Mr. Shelton with three counts of bank fraud

24  (Counts 1-3), five counts of wire fraud (Counts 4-8), and four counts of tax evasion (Counts 9-12)

25  arising from an alleged seven-years long scheme to embezzle funds from his employer ("the

26  Employer").  (Dkt. No. 1.)  The government alleges Mr. Shelton used his control of the

27  _____

28  [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
    ECF-generated page numbers at the top of the documents.

1    Employer's payroll account to submit false information to the payroll processor about the amount

2    of money he was entitled to receive, including inflating his salary and bonus and representing that

3    he was entitled to receive "executive loans" and "reimbursements" that he did not actually incur

4    and was not entitled to receive.  (*Id.*)

5         After his indictment, Mr. Shelton initiated an action in the Delaware Court of Chancery to

6    require the Employer advance his legal fees pursuant to an Indemnification Agreement he signed

7    in February 2020 while working at the company.  (Dkt. No. 76-2 (indemnification agreement).)

8    On May 13, 2024, the Court of Chancery ruled on cross-motions for summary judgment, and

9    ordered the Employer to advance Mr. Shelton's expenses for Counts 1-8 of the federal indictment

10   (the bank and wire fraud charges), but not expenses incurred solely for Counts 9-12 (the tax

11   evasion charges).  (Dkt. No. 76-3 at 3-4.)  The Employer initially complied with the Delaware

12   court's Order.  (Dkt. 76-5 at 2-4.)

13        Less than two months after the Delaware court ordered the fees advancement, the

14   Employer wrote the government to complain that the Employer was financially strained by the

15   Delaware Court's order requiring it to advance Mr. Shelton's legal fees.  (Dkt. No. 83-1 at 4-5.)

16   The Employer requested the government dismiss Counts 1-8 in order to relieve the company of its

17   court-ordered obligations for financial reasons.  (*Id.* at 5.)  The government subsequently informed

18   Mr. Shelton and the Employer that it planned to dismiss the charges as the Employer proposed.

19   (Dkt. No. 82-1 ¶ 3.)  The Employer thereafter decided not to advance Mr. Shelton's legal expenses

20   incurred after the date it was notified of the government's decision.  (Dkt. 76-5 at 2-4.)  As

21   required by Federal Rules of Criminal Procedure 48(a), the government then requested leave of

22   court to dismiss Counts 1-8.  (Dkt. 65.)  Mr. Shelton argues that dismissal of these Counts for the

23   purpose of terminating the Employer's obligation to pay his legal fees violates the Sixth

24   Amendment.

25        Jury trial is currently scheduled to commence on December 2, 2024, with a pretrial

26   conference scheduled for November 13, 2024.

27   //

28   //

United States District Court
Northern District of California

2

**DISCUSSION**

### A.     Federal Rules of Criminal Procedure 48(a)

"At common law a prosecutor had unrestricted authority to enter a *nolle prosequi* without the consent of the court." *United States v. Gonzalez*, 58 F.3d 459, 460 (9th Cir. 1995).  Federal Rules of Criminal Procedure 48(a) "represents a departure from the common law," providing instead that "the Government may file a dismissal of an indictment, information, or complaint 'by leave of court.'" *United States v. Garcia-Valenzuela*, 232 F.3d 1003, 1007 (9th Cir. 2000).  The rule's primary purpose is "to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977); *see also Gonzalez*, 58 F.3d at 461 ("The primary purpose of the requirement that leave of court be obtained is to grant judges discretion to prevent the government from using its discretionary power to dismiss indictments for purposes of harassment.").

"[A] district court is limited in its ability to second-guess the government's decisions on whether and what to prosecute." *García-Valenzeula*, 232 F.3d at 1007.  "The decision to dismiss an indictment implicates concerns that the Executive is uniquely suited to evaluate, and a district court should be reluctant to deny its request." *Gonzalez*, 58 F.3d at 462.  But, when, as here, "the defendant contests a Rule 48(a) motion, the motion raises concerns that are not present when the court considers an uncontested motion to dismiss: the district judge … must be careful to safeguard [the defendant's] rights." *Id.*

### B.     Dismissal of Counts 1-8 Would Violate the Sixth Amendment

In *Luis v. United States*, 578 U.S. 5 (2016), the government charged the defendant with healthcare fraud.  Pursuant to statute, the government obtained a pretrial order freezing all of the defendant's assets up to the amount of the alleged healthcare fraud ($45 million), including assets unrelated to the fraud (untainted assets).  *Id.* at 8-9.  The defendant argued the untainted assets freeze prevented her from hiring counsel of her choice and so violated her Sixth Amendment right to counsel.  The Supreme Court agreed.

The Court held the Sixth Amendment "guarantees a defendant the right to be represented

by an otherwise qualified attorney whom that defendant can afford to hire." *Id.* at 12.  This right is "fundamental" and "the wrongful deprivation of the right to counsel [is] a 'structural' error that so 'affec[ts] the framework within which the trial proceeds' that courts may not even ask whether the error harmed the defendant." *Id.* at 11 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2005)).  Four justices held the government's interest in preserving the defendant's untainted assets for payment of forfeiture and restitution to the victims of the healthcare fraud was not outweighed by the defendant's Sixth Amendment right to counsel of her choice.  *Id.* at 19 ("despite their importance, compared to the right to counsel of choice, these interests [ensuring funds for forfeiture/restitution] would seem to lie somewhat further from the heart of a fair, effective criminal justice system").  Because the defendant's property was hers, untainted by crime, and she "need[ed] some portion of those same funds to pay for the lawyer of her choice," "the Sixth Amendment prohibit[ed] the court order that the Government s[ought]." *Id.* at 18.  Justice Thomas concurred in the decision, but rather than balancing the government's interests and the defendant's right to counsel of her choice, Justice Thomas held the Sixth Amendment prevents the government from obtaining a freeze of untainted assets, period.  *Id.* at 24-25 (Thomas, J., concurring).

It is undisputed the Delaware Court of Chancery ordered the Employer to advance Mr. Shelton's legal fees for defending Counts 1-8.  It is also undisputed the government seeks leave to dismiss Counts 1-8 so that the Employer will no longer be obligated to pay Mr. Shelton's legal fees.  Finally, it is undisputed that without the Employer advancing Mr. Shelton's legal fees, Mr. Shelton will not be able to have counsel of his choice, Mr. Fee, represent him at trial.[2]  Based on these undisputed facts, *Luis* compels the conclusion that permitting the government to dismiss Counts 1-8 for the admitted purpose of relieving the Employer from its court-ordered obligation to advance Mr. Shelton his legal fees would violate the Sixth Amendment.  Like the assets in *Luis*,

---

[2] Mr. Shelton financially qualifies for appointed counsel, and a federal defender was initially appointed to represent him. (Dkt. Nos. 5, 7.)  When private counsel Mr. Fee appeared on behalf of Mr. Shelton, he advised it was based on his opinion that the indemnification agreement required payment of Mr. Shelton's legal fees and that Mr. Shelton would be filing an action in Delaware to enforce that right.  Mr. Shelton did file that action and, as explained, the Delaware court agreed with Mr. Shelton.

United States District Court
Northern District of California

1    Mr. Shelton's indemnification agreement, as enforced by the Delaware court, provides him with

2    untainted assets; namely, the advancement of his legal fees in this criminal action.  And, as the

3    government in *Luis*, the government seeks to deprive Mr. Shelton of those assets leading to his

4    inability to pay counsel of his choice.  Indeed, the government admits its decision to dismiss

5    Counts 1-8 is based solely on its acquiescence to the Employer's request that the government

6    dismiss those charges so that it would no longer need to pay Mr. Shelton's legal fees. (Dkt. No.

7    83-1 at ¶ 3.)   The primary difference between *Luis* and here is that rather than seeking a "freeze"

8    on the assets, the government seeks to eliminate the assets all together.  So, an order granting the

9    government leave to dismiss Counts 1-8 "would seriously undermine that constitutional right" to

10   counsel of one's choice.  *Luis*, 578 U.S. at 19.

11        *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), is instructive.  There the defendants

12   moved to dismiss all charges against them based upon the Department of Justice's "Thompson

13   memorandum," which stated that "payment of legal fees for employees and former employees

14   may be viewed as protection of culpable employees and thus cut in favor of indicting the entity."

15   *United States v. Stein*, 435 F. Supp. 2d 330, 363 (S.D.N.Y. 2006).  KPMG, the defendants'

16   employer, had a long-standing policy of paying its employees' legal fees in similar cases, but

17   attested that the Thompson memorandum substantially influenced its decision to not advance the

18   defendants' legal fees.  *Stein*, 541 F.3d at 140.  As a result of the employer's decision, some

19   defendants had been unable to retain counsel of their choice and other counsel were limited in

20   their work because of the lack of funds.  *Id.*  The trial court determined the government's policy—

21   which dissuaded KPMG from advancing the defendants' legal fees—violated the defendants' Sixth

22   Amendment right to counsel of their choice.  *Id.* at 151.

23        The Second Circuit affirmed.  It first held "[i]t is axiomatic that if defendants had already

24   received fee advances from KPMG, the government could not (absent justification) deliberately

25   interfere with the use of that money to fuel their defenses."  *Id.* at 155.  And the government

26   conceded it also could not "prevent a lawyer from furnishing a defense gratis."  *Id.*  From these

27   two propositions, the court determined "if the Sixth Amendment prohibits the government from

28   interfering with such arrangements, then surely it also prohibits the government from interfering

5

1    with financial donations by others." *Id.* at 156 (citing *United States v. Inman*, 483 F.2d 738, 739-

2    40 (4th Cir. 1973) (per curiam)).  And surely the Sixth Amendment also prohibits the government

3    from interfering with contractual (and court-ordered) obligations to fund a defense.

4         That the situation here is in some ways the reverse of that in *Stein* does not mean the result

5    should be different.  Indeed, the *Stein* trial court was focused on "the extrajudicial action by the

6    government that deliberately or recklessly tilt[ed] the playing field against a criminal defendant."

7    *Stein*, 435 F. Supp. 2d at 362 n.159.  There, it was the government pressuring a company to

8    withhold its payment of funds to a defendant when it would have otherwise paid them.  Here, it is

9    the government acting jointly with the company to ensure the company is no longer contractually

10   obligated to pay the defendant's legal fees.  In either case, the government deprives the defendant

11   of untainted assets and so violates the defendant's Sixth Amendment right to counsel of choice.

12        The government's insistence "there was no state action with respect to Shelton's legal fees,

13   and so there can be no constitutional violation" (Dkt. No. 82 at 12), is unpersuasive.  The

14   Employer's reasonable desire to not pay Mr. Shelton's legal fees would not violate Mr. Shelton's

15   Sixth Amendment right to counsel of his choice unless and until the government *acts* to dismiss

16   Counts 1-8 for the admitted purpose of ensuring that the Employer does not have to pay his fees.

17   Indeed, just as the government's action in *Stein*—the Thompson memorandum—dissuaded the

18   defendants' employer from paying their legal fees, so too the government's act here—moving to

19   dismiss Counts 1-8—has already persuaded the Employer to stop advancing Mr. Shelton's fees.

20        Next the government argues the Sixth Amendment is not violated in these circumstances

21   because it is acting in "good faith."  But, the government in *Luis* demonstrated the exact same

22   good faith: it did not seek to freeze the defendant's untainted assets for the purpose of making it

23   harder for the defendant to retain counsel of her choice, it sought to freeze the assets to ensure

24   restitution for the victims of the alleged fraud.  So, the government's alleged good faith is

25   immaterial.  It is also one-sided.  It is "good faith" toward the victim, but arguably not good faith

26   toward the defendant's Sixth Amendment right to counsel of his choice.  *See Stein*, 435 F. Supp.

27   2d at 362 n.159 (explaining the government's conduct "tilt[ed] the playing field against a criminal

28   defendant").

1    Finally, at oral argument the government argued for the first time that because the

2    Delaware court order requires the Employer to advance fees for the defense of Counts 1-8, Mr.

3    Shelton is not being deprived of untainted assets that could be used to pay counsel to defend the

4    tax evasion charges (Counts 9-12). The government points to language in the parties' fees

5    stipulation that Mr. Shelton is to in good faith "exclude fees for services performed and expenses

6    incurred solely in connection with the Non-Advanceable Counts." (Dkt. No. 76-3 at 3.) So,

7    argues the government, because Mr. Shelton has a property interest in advanced fees for Counts 1-

8    8 and no property right to advanced fees for Counts 9-12, there can be no Sixth Amendment

9    violation.

10    But the Delaware court's order itself demonstrates Mr. Shelton's property interest. It

11    requires Mr. Shelton to exclude from requested expenses those "incurred *solely* in connection"

12    with the tax evasion counts. (Dkt. No. 76-3 at 3-4 (emphasis added).) Indeed, it states that Mr.

13    Shelton shall "include" expenses incurred "in connection *with both* the Non-Advanceable Counts

14    and the Advanceable Counts that reasonably cannot be attributed solely to the Non-Advanceable

15    Counts or the Advanceable Counts." (*Id.* (emphasis added).) It thus recognizes that the court-

16    ordered expenses are used in defense of the fraud *and* tax evasion charges. Such an order makes

17    sense as the tax evasion charges are derivative of the embezzlement charges. Indeed, the

18    government admits that "[w]hether or not we proceed on the bank and wire fraud counts, that

19    conduct is centrally relevant to the tax evasion counts, and thus would have to be part of the

20    factual basis of any plea." (Dkt. No. 76-4 at 2.) So, when expenses were advanced for the defense

21    of the fraud charges they were advanced for the defense of the tax evasion charges. And when the

22    government seeks to eliminate the contractual obligation to advance expenses in defense of the

23    fraud charges it therefore seeks to eliminate the contractual obligation to advance expenses in

24    defense of the tax evasion charges. Permitting such interference with untainted assets would

25    violate Mr. Shelton's Sixth Amendment right to counsel of choice.

26    The government urges that its exercise of its prosecutorial discretion cannot violate Mr.

27    Shelton's Sixth Amendment right to counsel of choice, especially, when, as here, it is merely

28    seeking to avoid exacerbating harm to an alleged victim. It argues that if it had never charged Mr.

United States District Court
Northern District of California

7

Shelton with the embezzlement counts, and from the beginning had only indicted him on the tax evasion charges, he would have no property right to advancement of legal fees; so, dismissing those charges a year into the case is no different. The Court does not agree. Under the undisputed facts, the government did charge Mr. Shelton with fraud. The Delaware court has ordered the Employer to advance Mr. Shelton's legal fees for both the fraud charges and tax evasion charges to the extent the fees cannot be attributed solely to the tax charges. The pretrial conference is scheduled to be held in less than a month. And until the government advised the Employer that it would acquiesce in the Employer's request to dismiss the fraud charges, the Employer did pay the expenses—expenses that were incurred in defending the fraud and tax evasion counts. So, the government's conduct will interfere (and perhaps already has interfered) with Mr. Shelton's ability to retain counsel of his choice.

### C.    Leave to Dismiss Will be Denied

In light of the Court's conclusion that permitting the government to dismiss Counts 1-8 for the express purpose of relieving the Employer of its obligation to advance his legal fees would violate the Sixth Amendment, it follows that the Court should not approve the proposed dismissal.[3]

*United States v. Deschambault*, No. 19-cr-00187-JAW, 2023 WL 4974003, at *14-15 (D. Me. Aug. 3, 2023), is not to the contrary. In *Deschambault*, the government had charged the defendant with two counts of sexual exploitation in 2019, only to obtain a superseding indictment in 2021 adding a charge for child pornography. *Id.* at *1. In December 2022, the government dismissed the child pornography charge and trial began three weeks later. *Id.* On appeal, the defendant argued the prosecution's actions amounted to "gamesmanship" because the government dismissed the child pornography count to limit "the scope of cross-examination of the victim" to "defend the victim's rights under the Crime Victim's Rights Act." *Id.* at *14. The trial court held this action was not improper because the government was not improperly motivated and the

---

[3] At the October 16 hearing, Mr. Shelton argued the Sixth Amendment violation already materialized because the fees the Employer had stopped advancing already impacted the defense's ability to pay its vendors and experts. These factual contentions are not in the record so they do not play any role in the Court's Order.

8

1   decision to bring one less charge would not "jeopardize [the defendant's] defense." *Id.*  But the

2   court held the dismissal did not jeopardize the defendant's defense.  Here, in contrast, the

3   government's proposed dismissal not only jeopardizes Mr. Shelton's ability to fund his defense, it

4   also likely violates his Sixth Amendment right to counsel of his choice.

5       The government notes the Ninth Circuit has only approved denial of leave under Rule

6   48(a) in two situations: (1) the government has engaged in prosecutorial harassment, e.g.,

7   charging, dismissing and recharging, and (2) the dismissal is not in the public interest.  (Dkt. No.

8   82 at 8 (citing *Garcia-Valenzuela*, 232 F.3d at 1008).)   But *Garcia-Valenzuela* does not hold

9   those are the only two situations in which leave may be denied.  *See United States v. Hector*, 577

10  F.3d 1099, 1102-03 (9th Cir. 2009) (remanding case to the district court to consider double

11  jeopardy considerations after holding the court did not properly exercise its discretion when

12  granting the government's motion for leave under Rule 48(a)).  And, in any event, depriving a

13  defendant of his Sixth Amendment right to counsel of his choice is "clearly contrary to the public

14  interest." *García-Valenzuela*, 232 F.3d at 1008 (quoting *Gonzalez*, 58 F.3d at 462).  As the *Luis*

15  Court noted, permitting the government to restrain untainted assets that could be used to retain

16  counsel will require more defendants to "fall back upon publicly paid counsel, including

17  overworked and underpaid public defenders."  5 U.S. at 21.  It is also as unfair, if not more unfair,

18  as charging, dismissing, and recharging.  There is simply no good argument that the Court must

19  approve a dismissal that leads to a violation of a defendant's Sixth Amendment right to counsel of

20  his choice.

21          **D.      Motions to Seal**

22      The parties have also filed motions to seal the letter from the Employer's counsel to the

23  government.  (Dkt. Nos. 83 & 84).  Because the Employer is the alleged victim in this matter, is

24  not a party, and the letter contains sensitive information about its finances and other such details,

25  the Court GRANTS both motions.  The relevant portions of both parties' briefings which make

26  reference to this letter may remain redacted.

27  //

28  //

9

**CONCLUSION**

For the reasons explained above, the Court exercises its discretion to DENY the government's request for leave under Federal Rules of Criminal Procedure 48(a) to dismiss Counts 1-8 but continue to trial on Counts 9-12.  The Administrative Motions to File Under Seal (Dkt. Nos. 83, 84) are GRANTED.

This Order disposes of Docket Nos. 65, 76, 83, and 84.

**IT IS SO ORDERED.**

Dated: October 17, 2024

_____
JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

10

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

KENNETH W. MATTSON,

Defendant.

Case No. 25-cr-00126-JST-1

**ORDER DENYING MOTION TO MODIFY PRETRIAL ASSET RESTRAINT**

Re: ECF No. 44

Defendant Kenneth W. Mattson asks the Court to order the United States to withdraw the notices of lis pendens recorded against properties at 62 Farragut Avenue, Piedmont, California, and 1834–1836 Ocean Front, Del Mar, California, and to remove the requirement that he be required to post as security for bail a property located at 210 La Salle Avenue, Piedmont, California.  ECF No. 44.  He contends that these all constitute pretrial restraints on his assets that violate his Sixth Amendment right to counsel and asks the Court to order removal of the restraints or, in the alternative, conduct a hearing to determine "whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime[s] charged in the indictment."  *Kaley v. United States*, 571 U.S. 320, 324 (2014).  The Court will deny the motion.

The properties at issue fall into two categories.  First, the indictment alleges forfeiture of 62 Farragut and 1834–1836 Ocean Front, as well as another property not at issue in this motion, 1716 Ocean Front, Del Mar, California, as property "derived from proceeds the defendant obtained directly and indirectly, as the result of [the alleged] violations."  ECF No. 1 at 19.  Second, the indictment does not allege forfeiture of 210 La Salle.  Instead, that property was ordered by the magistrate judge to be provided as security for Mattson's pretrial release.  ECF No. 37.

United States District Court
Northern District of California

1   In *Luis v. United States*, a plurality of the United States Supreme Court held that "the

2   pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the

3   Sixth Amendment." 578 U.S. 5, 10 (2016). Untainted assets are those "not connected with the

4   crime." *Id.* After *Luis*, in a case not raised by the parties here, the Ninth Circuit held that the

5   "dispositive" question is "not whether the assets [are] tainted, but instead whether the government

6   [has] a substantial property interest in the assets." *United States v. Lillard*, 57 F.4th 729, 734 (9th

7   Cir. 2023). Thus, where "the government had a substantial property interest in [a defendant's]

8   untainted assets [by virtue of a prior restitution order] and seized them for the purpose of

9   restitution, the seizure did not violate the Sixth Amendment, despite its impact on [the

10  defendant's] ability to pay for counsel of his choice." *Id.* at 735.

11  A court must hold an evidentiary hearing to determine whether to release assets if "the

12  moving papers filed, including affidavits, are sufficiently definite, specific, detailed, and

13  nonconjectural, to enable the court to conclude that a substantial claim is presented. If the

14  allegations are sufficient, and factual issues are raised, a hearing is required." *United States v.

15  Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) (citation modified).

16  The parties disagree over what must be shown for a "substantial claim" to be presented.

17  The Ninth Circuit has not decided the question. However, as Mattson does not dispute, all courts

18  to have considered the question have required the defendant to "demonstrate that he or she does

19  not have sufficient alternative assets to find counsel of choice. This requires more than a mere

20  recitation; the defendant must make a sufficient evidentiary showing that there are no sufficient

21  alternative, unrestrained assets to fund counsel of choice."[1] *United States v. Bonventre*, 720 F.3d

22  126, 131 (2d Cir. 2013); *see also, e.g.*, *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998)

23  (requiring defendant to "demonstrate to the court's satisfaction that she has no assets, other than

24  those restrained, with which to retain private counsel and provide for herself and her family");

25  *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001) (requiring defendant to make "a

26

27  _____

    [1] In an unpublished opinion that is not binding precedent under Ninth Circuit Rule 36-3(a), the
    Ninth Circuit agreed that, "[e]ven assuming there were untainted funds" in a restrained asset, the

28  defendant must "clearly demonstrate that those funds were needed to pay for counsel of choice."
    *United States v. Lindell*, 766 F. App'x 525, 528 (9th Cir. 2019).

United States District Court
Northern District of California

1    threshold showing of need to use wrongly seized assets to pay his attorneys"); *United States v.*

2    *Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (requiring defendant to show "a bona fide need

3    to use some of the restrained assets to obtain counsel"); *United States v. Omidi*, No. CR 17-

4    661(A)-DMG, 2021 WL 7629897, at *4 (C.D. Cal. June 15, 2021) (requiring defendant to

5    "provide[] sufficient evidence that his Sixth Amendment rights are implicated, i.e., that his or her

6    seized assets are needed to pay for counsel"); *United States v. Swenson*, No. 1:13-CR-00091-

7    BLW, 2013 WL 3322632, at *8 (D. Idaho July 1, 2013) (requiring defendant to "make a sufficient

8    evidentiary showing that there are no adequate alternative, unrestrained assets to fund counsel of

9    choice").

10        There is a circuit split as to whether the defendant must also make "a prima facie showing

11   that the grand jury erred in determining the assets are traceable to the underlying offense." *Jones*,

12   160 F.3d at 649 (requiring such a showing); *Bonventre*, 720 F.3d at 131 (holding that the

13   defendant is not required to "make a formal *prima facie* showing that the funds were illegitimately

14   restrained"). However, the Court need not decide whether to adopt this second requirement

15   because, as discussed below, Mattson has not made the required showing on the first element: that

16   he lacks sufficient unrestrained assets to retain his counsel of choice.

17        The only evidence Mattson presents on this question is his declaration, which states: "At

18   present, I have access only to assets of a nominal value to pay for counsel. These assets are

19   insufficient to pay my chosen counsel through trial. I am unable to retain the counsel of my

20   choice with the assets currently available to me." ECF No. 44-1 ¶ 8. He also states, "I can only

21   afford to hire counsel if I am able to sell one or more of the properties that I own or control or that

22   my wife owns or controls." *Id.* ¶ 9. However, his declaration is silent as to whether he or his wife

23   own or control any properties other than those that have been restricted, and he has presented no

24   other information regarding his or his wife's assets. Nor has Mattson submitted "definite, specific,

25   detailed, and nonconjectural" evidence regarding the anticipated cost of his defense. *Unimex*, 991

26   F.2d at 551.

27        Mattson cites no authority finding that the sort of conclusory statements he has presented

28   are sufficient to meet his burden, and courts have held to the contrary. For example, the Seventh

1   Circuit has found insufficient a defendant's submission of "a bare-bones affidavit asserting that he

2   personally lacked sufficient funds to obtain counsel of his choice," without presenting any

3   evidence regarding funds available to him to fund his defense, "be they his own funds or funds

4   that his wife or some other relative was willing to provide him." *Kirschenbaum*, 156 F.3d at 792

5   (further noting that the defendant failed to present evidence regarding whether the defendant's

6   wife "had assets of her own or assets that were [the defendant's] but had been put in her name that

7   could pay for [the] defense"). Similarly, the Second Circuit found lacking a defendant's

8   declarations listing certain assets and monthly income—more than Mattson has presented here—

9   but "did not disclose [the defendant's] net worth, provide a comprehensive list of his assets, or

10  explain how he has been paying his . . . living expenses." *Bonventre*, 720 F.3d at 132–33. District

11  courts within the Ninth Circuit are in accord. *E.g.*, *United States v. Cobb*, No. 2:14-CR-00194-

12  APG-NJ, 2015 WL 518548, at *5 (D. Nev. Feb. 9, 2015) (finding "bare statements in [the

13  defendants'] papers" to be insufficient "evidence showing they do not have access to unrestrained

14  funds"); *United States v. Lacey*, No. CR-18-00422-001-PHX-DJH, 2021 WL 5882638, at *9 (D.

15  Ariz. Dec. 10, 2021) (denying motion for a hearing that did "not attach any declarations from

16  Defendants explaining how much they need to pay counsel or prepare for trial, what their trial

17  budget might be, what expenses they intend to pay from any released funds, what would become

18  of any unspent or excess funds not ultimately paid to counsel, or even swearing that they will

19  actually use any funds released to pay counsel" (citation modified)); *Omidi*, 2021 WL 7629897, at

20  *5 (in a case where the defendant had access to $10 million, finding evidence insufficient where

21  "[t]here has been no accounting of, or clear statement regarding, what funds out of the $10 million

22  have already been spent, or any detailed information, such as a declaration from [the defendant],

23  providing specific information regarding his lack of funds or lack of access to other funds").

24       The Court denies Mattson's motion because he has not presented the required

25  "'sufficiently definite, specific, detailed and nonconjectural' averments of [his] inability to pay the

26  counsel of [his] choosing." *Lacey*, 2021 WL 5882638, at *9 (quoting *Unimex*, 991 F.2d at 551).

27  In his reply, Mattson's counsel offered to provide "an estimate of defense costs or specific details

28  about assets available to Mr. Mattson to fund his defense . . . ex parte and under seal to protect

United States District Court
Northern District of California

1  Mr. Mattson's Fifth Amendment and attorney-client privileges." ECF No. 65 at 9. The Court

2  rejects that offer. *See id.* ("reject[ing] Defendants' request to review [declarations by counsel

3  regarding unpaid legal fees and estimated costs] *in camera*"). Denial is without prejudice to

4  Mattson renewing his motion for a hearing if he "can make a *prima facie* showing that [his] net

5  financial resources and income are insufficient to pay for counsel. To the extent [he] seek[s] to

6  file any evidence supporting such an assertion under seal, [he] must clearly articulate the basis for

7  doing so." *Id.*

8  In addition, "to enable the court to conclude that a substantial claim is presented," *Unimex*,

9  991 F.2d at 551, any renewed motion should address the title issues raised by the government.

10  The government presents evidence that KS Mattson Partners LP ("KSMP") holds title to

11  1834–1836 Ocean Front and to a portion of 62 Farragut. ECF No. 51 at 10. Mattson contends

12  that these arguments "point to logistical challenges with disposing of real property, not to any

13  legal shortcomings with Mr. Mattson's Sixth Amendment challenge," ECF No. 65 at 8, but the

14  Court is not persuaded. Mattson's declaration acknowledges that he is "not able to dispose or

15  otherwise control assets held by [KSMP] because KSMP is currently in bankruptcy proceedings."

16  ECF No. 44-1 ¶ 5. Thus, if these assets are, indeed, held by KSMP, any restraints on them could

17  not give rise to a Sixth Amendment violation because, even absent any restraints, Mattson could

18  not sell them to pay for his defense.

19  If Mattson seeks to file a renewed motion, the Court encourages the parties to meet and

20  confer to avoid potentially unnecessary motion practice. For example, Mattson might discuss with

21  the government what evidence the government would find sufficient to meet his burden to

22  demonstrate inability to pay the counsel of his choosing, and whether any or all such evidence

23  may be shielded from the government due to the attorney-client privilege or Mattson's invocation

24  of his Fifth Amendment rights. Similarly, the government might discuss with Mattson how it

25  would, as it asserts it could do at an evidentiary hearing, "show that proceeds of the scheme were

26  used to make payments on mortgages at 62 Farragut and 1834–1836 Ocean Front." ECF No. 51 at

27  21; *see also* ECF No. 65 at 13 (Mattson's reply brief, noting that "the government has repeatedly

28  failed to provide its tracing analysis").

1    Finally, the Court notes that as to 210 La Salle, the parties have had some discussions

2  about substituting a different security to satisfy the conditions of Mattson's pretrial release.  ECF

3  No. 65-1 ¶¶ 10–11.  The government also suggests, without asking for any modification of

4  Mattson's pretrial release conditions, that "[t]he revelation that 210 La Salle appears to be co-

5  owned by a third party—a fact known to the defendant but never disclosed to the Magistrate

6  Judge—may bear upon the Court's analysis of whether conditions exist that can reasonably assure

7  the defendant's appearance at future court proceedings."  ECF No. 51 at 22–23.  Any requests for

8  modification to the conditions of pretrial release shall be brought to the magistrate judge in the

9  first instance.  Additionally, if Mattson files a renewed motion regarding 210 La Salle, he should

10  present argument on how a defendant's Sixth Amendment rights intersect with a court's obligation

11  to determine suitable conditions to allow a defendant to be released pending trial.

12    **IT IS SO ORDERED.**

13  Dated:  July 29, 2025

14  _____

15  JON S. TIGAR
United States District Judge

# EXHIBIT G

1  RANDY SUE POLLOCK (CA SBN 64493)
   rsp@rspollocklaw.com
2  LAW OFFICES OF RANDY SUE POLLOCK
   286 Santa Clara Avenue,
3  Oakland, CA 94610-2624
   Telephone:    510.763.9967
4  Facsimile:    510.380.6551

5  Attorney for Defendant
   KENNETH W. MATTSON
6

7

8                    UNITED STATES DISTRICT COURT

9

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,           Case No. 4:25-cr-00126-JST

13            Plaintiff,                **DEFENDANT KENNETH W.**
                                        **MATTSON'S EMERGENCY EX PARTE**
14        v.                            **MOTION FOR A HEARING ON**
                                        **DEFENDANT'S MOTION TO MODIFY**
15  KENNETH W. MATTSON,                 **PRE-TRIAL ASSET RESTRAINT**

16            Defendant.                Judge:   Hon. Jon S. Tigar
                                        Ctrm:    6 – 2nd Floor
17

18                                      Indictment Filed:  May 13, 2025
                                        Trial Date:        None set
19

20

21

22

23

24

25

26

27

28

1    Pursuant to Local Rule of Criminal Procedure 47-3, Defendant Kenneth W. Mattson

2  respectfully moves the Court *ex parte* for an order granting Defendant's Motion to Modify Pre-

3  Trial Asset Restraint (the "Motion") or scheduling an evidentiary hearing concerning the Motion.

4  Mr. Mattson files this emergency motion for a hearing on the grounds that he will likely be

5  subject to involuntary bankruptcy proceedings on September 2, 2025.  After that date, all

6  properties he owns or controls will be administered by the bankruptcy estate and none may be

7  available to him to exercise his rights to defend his criminal case.  As the Court knows, KS

8  Mattson Partners, LP ("KSMP") is also subject to active bankruptcy proceedings, further limiting

9  Mr. Mattson's potentially available assets.  In support of this motion, Mr. Mattson submits the

10  motion, the accompanying memorandum of points and authorities, the Supplemental Declaration

11  of Kenneth W. Mattson, and a proposed order.  Accordingly, Defendant requests that if the Court

12  holds an evidentiary hearing, that it re-calendar the hearing for the afternoon of August 4, 2025 or

13  as soon thereafter as the matter may be heard.

14                **MEMORANDUM OF POINTS AND AUTHORITIES**

15    Mr. Mattson brings this emergency, *ex parte* motion to modify pre-trial asset restraints

16  and preserve his Sixth Amendment right to counsel.  Mr. Mattson has good cause for submitting

17  this emergency motion *ex parte* because he faces impending, involuntary bankruptcy that will

18  deprive him of any remaining, untainted assets otherwise available to fund his defense – thereby

19  violating his Sixth Amendment rights – and because the parties have already briefed the merits of

20  the matter.  Assets potentially available for his defense are: 62 Farragut Avenue, Piedmont,

21  California 94610; 1834–1836 Ocean Front, Del Mar, California 92014 (together, the "Forfeiture

22  Properties); and 210 La Salle Avenue, Piedmont, California 94610 ("210 La Salle").  *See* ECF

23  No. 44-1, ¶¶ 1–4.  Once involuntary bankruptcy proceedings against Mr. Mattson begin, all three

24  properties will be subject to bankruptcy and may be unavailable to fund Mr. Mattson's defense or

25  be posted as bond.  Mr. Mattson has no ability to control properties owned by KSMP now that

26  KSMP has entered bankruptcy and cannot use those properties for his defense or to post as

27  security for bail.  In light of Mr. Mattson's Supplemental Declaration, Mr. Mattson has

28

1    established a prima facie case for a Sixth Amendment violation, while the government has failed
2    to provide any evidence tracing Mr. Mattson's properties to the allegations in the indictment.

3    **I.    BACKGROUND**

4    Mr. Mattson raised a potential Sixth Amendment violation before the Magistrate Judge in
5    connection with his bond proceedings.  The Magistrate Judge agreed to allow Mr. Mattson to
6    submit briefing regarding the potential Sixth Amendment violation raised at a conference.  ECF
7    No. 38.  The parties stipulated that the Sixth Amendment issue was properly before this Court.
8    ECF No. 43.  The parties briefed the issue.  ECF Nos. 44 ("Motion" or "Mot."), 51 ("Opposition"
9    or "Opp."), 65 ("Reply").  On July 29, 2025, this Court denied Mr. Mattson's motion without
10   prejudice to filing a renewed motion on the grounds that Mr. Mattson failed to provide sufficient
11   evidence of a prima facie Sixth Amendment violation.  ECF No. 68 ("Order").  This renewed
12   Motion attaches a supplemental declaration responsive to the Court's concerns.

13   **II.    Good Cause Exists for This Emergency *Ex Parte* Motion and Hearing**

14   Good cause exists for this emergency *ex parte* motion and hearing.  Mr. Mattson will be
15   subjected to involuntary bankruptcy proceedings by the Official Creditors' Committee of LeFever
16   Mattson on September 2, 2025.  *See* Mattson Supp. Decl. ("Decl.") Ex. A.  After involuntary
17   bankruptcy proceedings begin, Mr. Mattson's real property may be unavailable for his defense.
18   He can only afford to retain counsel of his choice if he can sell the currently restrained properties.
19   Decl. ¶ 34.  Defendant requests that the Court re-calendar the hearing for the afternoon of August
20   4, 2025 or as soon thereafter as the matter may be heard, so that Mr. Mattson's Sixth Amendment
21   right to counsel may be protected before involuntary bankruptcy proceedings begin.

22   **III.    ARGUMENT**

23   **A.    Legal Standard**

24   "[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice
25   violates the Sixth Amendment."  *Luis v. United States*, 578 U.S. 5, 10 (2016).  Untainted assets
26   are those "not connected with the crime."  *Id.*  The "dispositive" question is "not whether the
27   assets [are] tainted, but instead whether the government [has] a substantial property interest in the
28   assets."  *United States v. Lillard*, 57 F.4th 729, 734 (9th Cir. 2023).  A court must hold an

1  evidentiary hearing to determine whether to release assets if "the moving papers filed, including

2  affidavits, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to

3  conclude that a substantial claim is presented." *United States v. Unimex, Inc.*, 991 F.2d 546, 551

4  (9th Cir. 1993) (citation omitted).

5          **B.**     **Mr. Mattson's Supplemental Declaration Establishes a Prima Facie Claim**

6        The Court identified several deficiencies with Mr. Mattson's Sixth Amendment claim.

7  Mr. Mattson provides a supplemental declaration responsive to those points, thereby establishing

8  his substantial claim. Mr. Mattson's declaration is sufficiently definite, specific, detailed, and

9  nonconjectural to enable to the Court to conclude that a substantial claim exists.

10        First, Mr. Mattson and his wife, Stacy Mattson, have access to liquid assets totaling

11  approximately $16,000, including all cash and checking accounts available to them. Decl. ¶¶ 2–

12  4. They do not hold any other accounts or securities. Decl. ¶¶ 1, 2.; *cf.* Order at 3–4 (citing

13  *Kirschenbaum*, 156 F.3d at 792). Ms. Mattson expects to earn an annual income of $72,000 from

14  a job that she just started. Decl. ¶ 5. Beyond that, the Mattsons own vehicles and furniture which

15  could be sold, although they currently need vehicles for work and for the management of the

16  untainted assets. The Mattsons currently are spending approximately $5,000-$6,000 per month

17  on living expenses. Decl. ¶ 10.

18        Second, Mr. Mattson has provided evidence concerning the title issues raised in the

19  government's Opposition and noted in the Court's Order. *See* Opp. at 10; Order at 5. The

20  properties at issue here are owned or controlled by the Mattsons, not by KSMP, and the net

21  proceeds of any sale will go to the Mattsons. Decl. ¶¶ 16–22. The two parcels at 62 Farragut

22  Avenue have separate Assessor's Parcel Numbers and can be sold separately. The parcel at 62

23  Farragut Avenue containing the residence is titled in Mr. Mattson's name. Decl. ¶¶ 18–19.

24  Further, due to a clerical error, 1834-1836 Ocean Front was incorrectly recorded as titled to

25  Equitable Ocean Front LLC, but this will be corrected. Decl. ¶ 21. The property at 210 La Salle

26  Avenue is owned by Ms. Mattson, with a third-party holding a deed of trust for $460,000. This

27  third party is entitled to that amount upon the sale of the property but cannot block a sale. Decl.

28  ¶ 23–25. The Mattsons do not own or control any other real property. Decl. ¶ 26. As such, these

1  properties are the only available sources of potential financial support for Mr. Mattson's defense.

2  Mr. Mattson also has no other properties to post as bond.  Requiring that he post 210 La Salle

3  Avenue would remove that asset as a source of funding for his defense.

4        Finally, Mr. Mattson has also provided evidence of the need for the real property to pay

5  for his defense.  Mr. Mattson will require substantially more than he currently has access to in

6  order to defend his case.  Mr. Mattson's counsel presently holds a retainer, but this amount is a

7  fraction of Mr. Mattson's estimated trial costs and inadequate to enable Mr. Mattson to mount a

8  robust defense.  Mr. Mattson has a right to retain the two counsel of his choice and is not limited

9  to single counsel.  *See In re Bundy*, 852 F.3d 945, 953 (9th Cir. 2017) (right to counsel "not

10 exhausted once [the defendant] has one competent criminal defense lawyer").  Due to the

11 complexity of the case, volume of expected discovery, extensive expert support and testimony

12 needed, expectation that the case will proceed to trial, and overall work expected necessary to

13 defend the case, two counsel are warranted to enable Mr. Mattson to mount an adequate defense.

14 Similarly, Mr. Mattson must retain experts to adequately defend the allegations against him, but

15 necessary retained experts have had to stop fully defending the case due to budget constraints.  To

16 the extent there is any doubt, Mr. Mattson has sworn that he will use any released funds to pay

17 lawyers, experts, and consultants for his defense in this matter and not for any other expenses.

18 Any unreleased funds would, as detailed below, be held in trust by Mr. Mattson's counsel.  Decl.

19 ¶¶ 29–35; *cf.* Order at 4 (citing *United States v. Lacey*, 2021 WL 5882638, at *9 (D. Ariz. Dec.

20 10, 2021)).  Taking into account Mr. Mattson's limited financial assets and demonstrated costs to

21 retain counsel, Mr. Mattson has made a prima facie showing for the Court to make a ruling in his

22 favor or, at a minimum, grant an expedited evidentiary hearing.

23        **C.    The Court Should Order the Government to Provide Its Tracing Analysis**

24        The Court should grant Mr. Mattson's motion because the government has failed to

25 establish that the Forfeiture Properties are tainted or that it has a substantial interest in the

26 properties.  As this Court recognized, the government has so far failed to substantiate its tracing

27 analysis.  *See* Order at 5.  By contrast, the defense's preliminary analysis shows nearly $15

28 million more flowing from KSMP's bank account to LM's "1059 Account" than flowing in the

1   opposite direction from 2020 to 2023.  Reply at 7.  That fact alone refutes any notion that investor

2   monies were somehow funneled into KSMP's or Mr. Mattson's properties.  Because the

3   government has not substantiated its claims regarding these properties, the Court should grant the

4   Motion.  At a minimum, the Court should order the government to substantiate its tracing analysis

5   and order the appearance of witnesses at an evidentiary hearing so that the government's tracing

6   analyses may be presented and tested.

7        Counsel for Mr. Mattson invited a meet and confer with the government the same day as

8   the Court issued its Order.  The government did not respond.  Mr. Mattson seeks only untainted

9   proceeds from the sale of any properties to be used for his defense.  If this Court orders the lis

10  pendens lifted, Mr. Mattson's attorneys will hold these assets in trust and retain any assets that the

11  Court determines the government can establish are traceable to the allegations in the indictment.

12  *See, e.g.*, *United States v. Laykin*, 886 F.2d 1534, 1541 (9th Cir. 1989) (cash withdrawal from

13  comingled account could be allocated proportionally as tainted and untainted); *United States v.*

14  *Genova*, 333 F.3d 750 (7th Cir. 2003) (distinguishing between forfeitable and nonforfeitable

15  contributions for improvements to real property).  This proposal would balance the impending

16  bankruptcy, Mr. Mattson's Sixth Amendment right to counsel of his choice, and the government's

17  interest in any allegedly tainted portion of the Forfeiture Properties.  To the extent further issues

18  related to modification of bond conditions exist after 210 La Salle Avenue is removed as a

19  potential asset for posting, Mr. Mattson agrees that referral to the Magistrate Judge for further

20  proceedings is appropriate.  In the event that the Court allows liquidation of the real properties at

21  issue, and for those funds to be held in trust as described above, there may be additional funds

22  which could be posted for bail purposes as well.

23       Mr. Mattson's Sixth Amendment right "is fundamental and the wrongful deprivation of

24  the right to counsel [is] a structural error" that necessarily harms a defendant.  *United States v.*

25  *Shelton*, 2024 WL 4520944, at *2 (N.D. Cal. Oct. 17, 2024).  The parties have accordingly agreed

26  and stipulated that it is appropriate that this Court decide this issue in the first instance.  *See*

27  *Dexter v. Kirschner*, 984 F.2d 979, 984 (9th Cir. 1992) ("In general, stipulations are not to be

28  lightly set aside.").  The Motion is best heard before this Court.

DEFENDANT'S EMERGENCY EX PARTE MTN.                    5                    CASE NO.: 4:25-CR-00126-JST
RE FORFEITURE

1

2     DATED: July 30, 2025            LAW OFFICES OF RANDY SUE POLLOCK

3

4                    By: */s/ Randy Sue Pollock*

5                       RANDY SUE POLLOCK

6                    Attorney for Defendant
                      KENNETH W. MATTSON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT H

1   RANDY SUE POLLOCK (CA SBN 64493)
    LAW OFFICE OF RANDY SUE POLLOCK
2   286 Santa Clara Avenue,
    Oakland, CA 94610-2624
3   Telephone:    510.763.9967
    Facsimile:    510.380.6551
4   rsp@rspollocklaw.com

5   Attorney for Defendant Kenneth W. Mattson

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,              Case No. 4:25-cr-00126-JST

12             Plaintiff,                  **SUPPLEMENTAL DECLARATION OF
                                           KENNETH W. MATTSON IN
13       v.                                SUPPORT OF DEFENDANT'S
                                           MOTION TO MODIFY PRE-TRIAL
14  KENNETH W. MATTSON,                    ASSET RESTRAINT**

15             Defendant.                  **[FILED UNDER SEAL]**

16

17       I, Kenneth W. Mattson, declare as follows:

18  <u>**Financial Resources Currently Available for My Defense**</u>

19       1.    I do not hold any checking, savings, money market, or brokerage accounts.  I do

20  not hold any certificates of deposit, bonds, stocks, cryptocurrency, or securities.

21       2.    My wife, Stacy Mattson, holds a checking account.  As of today, the balance in

22  that account is $4,681.29.  Ms. Mattson does not hold any other checking, savings, money

23  market, or brokerage accounts.  She does not hold any certificates of deposit, bonds, stocks,

24  cryptocurrency, or securities.

25       3.    Ms. Mattson has access to an ATM card with which she may withdraw funds from

26  an account held in her sister's name.  As of today, the balance in that account is $7,340.

27       4.    As of today, Ms. Mattson and I have approximately $4,000 in cash.

28

5.    Ms. Mattson recently started work at Hume Lake Christian Camps in Fresno County, California, at an annual salary of $72,000.  Because she just started this job, she has not yet received a paycheck.

6.    Ms. Mattson owns a 2024 GMC Yukon XL, which I believe to be worth approximately $70,000.

7.    Ms. Mattson owns a 2025 GMC Sierra 2500HD, which I believe to be worth approximately $80,000.

8.    I need to use a vehicle to meet with counsel and for upkeep on my property at 62 Farragut Avenue, Piedmont, California 94610.  Ms. Mattson needs to use a vehicle to commute to her job in Fresno County, California, several times per month.

9.    Neither Ms. Mattson nor I own any other vehicle.

10.    Ms. Mattson and I are currently paying our living expenses using the aforementioned resources.  Our living expenses are approximately $5,000-$6,000 per month and include food, gasoline, and property, auto, and liability insurance.

11.    I understand that the government in its Opposition to Defendant's Motion to Modify Pre-Trial Asset Restraint referred to sales of classic cars that I initiated between August 2024 and February 2025.  The proceeds from these sales were directed to KS Mattson Partners LP ("KSMP").  At that time, I was the manager of KSMP, and I directed that substantially all of these proceeds be used to service KSMP debt and to pay legal fees of Fennemore Craig, P.C., which represented KSMP in connection with various civil litigation and bankruptcy matters.

12.    In approximately May and June 2024, KSMP sold approximately 12 properties in Sonoma, California.  The proceeds from these sales were used to service KSMP debt and to pay legal fees of Fennemore Craig, P.C.

13.    Currently, I am not able to dispose of or otherwise control assets held by KSMP because KSMP is currently in bankruptcy proceedings.

14.    On November 22, 2024, LeFever Mattson filed an involuntary petition against me as an individual, seeking to initiate a bankruptcy case under Chapter 11 of the Bankruptcy Code. This case is captioned *In re: Kenneth W. Mattson*, Case No. 24-10714 (CB) (Bankr. N.D. Cal.).

15. On July 14, 2025, the bankruptcy court entered an order, following the stipulation of the parties regarding my consent to the entry of such order, that, as of September 2, 2025, I will be deemed to have consented to entry of an order granting relief to the petitioner under Chapter 11 of the Bankruptcy Code. Attached hereto as **Exhibit A** is a true and correct copy of Order Regarding Consent of Kenneth W. Mattson to Entry of Order for Relief, filed in *In re: Kenneth W. Mattson*, Case No. 24-10714 (CB) (Bankr. N.D. Cal.) as docket entry 118 on July 14, 2025. As a result of this order, I understand that as of September 2, 2025, assets under my control will be subject to bankruptcy proceedings.

**<u>Real Property Potentially Available for My Defense</u>**

16. I own or control residential properties at the following addresses:

    a. 62 Farragut Avenue, Piedmont, California 94610; and

    b. 1834-1836 Ocean Front, Del Mar, California 92014.

17. These two properties have an estimated, combined value of approximately $21 million.

18. 62 Farragut Avenue is comprised of two parcels. The parcel with a residence is titled in my name. A vacant parcel of approximately 10,000 square feet is titled in the name of KSMP.

19. Each of the parcels at 62 Farragut Avenue has a separate Assessor's Parcel Number and can be sold separately.

20. 62 Farragut Avenue is furnished with approximately $25,000 worth of furnishings, which would be offered with the house in a sale.

21. 1834-1836 Ocean Front is currently titled in the name of Equitable Ocean Front LLC ("Equitable"). This is the result of a clerical error resulting from the sale of 1716 Ocean Front, Del Mar, California 92014 to Equitable in 2024. Only 1716 Ocean Front, and not 1834-1836 Ocean Front, was sold to Equitable. I understand that the principal of Equitable will record a correction that includes the proper title.

22. I purchased 1834-1836 Ocean Front in 2005. In 2007, I transferred title to KSMP in connection with obtaining financing for the property. Once the loan was paid off, title should

1    have reverted to me under the terms of the loan.  When the loan was paid off, the title did not

2    reflect any change in ownership.

3         23.    Another residential property titled in my wife's name is located at 210 La Salle

4    Avenue, Piedmont, California 94610.

5         24.    The La Salle Avenue property has an estimated value of approximately $4 million.

6         25.    A third party, currently occupying the La Salle Avenue property, holds a deed of

7    trust for $460,000 and is entitled to that amount upon the sale of the property.

8         26.    Neither Ms. Mattson nor I own or control any other real property.

9    **Other Personal Property Potentially Available for My Defense**

10        27.    Ms. Mattson and I own personal property including neon signs and furniture,

11    which is currently stored in locations controlled by LeFever Mattson.  We do not currently have

12    access to these items of personal property.  If these items have been stored properly and remain in

13    good condition, they may be worth up to $150,000.

14        28.    Furnishings in the home my wife and I currently occupy in Sonoma, California,

15    are worth approximately $25,000.

16    **Need for Real Property to Pay for My Defense**

17        29.    I understand that my attorneys have estimated overall costs of defending me in this

18    action through trial of between $3 million and $8 million, depending on a variety of different

19    factors including the total volume of discovery, experts who need to be retained, motions that

20    may become necessary or appropriate, evidentiary hearings that become necessary, negotiations

21    and whether there is a stay in a parallel case brought by the Securities and Exchange Commission,

22    subpoenas to third parties, whether a trial is necessary and the duration of trial.

23        30.    I paid a retainer to my counsel, Randy Sue Pollock, in the amount of $500,000 at

24    the outset of her representation of me.  I understand that approximately $450,000 of this retainer

25    remains.

26        31.    I have been unable to pay consultants and counsel that I have retained.  I have been

27    unable to pay approximately $175,000 in fees invoiced by Morrison & Foerster LLP.

28

1     32.    Neither Ms. Mattson nor I hold any significant assets other than those described in

2    this declaration.

3     33.    The assets currently available to me are insufficient to pay my chosen counsel

4    through trial.

5     34.    I can only afford to hire counsel of my choice if I am able to sell one or more of

6    the properties that I own or control or that my wife owns or controls.  Lis pendens or the

7    government's request to post a property as bail currently impair or prevent me from attempting to

8    sell these properties.

9     35.    I will use any funds obtained from the released properties, after satisfying all debts

10    that may be owed in connection with them, to pay counsel and not for any other purpose.

11     36.    As part of my release conditions, I am required to notify the Court within 24 hours

12    of every transaction exceeding $5,000.  I understand that this means I will need to notify the

13    Court within 24 hours every time that I pay my attorneys.

14

15     I declare under penalty of perjury of the laws of the United States of America that the

16    foregoing is true and correct.

17

18    Dated: July 30, 2025

19                         Kenneth W. Mattson

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1

2

**Entered on Docket**
**July 14, 2025**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

KELLER BENVENUTTI KIM LLP
TOBIAS S. KELLER (Cal. Bar No. 151445)

(tkeller@kbkllp.com)                    **The following constitutes the order of the Court.**
                                        **Signed: July 14, 2025**

DAVID A. TAYLOR (Cal. Bar No. 247433)

3

(dtaylor@kbkllp.com)

4  DARA L. SILVEIRA (Cal. Bar. No. 274923)

(dsilveira@kbkllp.com) 5    THOMAS    B.    RUPP    (Cal.    Bar    No.    278041)

_____

                                        **Charles Novack**

(trupp@kbkllp.com)

6                                       **U.S. Bankruptcy Judge**

425 Market Street, 26th Floor

7                                       San Francisco, California 94105 Telephone:  (415)
                                        496-6723

8                                       Facsimile:  (650) 636-9251

9                                       Attorneys for LeFever Mattson, a California

corporation

10

11

26

27

28

1

2

Chales Nooch

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

15

16

17

18

19

26                    UNITED STATES BANKRUPTCY COURT

27

28

1

2

12

NORTHERN DISTRICT OF CALIFORNIA

13

SANTA ROSA DIVISION

14

In re:                                         Case No. 24-10714 (CN)

                                               Chapter 11

KENNETH W. MATTSON,

ORDER REGARDING CONSENT OF Debtor.        KENNETH W. MATTSON TO ENTRY OF
                                               ORDER FOR RELIEF

20

21

22

23

24

25

Upon consideration of the Stipulation Regarding Consent of Kenneth W. Mattson to Entry of

Order for Relief [Dkt. No. 114] (the "Stipulation")¹; and the Court having found that (i) the Court has

3  jurisdiction to consider the Stipulation and the relief requested therein pursuant to 28 U.S.C. §§ 157

4  and 1334, and the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General

5  Order 24 and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for

6  the Northern District of California; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408

7  and 1409; and (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and after due deliberation

8  the Court having determined that the relief requested in the Stipulation is in the best interests of

9  Mr. Mattson, his estate, and his creditors; and good and sufficient cause having been shown;

10        IT IS HEREBY ORDERED THAT:

26
11        1.

27
12        2.

28
13

14

15        3.

16  Relief

1

2

The Stipulation is approved as set forth herein.

On September 2, 2025, Mr. Mattson will be deemed to have consented to entry of an

order for relief in the form attached hereto as <u>Exhibit A</u>, effective as of that date.  LeFever Mattson is

be authorized to upload the Order for Relief at 9:00 a.m. Pacific Time on September 2, 2025.

The Preservation Order shall remain in full force and effect until entry of the Order for

Following entry of the Order for Relief, LeFever Mattson shall not oppose any request

from Mr. Mattson to convert the resulting chapter 11 case to one under chapter 7.

LeFever Mattson shall not oppose any request by Mr. Mattson to (a) stay the filing of

nondischargeability complaints under section 523 of the Bankruptcy Code or (b) extend the deadline

All discovery in the Involuntary Case is terminated.

This Court shall retain jurisdiction to hear and determine all matters arising from or

related to the implementation, interpretation, or enforcement of this Order.

Capitalized terms not otherwise defined herein shall have the meanings given to

APPROVED AS TO FORM AND CONTENT:

DATED:  July 10, 2025

3 FENNEMORE

26

27

28

KELLER  BENVENUTTI  KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

1

2

4

By: /s/ Micheline Nadeau Fairbank

5      MICHELINE NADEAU FAIRBANK

6      Attorneys for Kenneth W. Mattson

7                              ** END OF ORDER **

8

9

10

11

12

26

27

28

1

2

1

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

26

27

28

1

2
3

14

15

16

17

18

19

20

21

22

23

24

25

<u>EXHIBIT A</u>

3

4

5

6

7

8

9

10

11

26

27

28

1

2
12

26

27

28

1

2

1

26

27

28

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

1

2

3

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B2530 (Form 2530 12/15)

# United States Bankruptcy Court

## Northern District of California

**In re**    Kenneth W. Mattson                                    Case No.   24-10714

_____**Debtor***

Address:   3003 Castle Road, Sonoma, CA 95476                     Chapter   11


Last four digits of Social-Security or Individual Taxpayer- 6074
Identification (ITIN) No(s).,(if any)： n/a
_____
Employer Tax-Identification (EIN) No(s).(if any):    n/a _____


### ORDER FOR RELIEF IN
### AN INVOLUNTARY CASE


On consideration of the petition filed on__ November 22, 2024                        against

                                                      (date)     the    above-named

debtor, an order for relief under chapter 11 of the Bankruptcy Code (title 11 of the United States

Code) is granted.


_____               _____
        Date                                              Bankruptcy Judge


_____
*Set forth all names, including trade names, used by the debtor within the last 8 years.  (Fed. R. Bankr. P. 1005).

1    <u>Court Service List</u>

2    All ECF participants

3

4

5

6

7

8

9

10

11

12

KELLER  BENVENUTTI  KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT I

1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  CHRISTOFFER LEE (CABN 280360)
   NIKHIL BHAGAT (CABN 279892)
5  Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
         FAX: (415) 436-7234
8
   Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11
                         OAKLAND DIVISION
12

13

14  UNITED STATES OF AMERICA,            )   CASE NO. 4:25-CR-00126 JST
                                         )
15          Plaintiff,                   )   UNITED STATES' RESPONSE IN
                                         )   OPPOSITION TO DEFENDANT'S
16      v.                               )   EMERGENCY EX PARTE MOTION FOR A
                                         )   HEARING ON DEFENDANT'S MOTION TO
17  KENNETH W. MATTSON,                  )   MODIFY PRE-TRIAL ASSET RESTRAINT
                                         )
18          Defendant.                   )
                                         )
19                                       )
                                         )
20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

3

4   I.    FACTUAL AND PROCEEDURAL BACKGROUND...............................................2

5        A.    The Bankruptcy Proceedings ...........................................................................2

6        B.    The Criminal Proceedings.................................................................................4

7   II.   DISCUSSION .................................................................................................................4

8        A.    The Defendant Admits He Has *at Least* $450,000 Available to Fund His
              Criminal Defense and Has Failed to Provide Sufficient Evidence of His Need
9              for Additional Funds .........................................................................................5

10       B.    The Renewed Motion and Second Declaration Fail to Explain How Mattson
              Could Sell the Subject Assets Given Their Control by the Bankruptcy Court
11             and Ultimate Ownership by KSMP ....................................................................8

12             1.    The Court Should Decline Mattson's Invitation to Carve Out the
                    Subject Properties from the Bankruptcy's Existing Preservation Order
13                   and Further Administration.......................................................................8

14             2.    The Renewed Motion Does Not Address How Mattson Can Sell
                    Properties That Do Not Belong to Him ..................................................11

15                   (i)    1834-1836 Ocean Front .................................................11

16
                    (ii)   62 Farragut .....................................................................12
17
                    (iii)  210 La Salle ....................................................................13
18
         C.    Mattson's Renewed Declaration Remains Fatally Conclusory, Lacks
19             Evidentiary Support Necessary for a *Unimex* Hearing, and Contains
              Additional Inaccuracies ...................................................................................14
20
    III.  CONCLUSION.............................................................................................................15
21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

3

**Cases**

4

*In re Bundy*, 852 F.3d 945 (9th Cir. 2007)...................................................................................... 7

5

*In re Kearney*, 609 B.R. 383 (Bankr. D.N.M. 2019) ...................................................................... 9

6

*In re KS Mattson Partners,* No. 24-10715 (Bankr. N.D. Cal. Nov. 22, 2024)…………………………..12

*In re Mattson*, No. 24-10714 (Bankr. N.D. Cal. Nov. 22, 2024)…………………………………...*passim*

7

*Gusman v. Comcast Corp.*, 298 F.R.D. 592 (S.D. Cal. 2014) ........................................................ 5

8

*United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013) .............................................................. 11

9

*United States v. Cobb*, No. 2:14-CR-00194, 2015 WL 518548 (D. Nev. Feb. 9, 2015) ........................ 15

10

*United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001) ................................................................ 12

11

*United States v. Feathers*, No. 14-CR-00531, 2016 WL 7337518 (N.D. Cal. Dec. 19, 2016).......... 11, 12

12

*United States v. Heine*, No.  3:15-cr-238-SI , 2017 WL 3184717 (D. Or. Jul. 26, 2017) ........................ 6

*United States v. Hernandez-Gonzalez*, No. 16-20669-CR, 2017 WL 2954676 (S.D. Fla. Jun. 26, 2017)

13

.................................................................................................................................................... 15

14

*United States v. Kielar*, 791 F.3d 733 (7th Cir. 2015) .................................................................. 14

15

*United States v. Kirschenbaum*,156 F.3d 784 (7th Cir. 1998) ...................................................... 12

16

*United States v. Jones*,160 F.3d 641 (10th Cir. 1998) .................................................................. 15

17

*United States v. Lindell*, Crim. No. 13-00512 DKW, 2016 WL 4707976 (D. Haw. Sept. 8, 2016)......... 10

18

*United States v. Omidi*, No. CR 17-661-A-DMG, 2021 WL 7629897 (C.D. Cal. Jun. 15, 2021) ..... 5, 6, 7

*United States v. Spiegel*, 995 F.2d 138 (9th Cir. 1993) ................................................................ 10

19

*United States v. Unimex, Inc.*, 991 F.2d 546 (9th Cir. 1993)................................................ 5, 7, 14

20

*United States v. Warren*, No. 3:24-CR-113-TAV-JEM, 2025 WL 1570720 (E.D. Tenn. Jun. 3, 2025).. 15

21

*Turner v. Rogers*, 564 U.S. 431 (2011)......................................................................................... 7

22

*Wheat v. United States*, 486 U.S. 153 (1988) ............................................................................... 7

23

**Statutes**

24

25

Cal. Bus. & Prof. Code § 6148 (West) ......................................................................................... 6

26

**Rules**

27

Fed. R. Evid. 201 ....................................................................................................................... 9

28

U.S. OPP. TO DEF. MOT.
4:25-CR-00126-JST

1       The day after the Court denied his first motion to modify pre-trial asset restraints, defendant

2  Kenneth W. Mattson filed a second, this time on an "emergency" basis.  Renewed Motion, ECF No. 70

3  (the "Motion").  The Court correctly denied Mattson's first motion in a written order, ECF No. 68 (the

4  "Order"), finding that the motion and the defendant's first declaration failed to establish that he lacks

5  sufficient unrestrained assets to retain his counsel of choice.  These deficiencies were factual (a

6  threadbare declaration with no supporting evidence) and causal:  if the restrained assets were owned or

7  controlled by third parties, any restraints on them could not give rise to a Sixth Amendment violation

8  because, even absent any restraints, Mattson could not sell them to pay for his defense.

9       Far from remedying these deficiencies, Mattson's renewed motion and new declaration double

10  down on this approach, providing the Court with multiple dispositive grounds to again deny the motion.

11      First, even taking the defendant's second declaration at face value, he swears that he has

12  available—at this moment—at least $450,000 in unrestrained assets to pay his choice of counsel in the

13  form of an unused, fully-funded attorney retainer.  Notwithstanding speculative and unrealistic estimates

14  that his trial defense may ultimately cost him between three and eight million dollars, no legal authority

15  holds, let alone suggests, that nearly half a million dollars presently available to defend a federal

16  criminal case is constitutionally deficient, requiring the extraordinary relief requested by the defense.

17  The defendant also concedes that he and his wife own, outright, brand new vehicles with a value of at

18  least $150,000, and "neon signs" and furniture totaling $175,000, all of which are also unrestrained

19  assets that could be used for his defense.  The availability of at least $750,000 in unrestrained assets that

20  could be used to pay attorney's fees are a sufficient, independent basis to the deny the defendant's

21  renewed motion.[1]

22      Second, the renewed motion does not address the logical or causal flaw in the defendant's

23  proposal:  the *lis pendens* on 62 Farragut and 1834–1836 Ocean Front—if they are, in fact, pretrial

24  restraints—do not give rise to a Sixth Amendment violation because, even absent the *lis pendens*,

25  Mattson cannot sell these properties to pay for his criminal defense.  This is because (1) Mattson is

26  subject, right now, to a bankruptcy court order that precludes such a sale, relief from which is unlikely,

27

28      [1] And as described more fully below, since the filing of the second motion, the government has
learned that the defendant may possess additional assets that he has failed to disclose.

U.S. OPP. TO DEF. MOT.                                       1
4:25-CR-00126-JST

1    and (2) the properties do not belong to him, so they are not his to sell.

2    Third, the renewed motion gives short shrift to WITNESS-1 and KSMP's significant ownership

3    interests in 210 La Salle and ignores the Court's instruction to address "how a defendant's Sixth

4    Amendment rights intersect with a court's obligation to determine suitable conditions" of pretrial

5    release.  Order at 6.

6    Mattson's motion is styled as an "emergency," but there is no exigency here.  Prior to the

7    completion of his briefing on his first motion, Mattson voluntarily agreed to enter personal bankruptcy

8    as of September 2, 2025.  Moreover, for the purposes of this motion, that date is without meaning,

9    because the defendant—today—cannot sell any property without the bankruptcy court's blessing.  That

10    will not change on September 2, 2025.

11    For the reasons set forth below, the Court should again deny the motion.

12    **I.    FACTUAL AND PROCEUDRAL BACKGROUND**

13    **A.    The Bankruptcy Proceedings**

14    On November 22, 2024—nearly nine months ago, and well before the commencement of this

15    criminal action—Defendant Kenneth Mattson's creditors brought a proceeding in bankruptcy court

16    seeking to have him placed into Chapter 11 bankruptcy.  *See In re Mattson*, No. 24-10714 (Bankr. N.D.

17    Cal. Nov. 22, 2024) ("Bankruptcy Case").  On April 11, 2025, a bankruptcy judge entered an interim

18    order prohibiting Mattson "from selling, transferring, or encumbering any personal property in excess of

19    [$]15,000.00."  Endorsed Order, Bankruptcy Case ECF No. 70.  That interim order continued in effect,

20    *see* Bankruptcy Case ECF Nos. 81, 84, 87, until May 15, 2025, when the bankruptcy court entered a

21    Preservation Order declaring that "Sections 363 and 364 of Title 11 of the Bankruptcy Code shall apply

22    in this case to the same extent as if an order for relief had been entered" and explicitly retained

23    jurisdiction to "hear and determine all matters arising from or related to the implementation,

24    interpretation, or enforcement" of the order.  Bankruptcy Case ECF No. 91, attached hereto as AUSA

25    Lee Decl., Ex. M.[2] On July 10, 2025, the day after the United States filed its response to Mattson's first

26

27    _____

28    [2] In light of the government's previous opposition briefing and use of Exhibits A-L in support
thereof, ECF 51, and the substantial overlap in argument and evidence, the government has labeled the
newly-filed exhibits cited in the instant opposition beginning with Exhibit M.

U.S. OPP. TO DEF. MOT.                                    2
4:25-CR-00126-JST

1    motion regarding purported pretrial restraints in the criminal litigation, Mattson agreed that "[o]n

2    September 2, 2025, [he] shall be deemed to have consented to entry of an order" placing him in personal

3    bankruptcy.  Stipulation Regarding Consent of Kenneth W. Mattson to Entry of Order for Relief,

4    Bankruptcy Case ECF No. 114, attached hereto as Lee Decl. Ex. N.  In doing so, Mattson explicitly

5    acknowledged his understanding and consent to the bankruptcy court's existing preservation order—that

6    is, the one currently in force, and the same one that was in force at the time of the defendant's arrest and

7    his appearance before the magistrate judge—which "requires that any property sale or financing

8    transaction sought by Mr. Mattson must be approved under sections 363 or 364 of title 11 of the United

9    States Code."  *Id.* at 2.

10         The next day, the bankruptcy court held a status conference, where the parties represented that

11    following the court's approval of the stipulation, "[i]n the interim until September 2nd all discover[y],

12    including Mr. Mattson's deposition, will be terminated, and the *[sic]* preservation order will remain in

13    full effect."  Hearing Transcript, July 11, 2025, Bankruptcy Case ECF No. 120, attached hereto as Lee

14    Decl. Ex. O, at 7:22–7:25.  Thereafter, the bankruptcy judge asked a question:

15         THE COURT:  Right.  Now, you've informed me that there's a motion
         before Judge Tigar, again, in the criminal matter pending in the district
16         court.  Apparently, the United States has imposed or has recorded *lis
         pendens* against certain of Mr. Mattson's properties and that his criminal
17         counsel has filed a motion that Judge Tigar was going to hear next Friday
         to vacate the lis pendens to allow Mr. Mattson to sell property to generate
18         funds to pay for his criminal defense.

19         Has anyone informed Judge Tigar regarding the 303(f) order?

20         MS. SILVEIRA [Counsel for debtor LeFever Mattson]:  Yes, Your Honor.
         The government filed its opposition to the asset restraint motion on
21         Wednesday evening, and it attaches a copy of the preservation order.

22                                    * * *

23         THE COURT:  Okay.  Okay.  And any inkling that they're going to come
         before me to the extent necessary to seek relief from the 303(f) order, or
24         we just don't know?

25         MS. SILVEIRA:  I would defer to Mr. Bostick on that.

26         MR. BOSTICK [Counsel for Mattson]:  Your Honor, if there is a
         transaction to be had, they will be coming before this Court to –
27

28         THE COURT:  Okay.

1    MR. BOSTICK:  – get the Court's permission.

2    THE COURT:  Okay. Okay.  We'll just leave that where it is then.

3  *Id.* at 8:1–8:13; 8:22–9:6.

4    **B.    The Criminal Proceedings**

5    On June 25, 2025, Mattson filed a "Motion to Modify Pre-Trial Asset Restraint."  ECF No. 44.

6  On July 9, 2025, the government responded.  ECF No. 51.  The defendant filed a reply on July 18, 2025.

7  ECF No. 55.  On July 29, 2025, the Court issued an order denying the motion and vacating the hearing.

8  ECF No. 68.  The next day, July 30, 2025, the Defendant filed an "Emergency Ex Parte Motion for a

9  Hearing on Defendant's Motion to Modify Pre-Trial Asset Restraint," representing to the Court that he

10  needed emergency relief because of an impending bankruptcy proceeding "and because the parties have

11  already briefed the merits of the matter."  ECF No. 70 at 2.

12  **II.    DISCUSSION**

13    As an initial matter, both Mattson's initial declaration and his second declaration are, at best,

14  unreliable.  The defendant has responded to the Court's order with a lengthier declaration,

15  acknowledging, as he must, many of the things he previously kept from the Court, the magistrate judge,

16  and the pretrial services officer: his wife's secret bank account, maintained by her sister, his substantial

17  living expenses, an undisclosed agreement with the occupant of 210 LaSalle, and the fact that he has *at*

18  *least* $450,000 remaining for his defense.  But despite its length, this declaration, too, fails to meet the

19  mark.

20    First, Mattson's admission that he has at least $450,000, and up to an additional $325,000 in

21  potential funds, to pay for his legal defense are fatal to his argument that he has no assets to pay for his

22  criminal defense without selling the Subject Assets.

23    Second, Mattson has failed to show that even absent any *lis pendens*, he has the ability to sell any

24  of the assets at issue.  As the Court described in its order denying the motion, these are far more than

25  "logistical challenges with disposing of real property."  Order at 5. The fact that Mattson *has no ability*

26  *to sell the Subject Assets even absent the government's liens* is fatal to his motion for a hearing.  This is

27  because Mattson is currently prohibited from alienating the Subject Assets by court order.  Moreover,

28  there is substantial evidence that the Subject Assets are not actually owned by Mattson—a problem the

1    Court recognized in its initial order denying relief and which the defendant's second motion fails to

2    address.

3        Additionally, Mattson again provides no evidence to support his self-serving assertions, and

4    much of the second declaration is provably false, which casts substantial doubt on the declaration as a

5    whole.  Mattson's second declaration does not begin to approach this Court's requirement of "definite,

6    specific, detailed and nonconjectural evidence regarding the anticipated cost of his defense."  Order at 3

7    (quoting *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) (internal quotations omitted)).

8    Nothing in Mattson's renewed motion or second declaration alters the conclusion that the defendant has

9    failed to meet his burden, and if anything, both reinforce the Court's earlier conclusion that Mattson

10   failed to establish he lacks sufficient unrestrained assets to retain his counsel of choice.

11       **A.**    **The Defendant Admits He Has *at Least* $450,000 Available to Fund His Criminal**

12           **Defense and Has Failed to Provide Sufficient Evidence of His Need for Additional Funds**

13       In support of his renewed motion, the defendant avers that he has already paid Ms. Pollock

14   $500,000 and that $450,000 of that amount—90 percent—remains.  ECF No. 70-1, ("Second Mattson

15   Decl."), ¶ 30.  In other words, he admits that he does not need money to hire his counsel of choice

16   because he has already paid her, and almost all of that money remains available for use in this case.

17   *Accord United States v. Omidi*, No. CR 17-661-A-DMG, 2021 WL 7629897, at *5 (C.D. Cal. Jun. 15,

18   2021) (denying defendant's request for additional funds as premature in part because he already had

19   some money available to fund his defense).  Mattson has failed to explain why the $450,000 presumably

20   sitting in a trust account is insufficient to provide a constitutionally adequate defense.  For example,

21   Mattson has not provided the retainer agreement, which would outline the scope of those services, and

22   provide insight into whether, for example, he has a flat fee arrangement, whether the retainer was

23   deemed earned upon receipt, or whether he is able to access any funds.  *See, e.g.,* Cal. R. Pro'f.

24   Conduct 1.5 (describing various kinds of fee arrangements).  The agreement might also provide insight

25   into whether the retainer he has paid could be used to pay other law firms.  None of that information is

26   protected from disclosure, but Mattson has again declined to provide it.  *See Gusman v. Comcast Corp.*,

27   298 F.R.D. 592, 599 (S.D. Cal. 2014) ("The Ninth Circuit has repeatedly held retainer agreements are

28   not protected by the attorney-client privilege or work product doctrine" (internal quotations omitted)).

*Cf.* Order at 4–5 (declining Mattson's offer to review information *in camera* to protect privilege).  And even if the $450,000 remaining were subject to an hourly fee arrangement, it is hard to see how Mattson can know with any reasonable certainty that such a formidable war chest will be insufficient to fund a criminal defense.

Mattson's suggestion that he "understand[s] that my attorneys have estimated overall costs of defending me in this action through trial of between $3 million and $8 million," Second Mattson Decl. ¶ 29, illustrates the reliability problems posed by double hearsay.  The figure is also pure speculation, and that is not enough.  *See United States v. Heine*, No.  3:15-cr-238-SI, 2017 WL 3184717, at *4 (D. Or. Jul. 26, 2017) (rejecting argument of interference with counsel of choice in part because "any argument that Yates's right to counsel of choice may be denied in the future is at most speculative").  In *Omidi*, the Court rejected a request for release of funds where, as here, the defendant stated that his currently available funds "are likely not sufficient to fund [his] defense through trial in this complex case" and the defendant's lawyer "submitted a generalized declaration attesting that their legal fees in another criminal matter exceeded $20 million and they believe costs are likely to be similar in Mr. Omidi's case."  2021 WL 7629897 at *5 (internal quotation marks omitted).  This Court should do the same.

Mattson also suggests, in overly vague terms, that he has been "unable to pay approximately $175,000 in fees invoiced by Morrison & Foerster LLP."  Second Mattson Decl., ¶ 31.  But he fails to distinguish what part of those fees were incurred for the civil representation of KSMP in proceedings before the Securities and Exchange Commission (such as hiring a forensic accountant) from what part of those fees were for Mr. Mattson's personal criminal defense, a matter in which Morrison & Foerster has never entered a general appearance.  *See* ECF Nos. 19, 21, 28, 41 (Mr. Frentzen "specially appearing").  As is the case with his criminal defense attorney, Mattson has declined to attach his fee agreement with Morrison & Foerster or any invoices, making it impossible for the Court to determine the fee arrangement, the nature of services provided (*e.g.,* whether the invoices described are limited to fees and costs incurred in only the instant criminal proceeding or whether that total includes other fees and costs incurred in related civil proceedings), and the identity of the client (KSMP or Mr. Mattson personally in the criminal proceeding).  *See* CAL. BUS. & PROF. CODE § 6148 (requiring written fee agreements for

1    engagements in excess of $1,000 and describing requirements).  The declaration is also silent as to the

2    amount of fees already paid to Morrison & Foerster.  *Cf. Omidi*, 2021 WL 7629897, at *5 (rejecting

3    request for hearing in part because defendant failed to provide "accounting of, or clear statement

4    regarding" what funds had already been spent).  In a case where the Court must decide whether Mattson

5    has a actual *need* to sell the properties to pay his criminal defense lawyers (at the expense of potential

6    compensation to victims after any conviction), these details matter.  *Unimex*, 991 F.2d at 551 ("moving

7    papers filed, including affidavits" must be "sufficiently definite, specific, detailed, and nonconjectural,

8    to enable the court to conclude that a substantial claim is presented.")  And Mattson cannot ask this

9    Court to hold a hearing to release funds to pay his civil or bankruptcy legal fees; the Sixth Amendment

10    right to counsel of choice is only implicated in a criminal case.  *See Turner v. Rogers*, 564 U.S. 431, 441

11    (2011) ("[T]he Sixth Amendment does not govern civil cases."); *Cf.* Second Mattson Decl. ¶ 35

12    (promising to use funds to pay "counsel," but not limiting that promise to *criminal defense* counsel).

13          Nor has Mattson provided any authority to suggest that he is entitled to force the government to

14    lift *lis pendens* where he already has retained and paid a seasoned and experienced criminal defense

15    lawyer who has $450,000 remaining on her retainer, but simply desires supplemental services from

16    someone else.  The one case he cites on this point—*In re Bundy*, 852 F.3d 945 (9th Cir. 2007)—a case

17    which upheld the denial of *pro hac vice* admission to a particular out-of-district attorney—does not

18    support his position.  Mattson's motion mistakenly quotes from the dissent, not the opinion of the Court.

19    *See* Mot. at 5 (quoting *Bundy*, 852 F.3d at 953 (Gould, J., dissenting)).  In fact, in *denying* the

20    defendant's attempt to force the district court to allow the defendant to employ a second attorney, the

21    Ninth Circuit noted that the defendant's local lawyer, like his retained counsel here, had "been a member

22    of the [] Bar for more than twenty years," was previously a public defender, and had "extensive

23    experience in federal criminal cases." *Id.* at 951.  Indeed, "while the right to select and be represented

24    by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the

25    Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a

26    defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486

27    U.S. 153, 159 (1988).  Mattson has cited no binding authority to suggest that a *Monsanto* hearing is

28

1    triggered every time a defendant wants an additional lawyer, even where he has already retained and

2    paid the one he wants.

### B.   The Renewed Motion and Second Declaration Fail to Explain How Mattson Could Sell the Subject Assets Given Their Control by the Bankruptcy Court and Ultimate Ownership by KSMP

5          The Court's order denying the first motion observed that "if these assets are, indeed, held by

6    KSMP, any restraints on them could not give rise to a Sixth Amendment violation because, even absent

7    any restraints, Mattson could not sell them to pay for his defense."  Order at 5:16-18.  The defendant

8    now invokes his impending personal bankruptcy as a changed circumstance justifying the filing of the

9    new motion.  But Mattson does not explain how he could sell the properties to pay for his defense given

10   he is *currently* subject to a bankruptcy court preservation order and that, in any case, the properties

11   appear to be owned by KSMP.  These and similar problems, discussed below, plague the proposed sale

12   of 1834-1836 Ocean Front, 62 Farragut, and 210 La Salle.  Again, these are not "logistical" issues to be

13   worked through later.  These are fatal causation problems that further demonstrate the government's *lis*

14   *pendens* do not give rise to a Sixth Amendment violation.[3]

### 1.   The Court Should Decline Mattson's Invitation to Carve Out the Subject Properties from the Bankruptcy's Existing Preservation Order and Further Administration

17         First, on the purported exigency of the bankruptcy.  The defendant filed the instant motion on an

18   emergency basis "on the grounds that he will likely be subject to involuntary bankruptcy proceedings on

19   September 2, 2025.  After that date, all properties he owns or controls will be administered by the

20   bankruptcy estate and none may be available to him to exercise his rights to defend his criminal case."

21   Mot. at 2.  But Mattson's impending bankruptcy is not new information or a surprise.  He agreed to it on

22   July 10, 2025—a week before filing a reply brief with respect to his first motion—but his initial motion

23   papers make no mention of that urgency.  But perhaps more importantly, the September 2, 2025 date is

24   irrelevant for the purposes of this motion because the bankruptcy court has already precluded Mattson

25   from posting or disposing of any property.  An initial version of that order took effect on April 11,

26   2025—four months ago.  Bankruptcy Case ECF No. 70 (interim order).

27

28   ───────────────
     [3] As noted in the government's original opposition, the filing of *lis pendens* do not give rise to an
     asset restraint.  ECF No. 51 at 14-15 (citing authorities).

1    On May 15, 2025, the Bankruptcy Court entered a Preservation Order—an order that, while not

2 officially placing Mattson into bankruptcy, nonetheless restricted his ability to sell property and obtain

3 credit. *See* Lee Decl. Ex. M.  In his stipulation agreeing not to oppose personal bankruptcy starting

4 September 2, 2025, Mattson expressly acknowledged that "[t]he Preservation Order requires that any

5 property sale or financing transaction sought by Mr. Mattson must be approved under sections 363 or

6 364 of title 11 of the United States Code."  Stip. Regarding Consent of Kenneth W. Mattson to Entry of

7 Ord. for Relief, Bankruptcy Court ECF No. 114 (Jul. 10, 2025), Lee Decl. Ex. N.  And in a hearing on

8 the matter, Mattson's lawyer expressly acknowledged that fact and that Mattson could not sell any

9 property without the bankruptcy judge's approval.  *See* Lee Decl., Ex. O at 8:9–9:4 (THE COURT: Has

10 anyone informed Judge Tigar regarding the 303(f) order? . . . . Okay.  Okay.  And any inkling that

11 they're going to come before me to the extent necessary to seek relief from the 303(f) order, or we just

12 don't know? . . . . MR. BOSTICK: Your Honor, if there is a transaction to be had, they will be coming

13 before this Court to . . . get the Court's permission.)  The Court can and should take judicial notice that

14 the bankruptcy court's docket reflects that Mattson has never asked for relief from the Preservation

15 Order, even after the filing of the asset restraint motions, *see* Fed. R. Evid. 201, and both of Mattson's

16 declarations are conspicuously silent on the issue.

17    Nor is the bankruptcy court's approval of sales of the Subject Assets likely—bankruptcy courts

18 must weigh a different set of factors in determining what is best for the estate, and a debtor's criminal

19 lawyer is not high on the list.  *See In re Kearney*, 609 B.R. 383 (Bankr. D.N.M. 2019) (rejecting debtor's

20 request to use funds to pay criminal defense counsel, noting that "[a]lmost all courts that have addressed

21 the issue have held that criminal defense counsel does not benefit the estate" and holding that "Debtor's

22 Sixth Amendment rights do not [t]rump the 'Benefit to the Estate' Requirement").  As this Court's July

23 29 order acknowledged, it is Mattson's burden to demonstrate that he can sell the properties even absent

24 what he alleges are the government's pretrial restraints.  *See* Order at 5.  That means he must seek and

25 obtain relief from the bankruptcy court's Preservation Order *before* seeking relief from this Court, not

26 the other way around.  The district court in *Lindell* noted exactly that in rejecting relief there:

27         Moreover, notwithstanding the statements in Lindell's eleventh-hour Declarations, there is no
         indication of the amount of funds that would, in fact, be available, assuming they were untainted,
28         nor is there an indication of whether that amount would be sufficient to hire "counsel of choice."

1

2

  For example, counsel for the bankruptcy trustee is clear that, had Lindell attempted to remove
  funds from Wells Fargo –7984 for the purpose of hiring private counsel, the trustee would have
  sought to garnish those funds in partial satisfaction of Lindell's $5,000,000 judgment.

3

4

*United States v. Lindell*, Crim. No. 13-00512 DKW, 2016 WL 4707976, at *10 (D. Haw. Sept. 8, 2016),

*aff'd*, 766 F. App'x 525 (9th Cir. 2019) (internal citations omitted).  As in *Lindell*, here, it is common

5

sense that KSMP and the Creditors Committee will ask the bankruptcy court to prevent funds that would

6

otherwise be available to partially compensate Mattson's victim-creditors from being diverted to his

7

defense lawyers.  Nor has the defendant *ever* sought relief from the bankruptcy court to post 210

8

LaSalle, as the magistrate judge ordered on May 28, 2025, or to sell 62 Farragut or 1834-1836 Ocean

9

10

Front, all properties that he claims he needs to sell to vindicate his Constitutional rights.  Mattson has

known since April that he could not sell any property absent special permission from the bankruptcy

11

court, and he has known since May that he was facing a federal criminal prosecution.  He cannot now

12

credibly suggest, after the court has once denied his motion, that his situation is suddenly emergent.

13

  Nor is it the case that a favorable order on the defendant's motion on pre-trial restraints from this

14

Court would somehow automatically vitiate the bankruptcy court's Preservation Order.  The parties

15

agree that the bankruptcy order relates to a "core proceeding" under the Bankruptcy Code, *see*

16

Preservation Order, Lee Decl. Ex. M, which means that it is squarely within the bankruptcy judge's

17

purview.  *See id.* (retaining jurisdiction to hear and determine all matters related to order); General Order

18

No. 24 at § 1.01 (N.D. Cal. amended Oct. 19, 2023) (referring all bankruptcy proceedings to bankruptcy

19

judges of the district).  And this Court's ruling on Mattson's instant motion cannot displace the role of

20

the bankruptcy court in bankruptcy matters.  The Ninth Circuit recognized as much in *United States v.*

21

*Spiegel*, 995 F.2d 138 (9th Cir. 1993), another case where a criminal defendant asked the district court

22

presiding over his criminal case to modify a civil administrative restraining order so he could pay his

23

criminal defense lawyers:

24

  Spiegel is in no different a position than any other criminal defendant whose assets are tied down
  by a lien, a prejudgment attachment, or a bankruptcy court order.  In all such cases, the freezing

25

  of defendant's assets may interfere with his ability to pay a lawyer; but this does not empower

26

  the district court to interfere with the bankruptcy proceeding, or to lift the lien or attachment
  imposed by another court, state or federal.

27

28

995 F.2d at 141.  "If district courts had such power, criminal proceedings would become a forum, under

the guise of the Sixth Amendment, to relitigate any civil judgment against the defendant that disposed of the defendant's assets." *United States v. Feathers*, No. 14-CR-00531, 2016 WL 7337518, at *9 (N.D. Cal. Dec. 19, 2016) (Koh, J.).

At a minimum, Mattson should seek and obtain relief from the bankruptcy court first—*i.e.* get permission to actually sell the properties—before bringing a renewed motion to this Court.  The defendant's right to counsel "is not implicated unless the restraint *actually affects* the defendant's right to choose counsel and present a defense." *United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013) (emphasis added).  Because any sale is currently prohibited by the bankruptcy court's preservation order, and Mattson has presented no evidence that the bankruptcy court would permit proceeds of sales to fund his defense, Mattson cannot show that the government's *lis pendens* "actually affect[]" his right to counsel of choice, and the Court should deny the motion for a hearing.

### 2. The Renewed Motion Does Not Address How Mattson Can Sell Properties That Do Not Belong to Him

The Court's order identified one of the other logical flaws in defendant's first motion—the fact that to the extent assets are held by KSMP, any restraints on them could not give rise to a Sixth Amendment violation because, even absent any restraints, Mattson could not sell them to pay for his defense.  Order at 5:16-18.  As noted below, the renewed motion does not remedy this problem.

#### (i) 1834-1836 Ocean Front

In support of the renewed motion, Mattson claims for the first time that he purchased 1834–1836 Ocean Front in 2005 and that he transferred title to KSMP "in connection with obtaining financing for the property.  Once the loan was paid off, title should have reverted to me under the terms of the loan.  When the loan was paid off, the title did not reflect any change of ownership."  Second Mattson Decl. ¶ 22.  But this self-serving, post-hoc justification makes no sense.  Nor does it offer an evidentiary basis to conclude that Mattson has the ability to sell or encumber 1834-36 Ocean Front.

The title report, *see* Ex. C to Lee Decl. ECF No. 51-4 at 3, reflects that KSMP held title to the property from 2007 through July 2024, when KSMP transferred it by grant deed to "Equitable Ocean Front LLC."  And KSMP held a deed of trust on the property in connection with seller financing.  Lee Decl. Ex. D, ECF No. 51-5.  Finally, on April 22, 2025, Equitable Ocean Front filed a corrected deed of

1  trust that simply "corrects the erroneous legal description accidentally attached as Exhibit A" to the July

2  22, 2024 deed of trust.  Lee Decl. Ex. E, ECF No. 51-6.  Whether or not the Ocean Front property

3  belongs to Equitable Ocean Front or to KSMP, there is no scenario in which Mattson owns it, and no

4  scenario in which he can sell it.  KSMP concurs.  In its latest monthly operating report, filed with the

5  bankruptcy court on July 22, 2025, KSMP lists both 62 Farragut and 1834 –1836 Ocean Front as its

6  capital assets.  Chapter 11 Monthly Operating Report at 20, ECF No. 230, *In re KS Mattson Partners*

7  *LP*, No. 24-10715 (Bankr. N.D. Cal. Jul. 22, 2025), attached hereto as Lee Decl. Ex. P.

8       And even if Mattson could sell or encumber 1834–1836 Ocean Front, contrary to the record

9  evidence in the case, such actions would still need to be approved by the bankruptcy court, which as

10  noted above, is unlikely.  "Defendant only has a potential Sixth Amendment right to the assets if

11  Defendant owns the assets at issue or has a right of indemnification."  *Feathers*, 2016 WL 7337518, at

12  *8.  Mattson cannot "show a bona fide need to utilize seized assets . . . to conduct his defense" where he

13  has no ability to sell the property for which he seeks to lift restraints.  *United States v. Farmer*, 274 F.3d

14  800, 804 (4th Cir. 2001) (quoting *United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998)).

15                    **(ii)    62 Farragut**

16       Notwithstanding Mattson's assertion that one of two parcels at 62 Farragut is titled in Mattson's

17  name, not that of KSMP, his position that he can now sell the property appears to contradict other

18  positions taken by Mattson personally and KSMP historically.  Mattson concedes that at least one parcel

19  associated to 62 Farragut is titled in the name of KSMP, an omission from his first declaration.  KSMP's

20  latest monthly operating report, filed July 22, 2025, lists 62 Farragut as a KSMP capital asset.  *See* Lee

21  Decl, Ex. P at 20.  In a June 2023 financial statement provided to a lender to secure financing, Mattson

22  represented that 62 Farragut and 1834-1836 Ocean Front were assets of KSMP, not Mattson personally.

23  *See* Lee Decl, Ex. Q ("KS Mattson Partners, LP Schedule of Real Estate Owned as of 06/30/2023").

24  Mattson in 2019 generated a similar schedule of KSMP real estate, listing both properties as KSMP

25  assets.  *See* Lee Decl., Ex. R (KS Mattson Partners, LP Schedule of Real Estate Owned as of

26  12/31/2019).  The record suggests that Mattson has historically represented 62 Farragut as a KSMP asset

27  and not a personal Mattson asset, notwithstanding how one of the parcels is titled.  That suggests

28

1    Mattson could not alienate 62 Farragut to pay his lawyers given KSMP's control by a court-appointed

2    Responsible Individual, and in any event could not do so without the bankruptcy court's permission.

3                                    **(iii)    210 La Salle**

4            With respect to 210 La Salle, the Court's Order directed that modifications to the conditions of

5    pretrial release should be brought to the magistrate judge in the first instance, and also that if Mattson

6    files a renewed Sixth Amendment challenge regarding 210 La Salle, he should present argument on how

7    a defendant's Sixth Amendment rights intersect with a court's obligation to determine suitable

8    conditions to allow a defendant to be released pending trial.  Order at 6.  Mattson has not even attempted

9    to follow the Court's instruction.  Moreover, the factual arguments advanced by the motion and the

10   renewed declaration implicate the same problem with KSMP and WITNESS-1's ownership interests.

11           Mattson's renewed motion now, for the very first time, acknowledges the existence of

12   WITNESS-1, and claims that he "holds a deed of trust for $460,000 and is entitled to that amount upon

13   the sale of the property."  Second Mattson Decl. ¶ 25.  And his lawyers rely on that to suggest that

14   "[WITNESS-1] is entitled to that amount upon the sale of the property but cannot block a sale."  Mot. at

15   3.  This, too, is another unsupported Mattson assertion that is flatly contradicted by the evidence.

16           The co-ownership agreement, which KSMP (acting through Mattson) entered into with

17   WITNESS-1 on November 17, 2003, makes it clear that "for valuable consideration, [WITNESS-1] has

18   purchased a one third interest in [210 LaSalle]."  ECF No. 51, Lee Decl. Ex. H ¶ 1.02 (filed under seal).

19   The agreement further provides that KSMP "has the remaining two thirds interest in [210 La Salle]."  *Id.*

20   ¶ 1.02.  And it goes on to discuss WITNESS-1's Deed of Trust:

21           The [WITNESS-1] interest shall be secured by a recorded Deed of Trust against [210 LaSalle]
             for the principal sum of $460,000.00.  A copy of the Deed of Trust is attached.  The
22           parties agree the principal sum reasonably reflects the value of [WITNESS-1]'s initial
             investment in [210 LaSalle] and it will **in no manner limit the value of the [WITNESS-1]**
23           **Interest which shall remain at one third until such time the parties agree in writing**
             **otherwise.**
24

25   *Id.* ¶ 1.03 (emphasis added).  WITNESS-1 is entitled to a one-third share of the proceeds from 210

26   LaSalle, not just $460,000, and given that, according to the written agreement, KSMP "has the

27   remaining two thirds interest," KSMP appears to be the true owner, notwithstanding Mattson's self-

28   dealing transfer of title to Stacy Mattson.  Mattson's unsupported sworn statement to the contrary is

U.S. OPP. TO DEF. MOT.                              13
4:25-CR-00126-JST

incorrect.  And the defendant's unsupported claim that WITNESS-1 "cannot block a sale" is also wrong.
WITNESS-1 has an "exclusive right to occupy [210 LaSalle] until such time as [KSMP] and
[WITNESS-1] agree to a different occupation of [210 LaSalle]."  *Id.* ¶ 1.06.  The agreement
contemplates that they may only transfer interests "[u]pon mutual agreement."  *Id.* ¶ 1.08.

Mattson's renewed motion has not shown that he has an unqualified right to sell 210 LaSalle,
despite the fact that it is titled in Stacy Mattson's name.[4]  Mattson's Second Declaration fails to
meaningfully engage with the record evidence of WITNESS-1 and KSMP's ownership interests.
Critically, Mattson also completely ignored the Court's order to provide a legal framework for analyzing
how pretrial conditions of release—such as the posting of property to secure bond—implicate a
defendant's Sixth Amendment rights.  This is the defendant's burden, and one which he has failed to
meet.  The Court should deny the motion as to 210 LaSalle.

### C.   Mattson's Renewed Declaration Remains Fatally Conclusory, Lacks Evidentiary Support Necessary for a *Unimex* Hearing, and Contains Additional Inaccuracies

The Court correctly concluded that Mattson's first declaration and motion failed to rise to the
required level of "definite, specific, detailed and nonconjectural evidence regarding the anticipated cost
of his defense."  Order at 3 (quoting *Unimex*, 991 F.2d at 551 (internal quotations omitted)).  The
renewed motion and Second Declaration likewise fall short of the mark.

As a preliminary matter, while Mattson now provides additional estimates and figures, he has not
submitted any supporting evidence with the declaration or motion, such as a net worth statement, bank
statements, or any other documentary evidence to support his claims.  Courts have rejected requests for a
hearing under similar circumstances.  *See United States v. Kielar*, 791 F.3d 733, 740 (7th Cir. 2015)
(rejecting defendant's request for a hearing where he "offered no documentary evidence, other than an
unsubstantiated affidavit, to demonstrate that the restrained assets were needed to conduct his defense");
*United States v. Hernandez-Gonzalez*, No. 16-20669-CR, 2017 WL 2954676, at * 7 (S.D. Fla. Jun. 26,
2017) (rejecting request for hearing in part because defendant "failed to provide any proof of his net

---

[4] As the government noted in its original opposition, 210 La Salle is in foreclosure proceedings.
ECF No. 51 at 7.  Public records now reflect that it is scheduled to be sold in a trustee sale on August 19,
2025, which may ultimately affect its suitability as a viable asset to secure the defendant's bond, but
pursuant to the Court's direction, the government will raise any concerns on that front with the
magistrate judge.

U.S. OPP. TO DEF. MOT.                              14
4:25-CR-00126-JST

worth" and "no banking statements that show a lack of available assets"); *United States v. Cobb*, No. 2:14-CR-00194, 2015 WL 518548 at *5 (D. Nev. Feb. 9, 2015) (finding that defendants failed to make "threshold showing" where defendants provided bare statements but no evidence that they did not have access to unrestrained funds). And it is not just that Mattson has put forth no affirmative evidence to support his assertions: his statements are actually contradicted by the documentary evidence in the record. As described above, Mattson's statements about property ownership are contradicted by the evidence. And there are other reasons to question the Second Declaration's veracity. For example, Mattson swears, under penalty of perjury, that:

> I do not hold any checking, savings, money market, or brokerage accounts. I do not hold any certificates of deposit, bonds, stocks, cryptocurrency, or securities.

Second Mattson Decl. ¶ 1. But the government just learned that Mattson currently holds a 401(k) account that, as of June 30, 2025, was worth nearly $15,000. *See* Lee Decl., Ex. S. That account is currently almost entirely invested in a single mutual fund—in other words, a security. *Id.* At one point, it was worth more than $600,000. *Id.* That would seem to contradict Mattson's declaration. And other records suggest that as late as March 2024, Mattson held property in a self-directed IRA that was valued at over $300,000. *See* Lee Decl., Ex. T. If he has disposed of those assets since then, he has not explained how and why; if he has not, those, too, are assets he can and should use to pay counsel of his choice. *See United States v. Warren*, No. 3:24-CR-113-TAV-JEM, 2025 WL 1570720, at *9 (E.D. Tenn. Jun. 3, 2025) (rejecting request for a hearing where Defendant complained of tax consequences and early withdrawal penalties if she liquidated retirement accounts).

## III.    CONCLUSION

At a minimum, Mattson bears the burden of persuasion in convincing the Court that he "has no assets, other than those restrained, with which to retain private counsel." *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998). He has not done that. "[D]ue process does not automatically require a hearing[,] and a defendant may not simply ask for one." *Id.* As described above, even taking the second declaration at face value, the Court should deny the renewed motion because: (1) Mattson has at least $450,000 pre-paid to his counsel of record (plus an additional $375,000 should he sell his luxury vehicles, furniture, and neon signs) all available for his defense in this case; (2) he cannot meet his

burden in any case because the Subject Assets are subject to the bankruptcy court's orders, are in whole or in part owned by KSMP, and subject to financial interests from various lenders and WITNESS-1. Even if the Court granted all the relief Mattson is asking for, he still would not be able to sell any of the proposed properties to pay his criminal defense lawyers.  The Court should deny the request for a hearing.

DATED:  August 6, 2025                                        Respectfully submitted,

                                                             CRAIG H. MISSAKIAN
                                                             United States Attorney


                                                             _____/s/_____
                                                             CHRISTOFFER LEE
                                                             NIKHIL BHAGAT
                                                             Assistant United States Attorneys

1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division
4  CHRISTOFFER LEE (CABN 280360)
   NIKHIL BHAGAT (CABN 279892)
5  Assistant United States Attorneys

6      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
7      Telephone: (415) 436-7200
       FAX: (415) 436-7234
8

9  Attorneys for United States of America

10               UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                    OAKLAND DIVISION

13  UNITED STATES OF AMERICA,            )   **CASE NO. 4:25-CR-00126 JST**
                                         )
14          Plaintiff,                   )   **AUSA LEE DECLARATION ISO UNITED**
                                         )   **STATES' OPPOSITION TO DEFENDANT'S**
15                                       )   **EMERGENCY EX PARTE  MOTION FOR A**
        v.                               )   **HEARING ON DEFENDANT'S MOTION TO**
16                                       )   **MODIFY PRE-TRIAL ASSET RESTRAINT**
                                         )
17  KENNETH W. MATTSON,                  )
                                         )   Judge: Hon. Jon S. Tigar
18          Defendant.                   )
                                         )
19  _____    )

20

21          I, Christoffer Lee, declare and state as follows:

22          1.      I am an Assistant United States Attorney in the Northern District of California, and I am

23  assigned to represent the United States in the above-captioned matter.

24          2.      I am informed and believe that the exhibits attached herein are what they purport to be.

25          3.      Attached as **Exhibit M** is a May 15, 2025 Preservation Order issued by the Hon. Charles

26  Novak, United States Bankruptcy Judge, in *In re Mattson*, No. 24-10714 at ECF No. 91.

27          4.      Attached as **Exhibit N** is a Stipulation Regarding Consent of Kenneth W. Mattson to

28

1   Entry of Order for Relief in *In re Mattson*, No. 24-10714, at ECF No. 91.

2       5.      Attached as **Exhibit O** is a transcript of the July 11, 2025 hearing before Bankruptcy

3   Judge Novak in *In re Mattson*, No. 24-10714.

4       6.      Attached as **Exhibit P** is a July 22, 2025 Chapter 11 Monthly Operating Report filed by

5   KS Mattson Partners, LP in *In re KS Mattson Partners LP*, No. 24-10715, at ECF No. 230.

6       7.      Attached as **Exhibit Q** is a spreadsheet titled "Exhibit C KS Mattson Partners, LP

7   Schedule of Real Estate Owned as of 06/30/2023," which the government understands was one of

8   several attachments submitted in connection with financial reporting by Preferred Capital Partners to

9   California Bank of Commerce on or about December 11, 2023.  Ken Mattson appears to be copied on

10  the email transmission.

11      8.      Attached as **Exhibit R** is a May 22, 2020 email from Ken Mattson to Comerica Bank

12  titled "Mattson info" attaching personal financial statements and a spreadsheet titled "Exhibit C KS

13  Mattson Partners, LP Schedule of Real Estate Owned as of 12/31/2019."

14      9.      Attached as **Exhibit S** are two quarterly statements for Ken Matson reflecting his Home

15  Tax Service of America, Inc. 401(k) Profit Sharing Plan and Trust.  The first statement corresponds to a

16  statement period of January 1, 2024 to March 31, 2024; the second statement corresponds to a period of

17  April 1, 2025 to June 30, 2025.

18      10.     Attached as **Exhibit T** is an account statement for Ken Mattson for Provident Trust

19  Group for statement period January 1, 2024 to March 31, 2024 reflecting a purported market value of

20  approximately $322,935.73.

21      I declare under penalty of perjury that the foregoing is true and correct to the best of my

22  knowledge.

23

24  Dated:  August 6, 2025                                    _____
                                                                    */S/*
25                                                             CHRISTOFFER LEE

26

27

28

LEE DECL. ISO U.S. OPP. TO DEF. EMERGENCY EX PARTE MOT. TO MODIFY PRE-TRIAL ASSET RESTRAINT
3:25-CR-00126-JST

2

# Exhibit M

Entered on Docket
May 15, 2025
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DAVID A. TAYLOR (Cal. Bar No. 247433)
(dtaylor@kbkllp.com)
DARA L. SILVEIRA (Cal. Bar No. 247433)
(dsilveira@kbkllp.com)
THOMAS B. RUPP (Cal. Bar No. 27804)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:  (415) 496-6723
Facsimile:  (650) 636-9251

*Attorneys for Petitioning Creditors*
*LeFever Mattson, a California corporation, and*
*Windtree, LP*

The following constitutes the order of the Court.
**Signed: May 15, 2025**

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>KENNETH W. MATTSON,<br><br>                Debtor. | Case No. 24-10714 (CN)<br><br>Chapter 11<br><br>**PRESERVATION ORDER UNDER 11 U.S.C. § 303(f)**<br><br>**[Related to Dkt. No. 52]**<br><br>Date:  May 9, 2025<br>Time:  11:00 a.m.<br>Place:  (In Person or Via Zoom)<br>       United States Bankruptcy Court<br>       1300 Clay Street, Courtroom 215<br>       Oakland, CA 94612 |

1

1    Upon consideration of the Petitioning Creditors' *Motion for Preservation Order* (the

2    "Motion");[2] the Court having reviewed the Motion, the Sharp Declaration, and the LeFever

3    Mattson RJN; and the Court having found that (i) the Court has jurisdiction to consider the Motion

4    and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Order Referring*

5    *Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 and Rule 5011-1(a)

6    of the Bankruptcy Local Rules for the United States District Court for the Northern District of

7    California; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and (iii) this

8    is a core proceeding pursuant to 28 U.S.C. § 157(b); and after due deliberation the Court having

9    determined that the relief requested in the Motion is in the best interests of Mr. Mattson, his estate,

10   and his creditors; and good and sufficient cause having been shown;

11        **IT IS HEREBY ORDERED THAT:**

12        1.    The Motion is granted as set forth herein.

13        2.    Sections 363 and 364 of Title 11 of the United States Code shall apply in this case

14   to the same extent as if an order for relief had been entered.

15        3.    On or before May 21, 2025, Mr. Mattson shall file with the Court a declaration

16   attesting, under penalty of perjury, to full compliance with the Court's April 14, 2025, *Order*

17   *Continuing Hearing on Petitioning Creditors' Motion for Preservation Order* [Dkt. No. 72], as

18   modified by the Court's oral rulings at the hearings of April 25, May 2, and May 9, 2025.

19        4.    This Court shall retain jurisdiction to hear and determine all matters arising from

20   or related to the implementation, interpretation, or enforcement of this Order.

21                         ** END OF ORDER **

22   **APPROVED AS TO FORM:**

23   FENNEMORE CRAIG, P.C.

24   By: */s/    Micheline Nadeau Fairbank*
25   Micheline Nadeau Fairbank
     Attorneys for Kenneth W. Mattson
26   and KS Mattson Partners, LP

27   _____
28   [2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in
     the Motion.

1    PACHULSKI STANG ZIEHL & JONES LLP

2    By: /s/    Jason H. Rosell
     Jason H. Rosell
3    Attorneys for the Official Committee
     of Unsecured Creditors of LeFever Mattson

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

1

<u>**Court Service List**</u>

2    *All ECF Participants*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit N

**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DAVID A. TAYLOR (Cal. Bar No. 247433)
(dtaylor@kbkllp.com)
DARA L. SILVEIRA (Cal. Bar. No. 274923)
(dsilveira@kbkllp.com)
THOMAS B. RUPP (Cal. Bar No. 278041)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:  (415) 496-6723
Facsimile:  (650) 636-9251

*Attorneys for LeFever Mattson, a California corporation*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>KENNETH W. MATTSON,<br><br>Debtor. | Case No. 24-10714 (CN)<br><br>Chapter 11<br><br>**STIPULATION REGARDING CONSENT OF KENNETH W. MATTSON TO ENTRY OF ORDER FOR RELIEF** |

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

This Stipulation (the "Stipulation") is made by and between LeFever Mattson, a California corporation ("LeFever Mattson"), the debtor and debtor in possession in Case No. 24-10545 (CN) (Bankr. N.D. Cal.) and a petitioning creditor in the Involuntary Case (as defined below) on the one hand, and Kenneth W. Mattson, debtor in Case No. 24-10714 (CN) (Bankr. N.D. Cal.) (the "Involuntary Case"), on the other hand.  LeFever Mattson and Mr. Mattson together shall be referred to as the "Parties."  By and through their counsel of record, in reference to and consideration of the following, the Parties stipulate as follows:

**R E C I T A L S**

A.    On November 22, 2024, LeFever Mattson commenced the Involuntary Case.

B.    The Court entered the *Preservation Order Under 11 U.S.C. § 303(f)* [Dkt. No. 91] (the "Preservation Order") on May 15, 2025.  The Preservation Order requires that any property sale or financing transaction sought by Mr. Mattson must be approved under sections 363 or 364 of title 11 of the United States Code (the "Bankruptcy Code").

C.    The Parties wish to coordinate a smooth transition of Mr. Mattson into a voluntary case under the Bankruptcy Code.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT HEREBY IS STIPULATED AND AGREED, BY AND BETWEEN THE PARTIES, THROUGH THE UNDERSIGNED, AND THE PARTIES JOINTLY REQUEST THAT THE BANKRUPTCY COURT ORDER THAT:**

1.    On September 2, 2025, Mr. Mattson shall be deemed to have consented to entry of an order for relief in the form attached hereto as Exhibit A (the "Order for Relief"), effective as of that date.  LeFever Mattson shall be authorized to upload the Order for Relief at 9:00 a.m. Pacific Time on September 2, 2025.

2.    The Preservation Order shall remain in full force and effect until entry of the Order for Relief.

3.    Following entry of the Order for Relief, LeFever Mattson shall not oppose any request from Mr. Mattson to convert the resulting chapter 11 case to one under chapter 7.

4. LeFever Mattson shall not oppose any request by Mr. Mattson to (a) stay the filing of nondischargeability complaints under section 523 of the Bankruptcy Code or (b) extend the deadline for creditors to bring such complaints.

5. All discovery in the Involuntary Case is terminated.

6. This Stipulation may be modified by agreement of the Parties.

7. This Stipulation shall be binding on the Parties and each of their successors in interest.

8. This Stipulation shall constitute the entire agreement and understanding of the Parties relating to the subject matter hereof and supersede all prior agreements and understandings relating to the subject matter hereof.

9. This Stipulation may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

10. The Court shall retain jurisdiction to resolve any disputes or controversies arising from this Stipulation or any Order approving the terms of this Stipulation.

DATED:  July 10, 2025                    KELLER BENVENUTTI KIM LLP

                                         By:     /s/ Dara L. Silveira
                                              DARA L. SILVEIRA
                                              Attorneys for LeFever Mattson, a California
                                              corporation


DATED:  July 10, 2025                    FENNEMORE

                                         By:     /s/ Micheline Nadeau Fairbank
                                              MICHELINE NADEAU FAIRBANK
                                              Attorneys for Kenneth W. Mattson

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

1

**EXHIBIT A**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

B2530 (Form 2530 12/15)

# United States Bankruptcy Court
## Northern District of California

**In re**  Kenneth W. Mattson _____  Case No.  24-10714

                          **Debtor***

Address:  [ ]          Sonoma, CA 95476 _____  Chapter  11

Last four digits of Social-Security or Individual Taxpayer- 6074
Identification (ITIN) No(s).,(if any)**:**  n/a _____
Employer Tax-Identification (EIN) No(s).(if any):     n/a _____

## ORDER FOR RELIEF IN
## AN INVOLUNTARY CASE

          On consideration of the petition filed on November 22, 2024 _____ against
                                                        (date)
the above-named debtor, an order for relief under chapter 11 ___ of the Bankruptcy Code (title 11

of the United States Code) is granted.

                                          .

_____          _____
          Date                                    Bankruptcy Judge

_____
*Set forth all names, including trade names, used by the debtor within the last 8 years.  (Fed. R. Bankr. P. 1005).

# **Exhibit O**

1

```
 1                  UNITED STATES BANKRUPTCY COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                            -oOo-

 4    In Re:                    ) Case No. 24-10714
                                ) Chapter 11
 5    KENNETH W. MATTSON        )
                                ) Oakland, California
 6                   Debtor.    ) Friday, July 11, 2025
      _____ ) 11:00 AM
 7                              )
      In Re:                    ) Case No. 24-10511
 8                              ) Chapter 11
      LIVE OAK INVESTMENTS, LP  )
 9                              )
                     Debtor.    )
10    _____ )
                                )
11    In Re:                    ) Case No. 24-10545
                                )Chapter 11
12    LEFEVER MATTSON, A CALIFORNIA )
      CORPORATION, ET AL.       )
13                              )
                     Debtors.   )
14    _____ )

15                             24-10714 KENNETH W. MATTSON
                               STATUS CONFERENCE.  [7]
16
                               24-10511 LIVE OAK
17                             INVESTMENTS, LP
                               NOTICE OF MOTION TO APPOINT
18                             CHAPTER 11 TRUSTEE 11 U.S.C.
                               §1104 FILED BY  ANDREW
19                             REVOCABLE TRUST DATED JUNE
                               21, 2001.  [17]
20
                               24-10545 LEFEVER MATTSON, A
21                             CALIFORNIA CORPORATION
                               1. MOTION OF DEBTORS FOR
22                             ORDER (I) AUTHORIZING POST-
                               PETITION INTERDEBTOR LENDING
23                             PURSUANT TO SECTION 364 OF
                               THE BANKRUPTCY CODE; (II)
24                             GRANTING ADMINISTRATIVE
                               EXPENSE CLAIMS; AND (III)
25                             GRANTING RELATED RELIEF.
```

2

```
 1                              [1588]
                                2. STATUS CONFERENCE. [26]
 2                              CONT'D FROM 11/8/24, 12/6/24,
                                3/7/25, 4/25/25, 5/2/25
 3
                         TRANSCRIPT OF PROCEEDINGS
 4              BEFORE THE HONORABLE CHARLES NOVACK
                    UNITED STATES BANKRUPTCY JUDGE
 5

 6   APPEARANCES (All present by video or telephone):
     For LeFever Mattson, a     THOMAS B. RUPP, ESQ.
 7   California corporation:    DARA L. SILVEIRA, ESQ.
                                 DAVID TAYLOR, ESQ.
 8                              Keller Benvenutti Kim LLP
                                425 Market Street
 9                              26th Floor
                                San Francisco, CA 94105
10                              (415)496-6723

11   For Official Committee of  JOHN D. FIERO, ESQ.
     Unsecured Creditors:       Pachulski Stang Ziehl & Jones LLP
12                               One Sansome Street
                                Suite 3430
13                              San Francisco, CA 94104
                                (415)263-7000
14
     For Andrews and Burgess    THOMAS P. KELLY, III, ESQ.
15   Trusts:                    Law Offices of Thomas P. Kelly III
                                 P.C.
16                              50 Old Courthouse Square
                                Suite 609
17                              Santa Rosa, CA, 95404
                                (707)545-8700
18
     For Chase 1992 Family      DANIEL L. EGAN, ESQ.
19   Trust:                     Wilke Fleury LLP
                                 621 Capitol Mall
20                              Suite 900
                                Sacramento, CA 95814
21                              (916)441-2430

22   For Federal National       MARSHA A. HOUSTON, ESQ.
     Mortgage Association:      Reed Smith, LLP
23                               1901 Avenue Of The Stars
                                Suite 700
24                              Los Angeles, CA 90067
                                (213)457-8067
25
```

3

```
 1
      For Federal National        MICHAEL P. COOLEY, ESQ.
 2    Mortgage Association         2850 North Harwood Street
      (Cont'd):                    Suite 1500
 3                                  Dallas, TX 75201
                                    (469)680-4200
 4
      For Office of the U.S.       PHILLIP J. SHINE, ESQ.
 5    Trustee:                     U.S. Department of Justice
                                    450 Golden Gate Avenue
 6                                  Suite 05-0153
                                    San Francisco, CA 94102
 7                                  (415)705-3349

 8    For Umpqua Bank:             ROBERT B. KAPLAN, ESQ.
                                    Jeffer Mangels Butler & Mitchell
 9                                  LLP
                                    Two Embarcadero Center
10                                  5th Floor
                                    San Francisco, CA 94111
11                                  (415)398-8080

12    For Serene Investment        VADIM J. RUBINSTEIN, ESQ.
      Management LLC:              Loeb & Loeb LLP
13                                  345 Park Avenue
                                    New York, NY 10154
14                                  (212)407-4000

15    For Socotra Capital, Inc.:  THEODORE A. COHEN, ESQ.
                                    Sheppard, Mullin, Richter &
16                                  Hampton LLP
                                    333 South Hope Street
17                                  43rd Floor
                                    Los Angeles, CA 90071
18                                  (213)620-1780

19                                  JEANNIE KIM, ESQ.
                                    Sheppard, Mullin, Richter &
20                                  Hampton LLP
                                    Four Embarcadero Center
21                                  17th Floor
                                    San Francisco, CA 94111
22                                  (415)434-9100

23

24

25
```

4

```
1
     For Duggan's Mission        BENNETT G. YOUNG, ESQ.
2    Chapel and Bragg Family     Jeffer Mangels Butler & Mitchell
     Trust:                      LLP
3                                 Two Embarcadero Center
                                  5th Floor
4                                 San Francisco, CA 94111
                                  (415)398-8080
5
     For Monley Hamlin, Inc.     MIKAYLA E. KUTSURIS, ESQ.
6                                 Felderstein Fitzgerald Willoughby
                                  Pascuzzi & Rios LLP
7                                 500 Capitol Mall
                                  Suite 2250
8                                 Sacramento, CA 95814
                                  (916)329-7400
9
     For KS Mattson Partners,    RICHARD L. WYNNE, ESQ.
10   LP:                         Hogan Lovells US LLP
                                  1999 Avenue of the Stars
11                                Suite 1400
                                  Los Angeles, California 90067
12                                (310)785-4600

13   For Ken Mattson and KS      MARK S. BOSTICK, ESQ.
     Mattson Partners:           Fennemore Craig, P.C.
14                                1111 Broadway
                                  24th Floor
15                                Oakland, CA 94607
                                  (510)834-6600
16
     Also Present:               Robbin Itkin
17                                Responsible Individual for KSMP

18

19

20

21

22

23

24

25
```

5

```
Court Recorder:              RUBY BAUTISTA
                            DAWANA CHAMBERS
                            United States Bankruptcy Court
                            1300 Clay Street
                            Oakland, CA 94612

Transcriber:                RIVER WOLFE
                            eScribers, LLC
                            7227 N. 16th Street
                            Suite #207
                            Phoenix, AZ 85020
                            (800) 257-0885

Proceedings recorded by electronic sound recording;
transcript provided by transcription service.
```

```
 1          OAKLAND, CALIFORNIA, FRIDAY, JULY 11, 2025, 11:34 AM
 2                              -oOo-
 3      (Call to order of the Court.)
 4          THE CLERK:  Line item number 28, Your Honor, Kenneth
 5  W. Mattson.
 6          THE COURT:  Okay.  The petitioning creditor first.
 7          MS. SILVEIRA:  Good morning, Your Honor.  Dara
 8  Silveira, Keller Benvenutti Kim, on behalf of petitioning
 9  creditor LeFever Mattson.
10          THE COURT:  Okay.  Anyone on behalf of Mr. Mattson?
11          MR. BOSTICK:  Well, Your Honor, Mark Bostick,
12  Fennemore, on behalf of Mr. Mattson.
13          THE COURT:  Anyone else making an appearance?
14          MR. FIERO:  Good morning, Your Honor.  John Fiero for
15  the creditors committee in the jointly administered cases.
16          THE COURT:  Anyone else making an appearance?
17          MR. KAPLAN:  Yes.  Good morning, Your Honor.  Robert
18  Kaplan for Umpqua Bank.
19          THE COURT:  Anyone else?
20          Okay.  Okay.  This is a status conference in this
21  involuntary against Mr. Mattson.
22          Oh, Mr. Shine, you wanted to make an appearance?
23          MR. SHINE:  Yes, Your Honor.  Good morning.  Phillip
24  Shine, appearing on behalf of the United States Trustee.
25          THE COURT:  Good morning, Mr. Shine.
```

7

 1              Anyone else, Ms. Bautista?

 2              THE CLERK:  That's all you have, Your Honor.

 3              THE COURT:  Okay.  Well, I see a few folks popping up

 4      for -- Socotra Capital, perhaps, but not --

 5              Ms. Kim, are you making an appearance?

 6              MS. KIM:  Yes.  Mr. Cohen is also on the line.  We are

 7      appearing on behalf of Socotra Capital.  Sheppard Mullin.

 8              THE COURT:  Okay.  Good morning.

 9              Anyone else, Ms. Bautista?

10              THE CLERK:  That's all, Your Honor.

11              THE COURT:  Okay.  Mr. Cohen, I see you.  Thank you.

12      Good morning.

13              Okay.  So this is the status conference in the

14      involuntary against Mr. Mattson.  Thank you for the status

15      conference report.  Apparently, Mr. Mattson has agreed to

16      consent to an order for relief as of September 2nd, 2025.

17              Is that correct?

18              MS. SILVEIRA:  That's correct, Your Honor.

19              THE COURT:  Okay.  And in the interim, I guess all

20      things are essentially stayed in terms of discovery and things

21      like that?

22              MS. SILVEIRA:  That's exactly right, Your Honor.  In

23      the interim until September 2nd all discover, including Mr.

24      Mattson's deposition, will be terminated, and the perseveration

25      order will remain in full effect.

**Kenneth W. Mattson**

8

```
 1          THE COURT:  Right.  Now, you've informed me that
 2   there's a motion before Judge Tigar, again, in the criminal
 3   matter pending in the district court.  Apparently, the United
 4   States has imposed or has recorded lis pendens against certain
 5   of Mr. Mattson's properties and that his criminal counsel has
 6   filed a motion that Judge Tigar was going to hear next Friday
 7   to vacate the lis pendens to allow Mr. Mattson to sell property
 8   to generate funds to pay for his criminal defense.
 9          Has anyone informed Judge Tigar regarding the 303(f)
10   order?
11          MS. SILVEIRA:  Yes, Your Honor.  The government filed
12   its opposition to the asset restraint motion on Wednesday
13   evening, and it attaches a copy of the preservation order.
14          THE COURT:  Okay.
15          MS. SILVEIRA:  And just one correction, Your Honor.
16   The hearing on the asset restraint motion is July 31st.
17          THE COURT:  July?  Okay.  For some reason, I thought
18   the 18th.  Okay.
19          MR. BOSTICK:  Well, they are seeking to move it to
20   July 18th.
21          MS. SILVEIRA:  Okay.
22          THE COURT:  Okay.  Okay.  And any inkling that they're
23   going to come before me to the extent necessary to seek relief
24   from the 303(f) order, or we just don't know?
25          MS. SILVEIRA:  I would defer to Mr. Bostick on that.
```

1          MR. BOSTICK:  Your Honor, if there is a transaction to

2    be had, they will be coming before this Court to --

3          THE COURT:  Okay.

4          MR. BOSTICK:  -- get the Court's permission.

5          THE COURT:  Okay.  Okay.  We'll just leave that where

6    it is then.

7          So what, if anything, do I need to do?  Just continue

8    the status conference past September 2nd?  The status

9    conference may be mooted if the order for relief -- if an order

10   for relief is entered?

11         MS. SILVEIRA:  I think that would be appropriate, Your

12   Honor.  We uploaded an order yesterday evening approving the

13   stipulation, and then that order gives the petitioning creditor

14   the authority to upload the order for relief at 9 a.m. on

15   September 2nd.  We'll do so.

16         THE COURT:  Okay.  Just in case things don't happen as

17   the way things are planned, let me just continue the status

18   conference in the involuntary to September 12 at 11 o'clock.

19   Again, it'll come off calendar if an order for relief is

20   entered.

21         MS. SILVEIRA:  Thank you, Your Honor.

22         THE COURT:  Okay.  Anything else?

23         UNIDENTIFIED SPEAKER:  I want to thank you, Your

24   Honor, for --

25         MR. FIERO:  Your Honor, I would just --

1          THE COURT:  Yes.

2          MR. FIERO:  So no one is surprised, the committee

3    seeks its own discovery from Mr. Mattson, unrelated to the

4    involuntary case.  And we make seek to proceed with that very

5    discovery.  And that's not covered by the stipulation.

6    That's --

7          THE COURT:  Okay.

8          MR. FIERO:  -- just a statement for the record.

9          THE COURT:  Right.  No.  Okay.  I appreciate it.

10      (Whereupon these proceedings were concluded at 11:39 AM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Live Oak Investments, LP**

1          OAKLAND, CALIFORNIA, FRIDAY, JULY 11, 2025, 11:39 AM

2                              -oOo-

3        (Call to order of the Court.)

4              THE CLERK:  Your Honor, Live Oak Investment, LP.

5              MR. TAYLOR:  Good morning, Your Honor.  David Taylor

6    from Keller Benvenutti Kim for the LeFever Mattson debtors,

7    including Live Oak.

8              MR. FIERO:  John Fiero for the committee in the

9    jointly administered cases, including the Live Oak case, Your

10   Honor.

11             THE COURT:  Do we have Mr. Kelly with us?

12             THE CLERK:  Yes, Your Honor.

13             THE COURT:  Okay.

14             THE CLERK:  I just -- under his name.

15             MR. KELLY:  Good morning, Your Honor.

16             THE COURT:  Good morning, Mr. Kelly.  Again, you're

17   here representing the Andrew Revocable Trust and the Burgess

18   Trust; is that correct?  You're on --

19             Okay.  I see Mr. Egan.

20             You're on --

21             MR. KELLY:  Can you hear me now?

22             THE COURT:  Yes, I can.

23             MR. KELLY:  Yeah.  Yes, Your Honor, Burgess Trust and

24   the Andrew Trust.  Thank you.

25             THE COURT:  Oh, Mr. Egan, are you making an

Live Oak Investments, LP

1    appearance?

2            MR. EGAN:  Good morning, Your Honor.  Daniel Egan,

3    appearing on behalf of John Chase, trustee of the Chase 1992

4    Family Trust.

5            THE COURT:  Okay.  So this is a hearing on the motion

6    to appoint a Chapter 11 trustee in the Live Oak Investments, LP

7    Chapter 11 case.

8            Mr. Taylor, I think service was appropriate here.  I

9    know that Mr. Kelly should have filed this motion in the main

10   case.  He didn't, but I don't think it -- this is a case of no

11   harm, no foul.  So I'm going to --

12           MR. TAYLOR:  Your Honor, I would just say that we are

13   aware and committee counsel is aware of numerous folks who only

14   get service through the main case, which has been happening

15   throughout.  So there are people who have no idea who have

16   never seen this motion and may have an interest in it.

17           THE COURT:  Mr. Kelly.  I mean, again, I understand,

18   Mr. Kelly, and maybe I'm taking too pragmatic a view of this

19   because there are people who may have filed requests for

20   special notice in the main case, and they apparently didn't get

21   notice of it.  So why shouldn't I just continue this matter so

22   that you can serve those folks?  And I understand --

23           MR. KELLY:  Your Honor --

24           THE COURT:  And wait, no, I understand that the person

25   with the most "at stake" here, at least on the face of things,

**Live Oak Investments, LP**

13

1  are before me, again, LeFever Mattson, Inc. and the other

2  debtors and the committee and you.  I get it.  But there are a

3  lot of other parties who have filed requests for special

4  notice, and that request typically should be honored.

5         MR. KELLY:  Well, Your Honor, my position, I read your

6  order very carefully regarding the joint administration.  I

7  didn't see anything in there that waived the requirement that

8  9014 contested matter be filed in the case in which the relief

9  is sought.  In addition, we gave notice to absolutely everybody

10  that we could find.  In addition, the creditors committee is

11  alleging they didn't have notice, yet they had actual notice

12  and were able to file a joinder in the opposition.

13         So again, your characterization of no harm, no foul, I

14  agree.  At the same time, I put it in the Live Oak case

15  deliberately because we're dealing with an entity, not with a

16  person.  And I couldn't wrap my head around filing it in a

17  different case because when you're dealing with an entity and

18  it's a contested matter, your order did not appear to waive

19  that requirement.  Hence, that's why I filed it procedurally

20  (indiscernible).

21         THE COURT:  Well, again, Mr. Taylor.

22         MR. TAYLOR:  Your Honor, every single pleading in this

23  case, whether refers to sixty-one debtors or one debtor, has

24  been filed in the main case.  And that's the way that everyone

25  has gotten notice throughout.

**Live Oak Investments, LP**

14

```
 1            THE COURT:  How many people did not -- have you --
 2            MR. TAYLOR:  We don't know.  I don't know if Mr. --
 3            THE COURT:  Well, I mean, again --
 4            MR. RUPP:  Your Honor --
 5            THE COURT:  -- it's just whoever filed requests for
 6    special notice.
 7            MR. RUPP:  Your Honor, I would guess, I don't have the
 8    exact number, but at least a hundred people have filed requests
 9    for notice in the main LeFever Mattson case because when we
10    filed the sixty-one cases or the fifty-eight that day on the
11    12th of September, we sought joint administration right away.
12    So the only parties who really get ECF in Live Oak are myself
13    and the U.S. Trustee.  And Mr. Kelly may have served.  You can
14    check his COS.  I believe he served the other Live Oak
15    investors.  But I don't think he undertook any effort to get
16    notice to all of the parties who have filed requests for notice
17    of the case.
18            MR. TAYLOR:  And it's not as if this is a gotcha, Your
19    Honor.  We emailed Mr. Kelly three times.
20            THE COURT:  No, no, I understand.  No, I understand.
21            Okay.  Mr. Kelly, this is an important motion, and I
22    think it's important that those people who have requested
23    notice get it.  So again, I've reviewed everything that's been
24    filed here.  But if this is the start of the rebellion, I think
25    everyone needs to know what the rebellion is and why.  And I
```

1    don't -- and again, it's an important motion, and it needs to

2    be heard by -- it needs to be noticed out and received by those

3    people who have filed requests for special notice for that

4    exact purpose.  So you need to serve it on those folks.

5    Whoever's sought request -- whoever's filed a request for

6    special notice in the LeFever Mattson case needs to get notice

7    of this.

8            So I'm going to continue this to August 22nd at 11 and

9    ask that you serve those folks and ask for a response -- you

10   serve these folks by July 18, and tell them that they have to

11   respond to the motion by August 8.  And you have the chance to

12   reply to that by August 15.  Now --

13           MR. FIERO:  Your Honor --

14           THE COURT:  Yes.

15           MR. FIERO:  -- it's important that the pleadings that

16   the moving parties want to have heard and discussed here in

17   court be filed in the main case because when they do, they hit

18   Verita, the --

19           THE COURT:  Right.

20           MR. FIERO:  -- noticing agent that we're using.  And

21   Verita allows every individual to simply click on a thing which

22   says, give me the feed from the LeFever Mattson main case.  And

23   this is a larger universe of investors than had the wherewithal

24   or the knowledge to file a request for special notice.  But as

25   the representative of the creditors committee, we think it's

**Live Oak Investments, LP**

1  important that it appear on the docket in the main case.

2          THE COURT:  Right.  So Mr. Kelly, again, Mr. Fiero

3  makes a good point.  Please file the -- please file the motion

4  with a new notice of hearing for August 22nd in the main -- in

5  the main case with those deadlines.  And the notice should say

6  response by, what, August 1 and --

7          UNIDENTIFIED SPEAKER:  August 8.

8          THE COURT:  August 8th, and you can file a response by

9  the 15th.

10          MR. KELLY:  What time was the hearing, Judge?

11          THE COURT:  11 o'clock.

12          MR. KELLY:  So to clarify, you want me to reserve the

13  motion entirely?

14          THE COURT:  Just reserve it on those folks who filed

15  requests for special notice -- first of all, file it in --

16  again, you can ask me about service things, and that's not my

17  job.  File the motion in the main case.  To the extent that you

18  need to serve it on those folks who have requested special

19  notice because I don't know if they get it electronically or

20  not --

21          MR. KELLY:  Neither do I, Judge.

22          THE COURT:  Well, that's your job, not mine.

23          MR. KELLY:  Well, Judge, respectfully, this is --

24          THE COURT:  No, Mr. Kelly.

25          MR. KELLY:  -- your joint administration.

**Live Oak Investments, LP**

1          THE COURT:  Mr. Kelly, you're about to lose this

2     argument.

3          MR. KELLY:  Okay.  Sorry.

4          THE COURT:  File the motion.  Main case.  Serve it on

5     the appropriate parties.  And serve it on those -- you need to

6     ensure that it gets served on those folks who should have been

7     served but weren't served.

8          Now, how they get served, again, I suspect, although

9     I've not looked at this, that those folks who have asked for --

10    who filed requests for special notice will get electronic

11    notice.  But I don't know, and usually the request for special

12    notice will state, please send documents to this address.

13    That's your job, not mine.

14          I want to remind everyone that by the time I hear

15    this, it'll be August 22nd, and the exclusivity period ends

16    September 5.  So people should think about that when they come

17    to argue on August 22nd.

18          MR. TAYLOR:  Your Honor, I think briefly on that, you

19    will have a plan term sheet next week and I would think a plan

20    by middle of August.

21          THE COURT:  Okay.  Okay.

22          MR. EGAN:  Thank you, Your Honor.

23          THE COURT:  All right.  Thank you, all.

24     (Whereupon these proceedings were concluded at 11:49 AM)

25

**LeFever Mattson, a California corporation, et al.**

18

1          OAKLAND, CALIFORNIA, FRIDAY, JULY 11, 2025, 11:49 AM

2                              -oOo-

3      (Call to order of the Court.)

4          THE CLERK:  LeFever Mattson, a California corporation.

5          MR. TAYLOR:  David Taylor, again, for LeFever Mattson.

6          MR. RUPP:  Good morning again, Your Honor.  Thomas

7  Rupp from Keller Benvenutti Kim for the debtors.

8          MR. FIERO:  John Fiero, appearing for the committee,

9  Your Honor.

10          THE COURT:  One second here.

11          MS. HOUSTON:  Marsha Houston, appearing for Federal

12  National Mortgage Association.  And my partner Michael Cooley

13  is also on.

14          MR. SHINE:  And Phillip Shine appearing on behalf of

15  the United States Trustee.

16          MR. KAPLAN:  Robert Kaplan for Umpqua Bank.

17          MR. RUBINSTEIN:  Vadim Rubinstein of Loeb & Loeb for

18  Serene Investment Management.

19          MR. COHEN:  And Ted Cohen and Jeannie Kim of Sheppard

20  Mullin for Socotra Capital.

21          MR. YOUNG:  Bennett Young for Duggan's Mission Chapel

22  and the Bragg Family Trust.

23          MS. KUTSURIS:  Mikayla Kutsuris for Monley Hamlin,

24  Inc., Your Honor.

25          MR. WYNNE:  Good morning, Your Honor.  Richard Wynne

**LeFever Mattson, a California corporation, et al.**

19

1   of Hogan Lovells appearing for KSMP and the responsible

2   individual Robbin Itkin is also on the Zoom, Your Honor.

3          THE COURT:  Okay.  Good morning to you all.

4          This is a hearing on a motion for post-petition

5   financing and also a status conference.  Let's deal with the

6   status conference first, if we can.  And look at this from, I

7   guess, the 10,000-foot level, then we can Zoom in a bit.

8          Mr. Rupp, where is this -- you said that you've got a

9   plan is in the offering soon.

10          MR. RUPP:  It is imminent, Your Honor.

11          THE COURT:  Right.  Okay.  Again, what is it going to

12   say?

13          MR. RUPP:  Your Honor, in our status conference

14   statement on page 4, we have looks to be about eleven bullets

15   summarizing what we expect to be in the term sheet.  I'll give

16   you the hits, if Your Honor would like.

17          THE COURT:  I apologize.  I saw a status conference in

18   one but not the other.  Hang on.

19          MR. RUPP:  Docket 1694, Your Honor.  And it's ECF page

20   5.

21          THE COURT:  All right.

22       (Pause.)

23          THE COURT:  Okay.  Where are you on the forensic

24   accounting side of things?

25          MR. FIERO:  Your Honor, this afternoon, we will file

**LeFever Mattson, a California corporation, et al.**

20

1  substantial pleadings in support of our substantive

2  consolidation motion, which will give you a very clear

3  picture --

4          THE COURT:  Between whom and what?

5          MR. FIERO:  -- of how much work has been done.  Pardon

6  me?

7          THE COURT:  Between whom -- again, what's the --

8  again, motion for substantive consolidation of whom?

9          MR. FIERO:  Of all of the debtors.

10         THE COURT:  Okay.

11         MR. RUPP:  Your Honor, the current subcon motion is

12  between KSMP --

13         THE COURT:  Right.

14         MR. RUPP:  -- and LeFever Mattson.

15         THE COURT:  Um-hum.

16         MR. RUPP:  But when we have more of the same in our

17  investigation as to the rest of the debtors.  And when the time

18  comes, we'll be prepared to put that to the proof.

19         THE COURT:  And when's that motion going to be heard?

20         MR. FIERO:  Believe there's a status conference next

21  week, Your Honor.

22         THE COURT:  No, the motion for substantive

23  consolidation.

24         MR. FIERO:  I believe it's set for a status conference

25  next week, with a hearing to be set thereafter.

**LeFever Mattson, a California corporation, et al.**

1          THE COURT:  No.  Okay.  We're two ships passing the

2    night.  The motion for substantive consolidation between

3    KSMP --

4          MR. TAYLOR:  The preliminary hearing is the --

5          THE COURT:  -- and LeFever Mattson is --

6          MR. TAYLOR:  The 25th is a preliminary hearing on that

7    motion filed by the committee.

8          THE COURT:  Right.

9          MR. FIERO:  Yeah.  Forgive me, Your Honor.  I was off

10   by a week.

11         THE COURT:  Okay.  Okay.

12         MR. FIERO:  You'll be receiving a --

13         THE COURT:  And so what's the plan?  Okay.  So let's

14   walk back.  I looked at the budget in terms of the financing,

15   and you think there's going to be net sales proceeds of sixty-

16   five -- is that money in the bank, sixty-five million or

17   whatever that number was?

18         MR. RUPP:  Net sales proceeds, Your Honor.

19         THE COURT:  And to date, obviously, you haven't sold

20   sixty-five-million dollars' worth of stuff.  There's only been

21   a handful of sales.

22         MR. RUPP:  No, Your Honor.  Yes, just a handful.

23         THE COURT:  Okay.  Adversary proceedings.  Any

24   fraudulent conveyances going to be filed?  Anything along those

25   lines?

**LeFever Mattson, a California corporation, et al.**

22

1       MR. RUPP:  I'll defer to Mr. Fiero, but I don't know

2   about avoidance actions.  But I'll let him speak, as they have

3   standing for a number of parties.

4       MR. FIERO:  The standing stipulations were entered

5   into because the --

6       THE COURT:  That's not my question.

7       MR. FIERO:  Okay.  Will there be some filed?

8   Absolutely.

9       THE COURT:  Right.

10      MR. FIERO:  What will be the volume?  In the short-

11  term, I'm unsure.

12      THE COURT:  And that's going to be post-plan

13  confirmation?

14      MR. FIERO:  No, starting as early as perhaps next

15  week.

16      THE COURT:  Right.  Okay.  As part of the budget, I

17  see accrued professional fees of many millions of dollars.  By

18  accrued professional fees, what do you mean?  Because you've

19  been -- I mean, the professionals have been receiving -- I

20  signed an order allowing the debtors -- allowing the

21  professionals to be paid X percent of their billings every

22  month; is that correct?

23      MR. RUPP:  That's correct, Your Honor.

24      THE COURT:  So what does --

25      MR. RUPP:  You signed -- yeah.

**LeFever Mattson, a California corporation, et al.**

23

1        THE COURT:  -- the accrued professional fee number

2   represent?

3        MR. RUPP:  The accrued professional fee number

4   represents the projected into the future based on the best

5   estimates of each of the professionals given to DSI based on

6   the work they intend to be doing in the next few months,

7   obviously subject to final order of this Court --

8        THE COURT:  So these are -- okay.  I'm still not sure

9   what that means.  Does that mean -- so we're talking about --

10  again, accrued means -- accrued, that means that they've been

11  billed already, but have they been paid?  I'm wondering how

12  much are you going to owe in professional fees at the end of

13  the plan?  Unpaid.  I know that -- I know all these orders are

14  interim.

15       MR. RUPP:  Your Honor, it's a projection --

16       THE COURT:  Of?

17       MR. RUPP:  Of the fee amount.

18       THE COURT:  Of fees to be incurred?

19       MR. RUPP:  Yes, Your Honor, if I'm understanding.

20       THE COURT:  Fifteen-million dollars?

21       MR. TAYLOR:  Just, I think I can clarify, Your Honor.

22  I apologize for interjecting.

23       THE COURT:  Yeah.

24       MR. TAYLOR:  Many of the professionals, not all, but

25  many, have deferred significant fees.  And that is included in

**LeFever Mattson, a California corporation, et al.**

24

1    here.

2            THE COURT:  Okay.  And the sales proceeds of, again

3    68,920,000 -- again, about sixty-nine million, what do they

4    represent?  I mean, that's a number that someone has come up

5    with.  Obviously doesn't represent sales proceeds.  Does that

6    represent what you're going to market properties for and what

7    you anticipate --

8            MR. RUPP:  It represents, again, Your Honor, the best

9    estimate of our experts by net proceeds that will be net of, I

10   believe, sale costs, including brokers and FTI, and net of

11   secured debt.

12           THE COURT:  Okay.  Have the sales that have closed so

13   far been at or above the offering price?

14           MR. RUPP:  Your Honor, I don't have that information

15   at hand --

16           THE COURT:  Well, what's the price?

17           MR. RUPP:  -- but I believe they have trended very

18   close to the offering price.

19           THE COURT:  Okay.  Okay.  Okay.  The motion for

20   substantive consolidation is going to have to address -- how

21   nitty gritty is that going to be in terms of -- you're trying

22   to substantively consolidate sixty cases, a one, you just can't

23   paint a broad brush, can you?  Don't you have to go into detail

24   between all these debtors and all their equity security holders

25   and all their creditors and --

**LeFever Mattson, a California corporation, et al.**

25

1          MR. TAYLOR:  Your Honor, on that piece, I think you'll

2     see something that's similar in kind, but broader in scope to

3     the substantive consolidation motion that you've gotten from

4     the committee.

5          THE COURT:  Well, I haven't read it yet.

6          MR. TAYLOR:  Fair enough.

7          THE COURT:  Because it's not on my -- I mean --

8          MR. TAYLOR:  Fair enough.

9          THE COURT:  -- it's not my calendar.

10         MR. TAYLOR:  It will address all of the debtors.  The

11    central thesis will be that there was a Ponzi scheme here in

12    which there was an account that mixed, like a cement churner,

13    proceeds from all across the debtors and that the cost of

14    untangling that would be, frankly, shockingly high.  And

15    therefore, it makes sense for everyone to substantively

16    consolidate.

17         THE COURT:  Okay.  Okay.  Anything else in terms of

18    status conference?

19         MR. TAYLOR:  No, Your Honor.

20         MR. RUPP:  No, Your Honor.

21         THE COURT:  Okay.  And of course, it may not be

22    granted --

23         MR. TAYLOR:  Understood.

24         THE COURT:  -- which brings us to --

25         MR. COHEN:  I'm sorry, Your Honor.  This is Ted

**LeFever Mattson, a California corporation, et al.**

26

1    Cohen --

2            THE COURT:  Yeah.

3            MR. COHEN:  -- on behalf of Socotra.  I would just

4    request a clarification.  Counsel indicated that later today,

5    they will be filing significant pleadings for the substantive

6    consolidation motion.  And it wasn't clear to me whether that's

7    for the pending motion or the one that's going to be filed for

8    the entire group of --

9            THE COURT:  Constellation of LeFever Mattson cases.

10           MR. COHEN:  Yeah.

11           MR. FIERO:  It's for the KSMP matter, Your Honor.

12           THE COURT:  It's the KSMP.  It's the motion for

13   substantive consolidation that's already on file.  So the

14   consolidation between LeFever Mattson, Inc. and KSMP.  Does

15   that help, Mr. Cohen?

16           MR. COHEN:  Yes.  Thank you.

17           THE COURT:  Okay.

18           MR. FIERO:  And Mr. Cohen only needs to wait a few

19   hours.

20           THE COURT:  Eat lunch now.  That's what Mr. Fiero's

21   telling you, Mr. Cohen.  Again, I don't know if it's going to

22   cause digestion or not, but again, eat now.

23           MR. COHEN:  And sorry, just to clarify, the hearing

24   that's coming up is a status conference under --

25           THE COURT:  Yeah, what happened is, just to give you

**LeFever Mattson, a California corporation, et al.**

27

1   the background if you weren't here, I think the -- is that they

2   filed -- the motion for substantive consolidation was filed.

3   Scheduled to be heard, I think, on the 18th.  My concern was

4   that KSMP had just consented to entry of an order for relief,

5   and I appointed a not natural -- Ms. Itkin.  Again, I don't

6   remember her name.

7            MR. FIERO:  Itkin.

8            THE COURT:  Itkin.  She was appointed, and she,

9   despite being an experienced bankruptcy attorney and turnaround

10  person, needed more time to respond, if she was going to

11  respond, on behalf of KSMP.  So I just turned the 18th hearing

12  into a status conference, again, with the assumption that

13  people can tell me whether any discovery was necessary and how

14  that contested matter was going to proceed.  So that's what's

15  going on there.  Okay.

16           MR. COHEN:  Thank you.

17           THE COURT:  Right.

18           MR. COHEN:  Yep.

19           THE COURT:  Okay.  So do you want me to continue the

20  status conference, Mr. Taylor?  Mr. Rupp?

21           MR. RUPP:  Absolutely.  Your Honor.

22           THE COURT:  To when?  Oh, again, sorry, when's the

23  motion for substantive consolidation going to be heard again?

24           MR. RUPP:  Well, there's a --

25           THE COURT:  Status conference.  Well, again --

**LeFever Mattson, a California corporation, et al.**

28

```
 1              MR. FIERO:  25th.
 2              MR. TAYLOR:  The 25th.
 3              THE CLERK:  July 25th.
 4              THE COURT:  Right.  So I'll continue the status
 5     conference to the 25th, just so that that goes in tandem with
 6     the motion for substantive consolidation.
 7              MR. RUPP:  Okay.
 8              THE COURT:  Because that's obviously going to affect
 9     the outcome of these cases.
10              MR. RUPP:  And when would Your Honor like a status
11     conference statement?
12              THE COURT:  We'll need it -- I assume that the
13     elephant in the room is the motion for substantive
14     consolidation.  Right.
15              MR. RUPP:  Very good, Your Honor.
16              THE COURT:  All right.  Okay.  Let's turn to the
17     motion for financing.  Let me just shift out.
18         (Pause.)
19              THE COURT:  And before we get -- before we get there,
20     just turn back to the status conference.  So I've got -- you're
21     going to have to remind me about money flow here.  We're having
22     these sales, and the sales proceeds are being deposited into
23     the DIP accounts of the entity which owned the property,
24     correct?
25              MR. RUPP:  Correct, Your Honor.
```

**LeFever Mattson, a California corporation, et al.**

1          THE COURT:  Right.  So there hasn't been any

2    commingling?

3          MR. RUPP:  Correct, Your Honor.

4          THE COURT:  All right.  Okay.  Okay.  So again, would

5    turn to the financing motion.

6          MR. RUPP:  May I provide an update, Your Honor?

7          THE COURT:  Sure.

8          MR. RUPP:  Your Honor, I'll point out the debtor's

9    reply brief at docket 1702.  And at that --

10         THE COURT:  No, I read -- that stuff, I read.

11   Again --

12         MR. RUPP:  Very good.

13         THE COURT:  -- it's a lengthy docket, and again, for

14   some reason, I apologize, I missed the stats conference report,

15   but I've read the --

16         MR. RUPP:  Then very good, Your Honor.  I'll give you

17   the latest --

18         THE COURT:  Well, I think I've read the reply, but go

19   ahead.  What's the update?

20         MR. RUPP:  Since the filing of that reply brief,

21   counsel for the debtors and --

22         THE COURT:  That's right.  Right.  And your reply was

23   you were negotiating with Serene about how much money it wanted

24   from the sale of that development.  Things like that.  Right.

25         MR. RUPP:  Yes.  It was additional terms requested by

**LeFever Mattson, a California corporation, et al.**

1    Serene and also our responses to Socotra and Monley Hamlin.

2              THE COURT:  Um-hum.

3              MR. RUPP:  Since the filing of that reply brief, we've

4    continued our discussions with all of these parties, and I want

5    to report that we have agreed.  Socotra has asked for some

6    additional language.  And just before this hearing, we agreed

7    with the debtors, Socotra, and Serene to some more changes,

8    which I can read into the record or I can --

9              THE COURT:  Not yet.

10             MR. RUPP:  -- send to Your Honor.  And also Monley

11   Hamlin has agreed to drop their request for their additional

12   language that they wanted in their opposition.

13             THE COURT:  Right.  And again, it just seemed

14   premature.  It just seemed -- it just wasn't related to

15   anything that's really before me today.  I agree.

16             MR. RUPP:  So as to the parties that have filed

17   responses, I believe we're all set.

18             THE COURT:  Right.  Okay.  I understand the pragmatics

19   of the motion for financing, but let me just summarize what I

20   see and the issues that I have.  Okay.  So this is a motion

21   authorizing post-petition inter-debtor lending under Section

22   364.  And LeFever Mattson seeks to borrow up to 3,050,000

23   dollars from Bishop Pine, LP, Hager Properties LP, and Red Oak

24   Tree, LP.  And I understand that it really only needs an

25   immediate 950,000 dollars, essentially reserving the right to

**LeFever Mattson, a California corporation, et al.**

31

1  borrow up to the 3-million dollar number.  And apparently, it's

2  fully consumed the six million that was borrowed from Serene,

3  and it needs the funds to pay administrative expenses and to

4  continue to subsidize operations of Pineapple Bear and Harrow

5  Cellars, who are two nondebtor entities.  Nothing fully owned

6  by LeFever Mattson, Inc.

7          The interest rate on these notes, eight percent.

8  They'll be treated as an administrative expense.  And again,

9  Bishop Pine, Hager Properties, and Red Oak are all Chapter 11

10 debtors in this constellation of LeFever Mattson debtors.

11 There's no maturity date on the notes.

12         MR. RUPP:  There was no maturity date in the form of

13 inner-debtor lending.

14         THE COURT:  Right.

15         MR. RUPP:  But in our motion, we spelled a maturity

16 date of December 31.

17         THE COURT:  Okay.

18         MR. RUPP:  Okay, Your Honor.

19         THE COURT:  And so Red Oak Tree, LP has 590,042

20 dollars in unencumbered cash generated by the sale of Pinewood

21 Condos in Fairfield, and I guess the sale happened last August.

22 And Red Oak owns three properties, all of which are being

23 marketed.  And these sales will clear apparently 2.1 million,

24 which will provide it with the 2.6 million that LeFever Mattson

25 intends to borrow from it.  And this loan will leave Red Oak,

**LeFever Mattson, a California corporation, et al.**

1    in theory -- again, putting aside the motion for substantive

2    consolidation, this money will leave Red Oak with no funds or

3    other property to disperse to its specific creditors, correct?

4            MR. RUPP:  Until the money is repaid, yes, Your Honor.

5            THE COURT:  Right, but it won't be repaid if -- again,

6    it's -- right, if and when we paid.  So my question is -- I

7    mean, so you're asking me to look at this from the perspective

8    of LeFever Mattson, but you're not looking at it -- but you're

9    not asking me to look at this from the perspective of Red Oak

10   Tree, LP because it's a debtor seeking to lend funds at eight

11   percent unsecured.  lend it to -- so you got to look at it from

12   that perspective also.  So I've got a debtor lending money --

13   sending all of its cash, all of its assets, essentially, to

14   another debtor.  And in return, it's getting a promise to be

15   repaid at eight percent.  It's getting a piece of paper.  No

16   security.  Nothing.

17           And my question is, and it'll be the same question for

18   the other entities, how is that in the best -- how is Mr. Sharp

19   using -- how is that -- how is that justified under the

20   Bankruptcy Code?  A, do I know -- I hate to be technical here,

21   but I'm going to be because all I have is a motion for

22   substantive consolidation on file.  I've got no idea what its

23   merits are or the strength.  I'm not saying it won't be

24   granted.  I'm just saying, I just don't know.

25           And in the interim, Mr. Sharp is saying, well, under

**LeFever Mattson, a California corporation, et al.**

33

1   the Bankruptcy Code, this debtor can -- again, no one has

2   looked at it -- looked at it or asked me to look at this from

3   this angle.  And of course, I have to.  Is whether Red Oak Tree

4   should -- I mean, I know why LeFever Mattson wants this deal.

5   It's a sweet deal.  It can't get this deal on the market.  But

6   why would Red Oak -- why would Red Oak Tree lend this money to

7   LeFever Mattson?  How in the world does that -- can Mr. Sharp

8   justify this when he puts on his Red Oak Tree, LP cap?  I don't

9   know.  I don't know how this loan satisfies the business

10  judgment rule if you're looking at it from Red Oak Tree's

11  perspective.

12          Does the Red Oak Tree, LP operating agreement

13  authorize it to loan funds?  Can do it?  Again, I understand

14  the motion for substantive consolidation may cure all ills, but

15  we're not there yet.  And I recognize that LeFever Mattson owns

16  about seventy-percent interest in this debtor.  But I don't

17  know if there are any disputes regarding unrecorded interest

18  holders in that entity.

19          Same thing with Hager Properties.  Hager Properties

20  has 318,343 dollars in unencumbered cash from the sale of

21  Redwood Apartments in May 2024.  And Hager Properties doesn't

22  own any other property.  So again, what the proposed deal is,

23  is that LeFever Mattson is going to borrow all the funds, all

24  the assets of this entity, in exchange for which it gets a note

25  at eight percent unsecured.  And again, how is this in the

**LeFever Mattson, a California corporation, et al.**

34

1   best -- I understand why it's a good deal for LeFever Mattson.

2   I don't understand how Mr. Sharp, who is also the -- again, has

3   some fiduciary responsibilities, how he can justify that from

4   the Red Oak Tree perspective.  And again -- excuse me, from the

5   Hager Properties perspective.

6           And then you've got this -- again, and the same rings

7   true for Bishop Pine.  Bishop Pine has 96,335 dollars in

8   unencumbered cash generated by the sale of the Waters Edge

9   Riverside Properties in May 2024.  And Bishop Pine does not own

10  any other properties.  I assume doesn't have any other assets.

11  Same question.

12          I understand why this is a good deal for LeFever

13  Mattson under 364, but I don't understand how any of these

14  entities who are lending these funds can justify this deal,

15  again, because again, as we sit here today, these are all

16  separate Chapter 11 debtors who have different creditors.

17  Different equity interest holders.  And I understand that none

18  of them have opposed these motions, but that's not the answer

19  to my questions.

20          So then finally, we have LeFever Mattson, also without

21  court permission, borrowed apparently 400,000 dollars from

22  Beech Pine, LP in November and December of last year without

23  bankruptcy court permission.  And now, I guess it wants

24  retroactive court permission with regard to those -- with

25  regard to those borrowings.  And again, I have no evidence.

1   Again, the argument was, I guess initially, that this was

2   lending in the ordinary course of business, but I have no

3   evidence of lending in the ordinary course of business.

4        So that's my first issue.  And the answer -- so if you

5   look at the footnotes, again, that you -- again, that

6   references to the case law you gave me in the status conference

7   report saying, these inter-debtor transactions in these type of

8   cases happen.  But one of the cases you cited to me said,

9   usually there's no conflict, but there's a huge conflict here

10   that Mr. Sharp has.  And equally as significant is the conflict

11   that Keller Benvenutti has on being on both sides of this deal.

12        Now, I'm not trying to be -- I'm not trying to get in

13   the way of progress here.  But again, again, I don't -- how do

14   we -- how do I approve the -- so I understand, again, good deal

15   for -- a good deal for LeFever Mattson.  Be frank with you.

16   Bad deal for the lending entities.  And they need my approval

17   as much as LeFever Mattson needs my approval.

18        MR. RUPP:  Your Honor, no disagreement that it has to

19   be proven as to all of the entities and --

20        THE COURT:  Yet, you didn't address that at all.  That

21   was just not mentioned at all.

22        MR. RUPP:  Your Honor, I think if --

23        THE COURT:  Which is a sign to me that you know it's a

24   problem, and you don't -- and so again, I'm not trying to get

25   in the way of progress, Mr. Rupp.  I understand.  I appreciate

**LeFever Mattson, a California corporation, et al.**

36

1   everyone's hard work here.  But I'm not going to throw the --

2   I'm not going to ignore the Code and the Rules and everyone's

3   ethical obligations here.  Again, you guys ran out of money

4   before you could file the motion for substantive consolidation.

5          MR. RUPP:  Your Honor, I --

6          THE COURT:  Sorry.

7          MR. RUPP:  In our budget, it does show that the

8   LeFever Mattson has properties it is selling, and there will be

9   funds to repay these notes.  This was --

10         THE COURT:  Yeah.  Well, okay.  Let's talk about that

11  for a second.  The properties we're talking about are -- what,

12  the Pinyon development?  What's the name of it again?

13         MR. RUPP:  That's one of them.  Pinyon Creek II.

14         THE COURT:  Yeah, Pinon Creek.  Is there a deal?

15         MR. RUPP:  There is a signed PSA.

16         THE COURT:  Okay.  And the PSA is subject to

17  contingencies?

18         MR. RUPP:  I can't speak to it exactly, but --

19         THE COURT:  Right.

20         MR. RUPP:  -- it's a large deal and --

21         THE COURT:  Right.  So let's assume that it does.  And

22  out of that, you've got to pay, I guess, the mechanic's liens

23  against -- I forget the name of the objecting party.

24  Mechanic's liens of --

25         MS. KUTSURIS:  Monley Hamlin, Your Honor.  Oh,

1    apologies.  Monley Hamlin, Your Honor, as the mechanic's.

2              THE COURT:  Thank you.  And those mechanic's liens

3    are, what, 2.1?  2.2?  2.3 million?  Something like that?

4              MS. KUTSURIS:  Yes, Your Honor, roughly.  We filed a

5    proof of claim for the exact amount.  About 2.016, I believe,

6    million.

7              THE COURT:  Right.  Right.  And then you've reached a

8    deal with, I guess, Serene to pay it four million out of those

9    proceeds.  And again, so -- and then you've got broker's fees

10   and consulting fees that come out of the top.  So LeFever

11   Mattson's going to be -- and then it still owes another X-

12   million dollars to Serene.  And I think that comes due, what,

13   September?  October?  Something like that?

14             MR. RUPP:  Yes, Your Honor.  The budget --

15             THE COURT:  But again, so --

16             MR. RUPP:  -- goes through October.

17             THE COURT:  But again, that doesn't -- again, I

18   understand the need to borrow.  And then we can go over the

19   budget, and I've got some questions about that.  But that

20   doesn't mean I can authorize the institutions who are lending

21   the money or the debtors who are lending money to lend it

22   because it's a bad deal for them.  And I know you can say, Your

23   Honor, it's all going to come out in the wash.  The motion for

24   substantive consolidation.  But that's putting the cart before

25   the horse.

**LeFever Mattson, a California corporation, et al.**

1      MR. RUPP:  Your Honor, that's not what I'm going to

2   say because this --

3      THE COURT:  But again, okay.  I've said it.  Go ahead.

4   How do I -- again, again, Mr. Rupp, I have said this before,

5   and I'll say it again.  You need to educate me and tell me how

6   I approve this without violating the -- without violating the

7   Bankruptcy Code.  And then we have to talk about your firm in a

8   second.  Go ahead.

9      MR. RUPP:  Very good, Your Honor.  If we said, we're

10  going to borrow money from all of the other LPs and take what

11  we want, there would be no administrative problem here.  We

12  scoped --

13     THE COURT:  And of course, that's -- of course, that's

14  Mr. Kelly's argument in his Live Oak issue.

15     MR. RUPP:  But we took a look at this, and we only are

16  looking to borrow as much as we need just as a bridge until

17  properties are sold and only from those debtors where there are

18  no cash collateral issues and with this limited amount and with

19  the budget showing property sales.  And again, we're here in

20  court, and they will be --

21     THE COURT:  But Mr. Rupp, I understand the pragmatic

22  argument.  Again, I'm not trying to -- again, let me be honest

23  here.  I'm not trying to get in the way of progress, but it's

24  got to be consistent with the Code.  I hate to say that, but

25  I'm going to say it.  It's got to be consistent with the Code.

1    And to be more honest, it's got to be consistent with your

2    ethical obligations and Mr. Sharp's ethical obligations, both

3    of which are now in question.

4              MR. TAYLOR:  Your Honor, if I may, the --

5              THE COURT:  Again, and this isn't the first time I

6    have raised it, but we're now at the tipping point.

7              MR. TAYLOR:  From the perspective of the lending

8    debtors, they've had their administrative fees paid throughout

9    by LeFever Mattson and --

10             THE COURT:  What administrative fees have they

11   incurred?

12             MR. TAYLOR:  They have incurred their pro rata.  They

13   have avoided --

14             THE COURT:  No.  No.  No.  See, we've had this

15   discussion before, Mr. Taylor, about how you were -- how you

16   were -- and we had a lengthy conversation, and it was kicked

17   down the -- that can was kicked down the road.  There's no pro

18   rata.  I mean, you may think it's pro rata, but it's not until

19   it gets approved.

20             And to say that, oh -- there is no agreement here.

21   Maybe in your mind, but there's no agreement here as to how --

22   as to what all these entities' responsibilities are for the

23   fees that the LeFever Mattson has incurred.  That was made

24   perfectly clear by me to all of you in a lengthy hearing.

25             MR. TAYLOR:  Fair enough.

1        THE COURT:  Again, I'm not -- again, so with that

2   said --

3        MR. TAYLOR:  The other benefit, they've got a short-

4   term note on which they're going to make eight percent, which I

5   think is favorable to the rate at which these companies have

6   lended to each other in the past.  And it's budgeted to be

7   repaid in less than six months.  That's clearly a benefit to

8   these debtors.  Their LPs are making money.

9        THE COURT:  Oh, but it's giving up cash.

10        MR. TAYLOR:  It is, but it has no need for that cash

11   in the next six months.

12        THE COURT:  Sure it does.  It's got its own creditors.

13   It's got its own equity interest holders.  And they're saying

14   bye-bye to whatever is left of their equity interests, saying

15   bye-bye, with the hope -- and of course, they have no idea.

16   Only you folks do because I haven't seen the motion.  The

17   motion hasn't been filed.  Have no idea what they're going to

18   get out of this Chapter 11 plan that's being filed.  So they're

19   saying goodbye to their cash, and they don't know what LeFever

20   Mattson's going to be -- whether LeFever Mattson's going to be

21   able to repay them or not.

22        MR. TAYLOR:  I would suggest, given the way that we've

23   heard from Your Honor, we can amend our pleading to buttress

24   these arguments.  We haven't sat here and thought, oh, what's

25   good for LeFever Mattson.  What's not good for the others.

**LeFever Mattson, a California corporation, et al.**

41

1          THE COURT:  No, I know.

2          MR. TAYLOR:  So we're happy to do that.

3          THE COURT:  Okay.  But again, I hate to be the stick

4     in the mud here --

5          MR. TAYLOR:  Yeah.

6          THE COURT:  -- but don't you need conflict counsel?  I

7     mean, again, don't you need conflict counsel?  I mean, isn't

8     your firm -- your firm can't represent both borrower and

9     lender, can it?  And I don't think the Bankruptcy Code waives

10     any of that.

11          MR. TAYLOR:  As you indicated, these issues do come up

12     in cases.  And yes, when there are actual conflicts, when these

13     conflicts counsel.

14          THE COURT:  Right.  And now, we have --

15          MR. TAYLOR:  Okay.

16          THE COURT:  -- a conflict.  We've got a borrower

17     lender saying, I can't get these funds on the market, but I can

18     get it from entities that I control.  So I'm just going to

19     sweep their accounts.  Pay them a de minimis amount of

20     interest.  They can stick the money into T-bills and get four-

21     and-a-half percent.

22          MR. TAYLOR:  Yeah.  We have other lending sources.

23     The alternatives, unfortunately, come with terms that I don't

24     think any of the debtors would appreciate.  And so we've sought

25     a way --

**LeFever Mattson, a California corporation, et al.**

42

1         THE COURT:  Well, but again, any of the debtors --

2    okay.  Then let's figure out what the answer is.  And there's

3    an answer, again, if you want to brainstorm.  I mean, the

4    answer is, well, the professionals don't get paid until -- the

5    professionals stop getting paid, which typically happens in

6    Chapter 11 cases.  They don't get paid until confirmation.  And

7    because look, you folks have been getting paid eighty cents on

8    the dollars.  Maybe you cut it down to fifty cents on the

9    dollar.

10        MR. TAYLOR:  Your Honor, I will say that while you

11   have approved that, the professionals by and large are not

12   getting paid.  We have voluntarily deferred fees for this very

13   reason.

14        THE COURT:  Okay.  Then let's look at where the money

15   is going.

16        MR. TAYLOR:  Yes, Your Honor.

17        THE COURT:  Again, I'm just telling you, just because

18   it's a big case doesn't mean you get to walk away from your

19   ethical responsibilities.  Again, I hate to be the stick in --

20        MR. TAYLOR:  Fully understood.

21        THE COURT:  And again, and you need to tell me, I'm

22   wrong.  I don't mind being told I'm wrong.  But to tell me,

23   though, that big cases, I mean, we just get to waive all these

24   things.  I don't think you do.

25        MR. TAYLOR:  Here's what I would say, Your Honor.  No

**LeFever Mattson, a California corporation, et al.**

```
1   one is trying to shirk ethical obligations.
2              THE COURT:  No, I understand that.  But again, as I
3   said, this is where you need to educate me.  And the fact that
4   when you're dropping this stuff into a footnote, that's not a
5   good sign.
6              MR. TAYLOR:  The alternative, of course, at the other
7   end of the spectrum is sixty-one different sets of
8   professionals, which I don't think anyone would condone.
9              THE COURT:  I'm not saying --
10             MR. TAYLOR:  It would be prohibitively expensive.
11             THE COURT:  See, I'm not saying that's necessary.
12             MR. TAYLOR:  So there's a middle ground.  And the
13  question is where is that middle ground?  The fact is, there's
14  not a bright line in the case law --
15             THE COURT:  Okay.
16             MR. TAYLOR:  -- on where that middle ground is.
17             THE COURT:  No, I understand, but we're now -- and I
18  understand.  Again, you've got this -- I understand, but you're
19  now on both sides of a very specific transaction, where one
20  side is getting -- where you are absorbing, borrowing every
21  dime that these debtors have.  That's what I'm saying.
22             MR. TAYLOR:  The alternative would be to have counsel
23  for each of these debtors.  I question whether there are LPs
24  who have not objected that --
25             THE COURT:  But that doesn't -- but that doesn't
```

**LeFever Mattson, a California corporation, et al.**

44

1   matter.  I mean, I understand.

2           MR. TAYLOR:  -- whether they would want to --

3           THE COURT:  They haven't objected.  But that

4   doesn't -- oh, if you don't object -- again, look, I've said

5   this many times.  The fact that there's no objection to a

6   motion doesn't mean I grant it.

7           MR. TAYLOR:  Understood.  I think it's a tough

8   question whether it is in the best interest of these LPs to

9   spend money hiring their own counsel, getting it up to speed,

10  negotiating a deal versus taking eight percent on a note in six

11  months.  I don't think that's an easy question to answer.  We

12  have thought about this.  This is how --

13          THE COURT:  It's easy.

14          MR. TAYLOR:  It's easy?

15          THE COURT:  Sure.

16          MR. TAYLOR:  Well, then you certainly can order it.

17          THE COURT:  I mean, again, let's say -- put on your

18  Red Oaks hat.  Okay.  Let's have this conversation then.  Put

19  on your Red Oak Tree hat, or even better, the Hager Properties

20  hat.  The deal.  I come to you and say, I want every dime that

21  you have.  I'm not going to secure it.  Eight percent.  I think

22  you would get -- I think you would get paid back.  I don't

23  know.  And I know you -- and I know you've got other -- again,

24  again, you're the fiduciary for Hager Properties.  And you've

25  got creditors there.  You've got equity interest holders

**LeFever Mattson, a California corporation, et al.**

45

1   because LeFever Mattson only owns about thirty-seven percent.

2          How is that a good deal?  And maybe you need -- and so

3   maybe you need to file a motion saying, no -- and file a

4   declaration.  Well, again, but you didn't even address that

5   argument, Mr. Taylor, that this is a -- that Mr. Sharp, wearing

6   both hats, can honestly say or was willing to say, I think this

7   satisfies the business judgment test for these debtors.  And

8   maybe that's what you need to do because X, Y, Z.

9          MR. TAYLOR:  We can do that, or we can say, you know

10  what?  We couldn't make it.  And therefore, we're going to have

11  to hire different counsel.  I think we can do that, but that --

12  understood.  Understood.

13         THE COURT:  Again, but again, I assume you -- I assume

14  you had this -- well, I shouldn't assume anything.  Again, I'm

15  just saying, it's -- I understand why LeFever Mattson's filed

16  this motion.  I don't understand why you didn't say, and these

17  debtors can, under 363, do this and satisfy the business

18  judgment rule.  Maybe that's what -- maybe, if you meet that

19  test, I approve the funding.  But I have no idea --

20         MR. TAYLOR:  Understood.

21         THE COURT:  -- if these letters are authorized under

22  the operating agreement to loan money.  I have no idea

23  whether -- again, so I just don't know.

24         MR. TAYLOR:  Understood.

25         THE COURT:  Again, I'm not trying to get in the way of

**LeFever Mattson, a California corporation, et al.**

46

1    the progress, but I want to make sure that you comply with the

2    Code so that somewhere down the road, if everything blows up,

3    these debtors don't turn to someone and say, well, why did you

4    approve this deal?  I mean, it's -- I mean, again, they're

5    lending money to a Chapter 11 debtor.  Unsecured.  Eight

6    percent.  Every dime they have.

7           MR. TAYLOR:  We've been able to confer with our client

8    via text.  We're comfortable amending the pleading and

9    addressing the points you're raising.  It's understood.

10          THE COURT:  Right, and then -- okay.  So I can't

11   approve the financing because I can't approve it from the

12   perspective of Red Oak, Hager, and Bishop Pine.  And I don't

13   know how long the money that you have is going to last.  I just

14   don't know.

15          MR. TAYLOR:  We'll have to confer with our client.

16          THE COURT:  Okay.  So let's talk about this loan and

17   where the proceeds were going to go because maybe we need to

18   have a conversation too about this.  Part of the funds -- and

19   again, I appreciate the budget.  The cash flow forecast.  Part

20   of the funds, it's about 400,000 dollars from June to, what,

21   the end of October.  400 -- or more than that.  Sorry.  A

22   million dollars is going to Pineapple Bear operating funds.

23          And we had this conversation.  I think there was an

24   order out there somewhere where we've divided -- we've come up

25   with a formula whereby LeFever Mattson is funding X dollars of

**LeFever Mattson, a California corporation, et al.**

```
 1   Pineapple Bear, and the entities which are actually using
 2   Pineapple Bear services also funds it.  But you're borrowing
 3   three million, a million of which -- I mean, if someone came to
 4   my office and said, here is my cash flow -- here's my budget
 5   cash flow.  I'm saying, why are you spending a million dollars
 6   on an entity that can't support itself?
 7           And again, I remember the -- I remember the argument.
 8   The argument is, well, I mean, because that's -- I mean,
 9   because Pineapple Bear is just an entity with no contracts with
10   anyone providing services.  Well, maybe that needs -- maybe
11   that needs -- and you came up with a formula to somewhat
12   satisfy that.  But you're borrowing money to fund an entity
13   that is consistently losing money that has no value.
14           And then you're also spending another 760,000 dollars
15   on home tax payroll deficiency due to management fees impacted
16   by Chapter 11.  Well, maybe you need to fire somebody.  Maybe
17   you don't need that type of payroll.  If the funds it's
18   generating aren't sufficient to keep X number of people on the
19   payroll.
20           And then of course, there are loans to noncash flow
21   properties.  I don't know whether you need approval for that or
22   not.  I don't know if that's ordinary course, if that's your
23   argument.  But are those entities that have noncash flow
24   properties, are those properties being sold first rather than
25   later?
```

**LeFever Mattson, a California corporation, et al.**

48

1          MR. RUPP:  Your Honor, to answer your first question,

2     yes, we would assert that that lending is ordinary course.  And

3     second, all the properties are being sold as quickly as

4     whatever they happen to be and how quickly and efficiently you

5     can sell such a property.  It's a very varied portfolio of all

6     kinds of properties.  So they may be non-cash flowing, but if

7     there is maintenance that needs to be done, if the PG&E bill

8     needs to be paid, for example, not paying that will decrease

9     their value.

10          THE COURT:  Has anyone done a cost-benefit analysis as

11     to whether it makes sense to continue to fund these folks?  I

12     mean, are all these properties -- is there equity in all these

13     properties because somewhere along the line, you've mentioned

14     that some of the properties of 176 properties you've mentioned

15     there is no equity.

16          MR. FIERO:  Your Honor, the committee has asked

17     similar questions because it has the same concerns that you do.

18     And --

19          THE COURT:  And so why haven't you opposed any of

20     this, Mr. Fiero?

21          MR. FIERO:  -- is it is our understanding that --

22          THE COURT:  Mr. Fiero, why hasn't the committee

23     opposed any of this?

24          MR. FIERO:  The committee hasn't taken a position on

25     this motion, Your Honor.

**LeFever Mattson, a California corporation, et al.**

49

```
 1            THE COURT:  Why?  Because it needs the money.  Because
 2    its lawyers need the money.  Is that what you're saying?
 3            MR. FIERO:  It's --
 4            THE COURT:  I'm serious.  Why hasn't the committee
 5    opposed this motion?
 6            MR. FIERO:  Your Honor, I don't attend all the
 7    committee meetings.
 8            THE COURT:  Or not even opposed --
 9            MR. FIERO:  I'm sorry.
10            THE COURT:  -- but responded to this motion.
11            MR. FIERO:  Yes.
12            THE COURT:  I don't understand.
13            MR. FIERO:  The committee elected not to voice an
14    opinion on this motion.  But what I do want you to know is that
15    with regard to Pineapple Bear, there has been extensive
16    analysis of whether us taking all of the things that Pineapple
17    bear is connected to and simply turning them off, destroying
18    their going concern value --
19            THE COURT:  As a result of that -- and I appreciate
20    it, but and the answer is?
21            MR. FIERO:  And the answer is that that that is not a
22    good deal for these estates.
23            THE COURT:  Okay.
24            MR. FIERO:  That those assets which sit under the
25    Pineapple Bear umbrella are worth far more if the doors are
```

**LeFever Mattson, a California corporation, et al.**

1  kept open and the lights are kept on than if the alternative is

2  what happens.  And we've asked the question.  We've gotten

3  specific advice from FTI on this matter.  With --

4            THE COURT:  But why is the LeFever Mattson having to

5  fund this?  And I know we went through this, but why is --

6  again, if Pineapple Bear, again, is providing value, if its

7  services have value, why aren't those entities that are using

8  the services paying full boat on that and not compelling the

9  LeFever Mattson to borrow money to pay for these services?

10           MR. FIERO:  I think that question might be better

11  posed to the debtors, but I want you to know that it is our

12  understanding, based on the expert advice of retained

13  professionals whose qualifications --

14           THE COURT:  I understand.

15           MR. FIERO:  -- are unquestioned, that we do worse,

16  creditors do worse, if all of the businesses served by

17  Pineapple Bear turn off the lights and close the doors.

18           THE COURT:  Yeah, but I -- right.  Okay.  And they're

19  just not willing to pay for it.  Or again, because --

20           MR. FIERO:  Not able.

21           THE COURT:  I get it.  And again, we've had this

22  conversation because there's a formula out there between

23  LeFever Mattson and all the enemies.  I recall.  And I have

24  some -- okay.

25           Well, as I said, I'm not approving the financing.  The

**LeFever Mattson, a California corporation, et al.**

51

1   motion is denied.  Or we can -- well --

2           MR. TAYLOR:  Yeah.

3           THE COURT:  -- I'm not -- let me be more -- I'm not

4   approving it today.  If you want to supplement the motion with

5   declarations demonstrating that these lending institutions are

6   lending the money consistent with the Bankruptcy Code, that's

7   fine.  But if I get a declaration -- I mean, but I'm just --

8   again, I've given you why I'm skeptical.  It's one thing post-

9   motion for substantive consolidation.  It's another thing pre-

10  motion for substantive consolidation because I've got no idea

11  what the outcome of that motion is going to be.

12          I am not comfortable with LeFever Mattson's -- again,

13  I don't know what LeFever Mattson's ability is to pay all the

14  debts that it's incurring post-petition.  And I don't know why

15  these debtors, looking at what I see, should take a chance at

16  having no cash and having the cash replaced with a note when

17  they can, again, earn four-and-a-half percent investing in

18  ninety-day T-bills.

19          MR. TAYLOR:  Understood, Your Honor.  I do think we

20  should continue the hearing, and we can --

21          THE COURT:  Okay.  No, again, I -- again, I appreciate

22  everyone's work here.  And again, and I know how, and I

23  appreciate.  But again, there's an actual conflict here that

24  has to be addressed and needs to be addressed because if things

25  blow up, and I'm not saying they are or will, but if it does,

**LeFever Mattson, a California corporation, et al.**

52

1   the equity interest holders of these entities have a right to

2   know that Mr. Sharp protected their funds, as is his fiduciary

3   duty to do so.  So you have to tell me what you want to do or

4   how you get where you need to go consistent with the Code.

5   That's all I'm saying.

6              Okay.  So you want to continue it?

7              MR. TAYLOR:  Yes, Your Honor.

8              MR. RUPP:  Yes, Your Honor.

9              MR. TAYLOR:  I think we should, and Mr. Rupp --

10             THE COURT:  Tell me when.

11             MR. TAYLOR:  -- may have thoughts on a date.

12             MR. RUPP:  Well, may I have a moment, Your Honor?

13             THE COURT:  Oh, okay.  Well, we'll take a short break

14  so you can get that.  Let's talk about one more thing.

15             MR. RUPP:  Okay.

16             THE COURT:  I've got a free application on calendar,

17  your firm, next week.  And my concern, based upon this motion,

18  is that at some point, I have a question as to if and when your

19  firm became not disinterested or at some level in this -- at

20  some point.  And again, this motion reflects my concern that --

21  and again, because I've got Bradley Sharp and presumably your

22  firm on both sides of these loans, which means that -- which

23  raises the issue as to, at some point, did your firm no longer

24  satisfy the 327 requirement that you be both disinterested and

25  not have an adverse interest because it can't be on both sides

**LeFever Mattson, a California corporation, et al.**

53

1   of the transaction.  I mean, again, California law requires

2   waivers.  Things like that.  Interesting to see how you get a

3   waiver when the person seeking the waiver and the person

4   waiving it is the same person.

5           So these transactions cause a host of problems for --

6   possibly create a host of other problems.  And I'm not willing

7   to review the fee application absent some analysis as to

8   whether your firm has remained disinterested and if it, at some

9   point, didn't, when.  Because again, it can't be on both sides

10  of this.  And again, and I understand, again, again, this is a

11  large case.  It makes sense to have -- again, as these circuit

12  court cases that you cited to be indicate that you need the

13  same counsel, until there's an actual conflict, and there's an

14  actual -- I mean, the looks as if there is an actual conflict.

15          And if I'm wrong, tell me.  And again, I'm not --

16  again, that's why I asked you folks to educate me when

17  necessary.  But I don't know how -- I don't know how you're on

18  the same side of the transaction.  I mean, look, under

19  California law, you need a waiver, right?  We all agree you

20  need a waiver representing both borrower and lender?  I don't

21  know how you don't.  Problem.

22          MR. TAYLOR:  Your Honor --

23          THE COURT:  Yeah.

24          MR. TAYLOR:  -- I would just suggest that it's likely

25  to take longer than the break for us to figure out the issue.

**LeFever Mattson, a California corporation, et al.**

54

1           THE COURT:  No, no, no, no, no, see, I'm --

2           MR. TAYLOR:  Just, we can set a date.

3           THE COURT:  Okay.  Okay.  I'm not asking you to answer

4    these questions.  I'm just telling me -- I'm just asking you to

5    tell me when you want this heard and how much time you need to

6    respond --

7           MR. TAYLOR:  Yeah.

8           THE COURT:  -- so I can try and get it right.  And

9    again, I'm not trying to get in the way of progress, I'm not,

10   because I appreciate everyone's hard work here.  But again,

11   I've got a Code and Rules to follow.  I understand that I've

12   got discretion, particularly in cases like this, but here's the

13   conflict.  I mean, again, as those circuits -- I mean, until

14   there's an actual conflict, and it looks as if I've got an

15   actual conflict here that I just can't ignore.

16          So again, I'm going to take a short -- I'm going to

17   recess until 1 o'clock.  Again, I apologize for everyone else

18   who's on this calendar.

19          Mr. Bostick, you were about to say something, or no?

20          MR. BOSTICK:  No.  No, Your Honor.

21          THE COURT:  Okay.  I'll take a break till 1 o'clock.

22   Then you can tell me how you want to -- what do you want to do

23   with the motion for refinancing -- excuse me, the motion to

24   finance, what -- and when do you want me to hear your fee

25   application.

**LeFever Mattson, a California corporation, et al.**

55

1        And Mr. Shine, your office is going to have to respond

2    to my concerns.  That's your office's job.  And if I'm wrong,

3    from your office's perspective, I need you to tell me that.  So

4    whatever deadline, whatever briefing schedule I set for Keller

5    Benvenutti fee app, your office has got to participate because

6    that's what the primary functions of your office.  And again, I

7    appreciate you regularly do it in other cases.  I expect you --

8    and again, if you want to say we take no position, but that's

9    probably not a good thing to do because there's a position to

10   be had here, whether it's for or against.  And I expect your

11   office to tell me what you think the law is.

12        Okay.  Break until 1 o'clock.  Thank you.

13      (Recess from 12:44 p.m., until 1:01 p.m.)

14        MR. TAYLOR:  Yes, Your Honor.  We've conferred with

15   our client.  You've raised serious issues that we want to take

16   very seriously.  Our proposal is that we continue this to the

17   25th, when there's already a status.  And we may well request a

18   hearing at that status for some time soon in the future on both

19   our fee application and on the inter-debtor lending.

20        THE COURT:  Okay.  No, again, and I appreciate it.

21   But then I'll -- oh, go ahead.  Sorry.

22        MR. TAYLOR:  Well, I can't speak for the other

23   professionals who have fee applications on for the 18th.  I'd

24   like to check with them later and see what they want to do.

25        THE COURT:  Well, I mean, is it SS --

**LeFever Mattson, a California corporation, et al.**

56

```
 1          MR. TAYLOR:  There's SSL.  There's --
 2          MR. RUPP:  There's SSL.  The real estate counsel.  Don
 3  Davidson, the investigation --
 4          THE COURT:  I'm going to go with the -- I mean, as
 5  best I -- I think I'm going -- I don't think.  I'm going
 6  forward with those.
 7          MR. TAYLOR:  Okay.
 8          THE COURT:  I mean, because I mean, they don't --
 9  those fee applications don't raise the same issues, I don't
10  think, as yours do, if, again, when I take a -- and I've
11  already started my review of those fees.  But if they do, I'll
12  raise them next Friday.  But again, at first blush, again, I
13  didn't see those issues.  Again, I haven't -- again, and I've
14  just started my analysis of those fees.
15          So those hearings are going forward on those fees.
16          MR. TAYLOR:  Fair enough.
17          THE COURT:  Okay.
18          MR. RUPP:  That's fine.
19          THE COURT:  Okay.  So we're continuing the borrowing
20  motion to July 20th?  I'm sorry.
21          MR. TAYLOR:  If we could make it a status --
22          THE COURT:  Status?  Okay.
23          MR. TAYLOR:  -- on July 25th, at that point --
24          THE COURT:  Right.
25          MR. TAYLOR:  -- we'll be able to tell you, we think we
```

**LeFever Mattson, a California corporation, et al.**

57

1   can have a hearing on next date.

2              THE COURT:  The status on the borrowing motion --

3   status conference on the borrowing motion on July 25th at 11

4   o'clock.

5              MR. TAYLOR:  Yes, Your Honor.

6              THE COURT:  Okay.

7              MR. TAYLOR:  And I think a status on the fee app as

8   well.  I think, for both, we're going to submit something

9   supplemental.

10             THE COURT:  Oh, right.  Apologize.  On the fee

11  applications.

12             MR. TAYLOR:  Yeah.

13             THE COURT:  Okay.  I appreciate it.  Anything else

14  today?  Although it's probably good enough.

15             MR. TAYLOR:  Not from us, Your Honor.

16             MR. SHINE:  Your Honor, for the continued fee

17  application, is there a date by which we should file a

18  supplemental response?

19             THE COURT:  Well, it should have been filed already,

20  Mr. Shine.  I'll be blunt with you, I was surprised I didn't

21  see anything from your office.  Well, let's see what happens on

22  the 25th.  I mean, if you want to file something beforehand

23  just to raise whatever issues you think I should address, file

24  it and file it by -- file it by the 21st.

25             MR. SHINE:  Yes, Your Honor.

**LeFever Mattson, a California corporation, et al.**

58

1          THE COURT:  Okay.  Anything else?  Any comments from

2     anybody else?

3          Okay.  I appreciate everyone's patience here.

4        (Pause.)

5          THE COURT:  Okay.  So that takes care of the LeFever

6     Mattson matters, correct?

7          MR. TAYLOR:  It does.

8          THE COURT:  Correct.

9          MR. TAYLOR:  Thank you, Your Honor.

10          MR. RUPP:  Thank you, Your Honor.

11          THE COURT:  Okay.  Thank you.

12          MR. FIERO:  Thank you, Your Honor.

13          THE COURT:  Thank you, all.

14        (Whereupon these proceedings were concluded at 1:05 PM)

15

16

17

18

19

20

21

22

23

24

25

59

C E R T I F I C A T I O N

I, River Wolfe, certify that the foregoing transcript is a true
and accurate record of the proceedings.

_____

/s/ RIVER WOLFE, CDLT-265

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date:  July 15, 2025

## A

**ability (1)**
51:13
**able (5)**
13:12;40:21;46:7;
50:20;56:25
**above (1)**
24:13
**absent (1)**
53:7
**absolutely (3)**
13:9;22:8;27:21
**absorbing (1)**
43:20
**account (1)**
25:12
**accounting (1)**
19:24
**accounts (2)**
28:23;41:19
**accrued (6)**
22:17,18;23:1,3,10,
10
**across (1)**
25:13
**actions (1)**
22:2
**actual (8)**
13:11;41:12;51:23;
53:13,14,14;54:14,15
**actually (1)**
47:1
**addition (2)**
13:9,10
**additional (3)**
29:25;30:6,11
**address (6)**
17:12;24:20;25:10;
35:20;45:4;57:23
**addressed (2)**
51:24,24
**addressing (1)**
46:9
**administered (2)**
6:15;11:9
**administration (3)**
13:6;14:11;16:25
**administrative (5)**
31:3,8;38:11;39:8,
10
**Adversary (1)**
21:23
**adverse (1)**
52:25
**advice (2)**
50:3,12
**affect (1)**
28:8
**afternoon (1)**
19:25
**again (125)**

8:2;9:19;11:16;
12:17;13:1,13,21;
14:3,23;15:1;16:2,16;
17:8;18:5,6;19:11;
20:7,8;23:10;24:2,3,
8;26:21,22;27:5,12,
22,23,25;29:4,11,13;
30:13;31:8;32:1,5;
33:1,13,22,25;34:2,4,
6,15,15,25;35:1,5,5,
13,13,14,24;36:3,12;
37:9,15,17,17;38:3,4,
4,5,19,22,22;39:5;
40:1,1;41:3,7;42:1,3,
17,19,21;43:2,18;
44:4,17,23,24;45:4,
13,13,14,23,25;46:4,
19;47:7;50:6,6,19,21;
51:8,12,17,21,21,22,
23;52:20,21;53:1,9,
10,10,10,11,15,16;
54:9,10,13,16,17;
55:6,8,20;56:10,12,
12,13,13
**against (5)**
6:21;7:14;8:4;
36:23;55:10
**agent (1)**
15:20
**agree (3)**
13:14;30:15;53:19
**agreed (4)**
7:15;30:5,6,11
**agreement (4)**
33:12;39:20,21;
45:22
**ahead (4)**
29:19;38:3,8;55:21
**alleging (1)**
13:11
**allow (1)**
8:7
**allowing (2)**
22:20,20
**allows (1)**
15:21
**along (2)**
21:24;48:13
**alternative (3)**
43:6,22;50:1
**alternatives (1)**
41:23
**although (2)**
17:8;57:14
**amend (1)**
40:23
**amending (1)**
46:8
**amount (4)**
23:17;37:5;38:18;
41:19
**analysis (4)**
48:10;49:16;53:7;

56:14
**and-a-half (1)**
41:21
**Andrew (2)**
11:17,24
**angle (1)**
33:3
**anticipate (1)**
24:7
**Apartments (1)**
33:21
**apologies (1)**
37:1
**apologize (5)**
19:17;23:22;29:14;
54:17;57:10
**app (2)**
55:5;57:7
**Apparently (6)**
7:15;8:3;12:20;
31:1,23;34:21
**appear (2)**
13:18;16:1
**appearance (5)**
6:13,16,22;7:5;12:1
**appearing (7)**
6:24;7:7;12:3;18:8,
11,14;19:1
**application (5)**
52:16;53:7;54:25;
55:19;57:17
**applications (3)**
55:23;56:9;57:11
**appoint (1)**
12:6
**appointed (2)**
27:5,8
**appreciate (12)**
10:9;35:25;41:24;
46:19;49:19;51:21,
23;54:10;55:7,20;
57:13;58:3
**appropriate (3)**
9:11;12:8;17:5
**approval (3)**
35:16,17;47:21
**approve (6)**
35:14;38:6;45:19;
46:4,11,11
**approved (2)**
39:19;42:11
**approving (3)**
9:12;50:25;51:4
**argue (1)**
17:17
**argument (8)**
17:2;35:1;38:14,22;
45:5;47:7,8,23
**arguments (1)**
40:24
**around (1)**
13:16
**aside (1)**

32:1
**assert (1)**
48:2
**asset (2)**
8:12,16
**assets (4)**
32:13;33:24;34:10;
49:24
**Association (1)**
18:12
**assume (6)**
28:12;34:10;36:21;
45:13,13,14
**assumption (1)**
27:12
**attaches (1)**
8:13
**attend (1)**
49:6
**attorney (1)**
27:9
**August (11)**
15:8,11,12;16:4,6,7,
8;17:15,17,20;31:21
**authority (1)**
9:14
**authorize (2)**
33:13;37:20
**authorized (1)**
45:21
**authorizing (1)**
30:21
**avoidance (1)**
22:2
**avoided (1)**
39:13
**aware (2)**
12:13,13
**away (2)**
14:11;42:18

## B

**back (3)**
21:14;28:20;44:22
**background (1)**
27:1
**Bad (2)**
35:16;37:22
**Bank (3)**
6:18;18:16;21:16
**bankruptcy (7)**
27:9;32:20;33:1;
34:23;38:7;41:9;51:6
**based (4)**
23:4,5;50:12;52:17
**Bautista (2)**
7:1,9
**Bear (10)**
31:4;46:22;47:1,2,
9;49:15,17,25;50:6,17
**became (1)**
52:19

**Beech (1)**
34:22
**beforehand (1)**
57:22
**behalf (9)**
6:8,10,12,24;7:7;
12:3;18:14;26:3;
27:11
**benefit (2)**
40:3,7
**Bennett (1)**
18:21
**Benvenutti (5)**
6:8;11:6;18:7;
35:11;55:5
**best (6)**
23:4;24:8;32:18;
34:1;44:8;56:5
**better (2)**
44:19;50:10
**big (2)**
42:18,23
**bill (1)**
48:7
**billed (1)**
23:11
**billings (1)**
22:21
**Bishop (6)**
30:23;31:9;34:7,7,
9;46:12
**bit (1)**
19:7
**blow (1)**
51:25
**blows (1)**
46:2
**blunt (1)**
57:20
**blush (1)**
56:12
**boat (1)**
50:8
**borrow (8)**
30:22;31:1,25;
33:23;37:18;38:10,
16;50:9
**borrowed (2)**
31:2;34:21
**borrower (3)**
41:8,16;53:20
**borrowing (6)**
43:20;47:2,12;
31:19;57:2,3
**borrowings (1)**
34:25
**BOSTICK (8)**
6:11,11;8:19,25;
9:1,4;54:19,20
**both (12)**
35:11;39:2;41:8;
43:19;45:6;52:22,24,
25;53:9,20;55:18;

57:8
**Bradley (1)**
52:21
**Bragg (1)**
18:22
**brainstorm (1)**
42:3
**break (4)**
52:13;53:25;54:21;
55:12
**bridge (1)**
38:16
**brief (1)**
29:9,20;30:3
**briefing (1)**
55:4
**briefly (1)**
17:18
**bright (1)**
43:14
**brings (1)**
25:24
**broad (1)**
24:23
**broader (1)**
25:2
**brokers (1)**
24:10
**broker's (1)**
37:9
**brush (1)**
24:23
**budget (8)**
21:14;22:16;36:7;
37:14,19;38:19;
46:19;47:4
**budgeted (1)**
40:6
**bullets (1)**
19:14
**Burgess (2)**
11:17,23
**business (5)**
33:9;35:2,3;45:7,17
**businesses (1)**
50:16
**buttress (1)**
40:23
**bye-bye (2)**
40:14,15

**C**

**calendar (4)**
9:19;25:9;52:16;
54:18
**CALIFORNIA (6)**
6:1;11:1;18:1,4;
53:1,19
**Call (3)**
6:3;11:3;18:3
**came (2)**
47:3,11

**Can (41)**
11:21,22;12:22;
14:13;16:8,16;19:6,7;
23:21;24:23;27:13;
30:8,8;33:1,7,13;34:3,
14;37:18,20,22;
39:17;40:23;41:9,17,
20;44:16;45:6,9,9,11,
17;48:5;51:1,17,20;
52:14;54:2,8,22;57:1
**cap (1)**
33:8
**Capital (3)**
7:4,7;18:20
**care (1)**
58:5
**carefully (1)**
13:6
**cart (1)**
37:24
**case (26)**
9:16;10:4;11:9;
12:7,10,10,14,20;
13:8,14,17,23,24;
14:9,17;15:6,17,22;
16:1,5,17;17:4;35:6;
42:18;43:14;53:11
**cases (14)**
6:15;11:9;14:10;
24:22;26:9;28:9;35:8,
8;41:12;42:6,23;
53:12;54:12;55:7
**cash (13)**
31:20;32:13;33:20;
34:8;38:18;40:9,10,
19;46:19;47:4,5;
51:16,16
**cause (2)**
26:22;53:5
**Cellars (1)**
31:5
**cement (1)**
25:12
**central (1)**
25:11
**cents (2)**
42:7,8
**certain (1)**
8:4
**certainly (1)**
44:16
**chance (2)**
15:11;51:15
**changes (1)**
30:7
**Chapel (1)**
18:21
**Chapter (8)**
12:6,7;31:9;34:16;
40:18;42:6;46:5;
47:16
**characterization (1)**
13:13

**Chase (2)**
12:3,3
**check (2)**
14:14;55:24
**churner (1)**
25:12
**circuit (1)**
53:11
**circuits (1)**
54:13
**cited (2)**
35:8;53:12
**claim (1)**
37:5
**clarification (1)**
26:4
**clarify (3)**
16:12;23:21;26:23
**clear (4)**
20:2;26:6;31:23;
39:24
**clearly (1)**
40:7
**CLERK (8)**
6:4;7:2,10;11:4,12,
14;18:4;28:3
**click (1)**
15:21
**client (3)**
46:7,15;55:15
**close (2)**
24:18;50:17
**closed (1)**
24:12
**Code (11)**
32:20;33:1;36:2;
38:7,24,25;41:9;46:2;
51:6;52:4;54:11
**Cohen (15)**
7:6,11;18:19,19;
25:25;26:1,3,10,15,
16,18,21,23;27:16,18
**collateral (1)**
38:18
**comfortable (2)**
46:8;51:12
**coming (2)**
9:2;26:24
**comments (1)**
58:1
**commingling (1)**
29:2
**committee (16)**
6:15;10:2;11:8;
12:13;13:2,10;15:25;
18:8;21:7;25:4;48:16,
22,24;49:4,7,13
**companies (1)**
40:5
**compelling (1)**
50:8
**comply (1)**
46:1

**concern (4)**
27:3;49:18;52:17,
20
**concerns (2)**
48:17;55:2
**concluded (3)**
10:10;17:24;58:14
**condone (1)**
43:8
**Condos (1)**
31:21
**confer (2)**
46:7,15
**conference (23)**
6:20;7:13,15;9:8,9,
18;19:5,6,13,17;
20:20,24;25:18;
26:24;27:12,20,25;
28:5,11,20;29:14;
35:6;57:3
**conferred (1)**
55:14
**confirmation (2)**
22:13;42:6
**conflict (12)**
35:9,9,10;41:6,7,
16;51:23;53:13,14;
54:13,14,15
**conflicts (2)**
41:12,13
**connected (1)**
49:17
**consent (1)**
7:16
**consented (1)**
27:4
**consistent (5)**
38:24,25;39:1;51:6;
52:4
**consistently (1)**
47:13
**consolidate (2)**
24:22;25:16
**consolidation (20)**
20:2,8,23;21:2;
24:20;25:3;26:6,13,
14;27:2,23;28:6,14;
32:2,22;33:14;36:4;
37:24;51:9,10
**Constellation (2)**
26:9;31:10
**consulting (1)**
37:10
**consumed (1)**
31:2
**contested (3)**
13:8,18;27:14
**contingencies (1)**
36:17
**continue (11)**
9:7,17;12:21;15:8;
27:19;28:4;31:4;
48:11;51:20;52:6;

**55:16**
**continued (2)**
30:4;57:16
**continuing (1)**
56:19
**contracts (1)**
47:9
**control (1)**
41:18
**conversation (5)**
39:16;44:18;46:18,
23;50:22
**conveyances (1)**
21:24
**Cooley (1)**
18:12
**copy (1)**
8:13
**corporation (1)**
18:4
**correction (1)**
8:15
**COS (1)**
14:14
**cost (1)**
25:13
**cost-benefit (1)**
48:10
**costs (1)**
24:10
**counsel (12)**
8:5;12:13;26:4;
29:21;41:6,7,13;
43:22;44:9;45:11;
53:13;56:2
**course (11)**
25:21;33:3;35:2,3;
38:13,13;40:15;43:6;
47:20,22;48:2
**Court (217)**
6:3,6,10,13,16,19,
25;7:3,8,11,19;8:1,3,
14,17,22;9:2,3,5,16,
22;10:1,7,9;11:3,11,
13,16,22,25;12:5,17,
24;13:21;14:1,3,5,20;
15:14,17,19;16:2,8,
11,14,22,24;17:1,4,
21,23;18:3,10;19:3,
11,17,21,23;20:4,7,
10,13,15,19,22;21:1,
5,8,11,13,19,23;22:6,
9,12,16,24;23:1,7,8,
16,18,20,23;24:2,12,
16,19;25:5,7,9,17,21,
24;26:2,9,12,17,20,
25;27:8,17,19,22,25;
28:4,8,12,16,19;29:1,
4,7,10,13,18,22;30:2,
9,13,18;31:14,17,19;
32:5;34:21,23,24;
35:20,23;36:6,10,14,
16,19,21;37:2,7,15,

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 271
                                                                                            of 355

17;38:3,13,20,21;
39:5,10,14;40:1,9,12;
41:1,3,6,14,16;42:1,
14,17,21;43:2,9,11,
15,17,25;44:3,13,15,
17;45:13,21,25;46:10,
16;48:10,19,22;49:1,
4,8,10,12,19,23;50:4,
14,18,21;51:3,21;
52:10,13,16;53:12,23;
54:1,3,8,21;55:20,25;
56:4,8,17,19,22,24;
57:2,6,10,13,19;58:1,
5,8,11,13
**Court's (1)**
9:4
**covered (1)**
10:5
**create (1)**
53:6
**creditor (3)**
6:6,9;9:13
**creditors (9)**
6:15;13:10;15:25;
24:25;32:3;34:16;
40:12;44:25;50:16
**Creek (2)**
36:13,14
**criminal (3)**
8:2,5,8
**cure (1)**
33:14
**current (1)**
20:11
**cut (1)**
42:8

**D**

**Daniel (1)**
12:2
**Dara (1)**
6:7
**date (8)**
21:19;31:11,12,16;
52:11;54:2;57:1,17
**David (2)**
11:5;18:5
**Davidson (1)**
56:3
**day (1)**
14:10
**de (1)**
41:19
**deadline (1)**
55:4
**deadlines (1)**
16:5
**deal (21)**
19:5;33:4,5,5,22;
34:1,12,14;35:11,14,
15,16;36:14,20;37:8,
22;44:10,20;45:2;

46:4;49:22
**dealing (2)**
13:15,17
**debt (1)**
24:11
**debtor (7)**
13:23;32:10,12,14;
33:1,16;46:5
**debtors (28)**
11:6;13:2,23;18:7;
20:9,17;22:20;24:24;
25:10,13;29:21;30:7;
31:10,10;34:16;
37:21;38:17;39:8;
40:8;41:24;42:1;
43:21,23;45:7,17;
46:3;50:11;51:15
**debtor's (1)**
29:8
**debts (1)**
51:14
**December (2)**
31:16;34:22
**declaration (1)**
45:4;51:7
**declarations (1)**
51:5
**decrease (1)**
48:8
**defense (1)**
8:8
**defer (2)**
8:25;22:1
**deferred (2)**
23:25;42:12
**deficiency (1)**
47:15
**deliberately (1)**
13:15
**demonstrating (1)**
51:5
**denied (1)**
51:1
**deposited (1)**
28:22
**deposition (1)**
7:24
**despite (1)**
27:9
**destroying (1)**
49:17
**detail (1)**
24:23
**development (2)**
29:24;36:12
**different (5)**
13:17;34:16,17;
43:7;45:11
**digestion (1)**
26:22
**dime (3)**
43:21;44:20;46:6
**DIP (1)**

28:23
**disagreement (1)**
35:18
**discover (1)**
7:23
**discovery (4)**
7:20;10:3,5;27:13
**discretion (1)**
54:12
**discussed (1)**
15:16
**discussion (1)**
39:15
**discussions (1)**
30:4
**disinterested (3)**
52:19,24;53:8
**disperse (1)**
32:3
**disputes (1)**
33:17
**district (1)**
8:3
**divided (1)**
46:24
**docket (4)**
16:1;19:19;29:9,13
**documents (1)**
17:12
**dollar (2)**
31:1;42:9
**dollars (15)**
22:17;23:20;30:23,
25;31:20;33:20;34:7,
21;37:12;42:8;46:20,
22,25;47:5,14
**dollars' (1)**
21:20
**Don (1)**
56:2
**done (3)**
20:5;48:7,10
**doors (2)**
49:25;50:17
**down (4)**
39:17,17;42:8;46:2
**drop (1)**
30:11
**dropping (1)**
43:4
**DSI (1)**
23:5
**due (2)**
37:12;47:15
**Duggan's (1)**
18:21
**duty (1)**
52:3

**E**

**early (1)**
22:14

**earn (1)**
51:17
**easy (3)**
44:11,13,14
**Eat (2)**
26:20,22
**ECF (2)**
14:12;19:19
**Edge (1)**
34:8
**educate (3)**
38:5;43:3;53:16
**effect (1)**
7:25
**efficiently (1)**
48:4
**effort (1)**
14:15
**Egan (5)**
11:19,25;12:2,2;
17:22
**eight (8)**
31:7;32:10,15;
33:25;40:4;44:10,21;
46:5
**eighty (1)**
42:7
**elected (1)**
49:13
**electronic (1)**
17:10
**electronically (1)**
16:19
**elephant (1)**
28:13
**eleven (1)**
19:14
**else (11)**
6:13,16,19;7:1,9;
9:22;25:17;54:17;
57:13;58:1,2
**emailed (1)**
14:19
**end (3)**
23:12;43:7;46:21
**ends (1)**
17:15
**enemies (1)**
50:23
**enough (5)**
25:6,8;39:25;56:16;
57:14
**ensure (1)**
17:6
**entered (3)**
9:10,20;22:4
**entire (1)**
26:8
**entirely (1)**
16:13
**entities (10)**
31:5;32:18;34:14;
35:16,19;41:18;47:1,

23;50:7;52:1
**entities' (1)**
39:22
**entity (8)**
13:15,17;28:23;
33:18,24;47:6,9,12
**entry (1)**
27:4
**equally (1)**
35:10
**equity (8)**
24:24;34:17;40:13,
14;44:25;48:12,15;
52:1
**essentially (3)**
7:20;30:25;32:13
**estate (1)**
56:2
**estates (1)**
49:22
**estimate (1)**
24:9
**estimates (1)**
23:5
**ethical (5)**
36:3;39:2,2;42:19;
43:1
**even (3)**
44:19;45:4;49:8
**evening (2)**
8:13;9:12
**everybody (1)**
13:9
**everyone (5)**
13:24;14:25;17:14;
25:15;54:17
**everyone's (5)**
36:1,2;51:22;54:10;
58:3
**evidence (2)**
34:25;35:3
**exact (3)**
14:8;15:4;37:5
**exactly (2)**
7:22;36:18
**example (1)**
48:8
**exchange (1)**
33:24
**exclusivity (1)**
17:15
**excuse (2)**
34:4;54:23
**expect (3)**
19:15;55:7,10
**expense (1)**
31:8
**expenses (1)**
31:3
**expensive (1)**
43:10
**experienced (1)**
27:9

**expert (1)**
50:12
**experts (1)**
24:9
**extensive (1)**
49:15
**extent (2)**
8:23;16:17

## F

**face (1)**
12:25
**fact (3)**
43:3,13;44:5
**Fair (4)**
25:6,8;39:25;56:16
**Fairfield (1)**
31:21
**Family (2)**
12:4;18:22
**far (2)**
24:13;49:25
**favorable (1)**
40:5
**Federal (1)**
18:11
**fee (12)**
23:1,3,17;53:7;
54:24;55:5,19,23;
56:9;57:7,10,16
**feed (1)**
15:22
**fees (15)**
22:17,18;23:12,18,
25;37:9,10;39:8,10,
23;42:12;47:15;
56:11,14,15
**Fennemore (1)**
6:12
**few (3)**
7:3;23:6;26:18
**fiduciary (3)**
34:3;44:24;52:2
**FIERO (45)**
6:14,14;9:25;10:2,
8;11:8,8;15:13,15,20;
16:2;18:8,8;19:25;
20:5,9,20,24;21:9,12;
22:1,4,7,10,14;26:11,
18;27:7;28:1;48:16,
20,21,22,24;49:3,6,9,
11,13,21,24;50:10,15,
20;58:12
**Fiero's (1)**
26:20
**Fifteen-million (1)**
23:20
**fifty (1)**
42:8
**fifty-eight (1)**
14:10
**figure (2)**

42:2;53:25
**file (19)**
13:12;15:24;16:3,3,
8,15,17;17:4;19:25;
26:13;32:22;36:4;
45:3,3;57:17,22,23,
24,24
**filed (30)**
8:6,11;12:9,19;
13:3,8,19,24;14:5,8,
10,16,24;15:3,5,17;
16:14;17:10;21:7,24;
22:7;26:7;27:2,2;
30:16;37:4;40:17,18;
45:15;57:19
**filing (4)**
13:16;26:5;29:20;
30:3
**final (1)**
23:7
**finally (1)**
34:20
**finance (1)**
54:24
**financing (7)**
19:5;21:14;28:17;
29:5;30:19;46:11;
50:25
**find (1)**
13:10
**fine (2)**
51:7;56:18
**fire (1)**
47:16
**firm (8)**
38:7;41:8,8;52:17,
19,22,23;53:8
**first (8)**
6:6;16:15;19:6;
35:4;39:5;47:24;48:1;
56:12
**five (1)**
21:16
**flow (6)**
28:21;46:19;47:4,5,
20,23
**flowing (1)**
48:6
**folks (14)**
7:3;12:13,22;15:4,
9,10;16:14,18;17:6,9;
40:16;42:7;48:11;
53:16
**follow (1)**
54:11
**footnote (1)**
43:4
**footnotes (1)**
35:5
**forecast (1)**
46:19
**forensic (1)**
19:23

**forget (1)**
36:23
**Forgive (1)**
21:9
**form (1)**
31:12
**formula (3)**
46:25;47:11;50:22
**forward (2)**
56:6,15
**foul (2)**
12:11;13:13
**four (1)**
37:8
**four- (1)**
41:20
**four-and-a-half (1)**
51:17
**frank (1)**
35:15
**frankly (1)**
25:14
**fraudulent (1)**
21:24
**free (1)**
52:16
**FRIDAY (5)**
6:1;8:6;11:1;18:1;
56:12
**FTI (2)**
24:10;50:3
**full (2)**
7:25;50:8
**fully (3)**
31:2,5;42:20
**functions (1)**
55:6
**fund (3)**
47:12;48:11;50:5
**funding (2)**
45:19;46:25
**funds (15)**
8:8;31:3;32:2,10;
33:13,23;34:14;36:9;
41:17;46:18,20,22;
47:2,17;52:2
**future (2)**
23:4;55:18

## G

**gave (2)**
13:9;35:6
**generate (1)**
8:8
**generated (2)**
31:20;34:8
**generating (1)**
47:18
**gets (3)**
17:6;33:24;39:19
**given (3)**
23:5;40:22;51:8

**gives (1)**
9:13
**giving (1)**
40:9
**goes (2)**
28:5;37:16
**Good (30)**
6:7,14,17,23,25;7:8,
12;11:5,15,16;12:2;
16:3;18:6,25;19:3;
28:15;29:12,16;34:1,
12;35:14,15;38:9;
40:25,25;43:5;45:2;
49:22;55:9;57:14
**goodbye (1)**
40:19
**gotcha (1)**
14:18
**government (1)**
8:11
**grant (1)**
44:6
**granted (2)**
25:22;32:24
**gritty (1)**
24:21
**ground (3)**
43:12,13,16
**group (1)**
26:8
**guess (8)**
7:19;14:7;19:7;
31:21;34:23;35:1;
36:22;37:8
**guys (1)**
36:3

## H

**Hager (9)**
30:23;31:9;33:19,
19,21;34:5;44:19,24;
46:12
**Hamlin (5)**
18:23;30:1,11;
36:25;37:1
**hand (1)**
24:15
**handful (2)**
21:21,22
**Hang (1)**
19:18
**happen (3)**
9:16;35:8;48:4
**happened (2)**
26:25;31:21
**happening (1)**
12:14
**happens (3)**
42:5;50:2;57:21
**happy (1)**
41:2
**hard (2)**

36:1;54:10
**harm (2)**
12:11;13:13
**Harrow (1)**
31:4
**hat (3)**
44:18,19,20
**hate (4)**
32:20;38:24;41:3;
42:19
**hats (1)**
45:6
**head (1)**
13:16
**hear (4)**
8:6;11:21;17:14;
54:24
**heard (7)**
15:2,16;20:19;27:3,
23;40:23;54:5
**hearing (15)**
8:16;12:5;16:4,10;
19:4;20:25;21:4,6;
26:23;27:11;30:6;
39:24;51:20;55:18;
57:1
**hearings (1)**
56:15
**help (1)**
26:15
**Hence (1)**
13:19
**Here's (3)**
42:25;47:4;54:12
**high (1)**
25:14
**hire (1)**
45:11
**hiring (1)**
44:9
**hit (1)**
15:17
**hits (1)**
19:16
**Hogan (1)**
19:1
**holders (6)**
24:24;33:18;34:17;
40:13;44:25;52:1
**home (1)**
47:15
**honest (2)**
38:22;39:1
**honestly (1)**
45:6
**Honor (104)**
6:4,7,11,14,17,23;
7:2,10,18,22;8:11,15;
9:1,12,21,24,25;11:4,
5,10,12,15,23;12:2,
12,23;13:5,22;14:4,7,
19;15:13;17:18,22;
18:6,9,24,25;19:2,10,

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 273
of 355

13,16,19,25;20:11,21;
21:9,18,22;22:23;
23:15,19,21;24:8,14;
25:1,19,20,25;26:11;
27:21;28:10,15,25;
29:3,6,8,16;30:10;
31:18;32:4;35:18,22;
36:5,25;37:1,4,14,23;
38:1,9;39:4;40:23;
42:10,16,25;48:1,16,
25;49:6;51:19;52:7,8,
12;53:22;54:20;
55:14;57:5,15,16,25;
58:9,10,12
**honored (1)**
13:4
**hope (1)**
40:15
**horse (1)**
37:25
**host (2)**
53:5,6
**hours (1)**
26:19
**Houston (2)**
18:11,11
**huge (1)**
35:9
**hundred (1)**
14:8

## I

**idea (7)**
12:15;32:22;40:15,
17;45:19,22;51:10
**ignore (2)**
36:2;54:15
**II (1)**
36:13
**ills (1)**
33:14
**immediate (1)**
30:25
**imminent (1)**
19:10
**impacted (1)**
47:15
**important (5)**
14:21,22;15:1,15;
16:1
**imposed (1)**
8:4
**Inc (4)**
13:1;18:24;26:14;
31:6
**included (1)**
23:25
**including (4)**
7:23;11:7,9;24:10
**incurred (4)**
23:18;39:11,12,23
**incurring (1)**

51:14
**indicate (1)**
53:12
**indicated (2)**
26:4;41:11
**indiscernible (1)**
13:20
**individual (2)**
15:21;19:2
**information (1)**
24:14
**informed (2)**
8:1,9
**initially (1)**
35:1
**inkling (1)**
8:22
**inner-debtor (1)**
31:13
**institutions (2)**
37:20;51:5
**intend (1)**
23:6
**intends (1)**
31:25
**inter-debtor (3)**
30:21;35:7;55:19
**interest (11)**
12:16;31:7;33:16,
17;34:17;40:13;
41:20;44:8,25;52:1,
25
**Interesting (1)**
53:2
**interests (1)**
40:14
**interim (4)**
7:19,23;23:14;
32:25
**interjecting (1)**
23:22
**into (8)**
22:5;23:4;24:23;
27:12;28:22;30:8;
41:20;43:4
**investigation (2)**
20:17;56:3
**investing (1)**
51:17
**Investment (2)**
11:4;18:18
**Investments (1)**
12:6
**investors (2)**
14:15;15:23
**involuntary (4)**
6:21;7:14;9:18;
10:4
**issue (4)**
35:4;38:14;52:23;
53:25
**issues (7)**
30:20;38:18;41:11;

55:15;56:9,13;57:23
**item (1)**
6:4
**Itkin (4)**
19:2;27:5,7,8

## J

**Jeannie (1)**
18:19
**job (2)**
16:17,22;17:13;
55:2
**John (4)**
6:14;11:8;12:3;
18:8
**joinder (1)**
13:12
**joint (3)**
13:6;14:11;16:25
**jointly (2)**
6:15;11:9
**Judge (6)**
8:2,6,9;16:10,21,23
**judgment (3)**
33:10;45:7,18
**JULY (11)**
6:1;8:16,17,20;
11:1;15:10;18:1;28:3;
56:20,23;57:3
**June (1)**
46:20
**justified (1)**
32:19
**justify (3)**
33:8;34:3,14

## K

**KAPLAN (4)**
6:17,18;18:16,16
**keep (1)**
47:18
**Keller (5)**
6:8;11:6;18:7;
35:11;55:4
**Kelly (22)**
11:11,15,16,21,23;
12:9,17,18,23;13:5;
14:13,19,21;16:2,10,
12,21,23,24,25;17:1,3
**Kelly's (1)**
38:14
**Kenneth (1)**
6:4
**kept (2)**
50:1,1
**kicked (2)**
39:16,17
**Kim (6)**
6:8;7:5,6;11:6;18:7,
19
**kind (1)**

25:2
**kinds (1)**
48:6
**knowledge (1)**
15:24
**KSMP (8)**
19:1;20:12;21:3;
26:11,12,14;27:4,11
**Kutsuris (4)**
18:23,23;36:25;
37:4

## L

**language (2)**
30:6,12
**large (3)**
36:20;42:11;53:11
**larger (1)**
15:23
**last (3)**
31:21;34:22;46:13
**later (3)**
26:4;47:25;55:24
**latest (1)**
29:17
**law (5)**
35:6;43:14;53:1,19;
55:11
**lawyers (1)**
49:2
**least (2)**
12:25;14:8
**leave (3)**
9:5;31:25;32:2
**LeFever (42)**
6:9;11:6;13:1;14:9;
15:6,22;18:4,5;20:14;
21:5;26:9,14;30:22;
31:6,10,24;32:8;33:4,
7,15,23;34:1,12,20;
35:15,17;36:8;37:10;
39:9,23;40:19,20,25;
45:1,15;46:25;50:4,9,
23;51:12,13;58:5
**left (1)**
40:14
**lend (4)**
32:10,11;33:6;
37:21
**lended (1)**
40:6
**lender (3)**
41:9,17;53:20
**lending (16)**
30:21;31:13;32:12;
34:14;35:2,3,16;
37:20,21;39:7;41:22;
46:5;48:2;51:5,6;
55:19
**lengthy (3)**
29:13;39:16,24
**less (1)**

40:7
**letters (1)**
45:21
**level (2)**
19:7;52:19
**liens (1)**
36:22,24;37:2
**lights (2)**
50:1,17
**likely (1)**
53:24
**limited (1)**
38:18
**Line (4)**
6:4;7:6;43:14;
48:13
**lines (1)**
21:25
**lis (2)**
8:4,7
**Live (8)**
11:4,7,9;12:6;
13:14;14:12,14;38:14
**loan (5)**
31:25;33:9,13;
45:22;46:16
**loans (2)**
47:20;52:22
**Loeb (2)**
18:17,17
**long (1)**
46:13
**longer (2)**
52:23;53:25
**look (11)**
19:6;32:7,9,11;
33:2;35:5;38:15;42:7,
14;44:4;53:18
**looked (4)**
17:9;21:14;33:2,2
**looking (4)**
32:8;33:10;38:16;
51:15
**looks (3)**
19:14;53:14;54:14
**lose (1)**
17:1
**losing (1)**
47:13
**lot (1)**
13:3
**Lovells (1)**
19:1
**LP (10)**
11:4;12:6;30:23,23,
24;31:19;32:10;33:8,
12;34:22
**LPs (4)**
38:10;40:8;43:23;
44:8
**lunch (1)**
26:20

# M

**main (12)**
12:9,14,20;13:24;
14:9;15:17,22;16:1,4,
5,17;17:4
**maintenance (1)**
48:7
**makes (4)**
16:3;25:15;48:11;
53:11
**making (5)**
6:13,16;7:5;11:25;
40:8
**Management (2)**
18:18;47:15
**many (5)**
14:1;22:17;23:24,
25;44:5
**Mark (1)**
6:11
**market (3)**
24:6;33:5;41:17
**marketed (1)**
31:23
**Marsha (1)**
18:11
**matter (8)**
8:3;12:21;13:8,18;
26:11;27:14;44:1;
50:3
**matters (1)**
58:6
**Mattson (44)**
6:5,9,10,12,21;7:14,
15;8:7;10:3;11:6;
13:1;14:9;15:6,22;
18:4,5;20:14;21:5;
26:9,14;30:22;31:6,
10,24;32:8;33:4,7,15,
23;34:1,13,20;35:15,
17;36:8;39:9,23;
40:25;45:1;46:25;
50:4,9,23;58:6
**Mattson's (8)**
7:24;8:5;37:11;
40:20,20;45:15;
51:12,13
**maturity (3)**
31:11,12,15
**may (15)**
9:9;12:16,19;14:13;
25:21;29:6;33:14,21;
34:9;39:4,18;48:6;
52:11,12;55:17
**maybe (13)**
12:18;39:21;42:8;
45:2,3,8,18,18;46:17;
47:10,10,16,16
**mean (36)**
12:17;14:3;22:18,
19;23:9;24:4;25:7;
32:7;33:4;37:20;
39:18;41:7,7;42:3,18,
23;44:1,6,17;46:4,4;
47:3,8,8;48:12;51:7;
53:1,14,18;54:13,13;
55:25;56:4,8,8;57:22
**means (4)**
23:9,10,10;52:22
**mechanic's (4)**
36:22,24;37:1,2
**meet (1)**
45:18
**meetings (1)**
49:7
**mentioned (3)**
35:21;48:13,14
**merits (1)**
32:23
**Michael (1)**
18:12
**middle (4)**
17:20;43:12,13,16
**might (1)**
50:10
**Mikayla (1)**
18:23
**million (13)**
21:16;24:3;31:2,23,
24;37:3,6,8,12;46:22;
47:3,3,5
**millions (1)**
22:17
**mind (2)**
39:21;42:22
**mine (2)**
16:22;17:13
**minimis (1)**
41:19
**missed (1)**
29:14
**Mission (1)**
18:21
**mixed (1)**
25:12
**moment (1)**
52:12
**money (24)**
21:16;28:21;29:23;
32:2,4,12;33:6;36:3;
37:21,21;38:10;40:8;
41:20;42:14;44:9;
45:22;46:5,13;47:12,
13;49:1,2;50:9;51:6
**Monley (5)**
18:23;30:1,10;
36:25;37:1
**month (1)**
22:22
**months (4)**
23:6;40:7,11;44:11
**mooted (1)**
9:9
**more (8)**
32:7;33:4;37:20;
39:18;41:7,7;42:3,18,
23;44:1,6,17;46:4,4;
47:3,8,8;48:12;51:7;
53:1,14,18;54:13,13;
55:25;56:4,8,8;57:22
20:16;27:10;30:7;
39:1;46:21;49:25;
51:3;52:14
**morning (14)**
6:7,14,17,23,25;7:8,
12;11:5,15,16;12:2;
18:6,25;19:3
**Mortgage (1)**
18:12
**most (1)**
12:25
**motion (62)**
8:2,6,12,16;12:5,9,
16;14:21;15:1,11;
16:3,13,17;17:4;19:4;
20:2,8,11,19,22;21:2,
7;24:19;25:3;26:6,7,
12;27:2,23;28:6,13,
17;29:5;30:19,20;
31:15;32:1,21;33:14;
36:4;37:23;40:16,17;
44:6;45:3,16;48:25;
49:5,10,14;51:1,4,9,
10,11;52:17,20;54:23,
23;56:20;57:2,3
**motions (1)**
34:18
**move (1)**
8:19
**moving (1)**
15:16
**much (6)**
20:5;23:12;29:23;
35:17;38:16;54:5
**mud (1)**
41:4
**Mullin (2)**
7:7;18:20
**myself (1)**
14:12

# N

**name (4)**
11:14;27:6;36:12,
23
**National (1)**
18:12
**natural (1)**
27:5
**necessary (4)**
8:23;27:13;43:11;
53:17
**need (28)**
9:7;15:4;16:18;
17:5;28:12;35:16;
37:18;38:5,16;40:10;
41:6,7;42:21;43:3;
45:2,3,8;46:17;47:16,
17,21;49:2;52:4;
53:12,19,20;54:5;
55:3
**needed (1)**
27:10
**needs (14)**
14:25;15:1,2,6;
26:18;30:24;31:3;
35:17;47:10,11;48:7,
8;49:1;51:24
**negotiating (2)**
29:23;44:10
**Neither (1)**
16:21
**net (5)**
21:15,18;24:9,9,10
**new (1)**
16:4
**next (10)**
8:6;17:19;20:20,25;
22:14;23:6;40:11;
52:17;56:12;57:1
**night (1)**
21:2
**ninety-day (1)**
51:18
**nitty (1)**
24:21
**noncash (2)**
47:20,23
**non-cash (1)**
48:6
**nondebtor (1)**
31:5
**none (1)**
34:17
**note (4)**
33:24;40:4;44:10;
51:16
**notes (3)**
31:7,11;36:9
**notice (23)**
12:20,21;13:4,9,11,
11,25;14:6,9,16,16,
23;15:3,6,6,24;16:4,5,
15,19;17:10,11,12
**noticed (1)**
15:2
**noticing (1)**
15:20
**November (1)**
34:22
**number (9)**
6:4;14:8;21:17;
22:3;23:1,3;24:4;
31:1;47:18
**numerous (1)**
12:13

# O

**Oak (24)**
11:4,7,9;12:6;
13:14;14:12,14;
30:23;31:9,17;22:25;
32:2,9;33:3,6,6,8,10,
12;34:4;38:14;44:19;
27:10
**needs (14)**
**Oakland (3)**
6:1;11:1;18:1
**Oaks (1)**
44:18
**object (1)**
44:4
**objected (2)**
43:24;44:3
**objecting (1)**
36:23
**objection (1)**
44:5
**obligations (4)**
36:3;39:2,2;43:1
**obviously (4)**
21:19;23:7;24:5;
28:8
**o'clock (6)**
9:18;16:11;54:17,
21;55:12;57:4
**October (3)**
37:13,16;46:21
**off (4)**
9:19;21:9;49:17;
50:17
**offering (3)**
19:9;24:13,18
**office (6)**
47:4;55:1,5,6,11;
57:21
**office's (2)**
55:2,3
**one (14)**
8:15;10:2;13:23;
18:10;19:18;24:22;
26:7;33:1;35:8;36:13;
43:1,19;51:8;52:14
**only (9)**
12:13;14:12;21:20;
26:18;30:24;38:15,
17;40:16;45:1
**oOo- (1)**
6:2;11:2;18:2
**open (1)**
50:1
**operating (3)**
33:12;45:22;46:22
**operations (1)**
31:4
**opinion (1)**
49:14
**opposed (5)**
34:18;48:19,23;
49:5,8
**opposition (3)**
8:12;13:12;30:12
**order (21)**
6:3;7:16,25;8:10,
13,24;9:9,9,12,13,14,
19;11:3;13:6,18;18:3;
22:20;23:7;27:4;
44:16;46:24

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 275
of 355

**orders (1)**
23:13
**ordinary (4)**
35:2,3;47:22;48:2
**others (1)**
40:25
**out (13)**
15:2;28:17;29:8;
36:3,22;37:8,10,23;
40:18;42:2;46:24;
50:22;53:25
**outcome (2)**
28:9;51:11
**over (1)**
37:18
**owe (1)**
23:12
**owes (1)**
37:11
**own (6)**
10:3;33:22;34:9;
40:12,13;44:9
**owned (2)**
28:23;31:5
**owns (3)**
31:22;33:15;45:1

**P**

**page (2)**
19:14,19
**paid (11)**
22:21;23:11;32:6;
39:8;42:4,5,6,7,12;
44:22;48:8
**paint (1)**
24:23
**paper (1)**
32:15
**Pardon (1)**
20:5
**part (3)**
22:16;46:18,19
**participate (1)**
55:5
**particularly (1)**
54:12
**parties (8)**
13:3;14:12,16;
15:16;17:5;22:3;30:4,
16
**partner (1)**
18:12
**party (1)**
36:23
**passing (1)**
21:1
**past (2)**
9:8;40:6
**patience (1)**
58:3
**Pause (3)**
19:22;28:18;58:4

**pay (8)**
8:8;31:3;36:22;
37:8;41:19;50:9,19;
51:13
**paying (2)**
48:8;50:8
**payroll (3)**
47:15,17,19
**pendens (2)**
8:4,7
**pending (2)**
8:3;26:7
**people (9)**
12:15,19;14:1,8,22;
15:3;17:16;27:13;
47:18
**percent (12)**
22:21;31:7;32:11,
15;33:25;40:4;41:21;
44:10,21;45:1;46:6;
51:17
**perfectly (1)**
39:24
**perhaps (2)**
7:4;22:14
**period (1)**
17:15
**permission (4)**
9:4;34:21,23,24
**perseveration (1)**
7:24
**person (6)**
12:24;13:16;27:10;
53:3,3,4
**perspective (9)**
32:7,9,12;33:11;
34:4,5;39:7;46:12;
55:3
**petitioning (1)**
6:6,8;9:13
**PG&E (1)**
48:7
**Phillip (2)**
6:23;18:14
**picture (1)**
20:3
**piece (2)**
25:1;32:15
**Pine (7)**
30:23;31:9;34:7,7,
9,22;46:12
**Pineapple (10)**
31:4;46:22;47:1,2,
9;49:15,16,25;50:6,17
**Pinewood (1)**
31:20
**Pinon (1)**
36:14
**Pinyon (2)**
36:12,13
**plan (6)**
17:19,19;19:9;
21:13;23:13;40:18

**planned (1)**
9:17
**pleading (3)**
13:22;40:23;46:8
**pleadings (3)**
15:15;20:1;26:5
**please (3)**
16:3,3;17:12
**pm (3)**
55:13;13;58:14
**point (8)**
16:3;29:8;39:6;
52:18,20,23;53:9;
56:23
**points (1)**
46:9
**Ponzi (1)**
25:11
**popping (1)**
7:3
**portfolio (1)**
48:5
**posed (1)**
50:11
**position (4)**
13:5;48:24;55:8,9
**possibly (1)**
53:6
**post- (1)**
51:8
**post-petition (3)**
19:4;30:21;51:14
**post-plan (1)**
22:12
**pragmatic (2)**
12:18;38:21
**pragmatics (1)**
30:18
**pre- (1)**
51:9
**preliminary (1)**
21:4,6
**premature (1)**
30:14
**prepared (1)**
20:18
**preservation (1)**
8:13
**presumably (1)**
52:21
**price (3)**
24:13,16,18
**primary (1)**
55:6
**pro (3)**
39:12,17,18
**probably (2)**
55:9;57:14
**problem (3)**
35:24;38:11;53:21
**problems (2)**
53:5,6
**procedurally (1)**

13:19
**proceed (2)**
10:4;27:14
**proceedings (4)**
10:10;17:24;21:23;
58:14
**proceeds (9)**
21:15,18;24:2,5,9;
25:13;28:22;37:9;
46:17
**professional (5)**
22:17,18;23:1,3,12
**professionals (10)**
22:19,21;23:5,24;
42:4,5,11;43:8;50:13;
55:23
**progress (5)**
35:13,25;38:23;
46:1;54:9
**prohibitively (1)**
43:10
**projected (1)**
23:4
**projection (1)**
23:15
**promise (1)**
32:14
**proof (2)**
20:18;37:5
**properties (25)**
8:5;24:6;30:23;
31:9,22;33:19,19,21;
34:5,9,10;36:8,11;
38:17;44:19,24;
47:21,24,24;48:3,6,
12,13,14,14
**property (6)**
8:7;28:23;32:3;
33:22;38:19;48:5
**proposal (1)**
55:16
**proposed (1)**
33:22
**protected (1)**
52:2
**proven (1)**
35:19
**provide (2)**
29:6;31:24
**providing (2)**
47:10;50:6
**PSA (2)**
36:15,16
**purpose (1)**
15:4
**put (4)**
13:14;20:18;44:17,
18
**puts (1)**
33:8
**putting (2)**
32:1;37:24

**Q**

**qualifications (1)**
50:13
**quickly (2)**
48:3,4

**R**

**raise (3)**
56:9,12;57:23
**raised (2)**
39:6;55:15
**raises (1)**
52:23
**raising (1)**
46:9
**ran (1)**
36:3
**rata (3)**
39:12,18,18
**rate (2)**
31:7;40:5
**rather (1)**
47:24
**reached (1)**
37:7
**read (7)**
13:5;25:5;29:10,10,
15,18;30:8
**real (1)**
56:2
**really (3)**
14:12;30:15,24
**reason (3)**
8:17;29:14;42:13
**rebellion (2)**
14:24,25
**recall (1)**
50:23
**received (1)**
15:2
**receiving (2)**
21:12;22:19
**recess (2)**
54:17;55:13
**recognize (1)**
33:15
**record (2)**
10:8;30:8
**recorded (1)**
8:4
**Red (17)**
30:23;31:9,19,22,
25;32:2,9;33:3,6,6,8,
10,12;34:4;44:18,19;
46:12
**Redwood (1)**
33:21
**references (1)**
35:6
**refers (1)**

13:23
**refinancing (1)**
54:23
**reflects (1)**
52:20
**regard (3)**
34:24,25;49:15
**regarding (3)**
8:9;13:6;33:17
**regularly (1)**
55:7
**related (1)**
30:14
**relief (8)**
7:16;8:23;9:9,10,
14,19;13:8;27:4
**remain (1)**
7:25
**remained (1)**
53:8
**remember (3)**
27:6;47:7,7
**remind (2)**
17:14;28:21
**repaid (4)**
32:4,5,15;40:7
**repay (2)**
36:9;40:21
**replaced (1)**
51:16
**reply (6)**
15:12;29:9,18,20,
22;30:3
**report (4)**
7:15;29:14;30:5;
35:7
**represent (5)**
23:2;24:4,5,6;41:8
**representative (1)**
15:25
**representing (2)**
11:17;53:20
**represents (2)**
23:4;24:8
**request (8)**
13:4;15:5,5,24;
17:11;26:4;30:11;
55:17
**requested (3)**
14:22;16:18;29:25
**requests (8)**
12:19;13:3;14:5,8,
16;15:3;16:15;17:10
**requirement (3)**
13:7,19;52:24
**requires (1)**
53:1
**reserve (2)**
16:12,14
**reserving (1)**
30:25
**respectfully (1)**
16:23

**respond (5)**
15:11;27:10,11;
54:6;55:1
**responded (1)**
49:10
**response (4)**
15:9;16:6,8;57:18
**responses (2)**
30:1,17
**responsibilities (3)**
34:3;39:22;42:19
**responsible (1)**
19:1
**rest (1)**
20:17
**restraint (2)**
8:12,16
**result (1)**
49:19
**retained (1)**
50:12
**retroactive (1)**
34:24
**return (1)**
32:14
**review (2)**
53:7;56:11
**reviewed (1)**
14:23
**Revocable (1)**
11:17
**Richard (1)**
18:25
**right (40)**
7:22;8:1;10:9;
14:11;15:19;16:22;
17:23;19:11,21;
20:13;21:8;22:9,16;
27:17;28:4,14,16;
29:1,4,22,22,24;
30:13,18,25;31:14;
32:5,6;36:19,21;37:7,
7;41:14;46:10;50:18;
52:1;53:19;54:8;
56:24;57:10
**rings (1)**
34:6
**Riverside (1)**
34:9
**road (2)**
39:17;46:2
**Robbin (1)**
19:2
**Robert (2)**
6:17;18:16
**room (1)**
28:13
**roughly (1)**
37:4
**Rubinstein (2)**
18:17,17
**rule (2)**
33:10;45:18

**Rules (2)**
36:2;54:11
**RUPP (69)**
14:4,7;18:6,7;19:8,
10,13,19;20:11,14,16;
21:18,22;22:1,23,25;
23:3,15,17,19;24:8,
14,17;25:20;27:20,21,
24;28:7,10,15,25;
29:3,6,8,12,16,20,25;
30:3,10,16;31:12,15,
18;32:4;35:18,22,25;
36:5,7,13,15,18,20;
37:14,16;38:1,4,9,15,
21;48:1;52:8,9,12,15;
56:2,18;58:10

---

# S

**sale (6)**
24:10;29:24;31:20,
21;33:20;34:8
**sales (10)**
21:15,18,21;24:2,5,
12;28:22,22;31:23;
38:19
**same (11)**
13:14;20:16;32:17;
33:19;34:6,11;48:17;
53:4,13,18;56:9
**sat (1)**
40:24
**satisfies (2)**
33:9;45:7
**satisfy (3)**
45:17;47:12;52:24
**saw (1)**
19:17
**saying (17)**
32:23,24,25;35:7;
40:13,14,19;41:17;
43:9,11,21;45:3,15;
47:5;49:2;51:25;52:5
**schedule (1)**
55:4
**Scheduled (1)**
27:3
**scheme (1)**
25:11
**scope (1)**
25:2
**scoped (1)**
38:12
**second (4)**
18:10;36:11;38:8;
48:3
**Section (1)**
30:21
**secure (1)**
44:21
**secured (1)**
24:11
**security (2)**

24:24;32:16
**seek (2)**
8:23;10:4
**seeking (3)**
8:19;32:10;53:3
**seeks (2)**
10:3;30:22
**seemed (2)**
30:13,14
**sell (2)**
8:7;48:5
**selling (1)**
36:8
**send (2)**
17:12;30:10
**sending (1)**
32:13
**sense (3)**
25:15;48:11;53:11
**separate (1)**
34:16
**September (8)**
7:16,23;9:8,15,18;
14:11;17:16;37:13
**Serene (7)**
18:18;29:23;30:1,7;
31:2;37:8,12
**serious (2)**
49:4;55:15
**seriously (1)**
55:16
**serve (7)**
12:22;15:4,9,10;
16:18;17:4,5
**served (7)**
14:13,14;17:6,7,7,
8;50:16
**service (3)**
12:8;14:16;16:16
**services (5)**
47:2,10;50:7,8,9
**set (5)**
20:24,25;30:17;
54:2;55:4
**sets (1)**
43:7
**seventy-percent (1)**
33:16
**Sharp (8)**
32:18,25;33:7;34:2;
35:10;45:5;52:2,21
**Sharp's (1)**
39:2
**sheet (2)**
17:19;19:15
**Sheppard (2)**
7:7;18:19
**shift (1)**
28:17
**Shine (10)**
6:22,23,24,25;
18:14,14;55:1;57:16,
20,25

**ships (1)**
21:1
**shirk (1)**
43:1
**shockingly (1)**
25:14
**short (2)**
52:13;54:16
**short- (2)**
22:10;40:3
**show (1)**
36:7
**showing (1)**
38:19
**side (3)**
19:24;43:20;53:18
**sides (5)**
35:11;43:19;52:22,
25;53:9
**sign (2)**
35:23;43:5
**signed (3)**
22:20,25;36:15
**significant (3)**
23:25;26:5;35:10
**SILVEIRA (10)**
6:7;8:7;18:22;8:11,
15,21,25;9:11,21
**similar (2)**
25:2;48:17
**simply (2)**
15:21;49:17
**single (1)**
13:22
**sit (2)**
34:15;49:24
**six (4)**
31:2;40:7,11;44:10
**sixty (1)**
24:22
**sixty- (1)**
21:15
**sixty-five (1)**
21:16
**sixty-five-million (1)**
21:20
**sixty-nine (1)**
24:3
**sixty-one (3)**
13:23;14:10;43:7
**skeptical (1)**
51:8
**Socotra (7)**
7:4,7;18:20;26:3;
30:1,5,7
**sold (4)**
21:19;38:17;47:24;
48:3
**somebody (1)**
47:16
**someone (3)**
24:4;46:3;47:3
**somewhat (1)**

47:11
**somewhere (3)**
    46:2,24;48:13
**soon (2)**
    19:9;55:18
**Sorry (9)**
    17:3;25:25;26:23;
    27:22;36:6;46:21;
    49:9;55:21;56:20
**sought (4)**
    13:9;14:11;15:5;
    41:24
**sources (1)**
    41:22
**speak (3)**
    22:2;36:18;55:22
**SPEAKER (2)**
    9:23;16:7
**special (10)**
    12:20;13:3;14:6;
    15:3,6,24;16:15,18;
    17:10,11
**specific (3)**
    32:3;43:19;50:3
**spectrum (1)**
    43:7
**speed (1)**
    44:9
**spelled (1)**
    31:15
**spend (1)**
    44:9
**spending (2)**
    47:5,14
**SS (1)**
    55:25
**SSL (2)**
    56:1,2
**stake (1)**
    12:25
**standing (2)**
    22:3,4
**start (1)**
    14:24
**started (2)**
    56:11,14
**starting (1)**
    22:14
**state (1)**
    17:12
**statement (3)**
    10:8;19:14;28:11
**States (3)**
    6:24;8:4;18:15
**stats (1)**
    29:14
**status (28)**
    6:20;7:13,14;9:8,8,
    17;19:5,6,13,17;
    20:20,24;25:18;
    26:24;27:12,20,25;
    28:4,10,20;35:6;
    55:17,18;56:21,22;

57:2,3,7
**stayed (1)**
    7:20
**stick (3)**
    41:3,20;42:19
**still (2)**
    23:8;37:11
**stipulation (2)**
    9:13;10:5
**stipulations (1)**
    22:4
**stop (1)**
    42:5
**strength (1)**
    32:23
**stuff (3)**
    21:20;29:10;43:4
**subcon (1)**
    20:11
**subject (2)**
    23:7;36:16
**submit (1)**
    57:8
**subsidize (1)**
    31:4
**substantial (1)**
    20:1
**substantive (19)**
    20:1,8,22;21:2;
    24:20;25:3;26:5,13;
    27:2,23;28:6,13;32:1,
    22;33:14;36:4;37:24;
    51:9,10
**substantively (2)**
    24:22;25:15
**sufficient (1)**
    47:18
**suggest (2)**
    40:22;53:24
**summarize (1)**
    30:19
**summarizing (1)**
    19:15
**supplement (1)**
    51:4
**supplemental (2)**
    57:9,18
**support (2)**
    20:1;47:6
**sure (5)**
    23:8;29:7;40:12;
    44:15;46:1
**surprised (2)**
    10:2;57:20
**suspect (1)**
    17:8
**sweep (1)**
    41:19
**sweet (1)**
    33:5

**T**

**talk (4)**
    36:10;38:7;46:16;
    52:14
**talking (2)**
    23:9;36:11
**tandem (1)**
    28:5
**tax (1)**
    47:15
**Taylor (78)**
    11:5,5;12:8,12;
    13:21,22;14:2,18;
    17:18;18:5,5;21:4,6;
    23:21,24;25:1,6,8,10,
    19,23;27:20;28:2;
    39:4,7,12,15,25;40:3,
    10,22;41:2,5,11,15,
    22;42:10,16,20,25;
    43:6,10,12,16,22;
    44:2,7,14,16;45:5,9,
    20,24;46:7,15;51:2,
    19;52:7,9,11;53:22,
    24;54:2,7;55:14,22;
    56:1,7,16,21,23,25;
    57:5,7,12,15;58:7,9
**T-bills (2)**
    41:20;51:18
**technical (1)**
    32:20
**Ted (2)**
    18:19;25:25
**telling (3)**
    26:21;42:17;54:4
**term (4)**
    17:19;19:15;22:11;
    40:4
**terminated (1)**
    7:24
**terms (6)**
    7:20;21:14;24:21;
    25:17;29:25;41:23
**test (2)**
    45:7,19
**theory (1)**
    32:1
**thereafter (1)**
    20:25
**therefore (2)**
    25:15;45:10
**thesis (1)**
    25:11
**thirty-seven (1)**
    45:1
**Thomas (1)**
    18:6
**though (1)**
    42:23
**thought (3)**
    8:17;40:24;44:12
**thoughts (1)**
    52:11
**three (3)**
    14:19;31:22;47:3

**throughout (3)**
    12:15;13:25;39:8
**throw (1)**
    36:1
**Tigar (3)**
    8:2,6,9
**till (1)**
    54:21
**times (2)**
    14:19;44:5
**tipping (1)**
    39:6
**today (5)**
    26:4;30:15;34:15;
    51:4;57:14
**told (1)**
    42:22
**took (1)**
    38:15
**top (1)**
    37:10
**tough (1)**
    44:7
**transaction (4)**
    9:1;43:19;53:1,18
**transactions (2)**
    35:7;53:5
**treated (1)**
    31:8
**Tree (9)**
    30:24;31:19;32:10;
    33:3,6,8,12;34:4;
    44:19
**Tree's (1)**
    33:10
**trended (1)**
    24:17
**true (1)**
    34:7
**Trust (6)**
    11:17,18,23,24;
    12:4;18:22
**Trustee (5)**
    6:24;12:3,6;14:13;
    18:15
**try (1)**
    54:8
**trying (9)**
    24:21;35:12,12,24;
    38:22,23;43:1;45:25;
    54:9
**turn (5)**
    28:16,20;29:5;46:3;
    50:17
**turnaround (1)**
    27:9
**turned (1)**
    27:11
**turning (1)**
    49:17
**two (2)**
    21:1;31:5
**type (2)**

35:7;47:17
**typically (2)**
    13:4;42:5

**U**

**umbrella (1)**
    49:25
**Um-hum (2)**
    20:15;30:2
**Umpqua (2)**
    6:18;18:16
**under (10)**
    11:14;26:24;30:21;
    32:19,25;34:13;
    45:17,21;49:24;53:18
**Understood (9)**
    25:23;42:20;44:7;
    45:12,12,20,24;46:9;
    51:19
**undertook (1)**
    14:15
**unencumbered (1)**
    31:20;33:20;34:8
**unfortunately (1)**
    41:23
**UNIDENTIFIED (2)**
    9:23;16:7
**United (3)**
    6:24;8:3;18:15
**universe (1)**
    15:23
**Unpaid (1)**
    23:13
**unquestioned (1)**
    50:15
**unrecorded (1)**
    33:17
**unrelated (1)**
    10:3
**unsecured (3)**
    32:11;33:25;46:5
**unsure (1)**
    22:11
**untangling (1)**
    25:14
**up (12)**
    7:3;24:4;26:24;
    30:22;31:1;40:9;
    41:11;44:9;46:2,24;
    47:11;51:25
**update (1)**
    29:6,19
**upload (1)**
    9:14
**uploaded (1)**
    9:12
**upon (1)**
    52:17
**using (4)**
    15:20;32:19;47:1;
    50:7
**usually (2)**

17:11;35:9

## V

vacate (1)
  8:7
Vadim (1)
  18:17
value (5)
  47:13;48:9;49:18;
  50:6,7
varied (1)
  48:5
Verita (2)
  15:18,21
versus (1)
  44:10
via (1)
  46:8
view (1)
  12:18
violating (2)
  38:6,6
voice (1)
  49:13
volume (1)
  22:10
voluntarily (1)
  42:12

## W

wait (2)
  12:24;26:18
waive (2)
  13:18;42:23
waived (1)
  13:7
waiver (4)
  53:3,3,19,20
waivers (1)
  53:2
waives (1)
  41:9
waiving (1)
  53:4
walk (2)
  21:14;42:18
wants (2)
  33:4;34:23
wash (1)
  37:23
Waters (1)
  34:8
way (9)
  9:17;13:24;35:13,
  25;38:23;40:22;
  41:25;45:25;54:9
wearing (1)
  45:5
Wednesday (1)
  8:12
week (6)

17:19;20:21,25;
  21:10;22:15;52:17
weren't (2)
  17:7;27:1
what's (8)
  20:7;21:13;24:16;
  27:14;29:19;36:12;
  40:24,25
when's (2)
  20:19;27:22
whereby (1)
  46:25
Whereupon (3)
  10:10;17:24;58:14
wherewithal (1)
  15:23
whoever's (2)
  15:5,5
who's (1)
  54:18
whose (1)
  50:13
willing (3)
  45:6;50:19;53:6
without (4)
  34:20,22;38:6,6
wondering (1)
  23:11
work (5)
  20:5;23:6;36:1;
  51:22;54:10
world (1)
  33:7
worse (2)
  50:15,16
worth (2)
  21:20;49:25
wrap (1)
  13:16
wrong (4)
  42:22,22;53:15;
  55:2
Wynne (2)
  18:25,25

## X

X- (1)
  37:11

## Y

year (1)
  34:22
Yep (1)
  27:18
yesterday (1)
  9:12
Young (2)
  18:21,21

## Z

Zoom (2)
  19:2,7

## 1

1 (4)
  16:6;54:17,21;
  55:12
1:01 (1)
  55:13
1:05 (1)
  58:14
10,000-foot (1)
  19:7
11 (15)
  6:1;9:18;11:1;12:6,
  7;15:8;16:11;18:1;
  31:9;34:16;40:18;
  42:6;46:5;47:16;57:3
11:34 (1)
  6:1
11:39 (2)
  10:10;11:1
11:49 (2)
  17:24;18:1
12 (1)
  9:18
12:44 (1)
  55:13
12th (1)
  14:11
15 (1)
  15:12
15th (1)
  16:9
1694 (1)
  19:19
1702 (1)
  29:9
176 (1)
  48:14
18 (1)
  15:10
18th (5)
  8:18,20;27:3,11;
  55:23
1992 (1)
  12:3

## 2

2.016 (1)
  37:5
2.1 (2)
  31:23;37:3
2.2 (1)
  37:3
2.3 (1)
  37:3
2.6 (1)
  31:24
2024 (2)
  33:21;34:9

2025 (4)
  6:1;7:16;11:1;18:1
20th (1)
  56:20
21st (1)
  57:24
22nd (4)
  15:8;16:4;17:15,17
25th (9)
  21:6;28:1,2,3,5;
  55:17;56:23;57:3,22
28 (1)
  6:4
2nd (4)
  7:16,23;9:8,15

## 3

3,050,000 (1)
  30:22
303f (2)
  8:9,24
31 (1)
  31:16
318,343 (1)
  33:20
31st (1)
  8:16
327 (1)
  52:24
363 (1)
  45:17
364 (2)
  30:22;34:13
3-million (1)
  31:1

## 4

4 (1)
  19:14
400 (1)
  46:21
400,000 (2)
  34:21;46:20

## 5

5 (2)
  17:16;19:20
590,042 (1)
  31:19

## 6

68,920,000 (1)
  24:3

## 7

760,000 (1)
  47:14

## 8

8 (2)
  15:11;16:7
8th (1)
  16:8

## 9

9 (1)
  9:14
9014 (1)
  13:8
950,000 (1)
  30:25
96,335 (1)
  34:7

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 279
                                                        of 355

# **Exhibit P**

# UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF California

In Re. KS Mattson Partners, LP

§
§
§
§

Debtor(s)

Case No. 24-10715

☐ Jointly Administered

## Monthly Operating Report

Chapter 11

Reporting Period Ended: 06/30/2025

Petition Date: 06/09/2025

Months Pending: 1

Industry Classification: | 5 | 3 | 1 | 1 |

Reporting Method:          Accrual Basis ◯          Cash Basis ⦿

Debtor's Full-Time Employees (current):          0

Debtor's Full-Time Employees (as of date of order for relief):          0

**Supporting Documentation** (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒ Statement of cash receipts and disbursements
☒ Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒ Statement of operations (profit or loss statement)
☐ Accounts receivable aging
☐ Postpetition liabilities aging
☒ Statement of capital assets
☐ Schedule of payments to professionals
☐ Schedule of payments to insiders
☒ All bank statements and bank reconciliations for the reporting period
☐ Description of the assets sold or transferred and the terms of the sale or transfer

/s/ Richard L. Wynne
Signature of Responsible Party

Richard L. Wynne
Printed Name of Responsible Party

07/22/2025
Date

Hogan Lovells US LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 11-MOR (12/23/2022)

Debtor's Name  KS Mattson Partners, LP                                    Case No.  24-10715

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. Cash balance beginning of month | $27,410 | |
| b. Total receipts (net of transfers between accounts) | $10,700 | $10,700 |
| c. Total disbursements (net of transfers between accounts) | $916 | $916 |
| d. Cash balance end of month (a+b-c) | $37,193 | |
| e. Disbursements made by third party for the benefit of the estate | $0 | $0 |
| f. Total disbursements for quarterly fee calculation (c+e) | $916 | $916 |

| Part 2: Asset and Liability Status (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | |
|---|---|---|
| a. Accounts receivable (total net of allowance) | $0 | |
| b. Accounts receivable over 90 days outstanding (net of allowance) | $0 | |
| c. Inventory    (Book ○   Market ○   Other ⊙   (attach explanation)) | $0 | |
| d Total current assets | $37,193 | |
| e. Total assets | $114,756,460 | |
| f. Postpetition payables (excluding taxes) | $0 | |
| g. Postpetition payables past due (excluding taxes) | $0 | |
| h. Postpetition taxes payable | $0 | |
| i. Postpetition taxes past due | $0 | |
| j. Total postpetition debt (f+h) | $0 | |
| k. Prepetition secured debt | $84,700,239 | |
| l. Prepetition priority debt | $0 | |
| m. Prepetition unsecured debt | $1,482,686 | |
| n. Total liabilities (debt) (j+k+l+m) | $86,182,925 | |
| o. Ending equity/net worth (e-n) | $28,573,535 | |

| Part 3: Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b. Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c. Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4: Income Statement (Statement of Operations) (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. Gross income/sales (net of returns and allowances) | $10,700 | |
| b. Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. Gross profit (a-b) | $10,700 | |
| d. Selling expenses | $0 | |
| e. General and administrative expenses | $0 | |
| f. Other expenses | $916 | |
| g. Depreciation and/or amortization (not included in 4b) | $0 | |
| h. Interest | $0 | |
| i. Taxes (local, state, and federal) | $0 | |
| j. Reorganization items | $0 | |
| k. Profit (loss) | $9,784 | $9,784 |

UST Form 11-MOR (12/23/2022)

Debtor's Name  KS Mattson Partners, LP

Case No.  24-10715

| Part 5:  Professional Fees and Expenses | | | | | | |
|---|---|---|---|---|---|---|
| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* | | | | | |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | | | | | | |
| ii | | | | | | |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |

UST Form 11-MOR (12/23/2022)

Debtor's Name KS Mattson Partners, LP                                        Case No.  24-10715

| | | | | | |
|---|---|---|---|---|---|
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxviii | | | | | |

UST Form 11-MOR (12/23/2022)

Debtor's Name KS Mattson Partners, LP

Case No.  24-10715

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxiii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvii | | | | | | |
| lxxxvi | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| b. | | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | | | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |

UST Form 11-MOR (12/23/2022)

Debtor's Name  KS Mattson Partners, LP                                    Case No.  24-10715

| | | | | | |
|---|---|---|---|---|---|
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |

UST Form 11-MOR (12/23/2022)

Debtor's Name  KS Mattson Partners, LP                                    Case No.  24-10715

| | | | | | |
|------|--|--|--|--|--|
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxviii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxiii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |

UST Form 11-MOR (12/23/2022)

Debtor's Name  KS Mattson Partners, LP                                    Case No.  24-10715

| | xcix | | | | | |
|---|---|---|---|---|---|---|
| | c | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | | |

| Part 6:  Postpetition Taxes | Current Month | Cumulative |
|---|---|---|
| a. Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c. Postpetition employer payroll taxes accrued | $0 | $0 |
| d. Postpetition employer payroll taxes paid | $0 | $0 |
| e. Postpetition property taxes paid | $0 | $0 |
| f. Postpetition other taxes accrued (local, state, and federal) | $0 | $0 |
| g. Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

**Part 7: Questionnaire - During this reporting period:**

a. Were any payments made on prepetition debt?  (if yes, see Instructions)     Yes ⦿   No ◯

b. Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions)     Yes ◯   No ⦿

c. Were any payments made to or on behalf of insiders?     Yes ◯   No ⦿

d. Are you current on postpetition tax return filings?     Yes ⦿   No ◯

e. Are you current on postpetition estimated tax payments?     Yes ⦿   No ◯

f. Were all trust fund taxes remitted on a current basis?     Yes ⦿   No ◯

g. Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions)     Yes ◯   No ⦿

h. Were all payments made to or on behalf of professionals approved by the court?     Yes ◯   No ◯   N/A ⦿

i. Do you have:          Worker's compensation insurance?     Yes ◯   No ⦿

    If yes, are your premiums current?     Yes ◯   No ◯   N/A ⦿   (if no, see Instructions)

    Casualty/property insurance?     Yes ⦿   No ◯

    If yes, are your premiums current?     Yes ◯   No ◯   N/A ⦿   (if no, see Instructions)

    General liability insurance?     Yes ⦿   No ◯

    If yes, are your premiums current?     Yes ◯   No ⦿   N/A ◯   (if no, see Instructions)

j. Has a plan of reorganization been filed with the court?     Yes ◯   No ⦿

k. Has a disclosure statement been filed with the court?     Yes ◯   No ⦿

l. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?     Yes ⦿   No ◯

UST Form 11-MOR (12/23/2022)

Debtor's Name KS Mattson Partners, LP

Case No. 24-10715

**Part 8: Individual Chapter 11 Debtors (Only)**

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |
| l. | Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C § 101(14A)? | Yes ○  No ◉ |
| m. | If yes, have you made all Domestic Support Obligation payments? | Yes ○  No ○  N/A ◉ |

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6). The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith. This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**<u>I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.</u>**

| | |
|---|---|
| /s/ Robbin L. Itkin | Robbin L. Itkin |
| Signature of Responsible Party | Printed Name of Responsible Party |
| Responsible Individual | 07/22/2025 |
| Title | Date |

UST Form 11-MOR (12/23/2022)

Debtor's Name KS Mattson Partners, LP                                    Case No.  24-10715



PageOnePartOne

PageOnePartTwo

PageTwoPartOne

PageTwoPartTwo

UST Form 11-MOR (12/23/2022)

Debtor's Name  KS Mattson Partners, LP

Case No.  24-10715

Bankruptcy1to50

Bankruptcy51to100

NonBankruptcy1to50

NonBankruptcy51to100

UST Form 11-MOR (12/23/2022)

Debtor's Name KS Mattson Partners, LP

Case No.  24-10715



PageThree

PageFour

UST Form 11-MOR (12/23/2022)

**I r KS M        P r   r LP**

**C    N    -       CN**

**N       M       O   r      R   r**

**R    r      P   r   d**: 6 9 25   6 30 25

_____**r   N**_____ On November 22, 2024, an involuntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") was filed against KS Mattson Partners, LP (the "Debtor") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"). On June 9, 2025 (the "Relief Date"), the Bankruptcy Court entered the *Stipulated Order for Relief in an Involuntary Case* [Docket No. 131]. On June 24, 2025, the Bankruptcy Court entered an order [Docket No. 172] appointing Robbin L. Itkin as the Responsible Individual in this chapter 11 case (the "Responsible Individual"), effective as of June 16, 2025. The Debtor is authorized to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtor is providing the information and documents provided herewith (the "Monthly Operating Report") pursuant to the *Uniform Periodic Reports in Cases Filed Under Chapter 11 of Title 11*, promulgated by the United States Trustee Program, and the *United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtors in Possession* (Revised March 31, 2023). As the Responsible Individual was not appointed until June 16, 2025, she has no personal knowledge of and had no authority for any matters prior to the date of her appointment. All information in this Monthly Operating Report relates solely to the Debtor, and not to any non-Debtor affiliate. The following notes and statements and limitations should be referred to, and referenced in connection with, any review of the Monthly Operating Report.

_____**r   M    d**_____ The Debtor is filing this Monthly Operating Report solely for the purpose of complying with the monthly reporting requirements of the Debtor s chapter 11 case. The financial information contained herein is unaudited, limited in scope, and as such has not been prepared in accordance with accounting principles generally accepted in the Unites States of America. (" AAP") and does not include all the information and footnotes required by  AAP. The financial information disclosed herein was not prepared in accordance with federal or state securities laws or other applicable non-bankruptcy laws. The financial information included in the Monthly Operating Report has not been subjected to procedures that would typically be applied to financial information presented in accordance with  AAP or any other recognized financial reporting framework, and, upon application of such procedures, the Debtor believes that the financial information could be subject to changes, and these changes could be material.  The results of operations contained in the financial statements provided with this Monthly Operating Report is not necessarily indicative of results that may be expected from any other period or for the full year and may not necessarily reflect the results of operations and financial position of the Debtors in the future. The Debtor has prepared this report on a cash basis.

**R    r          R**____: The Debtor reserves all rights to amend or supplement this Monthly Operating Report in all respects, as may be necessary or appropriate. Nothing contained in this

Monthly Operating Report shall constitute a waiver of any of the Debtor s rights under any applicable law or admission with respect to any issue in the Chapter 11 case.

**R    r    P r d**: Unless otherwise noted, the information provided herein is current for the Debtor as of June 30, 2025, and for the period from June 9- June 30, 2025, the end of Debtor s fiscal month. Except as otherwise noted, no adjustments have been made for activity occurring after the close of the reporting period.

**A    r**    The Debtor has no traditional books and records detailing the assets, liabilities and operations of the Debtor. Many historical documents, including the laptop owned by the Debtor s former controlling person, Kenneth Mattson, were seized in May 2024 by the federal government in connection with the criminal investigation of Mr. Mattson. Moreover, the Debtor has access to limited records detailing potential assets and liabilities generated after the May 2024 seizure. Debtor has thus prepared the MOR based on the scant records and information available to it. The Debtor has made a diligent effort to complete these documents accurately and completely. However, the Debtor cannot warrant the accuracy of this MOR. Subsequent information or discovery may result in material changes to the MOR and errors or omissions may exist. Notwithstanding any such discovery, new information or errors or omissions, the Debtor does not undertake any obligation or commitment to update this MOR.

**E**    The Debtor is a real estate investment company with no employees.

**I    r**    : Due to the limited information available to the Debtor, the Debtor does not have full and accurate information regarding the status of property and general liability coverage. The Debtor is in the process of assessing property and general liability insurance coverage of the real estate assets and ensuring coverages are either in place or put in place as soon as practicable.

**R    N    R            F    r P r    r**    The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the results of operations, financial position, and cash flows of the Debtor in the future.

**C        A        R            C    D    r            r**    The Debtor affirms that bank reconciliations are prepared for all open and active bank accounts monthly. Cash balances include balances that are restricted pursuant to various debt or other agreements.  10,700 in total deposits were received and  916 in total disbursements were made by the Debtor during the period included in this report. The disbursements were for bank fees and for 3 utility payments initiated prior to the Relief Date, that could not be stopped or reversed. The Debtor initiated the opening of new bank accounts near the end of June 2025 at City National Bank. Those accounts were not fully open nor available for transactions until after the reporting period. No transactions occurred in those accounts, nor did they have any beginning or ending balances, and there are no statements nor reconciliations for June 2025. Those accounts have been listed on the accompanying Bank Reconciliation Exhibit. The Debtor understands that the  60,350.00 withdrawal in the First Bank account dated June 9, 2025, was to pay an insurance premium for D O coverage for the Responsible Individual and that such payment was made by wire that was initiated June 8, 2025. Accordingly, it is treated as a pre-Relief Date payment.

**A        R**            The Debtor is reporting on a cash basis, so is not reporting Accounts Receivable balances.

**R    E    A**        Real Estate Assets are comprised of residential, retail, office, agricultural and mixed-use properties in which the Debtor has various interests.  It would be prohibitively expensive, unduly burdensome, and an inefficient use of estate assets for the Debtor to obtain current market valuations for all its assets and certain estate assets are contemplated to be marketed for sale. For these reasons, the values of certain of the Debtors  assets are undetermined or unknown. Values reflected are the Debtor s best estimate of values on or around the Relief Date, using the lesser of available market data and broker opinions of values. The Debtor s interests are based on analysis of title documents and may be subject to other claims and other documents not yet identified.

**I              O   r E**        The Debtor may have holdings that include investments in joint venture entities. Review of prior tax returns indicate the Debtor at one point held interests in Divi Divi Tree, LP, Heathcock Park Apartments, LP and Beach Pine, LP. Other documents indicate the Debtor may have or have had interests in other entities, including Perris Freeway Plaza, LP, Specialty Properties Partners, LP, and Treehouse Investments, LP.

**N    R**            : The note receivable balance represents a face  19 million, non-interest-bearing note receivable related to a pre-Relief Date sale of a property. The assessment of the underlying sale transaction and the recoverability of this note is ongoing.

**C    R**            : Prior to the Relief Date, the Debtor filed 62 proofs of claim and one proof of interest (the "KSMP LFM Claims") against various debtors in the chapter 11 cases jointly administered under *In re LeFever Mattson, a California Corporation*, Lead Case No. 24-10545 (CN) (the "LFM Debtors"). The KSMP LFM Claims asserted claims totaling not less  86,667,175 against various LFM Debtors. The KSMP LFM Claims were filed by the Debtor while it was controlled by Kenneth Mattson, and not by Robbin Itkin, the Responsible Individual appointed June 16, 2025. The Responsible Individual has not yet diligenced the KSMP LFM Claims and expresses no opinion as to the amount, validity, priority or collectability of the KSMP LFM Claims.

**Pr -R    D    A        P**        Amounts are generally utility and insurance amounts found to be unpaid during the takeover of the properties. There may be other additional amounts outstanding that have not yet been identified.

**Pr -R    D    R    E    T    P**    : Amounts are unpaid property taxes identified through searches of available on-line records.  Such amounts may be incomplete and subject to material change.

**S   r d Pr -R    Cr d   r**        Amounts were sourced through review of title documents. Such amounts may be incomplete and subject to material change.

**E____**: The figures here represent net value of the Debtor s assets. Tenants in common are or may be co-owners of certain of the Debtor s real properties (which amounts and interests remain subject to diligence). Accordingly, the Debtor s equity may be materially lower than presented here.

**A_____I__d__r**  The Debtor has several affiliates with which it has historically engaged in a significant and material level of intercompany transactions. The Debtor and its advisors have not obtained or reviewed the Debtor s books and records of these transactions prior to the Relief Date. Additionally, the Debtor does not have direct access to its affiliates  books and records  thus there can be no assurance that there are not material unrecorded affiliated transactions which may result from review of and access to the books and records of its affiliates.

**D____r__A_____R____dP_r_____**  To the Debtor s knowledge, no activity has occurred between or on behalf of affiliates related parties and the Debtor during the post-Relief Date period.

**I____S_____**  Income and Expense are reported on a cash basis. Income generally consists of rentals related to certain of the Debtor s real estate holdings. Expenses to date have been utility costs and bank fees that relate to the Pre-Relief period. Bank fees were automatically deducted from the Debtor s account and the utility payments had been initiated prior to the Relief Date and could not be stopped.

**Pr_____**  No professional fees were paid during the period covered by this report.

**T____**  Debtor appears to be a partnership for federal tax purposes. It appears the entity had no employees. 2022 Federal and state tax returns appear to have been filed. The Debtor has no evidence that any such returns were filed for 2023 and 2024. Debtor has identified delinquencies related to 2023 and 2024 property taxes, which are shown on the accompanying financial statements. There may be other taxes, assessments, penalties and interest for which the Debtor may be obligated, that have not yet been identified.

**K S Mattson Partners, LP**
**Statement of Cash Receipts and Disbursements**
**June 9, 2025-June 30, 2025**
**DRAFT/ UNAUDITED**

|  | First Bank- KS Mattson Partners, LP- *3467 |
|---|---|
| **Ending Balance, June 9, 2025** | $ 27,410 |
| **Deposits** | |
| 6/10/25- Tenant Rent Receipts | $ 10,700 |
| **Disbursements** | |
| Bank Fees | $ (306) |
| Utilities | (611) |
| **Total Disbursements** | **$ (916)** |
| **Ending Cash** | **$ 37,193** |

**K S Mattson Partners, LP**
**Balance Sheet**
**June 30, 2025**
**DRAFT/ UNAUDITED**

**Assets**

| | | |
|---|---|---|
| Cash | $ | 37,193 |
| Real Estate Assets | $ | 95,719,267 |
| Investments in Other Entities | $ | - |
| Investment in Note Receivable **(1)** | | 19,000,000 |
| Claims Receivable | | - |
| **Total Assets** | **$** | **114,756,460** |

**Liabilities**

| | | |
|---|---|---|
| Accounts Payable | | |
|  Post-Relief Date | | |
|  Pre-Relief Date | $ | 47,991 |
| Total Accounts Payable | $ | 47,991 |
| Pre-Relief Date Real Estate Taxes Payable | $ | 1,434,694 |
| Total Pre-Relief Date Unsecured Debt | $ | 1,482,686 |
| Secured Creditors- Pre-Relief Date | $ | 84,700,239 |
| **Total Liabilities** | **$** | **86,182,925** |
| **Total Equity** | **$** | **28,573,535** |
| **Total Liabilities and Equity** | **$** | **114,756,460** |

**(1)** Face Value- see notes

See accompanying notes

**K S Mattson Partners, LP**
**Statement of Operations**
**June 9, 2025-June 30, 2025**
**DRAFT/ UNAUDITED**

**Revenues**
| | | |
|---|---|---|
| Tenant Rents | $ | 10,700 |
| **Total Revenues** | **$** | **10,700** |

**Expenses**
| | | |
|---|---|---|
| Utilities | $ | 611 |
| Bank Fees | | 306 |
| **Total Expenses** | **$** | **916** |
| **Net Income** | **$** | **9,784** |

**K S Mattson Partners, LP**
**Capital Asset Listing**
**June 30, 2025**
**DRAFT/ UNAUDITED**

| | |
|---|---:|
| 1014 1st St W, Sonoma, CA 95476 | $ 1,400,000 |
| 1549 E Napa St, Sonoma, CA 95476 | $ 2,800,000 |
| 18010 Hwy 12, Boyes Hot Springs, CA 95476 | $ 750,000 |
| 18275 Sonoma Highway, Boyes Hot Springs18285 Hwy 12, El Verano, CA 95476Arroyo Rd, Boyes Hot Springs320 Arroyo Rd, Boyes Hot Springs | $ 4,000,000 |
| 1834-1836 Ocean Front, Del Mar, CA 92014 | $ 10,500,000 |
| 18590 Hwy 12, Boyles Hot Springs, CA 95476 | $ 2,700,000 |
| 19357 Hwy 12, Sonoma, CA 94559 | $ 1,584,665 |
| 22 Boyes Blvd, Boyes Hot Springs, CA 95476 | $ 3,500,000 |
| 22666 Broadway, Sonoma, CA 95746 | $ 1,133,905 |
| 230 E Napa St, Sonoma, CA 95476 | $ 2,779,000 |
| 23105 Millerick Road, Sonoma | $ 631,000 |
| 2500 Castle Rd, Sonoma, CA 95476 | $ 2,500,000 |
| 3003 Castle Rd, Sonoma, CA 95476 | $ 5,398,504 |
| 3200 Castle Rd, Sonoma, CA 95476 | $ 2,573,493 |
| 3557 Golf View Terrace, Santa Rosa | $ 1,600,000 |
| 405 London Way, Agua Caliente, CA 95476 | $ 4,340,117 |
| 414 W Napa St, Sonoma, CA 95476 | $ 3,200,000 |
| 415 Pacific Ave., Piedmont, CA 94611 | $ 5,000,000 |
| 443 Casabonne Lane | $ 385,000 |
| 450G 1st Street East, Sonoma, CA 95476 | $ 1,200,000 |
| 450J 1st Street East, Sonoma, CA 95476 | $ 1,700,000 |
| 450 1st St E #A,B, K, Sonoma, CA 95476 | $ 600,000 |
| 454 15th Street, Del Mar, CA 92014 | $ 4,800,000 |
| 47 and 49 Natoma Street, Folsom, CA | $ 5,000,000 |
| 531 Camino Del Mar, Del Mar, CA 92014533 Camino Del Mar, Del Mar, CA 92014 | $ 3,995,000 |
| 62 Farragut Ave., Piedmont, CA 94610 | $ 6,058,684 |
| 8340/8350 Auburn Blvd. Citrus heights | $ 5,000,000 |
| 856 4th St E, Sonoma, CA 95476 | $ 1,350,000 |
| 904 Highway 121 | $ 750,000 |
| 969 Rachael Rd, Sonoma, CA 95476 | $ 8,489,900 |
| | $ 95,719,267 |

**(1)** Lower of Broker Opinion of Value or Average Reported Market Value (Zillow, Redfin, etc)

**KS Mattson Partners, LP**
**Cash**
**Bank Reconciliations**
**June 30, 2025**
**DRAFT/ UNAUDITED**

| | Per Bank | Outstanding Checks | Deposits in Transit | Net |
|---|---|---|---|---|
| First Bank- KS Mattson Partners, LP- *3467 | $  37,193.39 | | | $  37,193.39 |
| | $  37,193.39 | $      - | $      - | $  37,193.39 |

Note:  The following is a list of accounts at City National Bank, the opening of which was initiated
during the reporting period, but which were not available for transactions until July 1, 2025,
and so have no statements or account activity.

**Main DIP Account**
K S Mattson Partners, LP *3067

**Cash Collateral Accounts**
K S Mattson Partners, LP (Socotra)- *2476
K S Mattson Partners, LP (Deutsche Bank Trust) *4195
K S Mattson Partners, LP (New York Mellon) *4187
K S Mattson Partners, LP (We Alliance) *4292
K S Mattson Partners, LP (Sylva Family Prop) *4284
K S Mattson Partners, LP (Reprop Fin Mtg Inv) *4241
K S Mattson Partners, LP (LAFM Loan Owner LLC) *4233
K S Mattson Partners, LP (JP Morgan Chase) *4225
K S Mattson Partners, LP (Jack Metalinos, Tte) * 4217
K S Mattson Partners, LP (Flagstar Bank) *4209



**FIRST BANK**
Member FDIC

Last statement: May 30, 2025
This statement: June 30, 2025
Total days in statement period: 31

KS MATTSON PARTNERS LP
C/O STAPLETON GROUP
DEBTOR IN POSSESSION ACCOUNT
514 VIA DE LA VALLE SUITE 210
SOLANA BEACH CA 92075

Page 1
XXXXXX3467
( 3)

Direct inquiries to:
800 760-2265

Walnut Creek
1760 North Broadway
Walnut Creek CA 94596

---

*STREAMLINE THE PAYMENT ACCEPTANCE METHOD FOR YOUR CLIENTS AND HELP THEM PROTECT PAYMENT INFORMATION WITH WORLDPAY. VISIT WWW.FIRST.BANK AND SEARCH WORLDPAY TO LEARN HOW YOU CAN GIVE CLIENTS A SEAMLESS PAYMENT EXPERIENCE.*

---

## Small Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX3467 | Beginning balance | $40,439.93 |
| Enclosures | 3 | Total additions | 73,620.25 |
| Low balance | $27,409.65 | Total subtractions | 76,866.79 |
| Average balance | $46,743.17 | Ending balance | $37,193.39 |
| Avg collected balance | $44,461 | | |

### DEBITS

| Date | Description | Subtractions |
|---|---|---|
| 06-05 | ' Outgoing Wire-Beb | 700.00 |
| | 252514 Danielle Fellini | |
| 06-05 | ' Outgoing Wire-Beb | 775.00 |
| | 252557 David Wenzel | |
| 06-05 | ' Outgoing Wire-Beb | 1,200.00 |
| | 252526 Marsha Copeland | |
| 06-05 | ' Outgoing Wire-Beb | 2,445.00 |
| | 252515 Audrey McCoy | |
| 06-05 | ' Outgoing Wire-Beb | 3,375.00 |
| | 252530 Dona Wessells | |
| 06-05 | ' ACH Withdrawal | 4,000.00 |
| | CHASE CREDIT CRD EPAY 250605 | |
| 06-06 | ' ACH Withdrawal | 120.32 |
| | SONOMA WATER 7079332244 250606 | |

KS MATTSON PARTNERS LP                                          Page: 2 of 3
June 30, 2025                                                   XXXXXX3467

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 06-06 | ' ACH Withdrawal | 141.70 |
|  | SONOMA WATER 7079332244 250606 |  |
| 06-06 | ' ACH Withdrawal | 178.98 |
|  | SONOMA WATER 7079332244 250606 |  |
| 06-06 | ' ACH Withdrawal | 308.97 |
|  | SD GAS & ELEC PAID SDGE1 250605 |  |
| 06-06 | ' ACH Withdrawal | 346.26 |
|  | SONOMA WATER 7079332244 250606 |  |
| 06-06 | ' ACH Withdrawal | 1,000.00 |
|  | MACYS ONLINE PMT 250606 |  |
| 06-06 | ' ACH Withdrawal | 1,009.30 |
|  | SONOMA WATER 7079332244 250606 |  |
| 06-09 | ' ACH Withdrawal | 60,350.00 |
|  | INSURANCE OFFICE 8D9C022454 250609 |  |
|  | 800-243-6899 |  |
| 06-11 | ' Analysis Serv Charge | 305.50 |
|  | ANALYSIS ACTIVITY FOR 05/25 |  |
| 06-13 | ' ACH Withdrawal | 44.00 |
|  | VALLEY OF THE MO BILLPAY 250613 |  |
| 06-13 | ' ACH Withdrawal | 266.76 |
|  | VALLEY OF THE MO BILLPAY 250613 |  |
| 06-13 | ' ACH Withdrawal | 300.00 |
|  | VALLEY OF THE MO BILLPAY 250613 |  |

**CREDITS**

| Date | Description | Additions |
|------|-------------|----------:|
| 06-03 | Deposit | 36,245.54 |
| 06-04 | ' ACH Deposit | 18,134.71 |
|  | SHARON MCKINNON SENDER 794958428 |  |
| 06-06 | Deposit | 8,540.00 |
| 06-10 | Deposit | 10,700.00 |

**DAILY BALANCES**

| Date | Amount | Date | Amount | Date | Amount |
|------|-------:|------|-------:|------|-------:|
| 05-30 | 40,439.93 | 06-05 | 82,325.18 | 06-10 | 38,109.65 |
| 06-03 | 76,685.47 | 06-06 | 87,759.65 | 06-11 | 37,804.15 |
| 06-04 | 94,820.18 | 06-09 | 27,409.65 | 06-13 | 37,193.39 |



KS MATTSON PARTNERS LP
June 30, 2025

Page: 3 of 3
XXXXXX3467

**OVERDRAFT/RETURN ITEM FEES**

|  | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

**STATEMENT RESPONSIBILITY**

If you do not notify us of an unauthorized signature or alteration within a reasonable period of time (not to exceed 30 days), after we send or make available to you your statement and/or items, you cannot assert the unauthorized signature or alteration against us even if we are unable to show a loss due to your failure. Also, you cannot assert any unauthorized signatures or alterations by the same wrongdoer on items paid by us after the reasonable time mentioned above elapses and before we receive your notice. We lose these protections if we fail to exercise ordinary care in paying an item with an unauthorized signature or alteration. However, if you do not notify us of the problem within 60 days of when we send or make available to you the statement and/or items, you absolutely forfeit any right(s) to assert a claim against us. You must report any other account problem (e.g. erroneous statement or passbook entry, missing signature, unauthorized endorsement, etc.) within 60-day period or lose your right to assert claim against us.

**CHECKBOOK RECONCILIATION**
(THIS IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT)

| | | CHECKS OUTSTANDING | | |
|---|---|---|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $_____ Add+ | **CHECK NUMBER** | **AMOUNT** | |
| | | | | |
| | | | | |
| DEPOSITS NOT CREDITED ON THIS STATEMENT (if any) | $_____ _____ _____ _____ | | | |
| | | | | |
| | | | | |
| | Total $_____ Subtract | | | |
| | | | | |
| | | | | |
| CHECKS OUTSTANDING | $_____ | | | |
| | | | | |
| BALANCE | $_____ | | | |
| | The above amount should agree with checkbook balance after deducting the service charge (if any) shown on statement for the previous month. | | | |
| | | | | |
| | | **TOTAL** | $ | |

**HELPFUL HINTS**

(If your account does not balance, please check the following carefully.)
* Have you correctly entered the amount of each check in checkbook register?
* Are the amounts of your deposits entered in your register the same as on your statement?
* Have you carried the correct balance forward from one entry to another in your register?
* Have you checked all addition and subtraction in your register?
* Have you deducted all bank charges/fees from your register?

**ELECTRONIC FUND TRANSFERS ERROR RESOLUTION**

Telephone or write us at the phone number or address on the front of this statement as soon as you can in case of errors or questions about your electronic transfers, if you think your statement or receipt is wrong, or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you your FIRST statement on which the error or problem appeared.

  1. Tell us your name and account number.
  2. Describe the error or the transfer you are unsure about, and explain as clearly as
     you can why you believe there is an error or why you need more information.
  3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, (20 days for new accounts - accounts involving a transfer within 30 days after the first deposit was made to the account) we will credit your account for the amount you think is in error so that you will have use of the funds during the time it takes us to complete our investigation.

APY - Annual Percentage Yield                          APR - Annual Percentage Rate

# **Exhibit Q**

**Exhibit C**
**KS Mattson Partners, LP**
**Schedule of Real Estate Owned**
**as of 06/30/2023**

| | Property Description | % Owned | Market Value | Loan Balance | Loan Maturity | Equity | 2022 Annualized Gross Rents | Operating Expenses | NOI | Debt Service | DSCR | Net Cash Flow After Debt Ser. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 62 Farragut Ave., Oakland, CA | 100% | 12,500,000 | 4,251,754 | 2033 | 8,248,246 | 515,204 | 50,522 | 464,682 | 265,468 | 1.75 | 199,214 |
| 2 | 454 15th Street, Del Mar, CA | 100% | 4,500,000 | 1,724,316 | 2035 | 2,775,684 | 177,867 | 26,258 | 151,609 | 95,486 | 1.59 | 56,123 |
| 3 | 1745 Grand Ave, Del Mar, CA | 100% | 4,850,000 | 1,953,791 | 2037 | 2,896,209 | 213,888 | 16,912 | 196,976 | 100,020 | 1.97 | 96,956 |
| 4 | 1817/1819 Coast Blvd., Del Mar, CA | 100% | 4,500,000 | 804,294 | 2035 | 3,695,706 | 165,929 | 13,801 | 152,128 | 72,953 | 2.09 | 79,175 |
| 5 | 1823/1825 Coast Blvd., Del Mar, CA | 100% | 3,000,000 | 1,153,892 | 2037 | 1,846,108 | 132,014 | 23,561 | 108,453 | 75,648 | 1.43 | 32,805 |
| 6 | 1834/1836 Oceanfront, Del Mar, CA | 100% | 20,000,000 | 5,145,487 | 2035 | 14,854,513 | 747,377 | 117,460 | 629,917 | 232,626 | 2.71 | 397,291 |
| 7 | 531/533 Camino Del, Del Mar, CA | 100% | 4,850,000 | 1,303,701 | 2034 | 3,546,299 | 117,593 | 40,383 | 77,210 | 56,285 | 1.37 | 20,925 |
| 8 | 721 A/B Camino, Del Mar, CA | 100% | 3,850,000 | 1,416,174 | 2034 | 2,433,826 | 127,669 | 24,916 | 102,753 | 81,934 | 1.25 | 20,819 |
| 9 | 157 26th Street, Del Mar, CA | 100% | 12,500,000 | 4,742,906 | 2047 | 7,757,094 | 366,362 | 95,074 | 271,288 | 169,248 | 1.60 | 102,040 |
| 10 | 1716 Oceanfront, De; Mar, CA | 100% | 21,000,000 | 5,553,997 | 2025 | 15,446,003 | 627,135 | 135,295 | 491,840 | 315,174 | 1.56 | 176,666 |
| 11 | 415 Pacific Ave., Piedmont, CA | 100% | 6,550,000 | 1,998,344 | 2025 | 4,551,656 | 216,719 | 54,284 | 162,435 | 147,984 | 1.10 | 14,451 |
| 12 | 210 La Salle Ave., Piedmont, CA | 75% | 3,712,500 | 780,845 | 2033 | 2,931,655 | 208,841 | 33,165 | 175,676 | 90,768 | 1.94 | 84,908 |
| 13 | 1549 E Napa St, Sonoma, CA | 100% | 3,550,000 | 1,325,000 | N/A | 2,225,000 | 185,000 | 27,684 | 157,316 | 121,544 | 1.29 | 35,772 |
| 14 | 19021 7th St East, Sonoma, CA | 100% | 4,000,000 | 1,800,000 | 2026 | 2,200,000 | 386,028 | 89,530 | 296,498 | 176,064 | 1.68 | 120,434 |
| 15 | Folsom Village Sq., Folsom, Ca | 100% | 6,500,000 | 0 | N/A | 6,500,000 | 349,600 | 21,176 | 328,424 | 196,236 | 1.67 | 132,188 |
| 16 | 4321 First St, Pleasanton,CA | 100% | 2,950,000 | 953,441 | 2025 | 1,996,559 | 180,346 | 9,443 | 170,903 | 137,510 | 1.24 | 33,393 |
| 17 | 5200-5234 Gatewat PlazaDr, Benicia | 100% | 3,450,000 | 1,024,165 | 2025 | 2,425,835 | 238,384 | 34,901 | 203,483 | 200,168 | 1.02 | 3,315 |
| 18 | 22666 Braodway, Sonoma, CA | 100% | 5,500,000 | 1,600,000 | 2026 | 3,900,000 | 225,000 | 28,125 | 196,875 | 177,180 | 1.11 | 19,695 |
| 19 | 346 2nd Street East, Sonoma, CA * | 100% | 1,950,000 | 950,000 | 2041 | 1,000,000 | 387,215 | 60,750 | 326,465 | 243,432 | 1.34 | 83,033 |
| 20 | 2 W Spain St, Sonoma, CA | 100% | 4,950,000 | 2,200,000 | 2025 | 2,750,000 | 395,250 | 68,113 | 327,137 | 263,432 | 1.24 | 63,705 |
| 21 | 2377 Loval Valley Rd, Sonoma, CA | 100% | 3,550,000 | 1,250,000 | N/A | 2,300,000 | 185,000 | 24,316 | 160,684 | 127,488 | 1.26 | 33,196 |
| 22 | 1720/1722 The Strand, Manhattan Beac | 50% | 6,250,000 | 2,250,000 | 2026 | 4,000,000 | 345,000 | 32,154 | 312,846 | 180,000 | 1.74 | 132,846 |
| 23 | 332 2nd St East, Sonoma, CA | 100% | 1,850,000 | 1,350,000 | 2044 | 500,000 | 125,000 | 21,322 | 103,678 | 109,350 | N/A | (5,672) |
| 24 | 70 Moon Mtn Rd, Sonoma, CA | 100% | 4,500,000 | 700,000 | 2026 | 3,800,000 | CONSTRUCT | 11,215 | N/A | N/A | N/A | (11,215) |
| 25 | 230 E Napa St, Sonoma, CA | 100% | 2,950,000 | 1,100,000 | 2024 | 1,850,000 | 152,700 | 23,620 | 129,080 | 102,158 | 1.26 | 26,922 |
| 26 | 18285 Sonoma Hwy, Sonoma, CA | 100% | 5,500,000 | 1,170,000 | 2026 | 4,330,000 | 402,353 | 27,541 | 374,812 | 196,261 | 1.91 | 178,551 |
| 27 | 18010 Sonoma Hwy, Sonoma, CA | 100% | 2,500,000 | 375,000 | 2025 | 2,125,000 | 91,460 | 11,214 | 80,246 | 36,241 | 2.21 | 44,005 |
| 28 | 1190 E Napa St, Sonoma, CA | 100% | 5,600,000 | 1,439,855 | 2026 | 4,160,145 | 358,532 | 56,297 | 302,235 | 145,276 | 2.08 | 156,959 |
| 29 | 1230 East Napa St, Sonoma, CA | 100% | 950,000 | 545,000 | 2025 | 405,000 | 78,000 | 10,115 | 67,885 | 40,164 | 1.69 | 27,721 |
| 30 | 1221 Apple Tree Ct, Sonoma, CA | 100% | 2,150,000 | 0 | N/A | 2,150,000 | 138,000 | 18,674 | 119,326 | N/A | N/A | 119,326 |
| 31 | 969 Rachael Rd, Sonoma, CA | 100% | 8,500,000 | 4,024,365 | 2042 | 4,475,635 | 378,741 | 74,619 | 304,122 | 200,627 | 1.52 | 103,495 |
| 32 | 18590 Sonoma Hwy, Sonoma, CA | 100% | 2,950,000 | 950,000 | N/A | 2,000,000 | 212,000 | 25,500 | 186,500 | 109,716 | 1.70 | 76,784 |
| 33 | 5120 Loval Valley Rd, Sonoma, CA | 100% | 3,900,000 | 1,300,000 | 2026 | 2,600,000 | 362,369 | 32,797 | 329,572 | 75,000 | 4.39 | 254,572 |
| 34 | 19357 Sonoma Hwy, Sonoma, CA | 100% | 3,000,000 | 1,200,000 | 2025 | 1,800,000 | 155,000 | 28,125 | 126,875 | 115,848 | 1.10 | 11,027 |
| 35 | 450A,B,G,K,J/452C 1st Street East, So | 100% | 7,300,000 | 3,000,000 | 2025 | 4,300,000 | 470,873 | 41,267 | 429,606 | 264,300 | 1.63 | 165,306 |
| 36 | 3003 Castle Rd, Sonoma, CA | 100% | 10,500,000 | 2,350,000 | 2025 | 8,150,000 | 365,000 | 50,625 | 314,375 | 192,300 | 1.63 | 122,075 |
| 37 | 1170/1176 Castle Rd, Sonoma, CA | 100% | 6,500,000 | 2,300,000 | 2025 | 4,200,000 | 240,000 | 52,420 | 187,580 | 204,300 | 0.92 | (16,720) |
| 38 | 405 London Way, Sonoma, CA | 100% | 5,750,000 | 1,851,514 | 2030 | 3,898,486 | 221,625 | 46,715 | 174,910 | 211,740 | 0.83 | (36,830) |
| 39 | 236 King Av, Piedmont, CA | 100% | 3,650,000 | 1,555,071 | 2033 | 2,094,929 | 144,500 | 17,456 | 127,044 | 100,740 | 1.26 | 26,304 |
| 40 | 260 King Ave, Piedmont, CA | 75% | 2,662,500 | 503,276 | 2036 | 2,159,225 | 180,500 | 16,109 | 164,391 | 91,200 | 1.80 | 73,191 |
| 41 | 21000 8th Street East, Sonoma, CA | 100% | 2,750,000 | 650,000 | 2027 | 2,100,000 | LOT | 26,217 | N/A | N/A | N/A | (26,217) |
| 42 | 2500 Castle Rd, Sonoma, CA | 100% | 2,500,000 | 0 | N/A | 2,500,000 | LOT | 23,177 | N/A | N/A | N/A | (23,177) |
| | **Grand Totals** | | **230,425,000** | **70,546,188** | | **159,878,812** | **10,570,075** | **1,642,848** | **8,987,836** | **5,721,869** | **1.57** | **3,205,358** |

CONFIDENTIAL - SUBJECT TO FED.R.CRIM.P. 6(e)

TLEFEVER-GC0002798

# Exhibit R

| **Date:** | Fri, 22 May 2020 6:06:06 PM -0400 |
| **Sent:** | Fri, 22 May 2020 6:04:31 PM -0400 |
| **Subject:** | Mattson info |
| **From:** | k < ███████ ████████ > |
| **To:** | Quinn, Gema L < ███████████ >; |
| **Attachments:** | FNST 1219 Comerica update Symphony.pdf; FNSTLP 1219 Comerica update Symphony.pdf; KSP SREO 1219.pdf; P&L KSP 1219 Comerica update Symphony.pdf; KSP 2018 Comerica update Symphony.pdf; KWM 2018 Comerica update Symphony.pdf |

DOJ-00138562

# PERSONAL FINANCIAL STATEMENT

| Name: | KENNETH W MATTSON |
|---|---|
| Date prepared | December 31, 2019 |

**ASSETS**

| | |
|---|---:|
| Cash (checking) accounts | 22,135.00 |
| Cash (savings) accounts | |
| Notes (contracts) owed to you | |
| Certificates of deposit | |
| Treasury bills | |
| Funds on deposit in open escrow | |
| Funds held for 1031 exchange | |
| Money market funds | |
| Tax refund due | |
| Securities (stocks, bonds) | |
| Real estate (market value) see attached schedule | |
| Vehicles (market value) | |
| Retirement plans (Dec 31, 2019) | 828,570.00 |
| K S MATTSON PARTNERS, LP (Market value 3/31/19) | 218,632,175.00 |
| **Total Assets:** | **219,482,880.00** |

**LIABILITIES**

| | |
|---|---:|
| Credit obligations on purchases | |
| Construction credit line | |
| Home mortgage | |
| Secured credit lines termed: | 216,487.00 |
| Auto loans | |
| Personal loans | |
| Personal guarantees | |
| Education loans | |
| Business loan obligations | |
| Taxes | |
| Other debts | |
| **Total Liabilities:** | **216,487.00** |

**NET WORTH**

| | |
|---|---:|
| **Total Net Worth:** | **219,266,393.00** |

DOJ-00138563

# PERSONAL FINANCIAL STATEMENT

| Name: | KS MATTSON PARTNERS, LP |
|---|---|
| Date prepared | December 31, 2019 |

**ASSETS**

| | |
|---|---:|
| Cash (checking) accounts | 534,296.00 |
| Cash (savings) accounts | |
| Notes (contracts) owed to you | |
| Notes (contracts) owed to you Lefever Mattson | 6,254,275.00 |
| Treasury bills | |
| Funds on deposit in open escrow | |
| Funds held for 1031 exchange | |
| Equity Shares Held | 8,478,840.00 |
| Outside Interests Held | 32,070,400.00 |
| Real estate (market value) see attached schedule | 180,442,500.00 |
| Auto/Collectibles (market value) | 6,267,000.00 |
| LEFEVER MATTSON (Market value 1/31/19) | 40,119,452.00 |
| **Total Assets:** | **274,166,763.00** |

**LIABILITIES**

| | |
|---|---:|
| Credit obligations on purchases | |
| Construction credit line - Secured | |
| Credit Line | |
| Other Mortgages from RE Schedule | 55,534,588 |
| Personal loans | |
| Personal guarantees | |
| Education loans | |
| Business loan obligations | |
| Taxes | |
| Other debts | |
| **Total Liabilities:** | **55,534,588.00** |

**NET WORTH**

| | |
|---|---:|
| **Total Net Worth:** | **218,632,175.00** |

**Exhibit C**
**KS Mattson Partners, LP**
**Schedule of Real Estate Owned**
**as of 12/31/2019**

| | Property Description | % Owned | Market Value | Loan Balance | Loan Maturity | Equity | 2019 Annualized Gross Rents | Operating Expenses | NOI | Debt Service | DSCR | Net Cash Flow After Debt Ser. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 62 Farragut Ave., Oakland, CA | 100% | 12,500,000 | 4,647,213 | 2033 | 7,852,787 | 476,335 | 50,522 | 425,813 | 265,468 | 1.60 | 160,345 |
| 2 | 454 15th Street, Del Mar, CA | 100% | 4,150,000 | 1,846,247 | 2035 | 2,303,753 | 152,056 | 22,311 | 129,745 | 95,486 | 1.36 | 34,259 |
| 3 | 1745 Grand Ave, Del Mar, CA | 100% | 4,500,000 | 2,156,615 | 2037 | 2,343,385 | 185,500 | 14,831 | 170,669 | 100,020 | 1.71 | 70,649 |
| 4 | 1817/1819 Coast Blvd., Del Mar, CA | 100% | 4,500,000 | 1,021,508 | 2035 | 3,478,492 | 101,230 | 10,635 | 90,595 | 72,953 | 1.24 | 17,642 |
| 5 | 1823/1825 Coast Blvd., Del Mar, CA | 100% | 4,000,000 | 1,298,360 | 2037 | 2,701,640 | 113,950 | 21,183 | 92,767 | 75,648 | 1.23 | 17,119 |
| 6 | 1834/1836 Oceanfront, Del Mar, CA | 100% | 15,500,000 | 5,686,021 | 2035 | 9,813,979 | 573,195 | 100,153 | 473,042 | 292,626 | 1.62 | 180,416 |
| 7 | 531/533 Camino Del, Del Mar, CA | 100% | 4,500,000 | 1,423,714 | 2034 | 3,076,286 | 101,400 | 15,380 | 86,020 | 82,584 | 1.04 | 3,436 |
| 8 | 721 A/B Camino, Del Mar, CA | 100% | 4,500,000 | 1,455,299 | 2034 | 3,044,701 | 111,280 | 25,109 | 86,171 | 79,704 | 1.08 | 6,467 |
| 9 | 157 26th Street, Del Mar, CA | 100% | 12,500,000 | 5,205,361 | 2047 | 7,294,639 | 322,400 | 79,382 | 243,018 | 169,248 | 1.44 | 73,770 |
| 10 | 1716 Oceanfront, De; Mar, CA | 100% | 19,500,000 | 3,250,000 | 2025 | 16,250,000 | 480,000 | 109,125 | 370,875 | 113,340 | 3.27 | 257,535 |
| 11 | 415 Pacific Ave., Piedmont, CA | 100% | 6,550,000 | 1,998,344 | 2019 | 4,551,656 | 188,150 | 49,909 | 138,241 | 147,984 | 0.93 | (9,743) |
| 12 | 210 La Salle Ave., Piedmont, CA | 75% | 3,712,500 | 1,074,095 | 2033 | 2,638,406 | 177,840 | 22,518 | 155,322 | 90,768 | 1.71 | 64,554 |
| 13 | 5819 Filaree Heights, Malibu, CA | 100% | 3,550,000 | 0 | N/A | 3,550,000 | LOT | 27,684 | N/A | N/A | N/A | (27,684) |
| 14 | Ceres West MHP, Ceres, CA | 100% | 3,100,000 | 873,915 | 2026 | 2,226,085 | 371,181 | 89,530 | 281,651 | 80,568 | 3.50 | 201,083 |
| 15 | Folsom Village Sq., Folsom, Ca | 100% | 6,500,000 | 1,979,314 | 2021 | 4,520,686 | 307,862 | 21,176 | 286,686 | 196,236 | 1.46 | 90,450 |
| 16 | 4321 First St, Pleasanton,CA | 100% | 2,950,000 | 953,441 | 2022 | 1,996,559 | 157,198 | 17,458 | 139,740 | 73,841 | 1.89 | 65,899 |
| 17 | 5200-5234 Gatewat PlazaDr, Benicia | 100% | 2,850,000 | 1,124,627 | 2021 | 1,725,373 | 204,804 | 29,560 | 175,244 | 88,861 | 1.97 | 86,383 |
| 18 | 103/105 Commerce Ct, Fairfield, CA | 100% | 6,500,000 | 2,637,863 | 2024 | 3,862,137 | 381,186 | 41,750 | 339,436 | 207,588 | 1.64 | 131,848 |
| 19 | 7456 Foothills Blvd, Roseville, CA | 100% | 7,500,000 | 2,314,128 | 2024 | 5,185,872 | 457,834 | 185,571 | 272,263 | 198,480 | 1.37 | 73,783 |
| 20 | 4950,60,70 Allison Pkwy, Vacaville, CA | 100% | 6,000,000 | 2,342,077 | 2021 | 3,657,923 | 305,284 | 67,557 | 237,727 | 190,452 | 1.25 | 47,275 |
| 21 | 70 Moon Mtn Rd, Sonoma, CA | 100% | 2,600,000 | 700,000 | 2020 | 1,900,000 | LOT | 11,215 | N/A | 78,744 | N/A | (89,959) |
| 22 | 230 E Napa St, Sonoma, CA | 100% | 2,750,000 | 1,100,000 | 2022 | 1,650,000 | 133,100 | 25,475 | 107,625 | 101,321 | 1.06 | 6,304 |
| 23 | 18275 Sonoma Hwy, Sonoma, CA | 100% | 4,550,000 | 1,170,000 | 2021 | 3,380,000 | 342,430 | 45,625 | 296,805 | 116,880 | 2.54 | 179,925 |
| 24 | 18010 Sonoma Hwy, Sonoma, CA | 100% | 1,500,000 | 375,000 | 2020 | 1,125,000 | 87,942 | 11,214 | 76,728 | 36,241 | 2.12 | 40,487 |
| 25 | 1190 E Napa St, Sonoma, CA | 100% | 4,580,000 | 1,505,462 | 2026 | 3,074,538 | 285,426 | 42,621 | 242,805 | 116,532 | 2.08 | 126,273 |
| 26 | 1200 Apple Tree Ct, Sonoma, CA | 100% | 2,250,000 | 545,000 | 2025 | 1,705,000 | 89,250 | 12,115 | 77,135 | 38,247 | 2.02 | 38,888 |
| 27 | 969 Rachael Rd, Sonoma, CA | 100% | 7,850,000 | 4,163,484 | 2042 | 3,686,516 | 284,200 | 66,640 | 217,560 | 294,132 | N/A | (76,572) |
| 28 | 19355 7th Street East, Sonoma, CA | 100% | 5,500,000 | 0 | N/A | 5,500,000 | 0 | 45,500 | -45,500 | N/A | N/A | (45,500) |
| 29 | 1025 Napa Rd, Sonoma, CA | 100% | 1,250,000 | 437,500 | 2020 | 812,500 | 120,000 | 9,844 | 110,156 | 31,848 | 3.46 | 78,308 |
| 30 | 302-310 1st St East, Sonoma, CA | 100% | 4,750,000 | 2,250,000 | 2022 | 2,500,000 | 312,545 | 52,420 | 260,125 | 200,250 | 1.30 | 59,875 |
| 31 | 18701 Gehricke Rd, Sonima, CA | 100% | 7,500,000 | 0 | N/A | 7,500,000 | 550,000 | 89,600 | 460,400 | - | N/A | 460,400 |
| | **Grand Totals** | | 180,442,500 | 55,534,588 | | 124,907,913 | 7,373,578 | 1,413,613 | 5,998,864 | 3,636,050 | 1.65 | 2,323,915 |

-

DOJ-00138565

DOJ-00138566

DOJ-00138567

KS MATTSON PARTNERS, LP
PROFIT/LOSS SREO
12 MOS ENDING 12/31/2019

**INCOME**

| | | |
|---|---|---|
| RENT INCOME | $ | 7,038,876.00 |
| MGMT FEES | $ | - |
| K-1 DIST/OWNER DIST | $ | 573,000.00 |

| | | |
|---|---|---|
| **TOTAL INCOME** | $ | 7,611,876.00 |

**EXPENSES**

| | | |
|---|---|---|
| GENERAL AND ADMIN | $ | 1,324,013.00 |
| INTEREST (NON MTGE) | $ | - |
| DEBT SERVICE (MTGE) | $ | 3,636,050.00 |
| LESS PRINCIPAL REDUC | $ | (428,401.00) |
| TOTAL EXPENSES | $ | 4,531,662.00 |
| NET INCOME BEFORE DEPR | $ | 3,080,214.00 |

DOJ-00138568

# Exhibit S

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

██████████

| | |
|---|---|
| Statement Period: | 01/01/2024 - 03/31/2024 |
| Participant ID: | ██████████ |
| Plan: | |

Do you have questions about ways to optimize your retirement savings strategy? We can help! We can review your strategy and help you make small changes now that can potentially make a big difference in the long term, such as consolidating outside accounts into your Empower account. We can also help you understand the impact of inflation and market volatility on your savings strategy. Call **855-756-4738** for a no-cost consultation with an Empower financial professional. Consider all your options and their features and fees before moving money between accounts.

Securities, when presented, are offered and/or distributed by Empower Financial Services, Inc., Member FINRA/SIPC. EFSI is an affiliate of Empower Retirement, LLC; Empower Funds, Inc.; and registered investment adviser Empower Advisory Group, LLC. This material is for informational purposes only and is not intended to provide investment, legal or tax recommendations or advice.

Point-in-time advice is provided by an Empower representative registered with Empower Financial Services, Inc. at no additional cost to account owners. There is no guarantee provided by any party that use of the advice will result in a profit.

## What is my account balance?

**$2,731.44**

As of 03/31/2024

## Where can I go for help?

| | |
|---|---|
| **Website:** | empowermyretirement.com |
| **Phone:** | 1-800-338-4015 |
| **Mail:** | Empower |
| | P.O. Box 173764 |
| | Denver, CO 80217-3764 |

## How has my account changed?

| | Employee | Employer | Total |
|---|---|---|---|
| **Balance as of December 31, 2023** | **$582,949.26** | **$32,027.71** | **$614,976.97** |
| Payroll Contributions | 7,624.98 | 444.00 | 8,068.98 |
| Change in Value | 13,419.84 | 724.10 | 14,143.94 |
| Expenses | -760.31 | -41.78 | -802.09 |
| Withdrawals | -600,652.63 | -33,003.73 | -633,656.36 |
| **Balance as of March 31, 2024** | **$2,581.14** | **$150.30** | **$2,731.44** |
| **Vested Balance as of March 31, 2024** | **$2,581.14** | **$150.30** | **$2,731.44** |
| Vesting information provided as of March 31, 2024 | | | |



**EMPOWER®**


# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON
▮▮▮▮▮▮

## How will my future contributions be invested?

| 100% | American Funds 2030 Trgt Date Retire R6 |
|---|---|

## How is my account invested?

| | Beginning Balance | Deposits | Change in Value | Transfers | Withdrawals /Expenses | Ending Balance | Ending Units/ Shares |
|---|---|---|---|---|---|---|---|
| **Asset Allocation** | | | | | | | |
| American Funds 2030 Trgt Date Retire R6 | 82,078.70 | 8,068.98 | 1,913.88 | | -89,330.12 | 2,731.44 | 160.673 |
| **Balanced Funds** | | | | | | | |
| American Funds American Balanced R6 | 390,308.64 | | 11,932.24 | | -402,240.88 | 0.00 | 0.000 |
| **Fixed** | | | | | | | |
| EI Fixed Account - Series Class I | 142,589.63 | | 297.82 | | -142,887.45 | 0.00 | |
| **Totals** | **614,976.97** | **8,068.98** | **14,143.94** | | **-634,458.45** | **2,731.44** | |

## How is my account being funded?

| | Beginning Balance | Deposits | Change in Value | Withdrawals /Expenses /Transfers | Ending Balance | Percent Vested | Vested Balance |
|---|---|---|---|---|---|---|---|
| Employee Before Tax | 582,949.26 | 7,624.98 | 13,419.84 | -601,412.94 | 2,581.14 | 100% | 2,581.14 |
| Safe Harbor Match | 32,027.71 | 444.00 | 724.10 | -33,045.51 | 150.30 | 100% | 150.30 |
| **Totals** | **614,976.97** | **8,068.98** | **14,143.94** | **-634,458.45** | **2,731.44** | | **2,731.44** |

## How has my account changed over time?

Average Annual Effective Yield For This Reporting Period:

| EI Fixed Account - Series Class I .................................................................. | 1.35% |
|---|---|

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 318 of 355

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON



## What activity took place this period?

|  | Payroll Date | Effective Date | Dollar Amount |
|---|---|---|---|
| **Deposits/Contributions** | | | |
| Contribution | Jan 03, 2024 | Jan 02, 2024 | 1,344.83 |
| Contribution | Jan 18, 2024 | Jan 18, 2024 | 1,344.83 |
| Contribution | Feb 02, 2024 | Feb 02, 2024 | 1,344.83 |
| Contribution | Feb 20, 2024 | Feb 16, 2024 | 1,344.83 |
| Contribution | Mar 04, 2024 | Mar 06, 2024 | 1,344.83 |
| Contribution | Mar 18, 2024 | Mar 18, 2024 | 1,344.83 |
| **Total Deposits/Contributions** | | | **8,068.98** |
| **Withdrawal Charges** | | | |
| ACH Special Handling Charge | | Feb 26, 2024 | -15.00 |
| Benefit Disbursement Fee - ERS | | Feb 26, 2024 | -50.00 |
| **Total Withdrawal Charges** | | | **-65.00** |
| **Expenses** | | | |
| Plan Administration Asset Based Fee | | Jan 17, 2024 | -802.09 |
| **Total Expenses** | | | **-802.09** |

## What are the rates on new deposits for fixed investments?

| Investment Option | Rate | Rate Valid Through |
|---|---|---|
| EI Fixed Account - Series Class I | 1.40% | June 30, 2024 |

## What is the rate of return on my retirement account(s)?

| Period | Year To Date |
|---|---|
| 01/01/2024 - 03/31/2024 | 01/01/2024 - 03/31/2024 |
| 3.49% | 3.49% |

Personalized performance information is provided to account holders as a general approximation of the overall recent performance of your account. It is calculated based on a formula which estimates the equivalent rate of return during the stated period, based on the opening balance, transaction activity including any applicable fees, and closing balance. Income received in the stated period will be included; income due but not received will be included in the following period. Performance calculations will not include loan balance. Due to the transaction activity in the account, overall performance may not equal individual performance returns published by the investment options in the plan. Past performance is not a guarantee or prediction of future investment results.

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

█████

| **How have the investments in my plan performed?** |
|---|

*The Investment Code can be used when you request certain investment related transactions on the voice response system.*

*Performance data quoted represents past performance and is not a guarantee or prediction of future results. The investment return and principal value of an investment will fluctuate so that, when redeemed, shares/units may be worth more or less than their original cost. Current performance may be lower or higher than performance data shown. Performance for a share class before its inception is derived from the historical performance of the oldest share class. If the newer fund has lower expenses, the extended performance is not adjusted for the lower expenses; had it, returns would have been higher. For performance data current to the most recent month-end, please visit empowermyretirement.com.*

*Carefully consider the investment options objectives, risks, fees and expenses. Contact us for a prospectus, summary prospectus for SEC registered products or disclosure document for unregistered products, if available, containing this information. Read each carefully before investing.*

| Investment Option | Investment Code | 3 Month | YTD | 1 Year | 3 Year | 5 Year | Inception /10 Year | Inception Date | Expense Ratio |
|---|---|---|---|---|---|---|---|---|---|
| **Asset Allocation** | | | | | | | | | |
| American Funds 2030 Trgt Date Retire R6 [1,1,1] | 10382 | 4.81 | 4.81 | 14.83 | 4.11 | 8.05 | 7.58 | Jul 2009 | .33 |
| American Funds 2040 Trgt Date Retire R6 [1,1,1] | 10383 | 7.21 | 7.21 | 21.05 | 5.83 | 10.37 | 9.17 | Jul 2009 | .37 |
| American Funds 2050 Trgt Date Retire R6 [1,1,1] | 10384 | 7.68 | 7.68 | 22.57 | 5.90 | 10.64 | 9.41 | Jul 2009 | .38 |
| American Funds 2060 Trgt Date Retire R6 | 9192 | 7.87 | 7.87 | 23.31 | 5.86 | 10.60 | 9.54 | Mar 2015 | .39 |
| **International Funds** | | | | | | | | | |
| American Funds New Perspective R6 | 7766 | 8.49 | 8.49 | 22.92 | 5.22 | 12.78 | 10.96 | May 2009 | .42 |
| Franklin Intl Growth R6 | 9387 | 3.19 | 3.19 | 6.00 | -5.33 | 5.57 | 5.60 | May 2013 | .82 |
| **Small Cap Funds** | | | | | | | | | |
| Fidelity Small Cap Index [3] | 21431 | 5.19 | 5.19 | 19.83 | -.02 | 8.21 | 7.74 | Sep 2011 | .03 |
| **Mid Cap Funds** | | | | | | | | | |
| JPMorgan Mid Cap Growth R6 [3] | 4549 | 10.26 | 10.26 | 26.21 | 2.85 | 13.53 | 12.05 | Nov 2011 | .75 |
| **Large Cap Funds** | | | | | | | | | |
| Fidelity 500 Index [4] | 21300 | 10.55 | 10.55 | 29.87 | 11.48 | 15.04 | 12.95 | May 2011 | .02 |
| T. Rowe Price Blue Chip Growth I [4] | 12507 | 14.08 | 14.08 | 46.51 | 7.15 | 13.31 | 14.17 | Dec 2015 | .57 |
| **Balanced Funds** | | | | | | | | | |
| American Funds American Balanced R6 | 6811 | 6.24 | 6.24 | 18.11 | 6.21 | 8.91 | 8.37 | May 2009 | .25 |
| **Bond Funds** | | | | | | | | | |
| American Funds Bond Fund of Amer R6 | 7283 | -.74 | -.74 | 1.40 | -2.19 | 1.22 | 2.02 | May 2009 | .24 |
| Fidelity US Bond Index | 21448 | -.72 | -.72 | 1.69 | -2.48 | .33 | 1.52 | May 2011 | .03 |
| **Fixed** | | | | | | | | | |
| EI Fixed Account - Series Class I [2] | 23872 | | | | | | | | |

Note: **Average Annualized Total Return as of March 28, 2024**

*These returns and fund operating expenses are expressed as percentages. 3, 5 and 10 Year/Since Inception returns shown are annualized. For 10 Year/Since Inception, if the fund was not in existence for 10 years, returns shown are since inception. If the fund is less than one year old, returns are not annualized.*

*Returns reflect deduction of fund expenses. Your Plan may have higher or lower fund expenses and may assess a plan administrative fee that was not deducted in the returns shown.*

*Funds may impose redemption fees and/or transfer restrictions if assets are held for less than the published holding period.*

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

<div style="background:black; width:100px; height:20px"></div>

| How have the investments in my plan performed? (continued) |
|---|

**Securities, when presented, are offered and/or distributed by Empower Financial Services, Inc., Member FINRA/SIPC. EFSI is an affiliate of Empower Retirement, LLC; Empower Funds, Inc.; and registered investment adviser, Empower Advisory Group, LLC. This material is for informational purposes only and is not intended to provide investment, legal or tax recommendations or advice.**

*Where data obtained from Morningstar, 2023 Morningstar, Inc. All rights reserved. The data: (1) is proprietary to Morningstar and/or its content providers; (2) may not be copied or distributed and (3) is not warranted to be accurate, complete or timely. Neither Morningstar nor its content providers are responsible for any damages or losses arising from any use of this information.*

*Funds that do not have a ticker symbol may be exempt from SEC registration or part of a group annuity contract.*

*The net expense ratio is less applicable fee waivers or expense reimbursements the investment adviser and/or administrator may have agreed upon, either voluntary or by contractual agreement; the gross expense ratio is not. Voluntary fee waivers and reimbursements may be modified or terminated at any time. Additional information can be found in the Fund's prospectus and/or other disclosure documents regarding effective dates and/or if waivers or reimbursements are voluntary or by contractual agreement. Absent waivers or reimbursements, the performance would have been lower.*

[1] *The date in the name of the target date fund is the assumed date of retirement. The asset allocation becomes more conservative as the fund nears the target retirement date; however, the principal value of the fund is never guaranteed.*

[2] *This fixed fund is offered through a group fixed and variable deferred annuity contract issued by Empower Annuity Insurance Company of America . A ticker symbol is not available for this investment option.*

[3] *Securities of small and mid-size companies may be more volatile than those of larger, more established companies.*

[4] *Securities that invest in stocks may decline in value.*

This statement confirms transactions during the stated time period. You have an obligation to review all of the information carefully to confirm that we have acted on your instructions properly. You must notify Empower of any error within this statement as soon as possible. The actual benefits payable will be determined by the plan document that governs the operations of your plan. If you have any questions, inquiries or complaints concerning your benefits, please contact Empower.

Some of the plan's administrative expenses for the preceding quarter may have been paid from the total annual operating expenses (investment expenses) of one or more of the plan's investment options.

Representatives of Empower do not offer or provide investment, fiduciary, financial, legal or tax advice or act in a fiduciary capacity for any client unless explicitly described in writing. Please consult with your investment advisor, attorney and/or tax advisor as needed.

**Securities offered and/or distributed by Empower Financial Services, Inc., Member FINRA/SIPC.** Empower Financial Services, Inc. is an affiliate of Empower Retirement, LLC; Empower Funds, Inc.; and registered investment advisers, Empower Advisory Group, LLC and Personal Capital.

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON



### ------------An Important Message about Investing for Retirement & Diversification------------

To help achieve long-term retirement security, you should give careful consideration to the benefits of a well-balanced and diversified investment portfolio. Spreading your assets among different types of investments may help you achieve a favorable rate of return, while minimizing your overall risk of losing money. This is because market or other economic conditions that cause one category of assets, or one particular security, to perform very well may cause another asset category, or another particular security, to perform poorly. If you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified. Although diversification is not a guarantee against loss, it is an effective strategy to help you manage investment risk. In deciding how to invest your retirement savings, you should take into account all of your assets, including any retirement savings outside of the Plan. No single approach is right for everyone because, among other factors, individuals have different financial goals, different time horizons for meeting their goals, and different risk tolerances. It is also important to periodically review your investment portfolio, your investment objectives, and the investment options under the Plan to help ensure that your retirement savings will meet your retirement goals. Visit the Department of Labor website at www.dol.gov/agencies/ebsa/laws-and-regulations/laws/pension-protection-act/investing-and-diversification for more information on individual investing and diversification.

### ------------An Important Message about Market Timing / Excessive Trading------------

Pursuant to SEC rules, fund companies are required to enter into agreements with intermediaries to provide fund companies with the ability to identify and enforce restrictions on participants engaging in market timing or excessive trading (prohibited trading), as defined by the fund companies. Participants engaging in prohibited trading will receive a warning and, if the prohibited trading continues, will be restricted from transferring into the identified fund(s) for a specific time period determined by the fund company. Some fund companies may restrict participants immediately, without warning when prohibited trading is identified. At the end of the restriction period, the participant will be automatically allowed to resume transfers into the identified fund(s). Transfers out of the identified fund (s) will not be restricted.

### ------------ An Important Message about your Benefit Information ------

This benefit statement provides your vested benefit payable under the plan as of the end of the statement period. If you are terminated and eligible for a distribution, you may obtain more detailed information about your distribution options for these amounts by accessing your plan's Website or reviewing your Summary Plan Description (SPD). The amount eligible for a distribution in a lump sum may vary from the amount shown on this statement due to investment gains and/or losses that occur after the statement period end date. If you have any questions concerning your benefits, please contact the Service Center.

Case: 24-10714     Doc# 134     Filed: 09/10/25     Entered: 09/10/25 14:37:33     Page 322 of 355

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

▬▬▬▬

### ------------ An Important Message about the Lifetime Income Illustration ------------

This statement provides you with information about how much monthly income you could collect at retirement based on your current account balance. The estimated monthly payments in this statement are for illustrative purposes only; they are not a guarantee. Having this information now may help you plan how much money to save for your retirement.

Your account balance is $2,731.44 as of March 31, 2024. Below are estimates of how much money you could receive each month if you were to receive payments in one of the following two payment forms:

1. A single life annuity is an arrangement that pays you a fixed amount of money each month for the rest of your life. Following your death, no further payments would be made to your spouse or heirs. If you receive payments in this form, we estimate you would receive $17.83 per month starting at retirement.
2. A qualified joint and 100% survivor annuity is an arrangement that pays you and your spouse a fixed monthly payment for the rest of your joint lives. In addition, after your death, this type of annuity would continue to provide the same fixed monthly payment to your surviving spouse for their life. If you receive payments in this form, we estimate you would receive $15.16 per month starting at retirement and, after your death, your surviving spouse would receive $15.16 per month.

An annuity with a lower survivor percentage may be available and reducing the survivor percentage (below 100%) would increase monthly payments during your lifetime but would decrease what your surviving spouse would receive after your death.

The following information is to help you understand these estimated monthly payments.

- The estimated monthly payments in this statement assume that your account balance is 100% vested.

- The estimated monthly payments in this statement assume that payments begin March 31, 2024 and that you are 67 on this date. Monthly payments beginning at a younger age would be lower than shown since payments would be made over more years. Monthly payments beginning at an older age would be higher than shown since they would be made over fewer years.

- The estimated monthly payments for a qualified joint and 100% survivor annuity in this statement assume that you are married with a spouse who is the same age as you (even if you do not currently have a spouse, or if you have a spouse who is a different age). If your spouse is younger, monthly payments would be lower than shown since they would be expected to be paid over more years. If your spouse is older, monthly payments would be higher than shown since they would be expected to be paid over fewer years.

- The estimated monthly payments in this statement are based on an interest rate of 4.19%, which is the 10-year constant maturity U.S. Treasury securities yield rate as of March 1, 2024, as required by federal regulations. This rate fluctuates based on market conditions. The lower the interest rate, the smaller your monthly payment will be, and the higher the interest rate, the larger your monthly payment will be.

- The estimated monthly payments in this statement are based on how long you and a spouse, who is assumed to be your age, are expected to live. For this purpose, federal regulations require that your life expectancy be estimated using gender neutral mortality assumptions established by the Internal Revenue Service.

- The estimated monthly payments in this statement are the same whether you are male or female. This is required for annuities payable from an employer's plan. However, the same amount paid for an annuity available outside of an employer's plan may provide a larger monthly payment for males than for females since females are expected to live longer.

- The estimated monthly payments in this statement are based on prevailing market conditions and other assumptions required under

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

███████

federal regulations. If you decide to purchase an annuity, the actual payments you receive will depend on a number of factors and may vary substantially from the estimated monthly payments in this statement. For example, your actual age at retirement, your actual account balance (reflecting future investment gains and losses, contributions, distributions, and fees), and the market conditions at the time of purchase will affect your actual payment amounts.

- Unlike Social Security payments, the estimated monthly payments in this statement do not increase each year with a cost-of-living adjustment. Therefore, as prices increase over time, the fixed monthly payments will buy fewer goods and services.

Empower
P.O. Box 173764
Denver, CO 80217-3764

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

**Statement Period:** 04/01/2025 - 06/30/2025
**Participant ID:**
**Plan:**

Wondering what to do with your retirement savings account with your previous employer? We make it easy to understand your options and to take your next steps, including how to defer taxes and avoid IRS penalties. Visit **empowermyoptions.com** to see how you can put your savings towards achieving your retirement goals. Even smaller balances today can significantly impact your retirement savings tomorrow. Consider all your options and their features and fees before moving money between accounts.

## What is my account balance?

**$14,787.17**

As of 06/30/2025

## Where can I go for help?

**Website:** empowermyretirement.com
**Phone:** 1-800-338-4015
**Mail:** Empower
P.O. Box 173764
Denver, CO 80217-3764

## How has my account changed?

|  | **Employee** | **Employer** | **Total** |
|---|---|---|---|
| **Balance as of March 31, 2025** | **$13,009.79** | **$757.55** | **$13,767.34** |
| Change in Value | 981.79 | 57.17 | 1,038.96 |
| Expenses | -18.08 | -1.05 | -19.13 |
| **Balance as of June 30, 2025** | **$13,973.50** | **$813.67** | **$14,787.17** |
| **Vested Balance as of June 30, 2025** | **$13,973.50** | **$813.67** | **$14,787.17** |

Vesting information provided as of June 30, 2025

## How will my future contributions be invested?

| 100% | American Funds 2030 Trgt Date Retire R6 |



05130-01    0962089700440    07/07/2025    Page 1 of 5

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON



## How is my account invested?

| Asset Allocation | Beginning Balance | Deposits | Change in Value | Transfers | Withdrawals /Expenses | Ending Balance | Ending Units/ Shares |
|---|---|---|---|---|---|---|---|
| American Funds 2030 Trgt Date Retire R6 | 13,767.34 | | 1,038.96 | | -19.13 | 14,787.17 | 787.389 |
| **Totals** | **13,767.34** | | **1,038.96** | | **-19.13** | **14,787.17** | |

## How is my account being funded?

| | Beginning Balance | Deposits | Change in Value | Withdrawals /Expenses /Transfers | Ending Balance | Percent Vested | Vested Balance |
|---|---|---|---|---|---|---|---|
| Employee Before Tax | 13,009.79 | | 981.79 | -18.08 | 13,973.50 | 100% | 13,973.50 |
| Safe Harbor Match | 757.55 | | 57.17 | -1.05 | 813.67 | 100% | 813.67 |
| **Totals** | **13,767.34** | | **1,038.96** | **-19.13** | **14,787.17** | | **14,787.17** |

## What activity took place this period?

| | Effective Date | Dollar Amount |
|---|---|---|
| **Expenses** | | |
| Plan Administration Asset Based Fee | Apr 14, 2025 | -19.13 |
| **Total Expenses** | | **-19.13** |

## What is the rate of return on my retirement account(s)?

| Period 04/01/2025 - 06/30/2025 | Year To Date 01/01/2025 - 06/30/2025 |
|---|---|
| 7.41% | 8.31% |

Personalized performance information is provided to account holders as a general approximation of the overall recent performance of your account. It is calculated based on a formula which estimates the equivalent rate of return during the stated period, based on the opening balance, transaction activity including any applicable fees, and closing balance. Income received in the stated period will be included; income due but not received will be included in the following period. Performance calculations will not include loan balance. Due to the transaction activity in the account, overall performance may not equal individual performance returns published by the investment options in the plan. Past performance is not a guarantee or prediction of future investment results.

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 326 of 355

# HOME TAX SERVICE OF AMERICA, INC. 401(k) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

---

| How have the investments in my plan performed? |
|---|
| You can access detailed account information such as investment performance, investment allocations, transaction history, contribution details and more on your plan website at empowermyretirement.com. |

This statement confirms transactions during the stated time period. You have an obligation to review all of the information carefully to confirm that we have acted on your instructions properly. You must notify Empower of any error within this statement as soon as possible. The actual benefits payable will be determined by the plan document that governs the operations of your plan. If you have any questions, inquiries or complaints concerning your benefits, please contact Empower.

Some of the plan's administrative expenses for the preceding quarter may have been paid from the total annual operating expenses (investment expenses) of one or more of the plan's investment options.

Representatives of Empower do not offer or provide investment, fiduciary, financial, legal or tax advice or act in a fiduciary capacity for any client unless explicitly described in writing. Please consult with your investment advisor, attorney and/or tax advisor as needed.

**Securities, when presented, are offered and/or distributed by Empower Financial Services, Inc., Member FINRA/SIPC.** EFSI is an affiliate of Empower Retirement, LLC; Empower Funds, Inc.; and registered investment adviser, Empower Advisory Group, LLC. This material is for informational purposes only and is not intended to provide investment, legal, or tax recommendations or advice.

### ------------An Important Message about Investing for Retirement & Diversification------------

To help achieve long-term retirement security, you should give careful consideration to the benefits of a well-balanced and diversified investment portfolio. Spreading your assets among different types of investments may help you achieve a favorable rate of return, while minimizing your overall risk of losing money. This is because market or other economic conditions that cause one category of assets, or one particular security, to perform very well may cause another asset category, or another particular security, to perform poorly. If you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified. Although diversification is not a guarantee against loss, it is an effective strategy to help you manage investment risk. In deciding how to invest your retirement savings, you should take into account all of your assets, including any retirement savings outside of the Plan. No single approach is right for everyone because, among other factors, individuals have different financial goals, different time horizons for meeting their goals, and different risk tolerances. It is also important to periodically review your investment portfolio, your investment objectives, and the investment options under the Plan to help ensure that your retirement savings will meet your retirement goals. Visit the Department of Labor website at www.dol.gov/agencies/ebsa/laws-and-regulations/laws/pension-protection-act/investing-and-diversification for more information on individual investing and diversification.

Case: 24-10714    Doc# 134    Filed: 09/10/25    Entered: 09/10/25 14:37:33    Page 327 of 355

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON



### ------------An Important Message about Market Timing / Excessive Trading------------

Pursuant to SEC rules, fund companies are required to enter into agreements with intermediaries to provide fund companies with the ability to identify and enforce restrictions on participants engaging in market timing or excessive trading (prohibited trading), as defined by the fund companies. Participants engaging in prohibited trading will receive a warning and, if the prohibited trading continues, will be restricted from transferring into the identified fund(s) for a specific time period determined by the fund company. Some fund companies may restrict participants immediately, without warning when prohibited trading is identified. At the end of the restriction period, the participant will be automatically allowed to resume transfers into the identified fund(s). Transfers out of the identified fund (s) will not be restricted.

### ------------ An Important Message about your Benefit Information ------

This benefit statement provides your vested benefit payable under the plan as of the end of the statement period. If you are terminated and eligible for a distribution, you may obtain more detailed information about your distribution options for these amounts by accessing your plan's Website or reviewing your Summary Plan Description (SPD). The amount eligible for a distribution in a lump sum may vary from the amount shown on this statement due to investment gains and/or losses that occur after the statement period end date. If you have any questions concerning your benefits, please contact the Service Center.

### ------------ An Important Message about the Lifetime Income Illustration ------------

This statement provides you with information about how much monthly income you could collect at retirement based on your current account balance. The estimated monthly payments in this statement are for illustrative purposes only; they are not a guarantee. Having this information now may help you plan how much money to save for your retirement.

Your account balance is $14,787.17 as of June 30, 2025. Below are estimates of how much money you could receive each month if you were to receive payments in one of the following two payment forms:

1. A single life annuity is an arrangement that pays you a fixed amount of money each month for the rest of your life. Following your death, no further payments would be made to your spouse or heirs. If you receive payments in this form, we estimate you would receive $98.64 per month starting at retirement.
2. A qualified joint and 100% survivor annuity is an arrangement that pays you and your spouse a fixed monthly payment for the rest of your joint lives. In addition, after your death, this type of annuity would continue to provide the same fixed monthly payment to your surviving spouse for their life. If you receive payments in this form, we estimate you would receive $84.16 per month starting at retirement and, after your death, your surviving spouse would receive $84.16 per month.

An annuity with a lower survivor percentage may be available and reducing the survivor percentage (below 100%) would increase monthly payments during your lifetime but would decrease what your surviving spouse would receive after your death.

The following information is to help you understand these estimated monthly payments.

- The estimated monthly payments in this statement assume that your account balance is 100% vested.

- The estimated monthly payments in this statement assume that payments begin June 30, 2025 and that you are 67 on this date. Monthly payments beginning at a younger age would be lower than shown since payments would be made over more years. Monthly payments

# HOME TAX SERVICE OF AMERICA, INC. 401(K) PROFIT SHARING PLAN AND TRUST

KENNETH W MATTSON

beginning at an older age would be higher than shown since they would be made over fewer years.

- The estimated monthly payments for a qualified joint and 100% survivor annuity in this statement assume that you are married with a spouse who is the same age as you (even if you do not currently have a spouse, or if you have a spouse who is a different age). If your spouse is younger, monthly payments would be lower than shown since they would be expected to be paid over more years. If your spouse is older, monthly payments would be higher than shown since they would be expected to be paid over fewer years.

- The estimated monthly payments in this statement are based on an interest rate of 4.46%, which is the 10-year constant maturity U.S. Treasury securities yield rate as of June 1, 2025, as required by federal regulations. This rate fluctuates based on market conditions. The lower the interest rate, the smaller your monthly payment will be, and the higher the interest rate, the larger your monthly payment will be.

- The estimated monthly payments in this statement are based on how long you and a spouse, who is assumed to be your age, are expected to live. For this purpose, federal regulations require that your life expectancy be estimated using gender neutral mortality assumptions established by the Internal Revenue Service.

- The estimated monthly payments in this statement are the same whether you are male or female. This is required for annuities payable from an employer's plan. However, the same amount paid for an annuity available outside of an employer's plan may provide a larger monthly payment for males than for females since females are expected to live longer.

- The estimated monthly payments in this statement are based on prevailing market conditions and other assumptions required under federal regulations. If you decide to purchase an annuity, the actual payments you receive will depend on a number of factors and may vary substantially from the estimated monthly payments in this statement. For example, your actual age at retirement, your actual account balance (reflecting future investment gains and losses, contributions, distributions, and fees), and the market conditions at the time of purchase will affect your actual payment amounts.

- Unlike Social Security payments, the estimated monthly payments in this statement do not increase each year with a cost-of-living adjustment. Therefore, as prices increase over time, the fixed monthly payments will buy fewer goods and services.

# <u>Exhibit T</u>

ACCOUNT #       ███
ACCOUNT NAME    KENNETH W. MATTSON IRA
ACCOUNT TYPE    TRADITIONAL IRA



**P** **PROVIDENT**
TRUST GROUP
an Ascensus® company

PROVIDENT TRUST GROUP
8880 W SUNSET RD STE 250
LAS VEGAS NV 89148-5006

PHONE (888) 855-9856
FAX (702) 253-7565

KENNETH MATTSON

**ACCOUNT STATEMENT**

**01/01/2024 - 03/31/2024**

## YOUR ACCOUNT SUMMARY                    AS OF 03/31/2024

| TOTAL CONTRIBUTIONS | | ROLLOVER CONTRIBUTIONS | | CONVERSIONS | |
|---|---|---|---|---|---|
| 2024 | $0.00 | 2024 | $0.00 | 2024 | $0.00 |

| DISTRIBUTIONS | GROSS | TAX WITHHELD | NET |
|---|---|---|---|
| 2024 | $0.00 | $0.00 | $0.00 |

**ASSETS (INCLUDING CASH)**

| INVESTMENT TYPE | # OF ASSETS | MARKET VALUE | ALLOCATION |
|---|---|---|---|
| PARTNERSHIPS | 1 | $322,021.27 | 99.72 % |
| CASH | | $914.46 | 0.28 % |
| **TOTAL** | **1** | **$322,935.73** | **100.00 %** |

**LIABILITIES**

| INVESTMENT TYPE | # OF LIABILITIES | LIABILITIY VALUE | ALLOCATION |
|---|---|---|---|
| **TOTAL** | **0** | **$0.00** | **0.00 %** |

**YOUR ACCOUNT MARKET VALUE**     **$322,935.73**

Important and binding information about valuing the assets in your account can be found at:
https://trustprovident.com/Forms-Statement-Disclosure

Please contact us within 60 days if you believe the values displayed above are not correct. Your asset company may have
additional information not displayed here.

SEC-ASCENSUS-E-0032865
SEC-USAO-EPROD-000080247

ACCOUNT #
ACCOUNT NAME    KENNETH W. MATTSON IRA
ACCOUNT TYPE    TRADITIONAL IRA



## ASSET ALLOCATION                                     AS OF 03/31/2024



- PARTNERSHIPS (99.72%)
- CASH (0.28%)

## AUTHORIZED THIRD PARTY INFORMATION

| Authorized Third Party Name | Contact Name | Address |
| --- | --- | --- |
| LEFEVER MATTSON | LeFever Mattson | PO BOX |

## BENEFICIARIES

### PRINCIPAL BENEFICIARIES

| NAME | SSN |
| --- | --- |
| STACY MATTSON | XXXXXXX01 |

### CONTINGENT BENEFICIARIES

No beneficiaries have been designated for this account

If you would like to update the information displayed in this section login to your account via our Online Portal. Alternatively, you can complete a paper Beneficiary Designation Form located in the forms section of our website.

SEC-ASCENSUS-E-0032866
SEC-USAO-EPROD-000080247

ACCOUNT #
ACCOUNT NAME     KENNETH W. MATTSON IRA
ACCOUNT TYPE     TRADITIONAL IRA



## LIST OF ASSETS/LIABILITIES                                     AS OF 03/31/2024

### ASSETS (INCLUDING CASH)

| TICKER | NAME | SHARES | PRICE | MARKET VALUE | ALLOCATION | LAST UPDATED |
|---|---|---|---|---|---|---|
| PARTNERSHIPS | | | | | | |
| OASWEET9A | SWEET LORRAINE PRODUCTIONS, | 322,021.2700 | $1.00 | $322,021.27 | 99.72 % | 11/27/2013 |
| | | PARTNERSHIPS SUBTOTAL | | $322,021.27 | 99.72 % | |
| CASH | | | | | | |
| CASH | | | | $914.46 | 0.28 % | |
| | | CASH SUBTOTAL | | $914.46 | 0.28 % | |
| ASSETS TOTAL | | | | | $322,935.73 | 100.00 % |

### LIABILITIES

| TICKER | NAME | SHARES | PRICE | MARKET VALUE | ALLOCATION | LAST UPDATED |
|---|---|---|---|---|---|---|
| LIABILITIES TOTAL | | | | | $0.00 | 0.00 % |

SEC-ASCENSUS-E-0032867
SEC-USAO-EPROD-000080247

ACCOUNT #  
ACCOUNT NAME    KENNETH W. MATTSON IRA
ACCOUNT TYPE    TRADITIONAL IRA



## TRANSACTIONS

| DATE | DESCRIPTION | TRANSACTION AMOUNT | ASSET SHARES | ACCOUNT CASH BALANCE |
|------|-------------|-------------------:|-------------:|---------------------:|
| 01/01/2024 | **BEGINNING CASH BALANCE** | | | **1,001.96** |
| 01/15/2024 | QUARTERLY FEE PAID FROM ACCOUNT CASH BALANCE | -87.50 | | 914.46 |
| | *QUARTERLY ADMINISTRATION FEE Q1 2024 FEE TRANSACTION FOR PERIOD ENDING 01/14/2024;INV. 9695651 FEE TRANSACTION PERIOD ENDING 01/14/2024; INVOICE 9695651* | | | |
| 03/31/2024 | **ENDING CASH BALANCE** | | | **914.46** |

ACCOUNT STATEMENT 01/01/2024 - 03/31/2024

PAGE 4 OF 5

SEC-ASCENSUS-E-0032868
SEC-USAO-EPROD-000080247

ACCOUNT #
ACCOUNT NAME      KENNETH W. MATTSON IRA
ACCOUNT TYPE      TRADITIONAL IRA



## FEES & OUTSTANDING INVOICES

| DATE | FEE DESCRIPTION | PAYMENT METHOD | AMOUNT |
|---|---|---|---|
| **FEES PAID** | | | |
| 01/15/2024 | QUARTERLY FEE | CASH FROM ACCOUNT | $87.50 |
| **TOTAL FEES PAID THIS PERIOD** | | | **$87.50** |

| INVOICE # | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| **OUTSTANDING INVOICES** | | | |
| **NO OUTSTANDING FEES FOR THE SPECIFIED PERIOD** | | | |

SEC-ASCENSUS-E-0032869
SEC-USAO-EPROD-000080247

# EXHIBIT J

1    RANDY SUE POLLOCK (CA SBN 64493)
     rsp@rspollocklaw.com
2    LAW OFFICES OF RANDY SUE POLLOCK
     286 Santa Clara Avenue,
3    Oakland, CA 94610-2624
     Telephone:    510.763.9967
4    Facsimile:    510.380.6551

5    Attorney for Defendant
     KENNETH W. MATTSON
6

7

8                        UNITED STATES DISTRICT COURT

9

10                      NORTHERN DISTRICT OF CALIFORNIA

11

12   UNITED STATES OF AMERICA,              Case No. 4:25-cr-00126-JST

13                  Plaintiff,              **DEFENDANT KENNETH W.**
                                            **MATTSON'S REPLY BRIEF IN**
14          v.                              **SUPPORT OF EMERGENCY EX**
                                            **PARTE MOTION FOR A HEARING ON**
15   KENNETH W. MATTSON,                    **DEFENDANT'S MOTION TO MODIFY**
                                            **PRE-TRIAL ASSET RESTRAINT**
16                  Defendant.
                                            Judge:   Hon. Jon S. Tigar
17                                          Ctrm:    6 – 2nd Floor

18
                                            Indictment Filed:  May 13, 2025
19                                          Trial Date:        None set

20

21

22

23

24

25

26

27

28

1      Pursuant to Local Rule of Criminal Procedure 47-3, Defendant Kenneth W. Mattson

2  moved the Court *ex parte* for an order granting Defendant's Motion to Modify Pre-Trial Asset

3  Restraint or scheduling an evidentiary hearing concerning the Motion.  ECF No. 70 (the "Motion"

4  or "Mot.").  This Court ordered the government to respond by August 6, 2025 and indicated a

5  hearing may take place on August 19, 2025.  ECF No. 72.  As ordered, the government filed its

6  brief in opposition on August 6, 2025.  ECF No. 73 (the "Opposition" or "Opp.").  Mr. Mattson

7  respectfully submits this reply in support of his *ex parte* motion and seeks briefly to address the

8  government's Opposition.

9      **First,** there is good cause for the *ex parte* motion.  Mr. Mattson faces imminent

10  involuntary bankruptcy on September 2, 2025.  On that date, all properties he owns or controls

11  will be administered by the bankruptcy estate and none may be available to him to exercise his

12  constitutional rights to defend himself.  As the Court recognized in its potential hearing date,

13  there is an urgent need because Mr. Mattson must secure funds to retain counsel before his

14  involuntary bankruptcy.  Because the government (by placing lis pendens on two properties) and

15  this Court (by requiring posting of one property) have been tying up Mr. Mattson's assets since

16  his arrest, if those assets are not available to him through bankruptcy or otherwise during this

17  period of restraint there will be a violation of his rights.

18      The government's central premise in its Opposition has it backwards: a bankruptcy court

19  cannot issue an order that prevents this Court from deciding a constitutional issue.  No authority

20  holds that a bankruptcy court's interim order divests this Court of jurisdiction to decide if a

21  constitutional violation has been committed.  On the contrary, the case law (including the

22  government's cited authority) is uniform in vesting the district court, not the bankruptcy court,

23  with the authority to adjudicate questions regarding a defendant's constitutional rights.  *In re*

24  *Kearney*, 609 B.R. 383, 388 (Bankr. D.N.M. 2019) ("Sixth Amendment issues are the concern of

25  the court trying the criminal case, not the bankruptcy court."); *In re Duque*, 48 B.R. 965, 975

26  (S.D. Fla. 1984) ("[P]otential violations of the debtor's constitutional rights posed by criminal

27  investigations or prosecutions occurring after the filing are of concern to the criminal forum, not

28  the bankruptcy court."); *In re Dixon*, 143 B.R. 671, 679 (Bankr. N.D. Tex. 1992) ("[Defendant's]

1    remedy would not be in the Bankruptcy Court—any remedy for a Constitutional violation would

2    have to be brought in state or federal court.").

3         **Second,** Mr. Mattson's supplemental declaration unquestionably established a prima facie

4    claim for a Sixth Amendment violation.  The Court determined Mr. Mattson's prior declaration

5    was not specific enough.  ECF No. 68 at 4–5.  Mr. Mattson provided a supplemental declaration

6    directly responsive to the Court's concerns.  ECF No. 70-1.  Mr. Mattson's sworn supplemental

7    declaration is sufficiently definite, specific, detailed, and non-conjectural to warrant a hearing.

8    *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993); *United States v. Lacey*, 2021

9    WL 5882638, at *9 (D. Ariz. Dec. 10, 2021).  Under the formulaic rule courts in this district

10   apply, Mr. Mattson has made a threshold showing demonstrating his lack of funds or access to

11   funds and need for funds, and a hearing must take place where "the government has the burden to

12   show probable cause."  *United States v. Feathers*, 2016 WL 7337518, at *6 (N.D. Cal. Dec. 19,

13   2016).

14        The government argues ineffectually that Mr. Mattson has still failed to demonstrate his

15   inability to pay for his defense.  Opp.at 5–7, 14–15.  The government is wrong that the retainer is

16   sufficient to pay Mr. Mattson's counsel of choice and defend himself.  A $450,000 retainer is

17   plainly insufficient to retain counsel, forensic analysts, and consultants in this type of case where

18   the government alleges tampering with e-discovery material and a decade-long Ponzi scheme.

19   Addressing many of the same issues, the lawyers involved in the LM bankruptcy are incurring

20   fees of over $1 million per month, far more than Mr. Mattson asserts he needs to take this matter

21   through a trial against the unlimited resources of the federal government and multiple agencies.

22   *See* ECF No. 65-1, ¶ 13.  This case will likely require experts for an adequate defense, and those

23   costs will quickly consume Mr. Mattson's retainer.  *See* Declaration of Randy Sue Pollock in

24   Support of Emergency Ex Parte Motion ("Pollock Decl."), ¶ 3.

25        The government alleges the Mattsons could sell both cars to fund his defense, but each has

26   a need for transportation and the sales would not sufficiently fund his defense.  The government

27   further calculates that Mr. Mattson could sell personal property stored in locations controlled by

28   LeFever Mattson that he cannot access, which is inconsistent with its assertion that Mr. Mattson

1    lacks control over other assets.  As for the allegations that Mr. Mattson controlled a retirement

2    account with approximately $300,000 as of March 2024, that says nothing about his present

3    financial condition.  As the account statement that the government submits with its Opposition

4    shows, the partnership interest constituting over 99% of the IRA's stated balance was last valued

5    "11/27/2013."  ECF No. 73-9 at 4.  In fact, this company has ceased operations and the asset is

6    now worthless.  The balance of the Home Tax Service 401(k) was withdrawn on February 26,

7    2024, upon Mr. Mattson's termination of employment.  ECF No. 73-8 at 3-4.  While it appears

8    that contributions continued to be made to the account after that date, Mr. Mattson was not aware

9    such contributions were made.  A hearing is warranted despite the government's obfuscations.

10   Mr. Mattson's supplemental declaration establishes a threshold prima facie claim of a Sixth

11   Amendment violation.

12       **Third**, the Court should grant the Motion because the government has completely failed

13   despite multiple opportunities to establish probable cause that the restrained properties are tainted

14   or that it has a substantial interest in the properties.  Courts in the Ninth Circuit have followed the

15   Second Circuit test placing the burden on the government to establish traceability.  *United States*

16   *v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013) (holding that the defendant is not required to

17   "make a formal prima facie showing that the funds were illegitimately restrained"); *see, e.g.*,

18   *United States v. Omidi*, 2021 WL 7629897, at *5 (C.D. Cal. June 15, 2021) (government has

19   burden to demonstrate probable cause); *Lacey*, 2021 WL 5882638, at *5 (same).  The government

20   does not even attempt to meet its burden in showing that the restrained assets are traceable to the

21   allegations in the indictment.  It fails to provide *any* evidence regarding asset tracing at all,

22   despite the Court having pointed out that the government has not yet shown that proceeds from

23   Mr. Mattson's alleged Ponzi scheme paid mortgages on his properties.  *See* ECF No. 68 at 5.  The

24   government has certainly failed to show that any traceable proceeds are substantial enough to

25   extinguish the remaining equity in the properties, which Mr. Mattson could use to defend himself

26   against its charges.  Because the government has failed, despite multiple opportunities, to provide

27   any tracing analysis to the Court, the Court may and should grant Mr. Mattson's Motion without a

28   hearing.

1    **Fourth**, the government is wrong that Mr. Mattson is not entitled to two counsel.  The

2    Sixth Amendment right to counsel is widely understood to permit criminal defendants to retain a

3    defense team, not just a single defense lawyer.  *See In re Bundy*, 852 F.3d 945, 952 n.4 (9th Cir.

4    2017) (majority agreeing with the dissent that the right to counsel "not exhausted once [the

5    defendant] has one competent criminal defense lawyer").  In a complex factual case with

6    extensive discovery, consultants and potential expert witnesses, and potentially heavy motion

7    practice, the retention of two counsel is warranted.  The Defendant notes that the government is

8    represented by two AUSAs, with countless agents working for them, and has been for some time.

9    Taking into account legal and professional fees paid and invoiced to date, approximately

10   $370,000 of the retainer remains.  Pollock Decl., ¶ 6.

11   **Fifth**, Mr. Mattson has adequately explained the title issues and has offered solutions to

12   address concerns that the properties be used for his criminal defense.  The 62 Farragut Avenue

13   property is split into two separately saleable parcels.  Mr. Mattson owns and holds title to a

14   saleable parcel at 62 Farragut Avenue.  ECF No. 70-1, ¶¶ 18-19.  Title for 1834-1836 Ocean

15   Front should have reverted to Mr. Mattson under the terms of a loan.  *Id.*, ¶ 22.  A corrected grant

16   deed confirming that only 1716 Ocean Front, and not 1834-1836 Ocean Front, was sold to

17   Equitable Ocean Front LLC has been recorded.  Pollock Decl., Ex. B.  The property at 210 La

18   Salle Avenue is held in Stacy Mattson's name and has been conceded as untainted.  The Court

19   may also order an interlocutory sale of a property to "stop the accruing of taxes, its fees, and

20   HOA fees against its value," which may preserve value for creditors, victims, and Mr. Mattson.

21   *See United States v. Dezfooli*, 2024 WL 4150750, at *1 (D. Nev. Sept. 10, 2024).  Interlocutory

22   sale is also permitted if "the property is subject to a mortgage or to taxes on which the owner is in

23   default." *Id.* at *2.  Mr. Mattson currently cannot pay the mortgage for any properties, and 210

24   La Salle faces a foreclosure sale.  An interlocutory sale may be warranted here and could address

25   any potential forfeiture considerations and protect Mr. Mattson's right to counsel.

26   **Finally**, the government ignores the potential compromise solution proposed in the

27   Motion that would protect both Mr. Mattson's constitutional rights, the government's interests,

28   and even the interests of the bankruptcy court.  Mot. at 5.  Mr. Mattson's attorneys can hold

1   Mr. Mattson's assets in trust, retaining those assets that the Court eventually determines are

2   traceable to the allegations in the indictment – whether through compromise or, if necessary,

3   adversarial hearing.  Proceeds from the sale of real property in excess of those amounts would be

4   released only if incurred for Mr. Mattson's criminal defense.  This procedure would safeguard

5   assets for potential forfeiture to the extent that the government prevails and would simultaneously

6   allow Mr. Mattson to exercise his Sixth Amendment right to counsel of his choice.  Any

7   additional funds could also be made available to the bankruptcy court following the conclusion of

8   the criminal case.  The government has not explained why this compromise proposal is

9   unworkable.  It has ignored it because its goal has been singular – to deprive Mr. Mattson of an

10  adequate defense at trial.

11          Mr. Mattson respectfully requests that the Court grant Mr. Mattson's motion without a

12  hearing or hold a hearing on the Motion on August 19, 2025, or as soon as it may be heard.

13

14  DATED: August 7, 2025                        LAW OFFICES OF RANDY SUE POLLOCK

15

16                                              By: */s/ RANDY SUE POLLOCK*
                                                RANDY SUE POLLOCK
17
                                                Attorney for Defendant
18                                              KENNETH W. MATTSON

19

20

21

22

23

24

25

26

27

28

1  RANDY SUE POLLOCK (CA SBN 64493)
   rsp@rspollocklaw.com
2  LAW OFFICES OF RANDY SUE POLLOCK
   286 Santa Clara Avenue,
3  Oakland, CA 94610-2624
   Telephone:    510.763.9967
4  Facsimile:    510.380.6551

5  Attorney for Defendant
   KENNETH W. MATTSON
6

7

8                      UNITED STATES DISTRICT COURT

9

10                   NORTHERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,              Case No. 4:25-cr-00126-JST

13              Plaintiff,                 **DECLARATION OF RANDY SUE
                                           POLLOCK IN SUPPORT OF
14       v.                                EMERGENCY EX PARTE MOTION
                                           FOR A HEARING ON DEFENDANT'S
15  KENNETH W. MATTSON,                    MOTION TO MODIFY PRE-TRIAL
                                           ASSET RESTRAINT**
16              Defendant.

17                                         Judge:   Hon. Jon S. Tigar
                                           Ctrm:    6 – 2nd Floor
18

19                                         Indictment Filed:  May 13, 2025
                                           Trial Date:        None set
20

21

22

23

24

25

26

27

28

I, Randy Sue Pollock, declare and state as follows:

1.  I was retained to represent Kenneth W. Mattson on May 29, 2024.

2.  My retainer agreement is attached hereto as **Exhibit A**.  **Exhibit A** is filed provisionally under seal.

3.  My retainer called for legal fees in the amount of $500,000.00 that would cover pretrial and trial fees.  The costs for experts were not included in the professional fees and Mr. Mattson was not able to provide me with funds for costs prior to the bankruptcy proceedings freezing his assets.

4.  As of today, I have invoices for legal fees in this matter in the amount of $105,612.50.

5.  I have also paid a total of $25,094.98 for expert consultants and my paralegal, who is an independent contractor.

6.  As of today, the remaining balance in my trust account, taking into account the invoices above, is $369,292.52.

7.  Attached hereto as **Exhibit B** is a true and correct copy of a Correction Grant Deed for APN 299-232-09-00, which is real property located at 1716 Ocean Front, Del Mar, California 92014, recorded as DOC# 2025-0216950 with the San Diego County Recorder on August 7, 2025.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: August 7, 2025                     */s/ DRAFT*

_____

Randy Sue Pollock

# EXHIBIT B

X
3P

PLEASE COMPLETE THIS INFORMATION.

RECORDING REQUESTED BY:

*Equitable Ocean Front LLC*

AND WHEN RECORDED MAIL TO:

*1819 Coast Blvd*
*Del Mar Ca. 92014*

DOC# 2025-0216950

Aug 07, 2025   09:51 AM
OFFICIAL RECORDS
JORDAN Z. MARKS,
SAN DIEGO COUNTY RECORDER
FEES: $105.00   (SB2 Atkins: $75.00)
PCOR: N/A
PAGES: 3

*THIS SPACE FOR RECORDER'S USE ONLY*

## Correction Grant Deed
(Please fill in document title(s) on this line)

Corrects the erroneus Legal description
accidently attached as Exhibit "A" to
Grant Deed recorded July 22, 2024
by the San Diego County Recorder as
Doc # 2024-0187416

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
(Additional recording fee applies)

9/95
Rec.Form #R25

**RECORDING REQUESTED BY:**

Equitable Ocean Front LLC

**WHEN RECORDED MAIL TO AND MAIL TAX STATEMENTS TO:**

Name: Equitable Ocean Front LLC

Address: 1819 COAST BOULEVARD

City: DEL MAR

State, Zip: CALIFORNIA 92014

Above Space for Recorder's Use Only

## CORRECTION **GRANT DEED**

Title Order No._____    Escrow No._____    APN No. 299-232-09-00

THE UNDERSIGNED GRANTOR(s) DECLARE(s)

DOCUMENTARY TRANSFER TAX is $ 0.00 _____    CITY TAX $ _____

*No Consideration Liened to Full Value*

- [ ] Computed on full value of property conveyed, or
- [ ] Computed on full value less value of liens or encumbrances remaining at time of sale,
- [ ] Unincorporated area    [x] City of DEL MAR _____, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

K S MATTSON PARTNERS LP, by and through its general partner, K S MATTSON COMPANY LLC

Hereby GRANT(s) to
EQUITABLE OCEAN FRONT LLC

The following described real property in the County of: SAN DIEGO _____, State of California:

See Exhibit A hereto - which corrects the erroneous legal description accidentally attached as Exhibit A to Grant Deed recorded on July 22, 2024 by San Diego County Recorder as DOC# 2024-0187416

_____
Date

Kenneth W. Mattson, Manager
KS MATTSON PARTNERS LP, by and through its general
partner, KS MATTSON COMPANY LLC
_____
Signature

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

County of _____Sonoma_____ } ss

On ___June 4th 2025___ before me, __Wendy L. O'Sullivan, Notary Public__
                                                                    Name and Title of officer

personally appeared __Kenneth W. Mattson__ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

_____
Notary Signature



WENDY L. O'SULLIVAN
COMM. #2397510
NOTARY PUBLIC - CALIFORNIA
SONOMA COUNTY
My Comm. Expires March 17, 2026

GD (03/13/2015)    MAIL TAX STATEMENTS TO ADDRESS AS SHOWN ABOVE

# EXHIBIT "A"

All that certain real property situated in the City of Del Mar, County of San Diego, State of California, described as follows:

PARCEL A:

LOTS 13 AND 14, EXCEPTING THE NORTHERLY 10 FEET OF SAID LOT 14 IN BLOCK 112 OF DEL MAR RESUBDIVISION NO. 2, IN THE CITY OF DEL MAR, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1277, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, AUGUST 4, 1910.

ALSO, THOSE PORTIONS OF LOTS 21 AND 22 IN SAID BLOCK 112, LYING NORTHERLY OF THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF SAID LOT 13 IN SAID BLOCK 112 AND SOUTHERLY OF THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF THE NORTHERLY 10 FEET OF SAID LOT 14 IN SAID BLOCK 112.

APN: 299-232-09-00

# EXHIBIT K

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

UNITED STATES OF AMERICA,

Plaintiff,

8

9

v.

10

KENNETH W. MATTSON,

Defendant.

11

Case No. 25-cr-00126-JST-1

**ORDER DENYING DEFENDANT'S MOTION FOR HEARING ON MOTION TO MODIFY PRETRIAL ASSET RESTRAINT**

Re: ECF No. 70

12

13    The Court previously denied without prejudice Defendant Kenneth W. Mattson's motion

14 to modify pretrial asset restraint after concluding that he did not present sufficient evidence of his

15 asserted inability to pay counsel of his choosing.  ECF No. 68 at 3–5.  The Court also explained:

16

17

18

19

20

21

22

23

24

In addition, "to enable the court to conclude that a substantial claim is presented," [*United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) (citation modified)], any renewed motion should address the title issues raised by the government.  The government presents evidence that KS Mattson Partners LP ("KSMP") holds title to 1834–1836 Ocean Front and to a portion of 62 Farragut.  ECF No. 51 at 10.  Mattson contends that these arguments "point to logistical challenges with disposing of real property, not to any legal shortcomings with Mr. Mattson's Sixth Amendment challenge," ECF No. 65 at 8, but the Court is not persuaded.  Mattson's declaration acknowledges that he is "not able to dispose or otherwise control assets held by [KSMP] because KSMP is currently in bankruptcy proceedings."  ECF No. 44-1 ¶ 5.  Thus, if these assets are, indeed, held by KSMP, any restraints on them could not give rise to a Sixth Amendment violation because, even absent any restraints, Mattson could not sell them to pay for his defense.

25    *Id.* at 5.

26    Mattson has now filed a motion for a hearing on a renewed motion to modify pretrial asset

27 restraint.  ECF No. 70.  He contends that this is an "emergency motion" because "he will likely be

28 subject to involuntary bankruptcy proceedings on September 2, 2025.  After that date, all

United States District Court
Northern District of California

1    properties he owns or controls will be administered by the bankruptcy estate and none may be

2    available to him to exercise his rights to defend his criminal case." *Id.* at 2.

3         Upon review of the bankruptcy court proceedings, the Court agrees with the government

4    that the September 2 date is not significant in terms of Mattson's ability to dispose of assets.  On

5    April 14, 2025, the bankruptcy court entered an order prohibiting Mattson "from selling,

6    transferring or encumbering any real property in which he has an interest" and "from selling,

7    transferring or encumbering any personal property in excess of $15,000." *In re: Kenneth W.*

8    *Mattson*, No. 24-10714 CN, ECF No. 72 (Bankr. N.D. Cal.).  On May 15, 2025, the bankruptcy

9    court entered a preservation order stating, "Sections 363 and 364 of Title 11 of the United States

10   Code shall apply in this case to the same extent as if an order for relief had been entered."  ECF

11   No. 73-2 at 3.  This requires Mattson to obtain approval for the sale of property "other than in the

12   ordinary course of business," 11 U.S.C. § 363(b)(1), and Mattson does not contend that selling the

13   real property at issue in his motion would constitute the ordinary course of business.

14        The preservation order also required Mattson to file "a declaration attesting, under penalty

15   of perjury, to full compliance with the Court's April 14, 2025, *Order Continuing Hearing on*

16   *Petitioning Creditors' Motion for Preservation Order* [Dkt. No. 72], as modified by the Court's

17   oral rulings at the hearings of April 25, May 2, and May 9, 2025."  ECF No. 73-2 at 3 (italics in

18   original).  Mattson filed the required declaration on May 21, 2025.  *In re: Mattson*, ECF No. 96.

19        On July 10, 2025, Mattson agreed in a stipulation that he is subject to the preservation

20   order, which "requires that any property sale or financing transaction sought by Mr. Mattson must

21   be approved [by the bankruptcy court] under sections 363 or 364 of title 11 of the United States

22   Code." ECF No. 73-3 at 3.[1]  Mattson further agreed that the preservation order "shall remain in

23   full force and effect until entry of the Order for Relief," which he agreed can be entered "at

24   9:00 a.m. Pacific Time on September 2, 2025." *Id.*

25        Mattson acknowledges that, after September 2, 2025, "all properties he owns or controls

26

27   _____

     [1] This stipulation also notes that the parties "wish to coordinate a smooth transition of Mr. Mattson
28   into a *voluntary* case under the Bankruptcy Code."  ECF No. 73-3 at 3 (emphasis added).  Thus,
     Mattson's representation to this Court that he "will likely be subject to *involuntary* bankruptcy
     proceedings" is incorrect.  ECF No. 70 at 2 (emphasis added).

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1  will be administered by the bankruptcy estate and none may be available to him to exercise his

2  constitutional rights to defend himself." ECF No. 76 at 2. However, the preservation order

3  restricts asset sales "to the same extent as if an order for relief had been entered." ECF No. 73-2 at

4  3. Mattson is therefore under the same obligations before the bankruptcy court today as he will be

5  after the order for relief is entered on September 2. Because Mattson concedes that the bankruptcy

6  court will have authority to bar him from selling properties after September 2 even if the proceeds

7  of such sales might be used to fund his criminal defense, he implicitly concedes that the

8  bankruptcy court has the same authority today.

9      Mattson argues that "the case law . . . is uniform in vesting the district court, not the

10  bankruptcy court, with the authority to adjudicate questions regarding a defendant's constitutional

11  rights." ECF No. 76 at 2. This is true as far as it goes, but the case law also supports the

12  conclusion that a bankruptcy court is not required to allow liquidation of an estate's assets to fund

13  a debtor's criminal defense. In a case cited by the government in its opposition but not addressed

14  by Mattson in his reply, the Ninth Circuit considered a similar procedural posture, where a

15  criminal defendant was subject to restraining orders by the Office of Thrift Supervision ("OTS")

16  "to ensure that [his] assets would not be dissipated or hidden." *United States v. Spiegel*, 995 F.2d

17  138, 139 (9th Cir. 1993). The court affirmed the district court's refusal "to issue an order

18  authorizing [the defendant] to use his own assets to pay attorneys' fees in advance and to pay

19  counsel at their customary hourly rates, despite the OTS order to the contrary." *Id.* at 140 (citation

20  modified). Analogizing the defendant's position to a defendant subject to a bankruptcy court

21  order, the Ninth Circuit held that a district court could not "modify the OTS's order" even if that

22  order "affect[ed] the exercise" of the defendant's constitutional right to counsel:

23          [The defendant] is in no different a position than any other criminal
            defendant whose assets are tied down by a lien, a prejudgment
24          attachment or a bankruptcy court order. In all such cases, *the
            freezing of defendant's assets may interfere with his ability to pay a
25          lawyer; but this does not empower the district court to interfere with
            the bankruptcy proceeding*, or to lift the lien or attachment imposed
26          by another court, state or federal.

27  *Id.* at 141 (emphasis added).

28      Even if this Court were not bound by *Spiegel*, the cases cited by Mattson are in accord.

United States District Court
Northern District of California

1    Although "Sixth Amendment issues are the concern of the court trying the criminal case, not the

2    bankruptcy court," a defendant's Sixth Amendment rights do not "supersede[] the 'benefit to the

3    estate' requirement" that the bankruptcy court must consider, and "[a]lmost all courts that have

4    addressed the issue have held that criminal defense counsel does not benefit the estate." *In re*

5    *Kearney*, 609 B.R. 383, 387–88 (Bankr. D.N.M. 2019).  Paying criminal defense counsel would

6    "benefit the debtor but not the estate," and the estate need not "be burdened with nonbeneficial

7    expenses." *Id.* at 387, 389; *see also In re Dixon*, 143 B.R. 671, 679 (Bankr. N.D. Tex. 1992),

8    *aff'd*, 85 F.3d 626 (5th Cir. 1996)  ("Courts in this Circuit and elsewhere applying § 330 have

9    generally refused to authorize the use of estate funds post-petition for payment of criminal counsel

10    on the grounds that those expenses neither benefitted the estate, nor were actual and necessary to

11    the estate.").  Potential "violations of the debtor's constitutional rights posed by criminal

12    investigations or prosecutions occurring after the filing" cannot "give the debtor any greater

13    interest in the private rights surrounding the estate being administered by a bankruptcy court." *In*

14    *re Duque*, 48 B.R. 965, 975 (S.D. Fla. 1984); *accord In re Dixon*, 143 B.R. at 679 ("Dixon's Sixth

15    Amendment right does not entitle him to any greater rights in Bankruptcy Court or any greater

16    claims against the bankruptcy estate's assets.").

17      Mattson cannot sell any of the properties in question without approval from the bankruptcy

18    court.  That is true now, just as Mattson concedes it will be true after September 2.  Because

19    Mattson has presented no indication that the bankruptcy court would approve sale of any of the

20    properties even if this Court were to conclude that they are untainted assets, he has not made the

21    required showing of a substantial claim under the Sixth Amendment.  Accordingly, the Court

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

1    denies Mattson's motion for a hearing on his renewed motion to modify pretrial asset restraint.[2]

2        **IT IS SO ORDERED.**

3    Dated:  August 13, 2025



4    _____
                     JON S. TIGAR
5                     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    _____

      [2] The Court notes a few additional issues, which it need not resolve, that further call into question
22    whether Mattson has adequately presented a constitutional claim.  This list is not intended to be
      exhaustive.  First, Mattson has not attempted to separate out attorney's fees or costs that he
23    contends are required for his criminal proceedings as opposed to his defense in a related civil case,
      *SEC v. Mattson*, No. 25-cv-4387 (N.D. Cal.), in which he is represented by the same counsel; nor
24    has he explained why the Court should not consider that distinction.  Second, counsel has not
      presented any estimate of future costs for the defense of this matter or discussed whether her
25    retainer agreement allows her to bill any additional legal fees.  *See* ECF No. 76-1 ¶ 3 ("My
      retainer called for legal fees in the amount of $500,000.00 that would cover pretrial and trial fees.
26    The costs for experts were not included in the professional fees. . . .").  Third, Mattson does not
      discuss what assets are being used to pay for his bankruptcy counsel and whether that is a factor
27    the Court must consider.  Fourth, it is not clear that Mattson possesses title to 1834–1836 Ocean
      Front.  His declaration states that he "transferred title to KSMP in connection with obtaining
28    financing for the property" and that, "[o]nce the loan was paid off, title should have reverted to me
      under the terms of the loan," ECF No. 70-1 ¶ 22, but he presents no evidence that title ever
      actually transferred back.

5